Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


-------------------------- :

BRIAN CHIVAS JAMES,              :

    Plaintiff,                  :   Civil No.
                            8:11-cv-00271-JSM-AEP

vs.                              :

UNITED STATES OF AMERICA,        :

    Defendant.                  :

-------------------------- :



DEPOSITION OF:   STEPHEN P. DONALDSON

PURSUANT TO:     Notice by Counsel for Defendant

DATE:            September 21, 2011

TIME:            3:40 p.m. to 5:15 p.m.

PLACE:           Offices of the U.S. Attorney
                 400 North Tampa Street
                 Tampa, Florida 33602

REPORTED BY:     PHYLLIS DEFONZO, RPR
                 Notary Public
                 State of Florida at Large



Pages 1 - 78

Government
Exhibit

B

BayAreaReporting@gmail.com,   www.bar-tampa.com                     866-240-9500

Page 2

```
 1  APPEARANCES:
 2
 3        KENDALL JONES, ESQUIRE
          DWAUNE L. DUPREE, ESQUIRE
          Sutherland, Asbill & Brennan, LLP
 4        1275 Pennsylvania Avenue NW
          Washington, D.C. 20004-2415
 5            Appearing for Plaintiff
 6
 7        MICHAEL W. MAY, ESQUIRE
          United States Department of Justice
 8        Tax Division
          P.O. Box 14198
 9        Washington, D.C. 20044
              Appearing for Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                I N D E X
 3
 4  TESTIMONY OF STEPHEN P. DONALDSON        PAGE
 5  DIRECT EXAMINATION BY MR. MAY             4
 6  CROSS-EXAMINATION BY MR. JONES           71
 7  CERTIFICATE OF OATH            75
 8  CERTIFICATE OF REPORTER           76
 9  ERRATA SHEET                  77
10  WITNESS LETTER                78
11
12
13              E X H I B I T S
14
15  NO.    DESCRIPTION            PAGE
16   7   Organizational Chart      60
17   8   E-mail w/attachment       62
18   9   Settlor's Letter of Wishes 65
19  10   Form 3520-A, 2003         66
20
21
22
23
24
25
```

Page 4

```
 1              STEPHEN P. DONALDSON,
 2  the witness herein, being first duly sworn on oath, was
 3  examined and deposed as follows:
 4              DIRECT EXAMINATION
 5  BY MR. MAY:
 6      Q   All right.  Good afternoon, Mr. Donaldson.
 7      A   Good afternoon.
 8      Q   We're now on the record in your deposition.
 9          Of course we've spoken before and met, but my
10  name is Mike May.  I'm an attorney with the U.S.
11  Department of Justice, and representing the United States
12  in this case.
13          Would you please state your name and address
14  for the record?
15      A   Stephen P. Donaldson, 345 Bayshore Boulevard,
16  number 1901, Tampa, Florida 33606.
17      Q   And have you ever been deposed before?
18      A   I have.
19      Q   How many times?
20      A   In my life?
21      Q   Yes.
22      A   10, 15 times, probably.
23      Q   Okay.  And --
24      A   I'm old.
25      Q   And what were the nature of those actions
```

Page 5

```
 1  when you were deposed?
 2      A   Civil litigation.  Divorce action.
 3      Q   Okay.  I know you've been deposed before, but
 4  just for the sake of the record and for clarity.
 5          I'll be asking you some questions.  I'm sure
 6  Mr. Jones will have some questions for you.  If there's
 7  anything that's unclear about a question, just ask me to
 8  explain it or clarify it, and I'll be happy to do so.
 9      A   Will do.
10      Q   As I know you've noticed and are aware, of
11  course, the court reporter is taking down every word.  So
12  it's just important that you speak out loud.  Wait until
13  I finish the question before you answer, okay?
14          And if at any point you need a break -- now,
15  we've just had one -- but if you need a break, we can
16  take one.  Just let me know.  The only rule, I guess, is
17  that if I've asked a question, go ahead and answer the
18  question, and then we can take a break.
19          Fair enough?
20      A   Yes, sir.
21      Q   Have you taken -- and this question, I don't
22  want to be too personal, but just need to have it for the
23  sake of the record -- have you taken or do you intend to
24  take any medication that would prevent you from being
25  able to sit here and understand and answer my questions?
```

Page 6

1    A  No.
2    Q   Okay.  And if at any point counsel should
3  object to any of my questions -- or likewise, if I were
4  to object to any of his -- I'd ask you to just go ahead
5  and answer the question, okay?
6    A  Yes.
7    Q   All right.  Mr. Donaldson, what is your
8  occupation?
9    A  I'm chairman of a company called Fortress
10 Financial Group.
11       Based in Anguilla in the West Indies.
12    Q   Okay.  And what is the nature of the business
13 of Fortress Financial?
14    A  I do international asset protection and tax
15 strategies.
16    Q   And is this business similar to the business
17 that you did with Foster & Dunhill?
18    A  It is.
19    Q   And how long have you been connected to
20 Fortress Financial?
21    A  I formed it about a year ago.
22    Q   And so are you the owner of Fortress
23 Financial?
24    A  I am.
25    Q   Okay.  And is that a United States entity,

Page 7

1  or?
2    A  It's based in Anguilla in the West Indies.
3    Q   Okay.  So it's organized under the laws of
4  the West Indies?
5    A  Under the laws of Anguilla, yes, sir.
6    Q   Anguilla, okay.
7       And before Fortress Financial -- and excuse
8  me -- have you been involved with any other businesses
9  between the time you were involved with Foster & Dunhill
10 and the time now that you're with Fortress Financial?
11    A  Yes.  Chase International mergers and
12 acquisitions.
13    Q   Okay.  Is that Chase related to JPMorgan
14 Chase?
15    A  No.  It's not.
16       It's a Florida LLC.
17    Q   Okay.  And for what time period were you
18 involved with Chase?
19    A  I still am.
20       For the last two years.
21    Q   And what is -- I think the name suggests --
22 but what is the business of Chase?
23    A  Mergers and acquisitions.
24       We raise capital, both mezzanine and
25 long-term financing, for corporate clients; and help them

Page 8

1  place large real estate projects with potential
2  investors.
3    Q   Okay.  So it's mainly real estate?
4    A  It's substantially real estate.
5       But for example, all my work on it today was
6  involved in providing funding for clients.  In one case
7  50 million today, and in another case 7 and a half
8  million.
9       It depends on the day.
10    Q   Okay.  And is it primarily offshore, or
11 United States and offshore mixed?
12    A  It's mixed.
13    Q   Okay.  Now, as you know, this case involves
14 Dr. James, Brian Chivas James, some civil penalties that
15 he was assessed by the I.R.S. related to his failure to
16 file forms related to his offshore trust.  The years at
17 issue are 2001 through 2003, and then probably some
18 overlap of relevant facts on either side of those years.
19       But during the period, say, between 2001 and
20 2005, were you affiliated with Foster & Dunhill --
21    A  I was.
22    Q   -- for that entire time?
23       And what was the nature of Foster & Dunhill's
24 business?
25    A  Doing planning for international asset

Page 9

1  protection and tax strategies.
2    Q   And I understand that Foster & Dunhill is no
3  longer in business.
4       Is that correct?
5    A  That's correct.
6    Q   And what kind of business entity was Foster &
7  Dunhill?
8    A  It was a limited liability company.
9       And it was based in two countries, in the
10 Bahamas and in Anguilla.
11    Q   And were you a member of Foster & Dunhill?
12    A  I was the managing member.
13    Q   Okay.  Who were the other members?
14    A  It varied from time to time.
15       I believe I became the sole owner in about
16 2001, something like that.
17    Q   Okay.  So during the years 2001 to 2003, you
18 were the sole owner of --
19    A  Yes.
20    Q   -- Foster & Dunhill?
21       And who were the others prior to 2001?
22    A  Duane Crithfield, Anthony Pewonski.
23    Q   Okay.  And Mr. Crithfield, do you know -- or
24 what was the circumstance of him no longer being a
25 member?

Page 10

1     A   We agreed that I would buy him out.
2     Q   Do you know why he was interested in that?
3     A   Yes.  We agreed that it would work out better
4  if I owned and operated the planning company, and he was
5  involved in operating the product company; so that there
6  wasn't an overlap.
7         That enabled me to use other companies for
8  product, and it enabled him to take on clients from other
9  planning companies.
10    Q   Okay.  And by "product," what do you mean?
11    A   Trusts, insurance contracts, annuities.
12    Q   Do you know if, after his time with Foster &
13  Dunhill -- what was the name of Mr. Crithfield's company?
14    A   Well, he was involved with a number of them.
15  One is Offshore Trust Services, which was in
16  the administration business.
17        Another involved his being president of
18  Fidelity Insurance Company; president of Citadel
19  Insurance Company.
20        An executive, possibly president, of Alliance
21  Holding Company.
22        And an executive role, that I frankly don't
23  remember, of First Fidelity Trust.
24    Q   So he had some affiliation with First
25  Fidelity Trust Company?

Page 11

1     A   Yes.
2     Q   Have you ever had any affiliation, other than
3  referring clients to First Fidelity Trust?
4     A   Yes.  I was one of the founders when the
5  company was sold to Alliance Holding Company in, I
6  believe, 2001.  And when Duane and I reached an agreement
7  that I would not be in products and he would not be in
8  planning, I then sold all of my shares in Alliance.
9         And from 2002 on, April 2002 on, I had no
10  ownership in either First Fidelity Trust, Fidelity
11  Insurance Company, or its holding company Alliance
12  Holding.
13    Q   Did Alliance Holding Company then own
14  interests in both First Fidelity Trust and Fidelity
15  Insurance Company?
16    A   They did at that time.
17        I do not know what has occurred since April
18  of 2002 when I sold my interest.  After that point in
19  time, I had no -- I had no vested interest in
20  understanding what they were doing.
21    Q   Okay.  And where is Alliance Holding Company
22  based?
23    A   I believe it's based in Anguilla.  It's
24  possible that it's based in Nevis, but I believe it's
25  Anguilla.

Page 12

1     Q   And do you know who owns Alliance Holding
2  Company?
3     A   At that particular point in time, I think
4  there were some 300 owners.
5         It was widely held.
6     Q   Okay.  All right.  I'm going to hand you what
7  earlier was marked exhibit 1.
8     A   Uh-huh.
9     Q   Do you recognize exhibit 1?
10    A   It is.  It's a brochure that I had published
11  some years ago.
12    Q   Okay.  There's some handwriting on the front
13  page of exhibit 1, it's got a "708" down in the lower
14  right-hand corner.
15        Whose handwriting is that?
16    A   I have no idea.  Whoever probably received
17  the brochure.
18        The telephone number under the name "Steve"
19  is my cellphone at that time and now.
20    Q   Okay.  The number 727-560-1240?
21    A   Right.
22        And the information on the top side of the
23  brochure indicates Shula's Steakhouse at Urban Center,
24  which is where I had my offices.
25        THE REPORTER:  "Shula's Steakhouse at"?

Page 13

1         THE WITNESS:  At the Urban Center.
2         THE REPORTER:  Thank you.
3     A   Where I had my offices.
4         And I possibly met Dr. James at that
5  steakhouse, although I don't have any recollection of
6  that particular meeting.
7  BY MR. MAY:
8     Q   Okay.  But in 2001, your offices were -- was
9  it suite 130 at the Urban Center number 2?
10    A   That I don't know.  That suite number does
11  not look familiar.
12    Q   Okay.  But you know that you had offices near
13  -- is it Sheila's Steakhouse?
14    A   Shula's.
15    Q   Shula's.  Oh, is that --
16    A   You may have heard of him in football fame,
17  yes.  There we go.
18    Q   Don, right, okay.
19        Right.
20    A   You're not from these parts.
21    Q   It's that obvious.  That's for sure.  Okay.
22  How's the New York strip there?
23    A   It's very good.
24    Q   Okay.  All right.
25        If you'll turn in the exhibit number 1 to the

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 14

1  page, it's pretty near the back, SAB0729.
2       A    Got it.
3       Q    There's a bio there of Duane J. Crithfield.
4            Is that correct?
5       A    There is.
6       Q    And also of you?
7       A    Yes.
8       Q    And I would assume these are material and
9  correct in all respects?
10      A    To the best of my knowledge at the time they
11 were published.
12      Q    Okay.  And was this before -- it notes there
13 that Mr. Crithfield is a director of Foster & Dunhill.
14           Was this before or after he no longer owned
15 an ownership interest in Foster & Dunhill?
16      A    No.  This would have been while he did and
17 while Mr. Pewonski, on the other page, was as well.
18      Q    Okay.  And in reference to Mr. Pewonski, what
19 does he do now?
20      A    I haven't spoken to him in 10 years.
21      Q    Okay.
22      A    I have no idea.
23      Q    Okay.  Did Mr. Pewonski ever work with Dr.
24 James?
25      A    Not to the best of my knowledge.

Page 15

1       Q    Okay.  So in reference to First Fidelity
2  Trust Company, I understand that you had at one time an
3  ownership interest in the company, and then --
4       A    I did.
5       Q    -- relinquished that.
6            What percentage of the clients of Foster &
7  Dunhill who had offshore trusts had trusts with First
8  Fidelity Trust?
9       A    The majority.  Some of them utilized other
10 trust companies.
11           Once I separated the planning from the
12 product, then I gave clients choice, subject to the trust
13 company they selected being compliant.
14      Q    Okay.  And did you have any kind of policy in
15 regards to what trust companies a client would go with?
16      A    No.
17      Q    It was their decision?
18      A    Didn't matter to me.
19           It had no impact on me, financially or
20 otherwise.
21      Q    Okay.  So would you -- would you -- I mean,
22 as far as trust companies -- and I understand, we've had
23 some discussions off the record, and you mentioned that
24 there are -- you know, some trust companies are very
25 compliant with U.S. laws, and there are also companies

Page 16

1  that don't comply with U.S. laws?
2       A    Certainly the majority do not comply.
3       Q    Right.  As far as you recommending to
4  clients, would you make that clear with the clients, that
5  -- what you felt about a particular trust company?
6       A    Actually, I would start out with the
7  jurisdictions.
8            And I compared some 17 jurisdictions, so that
9  clients could first select the jurisdiction they wanted
10 to be in; because you would choose the trust company
11 based on the jurisdiction.
12           So that if you wanted your trust subject to
13 the laws of the Caymans, you would need to use the Cayman
14 trust company and so forth.  I felt that provably the two
15 countries with the best trust laws are Nevis and the Cook
16 Islands.
17           And I pointed out that on a compliant basis,
18 if they chose the Cook Islands, Cook Island Trust Company
19 was U.S.-compliant.
20           And if they chose Nevis, that First Fidelity
21 Trust was compliant.
22           And, of course, I pointed out that I was one
23 of the founders of First Fidelity Trust, and I needed
24 them to know that.  And if they wanted to use a company
25 other than them, I was happy to; subject to compliance.

Page 17

1       Q    If you knew a particular trust company was
2  noncompliant, would that -- would you still help a client
3  establish a trust with that trust company?
4       A    No.  I'd be then guilty of aiding and
5  abetting.
6       Q    So you would just part ways with the client
7  if they --
8       A    No.
9       Q    -- insisted, or?
10      A    They wouldn't insist.
11      Q    Okay.
12      A    They don't want to go to jail, either.
13      Q    Sure.
14           And why were Nevis and the Cook Islands the
15 best jurisdictions for trusts?
16      A    No one has ever succeeded in breaking a trust
17 in Nevis; in part due to the statutes of limitations,
18 which do not permit successful action against the trust
19 more than 12 months after the cause of action.
20           So if there was a real or imagined problem in
21 the U.S., someone would have to prepare a complaint, go
22 through discovery, have a trial, go through appeal, and
23 accomplish it in under 12 months; which is essentially
24 physically impossible.
25           Absent that, if it took them two years, and

Page 18

1  then in the deposition in aid of execution it was
2  disclosed that they had a trust, it would be impossible
3  to break the trust.
4        It never has happened.
5        Q.  Okay.  So the statute of limitations there is
6  not to the bringing of the action, but the completion and
7  reaching a judgment on the action?
8        A.  It is to the bringing of the action.
9        But how would you know to bring an action in
10  Nevis, unless in a deposition in aid of execution you
11  were aware of the fact that the client's assets were in a
12  Nevis trust?
13       Q.  Okay.  I follow you.
14       And why Cook Islands?
15       A.  Same.  Nevis actually copied the Cook Islands
16  trust laws when they went into the business.
17       They went from zero trust companies to like
18  35 in a span of a couple of years, because they're in
19  this hemisphere and a little easier to use.
20       Q.  When clients establish trusts in one of these
21  jurisdictions, do they have to travel to that
22  jurisdiction to establish the trust?
23       A.  They don't have to.
24       Most of them do.
25       Q.  Did Dr. James travel to Nevis to establish

Page 19

1  his trust?
2        A.  I'm sure he didn't travel to Nevis.
3        He probably established -- probably traveled
4  to the Bahamas, but I couldn't attest to that.
5        The only actual recollection I have of his
6  attending one of our meetings was in Cabo San Lucas.  But
7  he may have attended multiple meetings.
8        I just don't remember.
9        Q.  Earlier, we took your son Christopher's
10  deposition.
11       And he referenced the conferences that Foster
12  & Dunhill put on?
13       A.  For 13 years, I put on four a year in
14  different parts of the world.
15       Q.  And how would you describe these conferences?
16       A.  They were primarily for advisors who were
17  invited to bring a client or two so that they could do
18  due diligence.  This was their opportunity to meet trust
19  officers, presidents of insurance companies, investment
20  people and so forth.
21       And I invited all of these people to the
22  seminars.  Sometimes I invited as many as 10 competing
23  companies, so that the advisors that I used would have a
24  choice.  Most of my business has come from some 250 law
25  firms across the country.

Page 20

1        In Dr. James' case, he came to me directly;
2  which was actually very rare.
3        Q.  Do you know who referred him to you?
4        A.  I don't at this stage.
5        Q.  So did you meet him personally prior to his
6  attending the conference?
7        A.  I -- I don't know.
8        Q.  Maybe, but maybe not?
9        A.  That's the same as "I don't know."
10       I accept that, yeah.
11       Q.  Sure.
12       A.  I would think that I had to have met him
13  earlier, to have invited him to the conference.
14       But not necessarily.  He could have been
15  invited by someone else.
16       I just don't know.
17       Q.  Do you know an accountant named George
18  Famiglio?
19       A.  Name rings a bell.
20       It seems to me that it was one of Chivas'
21  earlier CPAs.  But I don't know that for a fact.
22       Q.  So George Famiglio isn't an accountant that
23  you work with regularly?
24       A.  He's not.
25       I can't -- I can't associate him with any

Page 21

1  client at all.
2        Q.  Okay.  Back to the conferences.
3        What was the agenda, what were some of the
4  items on the agenda at the conferences?
5        A.  To the best of my knowledge, with the
6  exception of having more high-tech slides as the years
7  went on, the seminars essentially never varied.
8        There was a -- there's an extensive
9  compliance section.  I'm happy to provide within the next
10  72 hours copies of slide presentations, PowerPoint
11  presentations, from different time periods.
12       You'll note that they're effectively all the
13  same.  Approximately a third is devoted to compliance,
14  with two-thirds devoted to what the advantages and
15  disadvantages are in utilizing foreign structures.
16       Specifically, trusts are tax-neutral, and
17  bring about no tax benefits.  They're there for asset
18  protection purposes.
19       Foreign insurance and annuity contracts bring
20  about tax benefits.  And the reason people use foreign
21  insurance companies is because of the discrepancy between
22  what the I.R.S. allows and what state insurance
23  departments allows -- allow.  The I.R.S. has much more
24  flexibility.
25       Q.  Okay.

BayAreaReporting@gmail.com,   www.bar-tampa.com                           866-240-9500

Page 22

1        So the purpose -- I think you explained that
2  fairly well.  But just so that I make sure I understand.
3        You're saying the reason that most -- I may
4  be putting words in your mouth -- would you say that most
5  of your clients used offshore trusts?
6        A   Aiding the witness, is that what you're doing
7  over here?  No.
8        MR. JONES:  I haven't objected yet.
9        A   Go ahead.
10  BY MR. MAY:
11        Q   Would you say that many of the plans involved
12  some type of --
13        A   Offshore trusts?
14        Q   -- offshore --
15        A   Clients --
16        Q   -- insurance company?
17        A   Many of them did.  It depends.
18        Approximately a third -- let's say 25 to 30
19  percent of the people that I did plans for, I recommended
20  that they not use us, because there was no benefit we
21  could bring to them.
22        You need to remember that when you, for
23  example, were in private practice, if you brought me a
24  potential client and asked me to review their situation,
25  you would expect and only do business with me if I gave

Page 23

1  you an honest answer, including (a), I can't use a trust
2  for your client, because he's already involved in
3  litigation and there would be fraudulent conveyance
4  issues, so it would be a waste of time and effort;
5        Or (b), the insurance structure isn't going
6  to help your particular client because of the type of
7  investments that he has.
8        And that would cause you over time to
9  understand that I am on the same side of the table as
10  you.  And you'd refer clients to me, because you know
11  that I'd only make recommendations when they made sense.
12        So I never viewed myself in a sales capacity.
13  I viewed myself in a counseling capacity.
14        Q   But is it fair to say that most of the
15  planning that you did involved some kind of insurance
16  product?
17        A   Well, it would be fair to say that all of the
18  planning that involved tax issues involved insurance, and
19  that none of the planning that involved asset protection
20  issues did.
21        Q   Okay.
22        A   It would depend.
23        You have to realize that I probably did 30 or
24  40 percent of my planning without even knowing the
25  client's name.  I worked for the law firms and the CPAs.

Page 24

1        Okay?
2        Q   So --
3        A   I was given a fact pattern.
4        I analyzed the fact pattern, made
5  recommendations based on that fact pattern, and then ran
6  before and after scenarios showing the costs and the
7  benefits of utilizing a particular strategy.
8        Q   Now, with Dr. James, do you remember if there
9  was an attorney that he was involved with?
10        A   I don't.
11        Q   Okay.  Do you remember who his accountants
12  were?
13        A   I don't.
14        Q   But you mentioned earlier that his situation
15  may have been a bit unusual, because you think you met
16  with him personally?
17        A   I know I met with him personally.
18        Q   Okay.  And so you, instead of working with an
19  attorney, you actually worked directly with him?
20        A   Right.
21        Q   Is that right?
22        A   I don't know the circumstances under which I
23  first met him.
24        Q   Okay.  But you know in the actual development
25  of his structure, you worked directly with him?

Page 25

1        A   I did.
2        Q   Now, during these offshore -- during these
3  conferences, you mentioned there was a compliance --
4  there was some compliance presentation?
5        A   Substantial.
6        In the later years, the last five or six
7  years, the compliance section was all done by prior
8  regional I.R.S. Commissioner William Simon, who handled
9  the compliance section for us.
10        Q   And what years was that, that he was
11  involved?
12        A   I don't remember.
13        But for, if -- I can't be in a deposition and
14  say if I had to speculate, so I don't want to speculate.
15        For at least five or six years.
16        And I ceased doing the seminars in 2008, so.
17        Q   Now, the conference that Dr. James attended,
18  you testified I think that you remember that he attended
19  a conference in Cabo San Lucas?
20        A   Yes.  I don't remember the year, so I hope
21  you're not going to ask me.
22        Q   Was it before 2002?
23        A   I really don't know.
24        No, I don't think so, actually.
25        In fact, I'm pretty sure that it wasn't.

Page 26

```
 1        Q   Do you believe --
 2        A   Could I tell you why?
 3        Q   Sure.  Yes.
 4        A   All right.
 5        Q   Absolutely.
 6        A   For a brief period of time, two years, I did
 7   some seminars in conjunction with a man named Tracy
 8   Sunderlage and a company called Business Planning
 9   Systems.
10           And it was Tracy that suggested that I move
11   some of the seminars from the Bahamas, where I had always
12   done them, to other places.
13           And so Tracy had to have been someone I knew
14   at that time, or I wouldn't have done it in Cabo.
15        Q   And when did you meet Mr. Sunderlage?
16        A   Well, that isn't going to help much, because
17   I met him in the sixties.
18        Q   Okay.
19        A   Okay?
20        Q   When did --
21        A   But when I first started doing business with
22   him for a short period of time, and I don't remember
23   exactly, somewhere in the early 2000.
24        Q   So when did you begin sponsoring these
25   conferences?
```

Page 27

```
 1        A   I'm going to say 1998 or 1999.
 2        Q   And so for --
 3        A   But -- but -- I realize I'm under oath, so I
 4   can't -- but I wouldn't want to swear to it.
 5           But I really wouldn't want to swear to it.  I
 6   don't know exactly.
 7        Q   You believe it was before 2000?
 8        A   Yeah, I do.
 9        Q   And prior to Mr. Sunderlage's suggestion,
10   these seminars were held exclusively in the Caribbean?
11        A   In the Bahamas.
12        Q   In the Bahamas?
13        A   And most of them were held in the Bahamas
14   even after, so.
15        Q   And how many conferences were in Cabo San
16   Lucas?
17        A   One.
18        Q   Just one?
19           And it was that conference that Dr. James
20   attended?
21           It sounds like you remember him specifically
22   being at that conference.  Why?
23        A   It's because he and my son went four-wheel
24   driving, and they ended up being late for the cocktail
25   party.
```

Page 28

```
 1           And I remember -- mentioned to my son that he
 2   had a responsibility to be there with the other clients.
 3        Q   What kind of four-wheel -- what kind of
 4   four-wheel --
 5        A   They were on the sand dunes.
 6        Q   Oh, okay.
 7        A   Yeah.
 8        Q   I wondered why he had -- maybe perhaps that's
 9   why your son remembers it --
10        A   Remember that, right.
11        Q   -- as well.
12        MR. JONES:  He also said "Ask my father."
13        MR. MAY:  Yes, that's true.
14   BY MR. MAY:
15        Q   Okay.  But you're just not sure of the date
16   of that conference?
17        A   I don't.
18           I certainly can find out for you.  I just
19   don't know what it is, so.
20        Q   Okay.  You believe you have some records that
21   might indicate --
22        A   Yes, I'm sure I have records.
23        Q   Okay.  Well, when they follow up with the
24   requests for those --
25        A   That's fine.
```

Page 29

```
 1        Q   In fact, I mean, I'll ask you if you don't
 2   mind just providing them, that would be great.
 3        A   Not at all.
 4        Q   At that conference, was there a session on
 5   compliance with U.S. tax reporting requirements?
 6        A   The first section of every seminar I've ever
 7   given, as you'll see in the slides, was on compliance.
 8           The first section always had slides of the
 9   3520, the 3520-A, the TD F 90-22.1.
10           And, depending on the years and what other
11   forms, other forms.
12        Q   And so the presentation clearly explained the
13   difference between the 3520 and 3520-A?
14        A   It stated what the penalties were for failure
15   to file.  Yes.
16        Q   And is there a scenario where someone who
17   owns a foreign trust would not be required to file a Form
18   3520?
19        A   I think a 3520, all my clients were required
20   to file them, that I've ever worked with.
21           But I mean, it is possible to have a
22   non-grantor trust.  I don't think a 3520 is required for
23   that.  But I don't know, because I've never done a
24   non-grantor foreign trust.
25           I can't think of any situation that I've ever
```

Page 30

1  worked in where a client wouldn't be required to file a
2  3520.
3          On the other hand, I would point out that the
4  trust company may well have done trusts for non-U.S.
5  citizens, commonly.  And I know they have non-U.S.
6  citizens as clients.  They're a foreign trust company.
7  And those clients would not have been filing 3520s; there
8  would have been no responsibility to do so.
9      Q   Right.
10     A   So.
11     Q   Sure.  You mentioned Tracy Sunderlage?
12     A   I did.
13     Q   And who is he?
14     A   He is a -- he is a financial planner that has
15  been in business for about 40 years with -- most of them
16  in partnership with a law firm in Chicago, which is no
17  longer together.
18     Q   And what was the name of that law firm?
19     A   Handler, Thayer and Duggan.
20     Q   And is he an attorney, Tracy Sunderlage?
21     A   He's not.
22     Q   Was his business primarily dealing with
23  offshore entities?
24     A   No.
25     Q   Just investments in general?

Page 31

1      A   No.  His business was involved in 98
2  different things that I wasn't involved in at all.  He
3  utilized me when he had a client that wanted to be
4  involved in foreign structures.
5          So I might have been two percent of his
6  business or something.
7          I really don't know.
8      Q   Okay.  With respect to Dr. James' requirement
9  to file Forms 3520, did you ever personally advise him of
10  his requirement to file a Form 3520?
11     A   Yes.
12     Q   And when did you give him that advice?
13     A   Well, when Offshore Trust Services prepared
14  the 3520, 3520-A, and ultimately the FBARs, they would
15  send them to the address requested by the settlor;
16  sometimes to the settlor, sometimes to his CPA.
17          I don't have files on this, because I wasn't
18  involved in the administration.  So I don't know to whom
19  they were addressed.
20          And I would routinely, if I were the one
21  involved, I would routinely verify that the person had
22  received them.
23          In Chivas' case, I actually talked to his
24  accountant to make sure he got it and make sure he knew
25  how to handle it.

Page 32

1      Q   You talked to his accountant?
2      A   I did.
3      Q   And what --
4      A   I believe that the failure to file is
5  entirely -- I know you don't want a voluntary question,
6  you can object, but -- it was absolutely the fault of the
7  accountant.
8          The accountant knew the form was there.  He
9  was informed by me that it was there.  He was informed by
10  me that he had to make sure that his software did not
11  accidentally check on the schedule B part 3 that he had
12  no foreign accounts, which is how most of them have their
13  software set up.
14          And he said he understood it.
15     Q   And you had a conversation with the
16  accountant?
17     A   With the CPA.
18     Q   When was that?
19     A   I don't know.
20          In one of those years.
21     Q   And you told the accountant that Dr. James
22  had a foreign trust?
23     A   Well, he said he knew it, but I just -- I
24  wanted to make sure he -- he had gotten the forms.
25          Many accountants are unfamiliar with 3520s.

Page 33

1  They're even unfamiliar with FBARs, surprisingly.  And I
2  just wanted to make sure he knew what to do with them.
3          Actually, I had made another call.  I wanted
4  to make sure he knew that the FBAR was not part of a tax
5  return, it had to be filed by June 30; and that
6  penalties, including criminal, would inure to Chivas if
7  he filed it after June 30.
8      Q   And just for the sake of the record, what is
9  an FBAR?
10     A   I'm sorry.  Foreign Bank Account Return, the
11  TD F 90-22.1 required on foreign accounts.
12     Q   Okay.  Now, did Foster & Dunhill ever prepare
13  Forms 3520 for clients?
14     A   No, we did not prepare forms at all.
15     Q   And you mentioned Offshore Trust Services.
16  What was their role?
17     A   They were retained and paid by tax -- by the
18  settlors to prepare 3520s.  They were retained by the
19  insurance -- or the trust company, rather -- to prepare
20  3520-As.
21     Q   Do you know if there is a time -- I know this
22  was Offshore Trust Services' business -- but --
23     A   That is not a company I was ever involved in.
24     Q   Okay.
25     A   Keep that in mind as you ask your

Page 34

1  questions --
2      Q   Sure.
3      A   -- yeah.
4      Q   Do you believe that Offshore Trust Services
5  prepared the Forms 3520 for Dr. James for the years 2001,
6  2002 and 2003?
7      A   I'm positive they did.
8      Q   Okay.  Have you seen the Forms 3520 that they
9  prepared?
10     A   No.  But I verified them with the president
11  of Offshore Trust Services.
12     Q   And who is that?
13     A   I verified 'em actually before I came to this
14  deposition with Josh Crithfield.
15         Since I had no facts, I thought it would be
16  nice to have some.
17     Q   Okay.  And Josh Crithfield is the president
18  of Offshore Trust Services?
19     A   At this stage, no.  I don't believe so.
20         I believe Duane Crithfield is the president
21  of Offshore Trust Services.  I believe all the current
22  work is being done by a company that Josh set up, because
23  Duane's more in a retirement mode.
24     Q   Okay.  And -- but your source of knowledge
25  with respect to Dr. James' Forms 3520 for the years at

Page 35

1  issue, '01, '02 and '03, is --
2      A   Josh ran the company at that time and was
3  president of Offshore Trust Services during that time.  I
4  verified that.
5      Q   Okay.  And your source -- because you seem
6  fairly certain that Dr. -- that OTS prepared the 3520s
7  for Dr. James --
8      A   I know that they did.
9      Q   -- for those years?
10     A   They have the best system of any trust
11  company I've ever seen.
12     Q   Okay.
13     A   They have checks and balances all over the
14  place.  It's not possible for one to slip through.
15         A number of years ago, probably seven or
16  eight years ago, to prevent any misunderstandings, they
17  sent every 3520 to the accountant or the client,
18  certified with return receipt requested, to make sure no
19  one could say they didn't get them.
20     Q   Was there ever a time in your knowledge that
21  Offshore Trust Service didn't send them by certified
22  mail, return receipt?
23     A   I'm sure there was.  I don't know what that
24  was.
25         And as we all know, and as the forms signed

Page 36

1  indicate, it's always the responsibility of the taxpayer.
2  It's not the responsibility of anybody other than the
3  taxpayer to file forms.
4         And Offshore Trust Services is not First
5  Fidelity Trust.  Offshore Trust Services was a firm that
6  was either hired or not hired to do it.
7         For example, I did three trusts a few weeks
8  ago, and I sent to the attorney.  I asked Josh for his
9  current price list.  And I said, "This is International
10  Financial Services Group" -- which is Josh's
11  administration company -- "this is their price list for
12  completion of 3520s, 3520-As and whatever.  Do you want
13  to retain them, or do you want to have your client's CPA
14  do it?"
15         So he said, "I'll get back to you."
16         Went to the CPA and sent me a letter saying
17  "No, we'd like to hire International Financial Services
18  Group at the prices indicated."
19         So Josh then signed a form to take that
20  engagement on.
21     Q   Okay.  So -- but are there occasions where
22  the clients ask Offshore Trust not to do the 3520, that
23  they'll have their own accountant do it?
24     A   Well, they couldn't ask Offshore Trust
25  Services not to do it, because --

Page 37

1      Q   Okay.
2      A   -- that would be like not hiring them.  They
3  just wouldn't hire them.
4      Q   Sure.  But there are occasions where people
5  who, maybe Offshore Trust Services does some services for
6  them, or did some services for them; don't do all of the
7  services?
8      A   Possibly.
9         But I really have no direct knowledge of that
10  at all, because I'm not involved in that.
11     Q   All right.  And again, just -- and I'm just
12  trying to make sure that I'm clear.
13         With respect to your certainty that Dr.
14  James' 3520s for the years at issue were prepared by
15  Offshore Trust Services, the source of that certainty is
16  from Josh Crithfield?
17     A   Yes.  And I asked him if he had photocopies
18  he could provide you.
19         And he said "Yes," so.
20     Q   Okay.
21     A   I believe it's there.
22         But I also believe, relative to this action,
23  that you'll find that they went to his accountant and not
24  to him.  But I don't know that for a fact.
25         And I'm sure you'll determine that.

Page 38

1    Q  Okay, sure.  As you probably are aware, we're
2  talking to Mr. Crithfield tomorrow.
3    A  I imagine you're talking to all the people
4  engaged in this, yes, sir.
5    Q  Yes.  Okay.
6       Because you didn't actually prepare the 3520s
7  or sent them to Mr. -- to Dr. James' accountant?
8    A  No.  I had nothing to do with that.
9    Q  All right.  If you would turn back to exhibit
10  1, to SAB718.
11   A  Got it.
12   Q  And there's the right-hand column, that
13  narrow column.
14      There's a paragraph, "We provide information
15  necessary for the preparation of all relevant U.S. and
16  Canadian tax and Treasury Department forms on an annual
17  basis, or as required by law."
18      What does that involve, or?
19   A  Well, if the -- I think you really want to
20  finish the paragraph, if it would be okay?
21   Q  Sure.
22   A  I'll finish it by saying, "This information
23  is provided to your accountant, who retains the
24  responsibility for timely filing."  Okay?  So.
25      In order to complete a 3520, someone would

Page 39

1  have to know what the beginning balance and ending
2  balance in the trust was.  And they'd have to know what
3  the transactions that took place were.
4       So we would make sure that if his accountant
5  was preparing them, great.
6       On the other hand, if they retained Offshore
7  Trust Services to prepare them, then Offshore Trust
8  Services would just get the data.  We didn't have to.
9    Q  Okay.  And Foster & Dunhill's role in that
10  process was what?
11   A  As it states in the brochure.
12      To provide the information to say, if you
13  were Chivas James' accountant, we would say for
14  purposes -- and you were preparing his 3520 -- we would
15  say for purposes of it, "Here is the financial statement
16  for his trust," without which you would not be able to
17  complete the 3520.
18   Q  Okay.  But that financial statement, was it
19  prepared by Foster & Dunhill, or?
20   A  No.  That would have been from the various
21  trust companies or whatever, so.
22   Q  Okay.  So that was the liaison role of Foster
23  & Dunhill?
24   A  Right.
25   Q  Okay.  I'm going to hand you what's already

Page 40

1  been marked exhibit 4.
2       Do you recognize exhibit 4?
3    A  I recognize the template.  I don't recognize
4  this particular trust.
5       But yeah, I've read 500 of them.  Yes.  Okay?
6    Q  Is this a template used by First Fidelity
7  Trust Company?
8    A  It is a template.  They have various
9  templates.
10      This would have been for a single grantor of
11  a defective grantor trust; so an incompleted gift that
12  did not have any tax ramifications.
13   Q  Okay.  I'd ask you to turn in exhibit 4 to
14  the page marked OTS - James, several zeros, and 28.
15      MR. JONES:  I'm sorry, what was the number
16  again?
17      MR. MAY:  28.
18      MR. JONES:  28?
19  BY MR. MAY:
20   Q  This page is, I guess, titled Execution of
21  Deed of Settlement?
22   A  Right.
23   Q  And to me, it looks like the signature page
24  of the trust deed?
25   A  Right.

Page 41

1    Q  There's a signature on the right, below which
2  it says Settlor's Signature?
3    A  Yes.
4    Q  Do you recognize that signature?
5    A  It's Dr. James' signature.
6    Q  Okay.  And have you seen Dr. James' signature
7  on occasion?
8    A  Sure.
9    Q  And so you'd know that that is his signature?
10   A  Well, either that or a very good replica.
11   Q  Okay.  In the left-hand column there's a
12  place for witness name?
13   A  Right.  I witnessed him signing this.
14   Q  Okay.  And is this your signature below where
15  it says Witness Signature?
16   A  It is.
17   Q  And it indicates it was in Freeport, Bahamas?
18   A  Yes.
19   Q  Is that right?
20   A  Indicating that he was there.
21   Q  Okay.  So do you remember the occasion of
22  being there and witnessing Dr. James?
23   A  I don't.
24      But for many years I had an office in the
25  Bahamas.  I had 20 employees there.

Page 42

1       I was there all the time, so it wasn't a
2   special occasion.
3       Q   Okay.  And --
4       A   Actually, I do remember he came down there to
5   take a medical exam for life insurance, with a Bahamian
6   doctor.
7       Q   Okay.  And was it a --
8       A   That's coming back, yeah.
9       In fact, I believe that's the time we
10  executed this trust deed.
11      Q   And that insurance policy, was it in any way
12  related to the annuity that he had with Fidelity
13  Insurance?
14      A   It was.
15      He decided not to do an insurance policy, but
16  to do an annuity instead.
17      Q   Okay.  And what was the difference between an
18  insurance policy and an annuity?
19      A   Well, they're both non-modified endowment
20  contracts.
21      But in a life insurance contract, in addition
22  to tax-deferred accumulation, you can borrow out the
23  profits through loans which are not taxable and which
24  cancel out on death.  So you can effectively avoid
25  taxation on all your gains in an insurance policy.

Page 43

1       On the other hand, in an annuity, they -- the
2   funds accumulate tax-free, but you pay ordinary income
3   when you take it out.
4       That would indicate that you're always better
5   off having a life insurance contract as opposed to an
6   annuity.
7       That's not always the case financially,
8   because the tax code requires a certain death benefit
9   umbrella.  And when you do an analysis, sometimes it
10  works out a lot better not having the life insurance than
11  it does having it.
12      Q   Under what kind of circumstances is it better
13  not to have the life insurance?
14      A   Well, the life insurance corridor, as stated
15  in the tax code, varies based on age and based on the
16  amount in the account, and is going to have a certain
17  cost.
18      So depending on the rate of return, it's
19  possible for the insurance to cost more than the tax
20  savings; in which case you would not be better off doing
21  it.
22      Q   Is that why Dr. James chose an annuity
23  instead of a life insurance?
24      A   I actually don't remember.
25      But I prepared all kinds of financial

Page 44

1   analyses, and I would imagine that's why he did.
2       Q   And you remember that his was an annuity and
3   not a life insurance policy?
4       A   I do remember that, yes.
5       Q   All right.  If you'll turn in exhibit 4 back
6   a few pages.
7       The page that ends 41.  Towards the back.
8       A   41? Oh.
9       Q   41, yes.
10      A   Got it.
11      Q   And this, along with the next five pages --
12      A   Right.  It's the compliance package prepared
13  by First Fidelity Trust.
14      Q   And was it the routine practice of Fidelity
15  Trust to require grantors to sign this compliance
16  package?
17      A   Hundred percent of the time.
18      Q   And on the next page, which ends in the
19  numbers 42, is that Dr. James' signature at the bottom of
20  that page?
21      A   Yes, it is.
22      Q   And is his signature on page 3, 5 and 6 of
23  the package?
24      A   Of this package, I'm sorry.
25      Q   Of the compliance package?

Page 45

1       Sorry.  The pages that end in 43, 45 and 46?
2       A   Well, I'm not a handwriting expert, but they
3   all appear to be the same.
4       Or let me put it this way.  They appear to be
5   sufficiently different that they all look to be
6   originals.
7       Q   And again, the purpose of this compliance
8   package, as you understand it, what's the purpose?
9       A   The purpose is to make sure that the taxpayer
10  knows he has a responsibility for filing.
11      There's no doubt in my mind that Chivas
12  understood these had to be filed.  There's also no doubt
13  in my mind that he believed his accountant was filing
14  them.
15      And he's the one that provided me the
16  information to talk to his accountant.  He's the one that
17  gave me his phone number and everything else to make sure
18  that his accountant knew how to fill them out.
19      Q   And who was his accountant?
20      A   I actually don't remember that.
21      But I'm happy to do a search to tell you who
22  I spoke to.  I should be able to find that.
23      Q   That would be great.
24      A   Will you remember to tell me?  All right.
25      Q   What may happen -- I may send you a follow-up

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 46

1   request for documents.
2       A   That's fine, sure.
3       Q   Something along those lines.
4       A   Yeah, you don't need a subpoena.
5           Just send me a letter, I'll be happy to send
6   it to you.
7       Q   Okay. I'm sorry, back to exhibit 4. And I
8   asked you about the signatures in the compliance package.
9           Do you remember if Dr. James signed the
10  compliance package at the same time he executed the deed
11  of settlement?
12      A   I don't.
13          I can tell you that I cannot think of any
14  situation where I didn't execute all the documents
15  simultaneously, however.
16      Q   It was your routine practice to require them
17  all be done at the same time?
18      A   Not require.
19          But it wouldn't have made any sense to have
20  them separate. They're all part of a single package.
21      Q   I'll tell you, I got a copy of this same
22  document, what we've labeled here exhibit 4, from Dr.
23  James. The copy he provided to me didn't have the
24  compliance package.
25          Do you have any understanding of why that

Page 47

1   might be the case?
2       A   I don't.
3       Q   All right. Okay. Now, Mr. Donaldson, I'm
4   handing you what's previously been marked as exhibit 5.
5           It's an e-mail, at least it appears to be an
6   e-mail, from Josh Crithfield to you?
7       A   It is. It's regarding a product having
8   nothing whatever to do with the trust or First Fidelity
9   Trust Company.
10          It's totally unrelated.
11      Q   And is that the BPP?
12      A   Yes, it's a business insurance product.
13      Q   And what is that product?
14      A   It was a product issued by a couple of
15  insurance companies as an alternative to a captive
16  insurance company.
17      Q   Do you know what insurance company provided
18  this BPP?
19      A   In this context, I don't. It was -- it would
20  either have been Fidelity or Citadel.
21          I believe in 2001 it would have been
22  Fidelity, but I'm not sure.
23      Q   Okay. And why -- do you remember this
24  e-mail?
25      A   No.

Page 48

1       Q   Do you --
2       A   I got 243 e-mails yesterday, sir.
3       Q   Yes. I suspect as much, but I have to ask.
4       A   Right.
5       Q   Do you know if the pages that follow the
6   e-mail are the original attachment; that the e-mail
7   indicates there's a PDF document attached?
8           Do you know if these are the -- if those are
9   that document?
10      A   I was trying to compare dates.
11          I have no idea. They don't appear to be in a
12  particular order. I -- if you request this of me, then I
13  should be able to find it.
14          I'm not sure this would have been an archived
15  file. But if it's in my archive, I can preprint it for
16  you in the order in which it came out.
17      Q   Okay.
18      A   So.
19      Q   That might -- I'd be impressed if you still
20  had e-mails from '04.
21      A   I have my tax return from 1953 and everything
22  after that.
23          That's why I pay so much in storage fees.
24      Q   That's awesome.
25          I'd ask you to turn in exhibit 5 to a page

Page 49

1   marked SAB0654.
2       A   Yes.
3       Q   And this appears to me to be a quarterly
4   summary.
5           And there's several, at least three sections
6   here; Trust Contributions, Trust Structure, and Annuity
7   Structure?
8       A   I gotta tell ya that I don't think this
9   had -- I don't think this has anything to do with this
10  e-mail.
11      Q   Okay.
12      A   Because the e-mail refers to summary pages
13  for the business protection policy.
14          The business protection policy -- these are
15  trust statements. Unless it was showing his reserves and
16  his captive going up. I just have to study.
17          I'm happy to do it, but it would take me an
18  hour or so. I just have to try to be able to follow the
19  money -- which is what you're trying to do, I guess -- to
20  see how it happened.
21          But I mean, I can't imagine why, on the
22  summary page for a business insurance policy, there would
23  be an invoice for a trust setup fee.
24      Q   All right.
25      A   I mean, it's entirely unrelated.

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 50

```
 1       Q   So as --
 2       A   But it could have been.  I wasn't -- I just
 3  don't know.
 4           I'm happy to check if I have it.
 5       Q   Sure.  Well, I want to ask you more about the
 6  business protection policy.
 7           But I'd just like to wrap up this one thing
 8  on --
 9       A   Sure.
10       Q   -- page 0654.
11           As I think your son explained it, the annuity
12  structure was a product sold by the insurance company,
13  and this was the annuity you were discussing a few
14  minutes ago --
15       A   It is.
16       Q   -- is that right?
17           And that would have been under the umbrella
18  of the trust; like the trust owned the annuity.
19           Is that a fair characterization?
20       A   Yeah, that's exactly right.
21       Q   And the trust also owned other assets?
22       A   Right.
23       Q   Okay.  And this page 0654 just kind of
24  summarizes what is held in that quarter of 2004 that it
25  reflects.
```

Page 51

```
 1           Is that a fair synopsis?
 2       A   I just need to --
 3       Q   Sure thing.
 4       A   Yes.
 5       Q   Okay.  But the annuity structure here is
 6  something other than the business protection policy?
 7       A   It has nothing to do with it --
 8       Q   Okay.
 9       A   -- at all.
10       Q   Okay.  So what is the business protection
11  policy?
12       A   Business protection policy was a business
13  contract under which a U.S. taxpayer who was
14  self-employed or had a business that he controlled would
15  take tax deductions under section 160 to his ordinary and
16  necessary business expenses; acquiring a variety of
17  mostly property and casualty coverages whose premiums
18  were set by an outside actuarial firm to establish the
19  rates.  And if there were a claim, it would be paid out
20  of the reserves that were set up.  And if there were not
21  claims exceeding the reserves, then the profits would
22  inure to the taxpayer.
23           In the same respect that captives under
24  831(b) now do it.  Fidelity and Citadel no longer issue
25  the business protection plan.  So now I just use straight
```

Page 52

```
 1  831(b) captives, which I don't consider as good as the
 2  BPP, even from the I.R.S.' perspective.
 3           The business protection policy required that
 4  a client have much higher reserves than the I.R.S.
 5  requires that have for captives.  If you wanted to
 6  take a deduction for $250,000 in a captive insurance
 7  contract today, I could set this up under section 831(b)
 8  and you would have to have a $62,500 reserve in the first
 9  year to meet all I.R.S. requirements.
10           Under the BPP, if you took that same $250,000
11  deduction, they would require you had a million dollars
12  in reserves.  And Fidelity and Citadel took the position,
13  either you're funding insurance or you're not.  How are
14  you ever going to pay a claim?
15           So they had much more stringent reserve
16  requirements than the I.R.S. required.
17       Q   Why are they no longer selling these
18  products?
19       A   Because the I.R.S. attacked it; even though
20  every single law firm that ever reviewed it and wrote an
21  opinion, from big law firms to small law firms, did at
22  the time and still stand behind it.
23           It was deemed by Fidelity and Citadel not to
24  be worth the effort to attempt to defend it.  Although
25  all of us believe that it was better for everybody,
```

Page 53

```
 1  including the I.R.S.
 2           I cannot imagine why 831(b) captives, which
 3  are almost considered a safe harbor and only require
 4  approximately a tenth of the reserves, I can't figure out
 5  why that is better for anybody than having much greater
 6  reserves.
 7       Q   Is there some requirement about a captive,
 8  831(b) captive, can it be issued by a foreign insurance
 9  company?
10       A   Captive is actually an insurance company
11  that's owned by the taxpayer.
12           Actually, the biggest captive there is, is
13  Allstate.  They set it up to insure their own risks.  And
14  then they -- that they could insure others, and they did.
15           All Fortune 500 companies have captives.  And
16  about 5,000 U.S. taxpayers, many of them physicians, have
17  captives.
18       Q   Is it still a part of your work that you --
19       A   Absolutely.  I make presentations on captives
20  every week.
21       Q   But are you any longer doing the business
22  protection plans?
23       A   No one does, because it's not offered by any
24  insurance company.
25           But if I had a choice, I would; because I
```

Page 54

1    believe it's better to have reserves.
2         Q    You said the I.R.S. attacked the business
3    protection plan?
4         A    Uh-huh.
5         Q    Or policy?
6         A    Actually, out of this office.
7         Q    When did that happen?
8         A    Oh, maybe three or four years ago.
9             Actually, more than four years ago.
10        Q    What form did that take?
11        A    A single I.R.S. agent felt that it did not
12   qualify under the code, and so he has devoted the last
13   four years to attacking it.
14            And no action has been taken by the Service
15   regarding any of those policies.  And no one has been
16   asked to sign a totaling agreement or anything.
17            But Fidelity and Citadel quit issuing the
18   policy.
19        Q    So was it in an audit --
20        A    No.
21        Q    -- of a Revenue agent?
22        A    Oh, no.
23            It was through the execution of a Grand Jury
24   subpoena.
25        Q    Okay.  Which was done by an I.R.S. agent?

Page 55

1         A    Yes, by C.I.D.
2         Q    Okay.  So was it a Special Agent, do you
3    know?
4         A    Yeah, I know a lot about it.
5         Q    Okay.
6         A    I mean, if you want, I am happy to answer
7    your questions.
8             But yes.  The relevant issue -- from my
9    perspective, of course -- is that that particular policy
10   was originally designed by the largest law firm in the
11   United States dealing in insurance contracts, who wrote a
12   tax opinion on it.  And clients had the opportunity --
13   including Dr. James, if he chose to -- to hire outside
14   law firm, an outside law firm, to opine on its efficacy
15   and tax deductibility.
16            Dr. James chose not to.  But every single
17   solitary client in the United States, whoever did, their
18   law firms, completely independent of each other with no
19   input from the insurance companies, unanimously supported
20   this business protection policy.
21            And I absolutely feel the I.R.S. is
22   completely on the wrong side of this one.
23        Q    Do you know, has the -- well, I'm just trying
24   to get a sense of, is it just an investigation --
25        A    Yes.

Page 56

1         Q    -- at this point?
2         A    It's an investigation at this point --
3         Q    Okay.
4         A    -- starting in its fifth year.
5         Q    Okay.  So there haven't been any tax court
6    cases or --
7         A    There hasn't been anything.
8         Q    -- any litigation on it?
9         A    No.
10        Q    Okay.  What was that law firm that you
11   mentioned, the largest insurance for the law --
12        A    The original opinion was done by Morris,
13   Manning and Martin, which specializes in insurance.
14            Lawyer there subsequently moved to another
15   law firm, whose name slips my mind.  You could track it
16   through the attorney, though.  His name is Brian Casey.
17   He is considered to be a real insurance expert.
18            Subsequent to that, the opinions were written
19   by Handler, Thayer and Duggan out of Chicago.
20        Q    And is -- in your knowledge, every law firm
21   that's issued an opinion on the business protection
22   policy has opined that they should be deductible under
23   section 160?
24        A    Sure, including -- including prior I.R.S.
25   Commissioner William Simon, who testified for that in a

Page 57

1    Grand Jury.
2         Q    And I understand that Dr. James had a
3    business protection --
4         A    He did.
5         Q    -- policy?
6             I'm going to hand you what's marked exhibit
7    6.
8             Is that the declarations of Dr. James'
9    policy?
10        A    Yeah.  It's a dec sheet for the business
11   insurance contract.
12        Q    Okay.  And so in the third page of that
13   exhibit, there's some X marks beside various items?
14            Those are --
15        A    Those are the coverages that he had.
16        Q    Do you know what cash reserves his policy
17   had?
18        A    I can tell you to the penny, because of the
19   ratio.
20            In the -- in 2001 he had -- well, in 2001, if
21   he had 60,000 as a premium, the insurance company would
22   have required a minimum reserve of four times that.  They
23   always required a minimum reserve of four times.
24            He would have had a reserve of 240,000.
25        Q    And you've -- just for the sake of the

Page 58

1    record -- that was from exhibit 5, the front page?
2         A   It was, yes.
3             Actually, I didn't need to take it from
4    exhibit 5.  I could take it from the dec sheet.
5         Q   Okay.  And --
6         A   Showed 60,000 in premiums.  So he would have
7    had 240,000 in reserves.
8         Q   And what was the source of the reserves?
9         A   He would have had to deposit cash.
10            And it would have been put in an account, I
11   forgot what the account was called now, a -- some type of
12   an account that the insurance company set up to maintain
13   reserves.
14            It was a pooling mechanism.  Because under
15   the tax code, risk distribution and risk shifting is
16   required.
17        Q   And so it would have been pooled with
18   reserves from other owners of business protection --
19        A   It would have been.
20        Q   -- policies?
21        A   And just as is in the case with an 831(b)
22   captive at the end of each year, the pool profits are
23   distributed.
24            So at the end of each year, the profits would
25   have been distributed.

Page 59

1         Q   And if the risks that are insured under that
2    declaration sheet did not occur, what would happen with
3    the cash reserves?
4         A   Well, as the case with an 831(b) captive, it
5    would inure to the client, so.
6         Q   At what point in time?
7         A   At the end of each year, again, as is the
8    case with an 831(b) captive, all pools are cleared at the
9    end of each year.
10        Q   And then if --
11        A   If they want to go another year and buy more
12   insurance that year, then they start a new year.
13        Q   And they start a new year?  And resupply --
14        A   Yeah.
15        Q   -- the cash reserves?
16        A   Right.
17        Q   And pay the premiums?
18        A   That's right.
19        Q   And Dr. James' business protection policy was
20   with which insurance company?
21        A   Fidelity.
22        Q   Fidelity Insurance Company.
23            And that's a company that's located where?
24        A   It's based in Anguilla in the West Indies.
25        Q   So -- and the business protection policy is

Page 60

1    wholly separate and apart from the trust and the annuity
2    that's --
3         A   Entirely unrelated.
4         Q   Okay.  I think also within the trust, Dr.
5    James had a real estate LLC?
6         A   He did.
7         Q   What do you remember about that?
8         A   Not much.
9             A lot of our clients have -- when clients ask
10   me today -- I did several trusts today -- "What should I
11   put in my trust?"
12            And I respond, "Whatever you don't want to
13   lose in litigation."
14        Q   So do you remember what real estate --
15        A   That is --
16        Q   -- that was?
17        A   Yeah.  I believe it was a property in New
18   Orleans, but I'm not sure.
19            I wasn't -- once I finished my original
20   design work and whatever the interactions with the client
21   are primarily with the trust company or the insurance
22   company, I'm not usually in the middle of any of those
23   unless they need some help.
24            (Organizational Chart, is received and marked
25            exhibit 7 by the court reporter.)

Page 61

1    BY MR. MAY:
2         Q   All right.  Mr. Donaldson, I've handed you
3    what's marked exhibit 7.
4             And to me, it just looks like an
5    organizational chart.  Is that a fair description?
6         A   Yes.
7         Q   At the top is "Dr. James," and I guess it
8    represents that he's the grantor?
9         A   Grantor of the Hornsby trust.
10            The Hornsby trust owned a real estate LLC,
11   and it owned an annuity.  And the assets in the annuity
12   were held by a segregated asset account, incorporated
13   under that name, SA 16 thousand 2, LLC.
14        Q   Okay.  And then --
15        A   The purpose of segregated asset accounts --
16   just to get it on the record -- is to separate the assets
17   of an individual client from the creditors of the
18   insurance company.  And there's segregated asset account
19   legislation in all states, as well as most foreign
20   countries.
21        Q   Okay.  Do you know what the assets of the
22   segregated account were?
23        A   Sure.  They're in the prior statements that
24   you showed.
25        Q   Okay.  And as far as the Big Easy Real

Page 62

1  Estate, LLC, you think the condo is the only asset of --
2      A   Big Easy, that definitely indicates it was
3  probably a New Orleans property.
4      Q   As suspected.
5      A   Either that, or he had New Orleans on his
6  mind.
7      Q   One or the other.  All right.
8          MR. MAY:  Let's mark this one.
9          (E-Mail, with attachment, is received and
10     marked exhibit 8 by the court reporter.)
11 BY MR. MAY:
12     Q   All right, Mr. Donaldson.  Handing you what's
13 marked as exhibit 8.
14         Do you recognize exhibit 8?
15     A   No.  I've never seen it before.
16     Q   Okay.  Is -- who is Deborah Tyrell?  Do you
17 know who that is?
18     A   Administrator with the trust company.
19     Q   Okay.  Do you know if bcjames65@aol.com is
20 Dr. James' e-mail address?
21     A   I don't.
22     Q   Is steve.donaldson@fortressoffice.com an
23 e-mail that you've had?
24     A   It is.  Why, am I on here somewhere?
25     Q   In the "To" line of the e-mail.

Page 63

1      A   Okay.
2      Q   Okay.  Do you recognize the handwriting on
3  this copy of this e-mail?
4      A   No.  I don't.
5          I really don't have any recollection of ever
6  seeing this.
7      Q   Okay.  Do you know if Dr. James, does he
8  still have the Hornsby trust?
9      A   I don't know that.
10     Q   You don't know?
11     A   No.
12     Q   Do you have any ongoing interaction with Dr.
13 James?
14     A   I haven't spoken to him for several years.
15         He's a little nonplussed over the tax penalty
16 that was assessed to him.
17     Q   Okay.  So is it fair to say you've not spoken
18 with him since around the time that he was assessed with
19 the penalty?
20     A   Well, not since the time he was assessed, but
21 I think probably since the time he actually had to pay
22 it.
23     Q   So how many years has it been since you
24 talked to him?
25     A   Several years.  Last time was at a party at

Page 64

1  his house.
2      Q   When was that party?
3      A   Several years ago.
4      Q   Before 2008?
5      A   I can't say that.  Probably -- I really don't
6  know.
7      Q   More than three years ago?
8      A   It's probably more than three years ago,
9  yeah.
10     Q   Okay.  But you're not aware of the status of
11 the Hornsby trust --
12     A   I don't know --
13     Q   -- at --
14     A   -- the --
15         THE REPORTER:  I'm sorry, you were talking on
16 top of each other.
17         "You're not" --
18         MR. MAY:  Okay.
19         THE REPORTER:  -- "aware of the status of the
20 Hornsby trust"?
21         MR. MAY:  "At this time."
22     A   I have no idea whether he has it or not.  I
23 haven't spoken to him.
24 BY MR. MAY:
25     Q   Okay.

Page 65

1          (Settlor's Letter of Wishes, is received and
2      marked exhibit 9 by the court reporter.)
3  BY MR. MAY:
4      Q   Okay.  All right, Mr. Donaldson.  I'm going
5  to hand you what's marked exhibit 9.
6          Have you ever seen exhibit 9 before?
7      A   I don't have any recollection of it, but I
8  certainly could have.
9      Q   Okay.  It appears to me to be a settlor's
10 letter of wishes?
11     A   Right.  Where he's contributing the -- or
12 distributing the real estate from his trust.
13     Q   Now, as I understand it, the trust that Dr.
14 James established, it would have given the trustee a
15 great -- really sole discretion over how to handle the
16 assets within the trust.
17         Is that correct?
18     A   It's true.
19     Q   So this is just him informing the trustee of
20 what he wants to happen?
21     A   Right.
22         The trustee could refuse it; although
23 trustees don't routinely refuse any reasonable request.
24     Q   But at least it looks like to me that in
25 exhibit 9 he's asking that Big Easy Real Estate, LLC be

Page 66

1   distributed out of the trust?
2        A   Right.  So there was no tax issues going in,
3   no tax issues going out.
4            It was a nontax issue here.
5        Q   Do you know why he would have wanted it
6   distributed?
7        A   No idea.  Maybe to sell it or refinance it or
8   anything.
9        Q   Okay.
10           (Form 3520-A, 2003, is received and marked
11       exhibit 10 by the court reporter.)
12  BY MR. MAY:
13       Q   Okay, Mr. Donaldson.  I've handed you what's
14  marked exhibit 10.
15           And what is exhibit 10?
16       A   It's 3520-A filed by First Fidelity Trust
17  Company on behalf of the Hornsby trust in 2003.
18       Q   Okay.  For the year 2003?
19       A   Yes.
20       Q   So would it actually have been timely to file
21  it in 2004 for the year 2003?
22       A   Well, yeah.  I mean, you do have some time,
23  yeah.
24       Q   Sure.  You get a few months, right?
25           I mean, you don't have to file it December

Page 67

1   31, right?
2        A   However, this has nothing to do with the
3   taxpayer, as you know.
4        Q   Right.  This is --
5        A   This is filed by the trust company.
6        Q   This is the trust's report to the I.R.S.?
7        A   Right.  Exactly.
8        Q   I direct your attention to the second page of
9   the 3520-A.  At the bottom it is OTS - James, page 60.
10  In line 17 under part two, just about half -- right in
11  the middle of the page, basically.
12           "Enter the fair market value of total
13  distributions from the trust."
14           And there is a -- and then a "Distribution to
15  U.S. owners" in part B of that line.
16       A   Right.  Yes.
17       Q   And it's a distribution of $50,025?
18       A   Right.
19       Q   Do you know what that is?
20       A   No.
21           If that was the year that he distributed the
22  real estate -- well, it wasn't -- it could have been a
23  net profit.  This is in the tax section.  So you could --
24  there could have been significant nontaxable
25  distributions.

Page 68

1            This was to set the taxable income that was
2   distributed.
3        Q   So you believe that that $50,000 would have
4   been reportable by Dr. James' income in 2003?
5        A   Well, it says in part 2 that the total income
6   was $50,061.
7            And it -- you know, it would appear that you
8   definitely would have to report that as income, you know.
9   I mean, the fact is -- and again, I'm not trying to make
10  a case either way, although I'm obviously, you know, I
11  have my prejudices like everyone does -- but the fact of
12  the matter is that the taxpayer, in this case Dr. James,
13  knew the trust company was going to file this with the
14  Internal Revenue Service; knew that the Internal Revenue
15  Service would be notified that he had $50,000 of income.
16           And the position I've taken all along is that
17  this is an accountant's error.  It's not like this is
18  something you accidentally discover.  This is something
19  you are notified by the trust company on a form that he
20  paid to have sent to you.
21       Q   So you believe that --
22       A   Okay?
23       Q   So you believe Dr. James' accountant received
24  this form?
25       A   No.  I don't know whether he did or not.

Page 69

1   There was no requirement for the accountant to receive
2   the 3520-A.
3            In fact, I'm not even sure that it's -- I
4   don't know what the law is, but I'm not even sure it's
5   appropriate.
6            This is between the trust company and the
7   Service; as opposed to the 3520, which is between the
8   taxpayer.
9            But in all discussions with every accountant,
10  with every taxpayer, they all -- and, in fact, in the
11  invoicing that he was getting, he knew that he was paying
12  to have a form prepared and filed by the trust company,
13  telling the I.R.S. exactly what occurred in his trust.
14           And he knew that the 3520 was going to be
15  effectively a duplicate of it, because it was being
16  prepared by the same accounting firm.  And so there was
17  absolutely no motivation on any basis to not file a 3520;
18  when you know the Service not only is getting the 3520-A,
19  but is being told what the value of the trust is so they
20  know house to assess the penalty.  Okay?
21           I've never heard of a taxpayer purposely not
22  filing a 3520, ever.  It would make zero sense.  Because
23  the I.R.S. already knows everything from the 3520-A.
24       Q   Okay.  But you have no knowledge whether or
25  not Dr. James gave this form to his accountant that

Page 70

1  prepared his personal tax return?
2      A   I, I -- I have -- I have no knowledge as to
3  whether or not -- you'd have to ask Josh -- but I don't
4  have any knowledge as to whether the administration firm
5  provides copies of the 3520-A to the taxpayer.
6          Maybe they do, I just don't know it.
7      Q   You don't know? Okay.
8      A   Yeah.
9      Q   Are they not -- is the trust -- excuse me --
10  is there not a portion of that form that's required to go
11  to the owner of the trust?
12     A   Of the 3520-A?
13     Q   Yes.
14     A   I don't know that. I've never completed one.
15     Q   Okay. All right.
16         MR. MAY: I'm going to pass the witness.
17         THE WITNESS: I'm going to send my whole
18  staff home, since I'm obviously not going to be --
19         MR. MAY: Okay. I'm going to pass the
20  witness.
21         MR. JONES: Can we take two and a half
22  minutes?
23         MR. MAY: Yes, sure.
24         (Recess taken.)
25         MR. JONES: Okay, back on the record.

Page 71

1          CROSS-EXAMINATION
2  BY MR. JONES:
3      Q   Okay. Thank you, Mr. Donaldson, again, for
4  putting up with this for this afternoon. And this will
5  be fairly brief, I think.
6          And again, I'm Ken Jones with Sutherland,
7  Asbill, Brennan in Washington, D.C. and I represent Dr.
8  James.
9          I believe you said -- and I want to clarify.
10  Do you recall, when Dr. James got the I.R.S. penalty
11  notices, that he contacted you?
12     A   Did he contact me?
13     Q   Yes.
14     A   He absolutely did.
15     Q   And do you recall what happened in that
16  conversation?
17     A   Well, how about in a series of conversations,
18  because I wouldn't be able to differentiate.
19         As a result of his call to me, I -- I
20  suggested that he hire William H. Simon, William H. Simon
21  and Company -- who is in the tax controversy business and
22  had previously been a regional I.R.S. Commissioner -- to
23  go to the I.R.S. in his behalf to explain that this was
24  an accounting error, not an intentional attempt to
25  defraud the I.R.S.; since, as I stated in my earlier

Page 72

1  testimony, 3520-As have always been filed.
2      Q   Do you recall during those years where they
3  were filed?
4      A   I have no idea.
5      Q   Okay. So obviously, Dr. James was upset?
6      A   Yeah, I think that'd be safe to say.
7      Q   And you described it as an accounting error
8  from your perspective, or an accountant error -- I don't
9  want to put words in your mouth -- whose did you say?
10     A   I knew his accountant had the forms. I knew
11  they had been sent.
12         It's certainly not unusual -- I realize it's
13  all of our responsibilities as taxpayers to read every
14  line of our tax returns. But often, if you get a
15  one-inch-thick tax return, it's possible to miss
16  something.
17         And there was no indication in any
18  conversation I ever had with Dr. James that he was not
19  filing the forms. And he was certainly paying every year
20  to have the forms prepared for him, and he knew it and
21  was paying the bills.
22     Q   Have you encountered other clients that had
23  the same penalty-type issues?
24     A   No. I've never had a client that's had this
25  penalty issue.

Page 73

1      Q   But as you pointed out -- again, just to
2  clarify the point you made -- and the fact that the
3  I.R.S. penalized the doctor or notified him that they
4  were going to penalize him, they had the information --
5  "they," the I.R.S. -- in front of them?
6      A   Right. They knew exactly how much to set the
7  penalty, because Chivas James had paid Offshore Trust
8  Services to prepare this form and file it with the
9  Service.
10         The 3520-A is the "form" I'm referring to.
11     Q   You said before you were aware of offshore
12  trust companies that might not have been -- can I call it
13  compliance-focused?
14     A   Yeah. Many foreign trust companies are not.
15     Q   And so you're saying -- are you suggesting
16  some of those companies might not have filed the form or
17  prepared the Form 3520-A?
18     A   Hundreds of them don't.
19     Q   And in that case, the I.R.S. would not know
20  about the trust, the assets in the trust, or any income?
21     A   Or the existence of anything at all.
22         All of those people, of course, would be
23  unindicted felons. But set -- that set aside, yes.
24         The answer to your question is --
25     Q   But that's not the case --

BayAreaReporting@gmail.com, www.bar-tampa.com                          866-240-9500

Page 74

1    A    -- the I.R.S. would not know.
2    Q    But that is not the case here, the I.R.S. --
3    A    That's not the case here.
4    Q    -- clearly knew?
5    A    And did not know by accident.
6         They knew on purpose, because the taxpayer
7    paid a company to file the form with the I.R.S.
8         MR. JONES:  No further questions.
9         MR. MAY:  I don't have any other questions.
10        THE REPORTER:  And the same transcript orders
11   as before, gentlemen?
12        MR. JONES:  Yes.
13        MR. MAY:  Yes.
14        THE REPORTER:  Thank you.
15        (Time noted:  5:15 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 75

2         CERTIFICATE OF OATH
3
4    STATE OF FLORIDA
5    COUNTY OF HILLSBOROUGH
6
7         I, the undersigned authority, certify that STEPHEN
8    P. DONALDSON personally appeared before me and was duly
9    sworn.
10
11        WITNESS my hand and official seal this 1st day of
12   October, 2011.
13
14
15
16
17
18
19        Phyllis DeFonzo, RPR
20        Notary Public State of Florida
21        My Commission Expires:  8/1/12
22        Commission No.:  DD 783768
23
24
25

Page 76

1
2              REPORTER'S CERTIFICATE
3
4
5    STATE OF FLORIDA       :
6    COUNTY OF HILLSBOROUGH:
7         I, Phyllis DeFonzo, RPR, certify that I was
     authorized to and did stenographically report the
8    deposition of STEPHEN P. DONALDSON; that a review of the
     transcript was requested, and that the transcript is a
9    true and complete record of my stenographic notes.
10        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
11   am I a relative or employee of any of the parties'
     attorneys or counsel connected with the action, nor am I
12   financially interested in the outcome of the foregoing
     action.
13
          Dated this 1st day of October, 2011, IN THE
14   CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.
15
16
17         Phyllis DeFonzo, RPR
18
19
20
21
22
23
24
25

Page 77

1
2              ERRATA PAGE
3    PLEASE ATTACH TO THE DEPOSITION OF STEPHEN P. DONALDSON
     TAKEN ON SEPTEMBER 21, 2011 IN THE CASE OF
4    BRIAN CHIVAS JAMES VS. UNITED STATES OF AMERICA
5    PAGE LINE    CORRECTION AND REASON THEREFOR
6
7
8
9
10
11
12
13
14
15
16
17
18   I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
     CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
19   SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.
20
21   _____  _____
22   STEPHEN P. DONALDSON          DATE
23   _____  _____
24   WITNESS TO SIGNATURE          DATE
25

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

Page 78

```
 1
 2    October 1, 2011
 3    Mr. Stephen P. Donaldson
      345 Bayshore Boulevard, Number 1901
 4    Tampa, Florida 33606
 5    In Re: September 21, 2011 deposition of Stephen P.
             Donaldson, James v. United States of America
 6
 7    Dear Mr. Donaldson:

      This letter is to advise that the transcript for the
 8    above-referenced deposition has been completed and is
      available for review.  Please contact our office to make
 9    arrangements for read and sign, or sign below to waive
      review of this transcript.
10
      It is suggested that review of this transcript be
11    completed within 30 days of your receipt of this letter,
      as considered reasonable under Federal Rules*; however,
12    there is no Florida Statute in this regard.
13    The original of this transcript has been forwarded to the
      ordering party and your errata, once received, will be
14    forwarded to all ordering parties for inclusion in the
      transcript.  Thank you.
15
      Sincerely,
16
17    Phyllis DeFonzo
      Bay Area Reporting
18
19    Waiver:
20    I,_____, hereby waive the
      reading & signing of my deposition transcript.
21
22    _____    _____
      Deponent Signature         Date
23
      *Federal Civil Procedure Rule 30(e)/Florida Civil
24     Procedure Rule 1.310(e)
25
```

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR