BayAreaReporting@gmail.com,   www.bar-tampa.com                              866-240-9500

Page 1

```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                    MIDDLE DISTRICT OF FLORIDA
                         TAMPA DIVISION


    ---------------------------- :
    BRIAN CHIVAS JAMES,          :
         Plaintiff,              : Civil No.
                                   8:11-cv-00271-JSM-AEP
    vs.                          :

    UNITED STATES OF AMERICA,    :
         Defendant.              :
    ---------------------------- :


         DEPOSITION OF:   JOSHUA CRITHFIELD

         PURSUANT TO:     Notice by Counsel for Defendant

         DATE:            September 22, 2011

         TIME:            9:55 a.m. to 11:15 a.m.

         PLACE:           Offices of the U.S. Attorney
                          400 North Tampa Street
                          Tampa, Florida 33602

         REPORTED BY:     PHYLLIS DEFONZO, RPR
                          Notary Public
                          State of Florida at Large




                          Pages 1 - 67
```



**Government Exhibit**
C

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR

Page 2

1  APPEARANCES:
2
3     KENDALL JONES, ESQUIRE
      DWAUNE L. DUPREE, ESQUIRE
      Sutherland, Asbill & Brennan, LLP
4     1275 Pennsylvania Avenue NW
      Washington, D.C. 20004-2415
5        Appearing for Plaintiff
6
7     MICHAEL W. MAY, ESQUIRE
      United States Department of Justice
8     Tax Division
      P.O. Box 14198
9     Washington, D.C. 20044
         Appearing for Defendant
10
11
      JENNY DAPHNE JOHNSON-SARDELLA, ESQUIRE (via phone)
12    MARK DAVID HUNTER, ESQUIRE (via phone)
      Leser, Hunter, Taubman & Taubman, LLP
13    255 University Drive
      Coral Gables, Florida 33134
14       Appearing for Witness Joshua Crithfield

Page 3

I N D E X

TESTIMONY OF JOSHUA CRITHFIELD            PAGE

DIRECT EXAMINATION BY MR. MAY              4

CROSS-EXAMINATION BY MR. DUPREE           42

REDIRECT EXAMINATION BY MR. MAY           58

RECROSS-EXAMINATION BY MR. DUPREE         61

CERTIFICATE OF OATH                       64

CERTIFICATE OF REPORTER                   65

ERRATA SHEET                              66

SIGNATURE LETTER                          67


E X H I B I T S

NO.    DESCRIPTION                 PAGE

11     9/15/06 Letter                22

12     3/15/06 Letter                53

Page 4

1           JOSHUA CRITHFIELD,
2  the witness herein, being first duly sworn on oath, was
3  examined and deposed as follows:
4           DIRECT EXAMINATION
5  BY MR. MAY:
6     Q   All right. Good morning, Mr. Crithfield.
7  We're now on the record in your deposition.
8         Just for the sake of the record -- we've
9  spoken before -- but my name is Mike May. I'm an
10 attorney with the U.S. Department of Justice. And I
11 represent the United States in the matter that's brought
12 us here today, the case of Dr. James versus the United
13 States.
14        And I'll be asking you questions. Mr. Jones
15 or -- and/or Mr. Dupree may be asking you some questions
16 as well.
17        Would you please state your name for the
18 record?
19    A   Josh Crithfield.
20    Q   Okay. And I believe -- and you're
21 represented by counsel.
22        Is that correct?
23    A   Correct.
24    Q   And is your counsel present here on the
25 telephone with us this morning?

Page 5

1     A   They are on the phone.
2     Q   Okay. And I believe the court reporter has
3  already gotten their names.
4     A   Yes.
5     Q   All right. Have you ever been deposed
6  before?
7     A   Yes.
8     Q   Okay. How many times?
9     A   One time.
10    Q   Okay. And what was the nature of that
11 matter?
12    A   It was some litigation that I guess I was a
13 witness for.
14    Q   Okay.
15        So you were a witness in that case, not one
16 of the parties?
17    A   Right.
18    Q   Okay. If at any point while I'm asking you
19 questions, you know, if there's something that's not
20 clear, you don't understand what I mean, please ask me,
21 and I'll be happy to try to clarify the question. Fair
22 enough?
23    A   Yes.
24    Q   Also, you notice the court reporter, I'm
25 sure, sitting here. She's taking down every word that

Page 6

1   we're saying. So it's important, that's important for a
2   couple of things, reasons; or it has a couple of effects.
3       One is, make sure when you answer, to answer
4   out loud. So if the answer is yes, say "yes," not just
5   nod your head or, you know, so on and so forth.
6       Is that fair?
7   A   Yes.
8   Q   Okay. Good.
9       And also, if you'll wait until I finish
10  asking the question before you answer, that helps her out
11  so that she can keep track of what everyone's saying.
12  A   Okay.
13  Q   If at some point during the morning you need
14  a break, I'll be happy to take a break. I personally
15  don't anticipate this will take very long. But if for
16  some reason we need a break, of course that's available.
17  I just ask that if I've asked you a question, if you'll
18  wait until you answer and then we would take a break, not
19  while the question is pending. Okay?
20  A   Okay.
21  Q   Now, this last question, I'm just -- kind of
22  have to ask as a formality.
23      But have you taken any medication that would
24  interfere with your ability to sit for a couple of hours
25  and understand and answer questions?

Page 7

1   A   No.
2   Q   Okay. All right. Now, from time to time
3   counsel may object. Your counsel may instruct you not to
4   answer a question.
5       If someone only says "I object" or
6   "Objection," I'm going to ask you to go ahead and just
7   answer the question. If your counsel instructs you not
8   to answer the question, I'll leave that to you whether
9   you're going to follow that advice.
10      Fair enough?
11  A   Yes.
12  Q   All right. Mr. Crithfield, what is your
13  occupation?
14  A   I'm CEO of International Financial Services
15  Group.
16  Q   Okay. And what does International Financial
17  Services Group do?
18  A   We're an administration company. We file, or
19  do tax returns for foreign companies. We do accounting
20  work, bookkeeping work for foreign trusts and insurance
21  policies.
22      And we're currently trying to get in to do
23  some more administration work and compliance for domestic
24  investments or advisory firms, doing their compliance
25  work for them.

Page 8

1   Q   Okay. And by "compliance work," do you mean
2   compliance with Federal Internal Revenue laws?
3   A   Yes.
4   Q   Okay. Prior to International Financial
5   Services Group, where were you employed?
6   A   Offshore Trust Services.
7   Q   Okay. And is --
8   A   Actually, let me back up.
9       Sorry. It was Fortress Family Office Group.
10  Q   Okay.
11  A   And prior to that was Offshore Trust
12  Services.
13  Q   Okay. And was the nature of the business of
14  those two entities similar to International Financial
15  Services Group?
16  A   They did a little bit more.
17      International Financial Services Group
18  strictly just does administration work.
19  Q   Okay.
20  A   Whereas Offshore Trust Services also offered
21  client services as a liaison to foreign companies and
22  U.S. clients and advisors.
23      And due to the Florida laws that have
24  changed, that's no longer an option, to provide those
25  services.

Page 9

1   Q   Okay.
2   A   So International Services Group just strictly
3   does administration work.
4   Q   Okay. And during the years -- you may know,
5   the years at issue, particular years at issue in this
6   case are 2001, 2002 and 2003. There may be some relevant
7   facts in the years after that, probably through 2006 or
8   7, perhaps.
9       But in the years, say, 2001 through 2005,
10  were you working at Offshore Trust Services at that time?
11  A   Yes.
12  Q   And at what time did that -- I'm probably
13  jumping ahead.
14      Did Offshore Trust Services become Fortress
15  Family Services?
16  A   No. It -- there was another company, which
17  was a planning company.
18  Q   Okay.
19  A   And took the administration and the planning,
20  combined it together into one company. And that became
21  Fortress.
22  Q   Okay. What was the name of that other
23  company?
24  A   Foster & Dunhill.
25  Q   Oh, okay. Okay.

BayAreaReporting@gmail.com,    www.bar-tampa.com                            866-240-9500

Page 10

1      And so Fortress combined the work of Offshore
2  Trust Services and what Foster & Dunhill had done
3  previously?
4      A   Yes.
5      Q   Okay. Because I understand that Foster &
6  Dunhill was primarily the planning and services side?
7      A   Correct.
8      Q   Okay. And so during the years 2001 through,
9  say, 2005, what was your role at Offshore Trust Services?
10     A   I was in charge of client services up until
11 about 2005.
12     Q   Okay.
13     A   And at that point, I became president of
14 Offshore Trust Services.
15     Q   Okay. And was that in January of '05?
16     A   I don't know the exact date.
17     Q   Okay. Sometime during the year, though, of
18 2005?
19     A   I don't know exactly.
20     Q   Okay. That's fine. It probably doesn't
21 matter a great deal for our purposes this morning.
22         So who were the clients of Offshore Trust
23 Services? Was it individuals? Or was it foreign trust
24 companies?
25         Or would you say both?

Page 11

1      A   It was foreign trust companies and insurance
2  companies.
3      Q   Okay. So the individuals that owned foreign
4  trusts or perhaps insurance policy products with foreign
5  insurance companies weren't necessarily the clients of
6  Offshore Trust Services?
7      A   No.
8      Q   Okay. And this case, of course, involves
9  Brian Chivas James.
10         What was his relationship to Offshore Trust
11 Services?
12     A   We -- well, Offshore Trust Services had an
13 agreement with Alliance Holding Company. And that
14 administration -- it was an administration agreement to
15 provide accounting services and do the tax work for them.
16         And then we would -- so in terms of Brian
17 James, we would prepare his tax returns and do the
18 bookkeeping for his trust and policies.
19     Q   Okay. And when you say "tax returns," are
20 you referring only to the 3520 and 3520-A that related to
21 his trust?
22     A   It would have been a 3520-A.
23     Q   Okay.
24     A   It would have been a 3520.
25         And a TD F 90-22.1.

Page 12

1      Q   Okay. But not an 1140 or a corporate tax
2  return?
3      A   No.
4      Q   As far as the individual -- so even though
5  the individual owners or settlors of foreign trusts and
6  owners of foreign insurance policies were not directly
7  the clients of Offshore Trust Services, would you say --
8  what percentage of your time would you say, of Offshore
9  Trust Services' time, would you say was spent in
10 interacting with those individuals?
11     A   I'm trying to think.
12         Are you looking for like a percentage of the
13 work that was done in Offshore Trust Services?
14     Q   Sure, yes.
15     A   Maybe 15 to 20 percent of the time was spent
16 working with -- or answering questions for clients or
17 advisors.
18     Q   Okay. And when you -- and I understand that
19 the bulk of Offshore Trust Services' work was done for
20 the trust companies and the insurance companies.
21         I'm just trying to get a feel for, you know,
22 how Offshore Trust Services related to these individual
23 settlors of trusts. And, you know, really primarily
24 interested in is the relationship with Dr. James, of
25 course, and how that fit into that picture.

Page 13

1          But -- and so the question that I'm going to
2  asks after all that is, you know, I understand that at
3  some point, Offshore Trust Services or -- at least heard
4  from Steve Donaldson that at some point Offshore Trust
5  Services actually began preparing the Forms 3520 for at
6  least Dr. James.
7          Did Offshore Trust Services prepare 3520s for
8  other settlors of trusts as well?
9      A   Offshore Trust Services started just doing
10 3520-As, which were -- which was a form required for the
11 trustee to sign. And so we would prepare those for the
12 trustee.
13         And then after some time -- and I guess, I
14 think it was about 2005 as well -- they wanted us to
15 prepare all of them -- if it was a trust, it would be a
16 3520 and a TD F 90-22.1 -- to make sure that all the
17 clients were properly filing the returns.
18         And --
19     Q   Was there any --
20     A   Yeah.
21     Q   Okay. Was there any particular event that
22 kind of led to that change of doing both the 3520-A for
23 the trust, and the 3520 for the settlors and owners?
24     A   Yeah. I think there was some confusions
25 about -- and I believe there may have been some clients

Page 14

1  that didn't file the 3520, because they didn't realize
2  that it needed to be filed, or the TD F.
3       And so that's when the decision was made,
4  "Let's prep them all for the clients to make sure that
5  they're fully aware of what is required to be filed --
6  what's required to be filed."
7     Q  Okay.  But is it safe to say that prior to
8  2004 or 5, Offshore Trust Services would not have
9  prepared 3520s for the settlors, the owners?
10    A  That's correct.
11       I just don't remember when that exactly
12 started.
13    Q  Okay.  You're not sure if it was 2003 or 2004
14 or 2005?
15    A  I think it was about 2005.
16    Q  Okay.  But it may have been 2004?
17       Or you know for sure --
18    A  It's possible.  I don't know.
19    Q  You don't know?
20    A  I don't remember.
21    Q  Okay, sure.
22       Now, you said "they kind of made the
23 decision."
24       Who is "they"?
25    A  The trust company.

Page 15

1     Q  First Fidelity?
2     A  First Fidelity Trust.
3     Q  Okay.  In addition to First Fidelity Trust
4  Company, what other trust companies did Offshore Trust
5  Services work with?
6     A  That was the main one.
7        There was a trust company in the Bahamas that
8  wanted us to be U.S. agent.
9        But other than that -- and that was -- it was
10 First Fidelity trust.
11    Q  Okay.  And I understand your father's Duane
12 Crithfield.
13       Is that right?
14    A  Yes.
15    Q  And what was his role at Offshore Trust
16 Services?
17    A  He was owner.
18    Q  Okay.
19    A  I think he was president for several years
20 until David McNamee became president, and then later it
21 was me.
22    Q  Okay.  And where is David McNamee now?
23    A  I don't know.
24    Q  Okay.  At what time was he the president, do
25 you remember?

Page 16

1     A  It was -- it was before me.  Maybe 2002, 3,
2  4.  And then me, 5.
3     Q  Okay.
4     A  Somewhere in there.
5     Q  But there wasn't anybody in between him and
6  you being the president?
7     A  No.
8     Q  Okay.  And there was no one between him and
9  Duane Crithfield?
10    A  No.
11    Q  Okay.  As far as the owners of the foreign
12 trusts, the individuals that own the trusts, how would
13 you describe their level of sophistication?
14    A  I guess it was probably a wide range.  I know
15 there were doctors, there were attorneys and
16 entrepreneurs.
17       Just a wide range of people that set up
18 trusts.
19    Q  And from your understanding, what was -- what
20 was their predominant purposes in establishing the
21 offshore trusts?
22    A  The trust was for asset protection.
23    Q  Okay.  And as far as Dr. James, Brian Chivas
24 James, how would you characterize his level of
25 sophistication?

Page 17

1     A  I -- I wouldn't know.
2     Q  Okay.  Have you ever met Dr. James?
3     A  I have met him.
4     Q  Okay.  How many times have you met him?
5     A  Probably a couple.
6     Q  Okay.  Did you meet him at your office or
7  somewhere else?
8     A  I met him at a conference, and then ran into
9  him at a football game.
10       And I believe that's -- those are the only
11 two times.
12    Q  Where was the conference that you met him at?
13    A  I believe it was Mexico.  I'm trying to think
14 of where.
15       Somewhere Baja, somewhere down there.
16    Q  Okay.  Was this a concert -- "concert" -- I
17 don't know, was there a concert at the conference?
18    A  No.
19    Q  No.  Okay.
20       You might know, we spoke with Steve Donaldson
21 and Chris Donaldson yesterday.  They mentioned some
22 conferences that Foster & Dunhill used to put on.
23    A  Yes.
24    Q  Was this one of those conferences?
25    A  Yes.

BayAreaReporting@gmail.com, www.bar-tampa.com 866-240-9500

Page 18

1  Q  Okay. Would it have been at Cabo San Lucas?
2  A  Yes, probably so.
3  Q  Did you go four-wheeling with Chris
4 Donaldson?
5  A  Yes.
6  Q  And --
7  A  Right.
8  Q  Okay.
9  A  That's why I remember it.
10  Q  Okay. Did Chris get in trouble with his dad
11 a little bit over that?
12  A  I don't know that specific --
13  Q  Okay. I don't know.
14  A  -- aspect of it.
15  Q  They both mentioned that, or alluded to it at
16 least, yesterday.
17     So how would you describe Dr. James? I mean,
18 is he a nice guy? I mean.
19  A  Yeah, as far as I could tell.
20  Q  Sure. All right.
21     Now, I received some documents. They had --
22 they were Bates-ranged OTS - James 000001 through 000206.
23     You provided those documents to me. Is that
24 right?
25  A  Yes.

Page 19

1  Q  What was the source of those documents?
2  A  All the, like the trust documents and so
3 forth, those were from First Fidelity Trust.
4  Q  Okay.
5  A  And then -- all the tax stuff was Offshore
6 Trust Services' documents.
7  Q  So there were various copies. And I didn't
8 bring them all here today. I didn't think it would be
9 useful for our time to go through every single one of
10 them.
11     But there were a number of Forms 3520-A for
12 the Hornsby trust, there were several Forms 3520 for Dr.
13 James as the owner of the Hornsby trust.
14     It's your testimony that all of those forms,
15 3520 and 3520-A, were maintained in the records of
16 Offshore Trust Services?
17  A  Yes.
18  Q  Okay. And would all of those returns have
19 been prepared by Offshore Trust Services, then?
20  A  Yes.
21  Q  And was it part of the regular practice of
22 Offshore Trust Services to prepare returns such as that?
23  A  Yes.
24  Q  And would those returns have been prepared
25 from information provided at or near the time of the

Page 20

1 preparation of the returns?
2  A  Yes.
3  Q  Okay. And now specifically about the
4 documents from First Fidelity Trust Company.
5     I think you mentioned the trust documents
6 that are in those documents.
7     Do you know anything about how they maintain
8 their files at First Fidelity Trust Company?
9  A  They've got a -- it's a file room in their
10 office where they keep all the originals, and then they
11 also have electronic copies as well.
12  Q  Okay. So any quarterly -- what about, there
13 are some, I think some quarterly statements and year-end
14 statements for the trust and for the annuity that is held
15 by the trust.
16     Whose -- whose records would those have come
17 from?
18  A  Offshore Trust Services would prepare those
19 statements.
20  Q  Okay.
21  A  And then they would go onto the, I guess, the
22 First Fidelity Trust server and be stored there.
23  Q  Okay.
24  A  Just an electronic version.
25  Q  Oh, okay. That's convenient. Excellent.

Page 21

1     Now, we've spoken in general about the
2 preparation of Forms 3520 for the owners and
3 beneficiaries of these foreign trusts. And I'd like to,
4 first to speak just a moment about the timing of when
5 Offshore Trust Services began preparing specifically Dr.
6 James' Forms 3520.
7     In the documents provided by Offshore Trust
8 Services, the first 3520 that I identified was one for
9 2004.
10     Is that correct, as far as you understand?
11  A  The 3520, not the A.
12     The 3520, right?
13  Q  Right.
14  A  Yeah. Yes, I believe that's correct.
15  Q  Okay. Sure. And I represented that to you,
16 I mean.
17     And we understand, of course, at issue in
18 this case is the fact that Dr. James did not file Forms
19 3520 for the years 2001, 2002 and 2003; at least he did
20 not timely file those returns.
21     And so, like I said, it appeared to me that
22 maybe those weren't prepared by Offshore Trust Services
23 prior to your --
24     MR. JONES: Objection. Is there a question?
25 BY MR. MAY:

BayAreaReporting@gmail.com, www.bar-tampa.com 866-240-9500

Page 22

1  Q  I was just going to ask, is that correct, as
2  far as you understand it?
3  A  That's correct.
4  Q  Okay. So do you know at what point in time
5  Offshore Trust Services began preparing the Forms 3520
6  for Dr. James?
7  A  In the documents that we produced, whatever
8  the first one or whatever the first year was, that would
9  have been the year that we started, because it started
10 with all First Fidelity Trust clients at the same time.
11 Q  Okay. So when you began preparing them for
12 Dr. James, it was at the same time you began preparing
13 them -- and by "them," I mean Form 3520 -- for all of the
14 owners and beneficiaries for First Fidelity Trust
15 Company?
16 A  Correct.
17 Q  Okay.
18    (Letter dated September 15, 2006, is received
19    and marked exhibit 11 by the court reporter.)
20    MR. MAY: And I apologize, Miss Sardella and
21 Mr. Hunter.
22    I'm passing an exhibit to Mr. Crithfield.
23 It's marked exhibit 11. It's the first exhibit in
24 this deposition.
25    It's a letter signed by Mr. Crithfield to --

Page 23

1  addressed to Dr. James.
2     MR. HUNTER: Okay, fair enough.
3     MR. MAY: Okay.
4  BY MR. MAY:
5  Q  Mr. Crithfield, I've handed you what's marked
6  exhibit 11.
7     Do you recognize exhibit 11?
8  A  Yes.
9  Q  And what is exhibit 11?
10 A  It was a cover letter that went to Brian
11 James that included the 3520 and the 3520-A.
12 Q  Okay. And for what years?
13 A  This was the 2005 tax forms.
14 Q  Okay. And so am I to understand from this
15 letter that Offshore Trust Services had prepared these
16 two forms for that year?
17 A  There would have been these two forms.
18    And then when the TD F was due, there would
19 be another one for the TD F back on -- probably in June,
20 another letter.
21 Q  Okay.
22 A  That would have just the TD F on it.
23    Because the -- I believe this must have been
24 under extension, since the date of the letter is
25 September 15, '06.

Page 24

1  Q  Sure. But -- and I'm not really so much
2  concerned about the timing of the letter. It's just the
3  fact, I'm trying to figure out that it represents that
4  Offshore Trust Services -- you know, what work Offshore
5  Trust Services did.
6  A  Yes.
7  Q  Okay. And specifically, they prepared these
8  two forms --
9  A  Yes.
10 Q  -- for that year. Okay.
11    Now, prior to this year and perhaps 2004, you
12 testified, I think, that Offshore Trust Services also had
13 always prepared Forms 3520-A?
14 A  Yes.
15 Q  How were those transmitted to -- excuse me,
16 I'm assuming something.
17    Were those, or copies of those, transmitted
18 to the owners of the trusts?
19 A  They were.
20 Q  Okay.
21 A  Yes.
22 Q  And how were those transmitted to the owners?
23 A  I don't remember if First Fidelity Trust may
24 have sent them directly to the clients, or they may have
25 come out of Offshore Trust Services. I just don't

Page 25

1  remember.
2  Q  Okay. But are you very confident that Dr.
3  James received a copy of his form, of the Form 3520-A,
4  for the Hornsby trust for the years 2001, 2002 and 2003?
5     MR. JONES: Objection.
6  A  Yes.
7  BY MR. MAY:
8  Q  How are you confident?
9  A  Because when they were prepared, the trustee
10 had to sign it, and then a copy of it was sent to the
11 clients.
12 Q  And that was the -- was that the routine
13 practice of First Fidelity Trust Company and/or Offshore
14 Trust Services --
15 A  Yes.
16 Q  -- during those years? Okay.
17    Now, are you very familiar with Form 3520-A?
18 A  I'm not an accountant, but I'm familiar with
19 it.
20 Q  Okay. In reference to that, have you ever
21 prepared the Forms 3520 or 3520-A yourself?
22 A  No, I haven't.
23 Q  Okay. So there's people that work at
24 Offshore Trust Services that do that?
25 A  Yes.

BayAreaReporting@gmail.com,   www.bar-tampa.com                              866-240-9500

Page 26

1  Q   Or there were when Offshore Trust Services
2  was a business.
3       Okay.  But you're familiar with the forms?
4  A   Yes.
5  Q   I mean, you've seen them?
6  A   Yes.
7  Q   You've read through them?
8  A   Yes.
9  Q   Okay.  But the letter like exhibit 11, do you
10 know when it became the standard practice for Offshore
11 Trust Services to send it to the owners this way?
12      MR. DUPREE:  I'm sorry, I didn't understand
13     that question.
14      MR. MAY:  Okay.
15 BY MR. MAY:
16 Q   You can answer it if you feel like you
17 understand it.
18 A   I don't have all the documents with me.
19      But if 2004 was the first time that Brian
20 James got a cover letter with the 3520 and 3520-A and
21 TD F, then yes, that would have been the year that we did
22 it for all the clients of First Fidelity Trust.
23 Q   Okay.  So if there's a year in the files that
24 has a 3520-A but no 3520, what conclusion can we draw
25 from that?

Page 27

1      What conclusion would you draw from that?
2  A   That it was mailed to the client.
3  Q   That what was mailed?
4  A   The 3520-A.
5  Q   Okay.  And if for a year -- say, for example,
6  for the year 2001 --
7  A   Uh-huh.
8  Q   -- Offshore Trust Services' file had a 3520-A
9  for the Hornsby trust, but not a 3520 for Brian Chivas
10 James, what would you conclude from that fact?
11 A   I would believe that only the 3520-A was
12 prepared and sent to the client.
13 Q   Okay.  And I know you've mentioned that
14 TD F 90-22.1 a number of times.
15 A   Yes.
16 Q   Offshore Trust Services also prepared
17 those --
18 A   Yes.
19 Q   -- for their clients?
20 A   Yes.
21 Q   And for what years did Offshore Trust
22 Services prepare those?
23 A   I believe it started the same time that the
24 3520s were being prepared.
25 Q   Because whose responsibility is it to file a

Page 28

1  TD F 90-22.1?
2  A   The grantor of the trust.
3  Q   Okay.  Does that form also uncover -- excuse
4  me -- does that form also encompass other kinds of
5  accounts?
6      MR. DUPREE:  Objection.  It's a legal
7     conclusion.
8  BY MR. MAY:
9  Q   You can answer.
10 A   It could include any foreign accounts.
11 Q   Okay.  And as far as the Form 3520, whose
12 responsibility is it to file that?
13 A   It's the U.S. grantor of the trust.
14 Q   And as far as the 3520-A, whose
15 responsibility is it to file that form?
16 A   That's the trustee's responsibility.
17 Q   And -- okay, I think that we probably covered
18 that.
19      As far as -- prior to the time Offshore Trust
20 Services began preparing the Forms 3520 for the owners of
21 the foreign trusts -- and whether that was 2004 or 2005,
22 2003, maybe we're not absolutely certain about which year
23 that took place -- but we know that it, from your
24 testimony, from the files, that at some point that
25 occurred?

Page 29

1  A   Yes.
2  Q   Prior to that time, what kind of notification
3  were the owners of the trusts given of the existence of a
4  Form 3520?
5  A   At the conference it was covered.
6      There's a section that went over all possible
7  forms that could need to be required, depending on what a
8  person's offshore structure would be, I guess.  And so
9  that would be the first place.
10      And then there was a compliance package that
11 would be signed, acknowledging that the forms that are
12 due.
13 Q   Okay.
14 A   Those are the only ones I can think of right
15 now.
16 Q   Sure.  Did you ever personally tell Brian
17 Chivas James, "Hey, you need to file a Form 3520"?
18 A   No.
19 Q   Okay.  As far as the conference goes, the
20 conference in -- specifically now the conference in Cabo
21 San Lucas that you attended that Dr. James was at -- was
22 this compliance presentation given at that conference?
23 A   I'm certain it was.
24 Q   Okay.  Do you remember if -- or did you see
25 Dr. James in the session on compliance?

Page 30

1  A  No.
2  Q  So do you remember --
3  A  I don't remember.
4  Q  Okay. So you don't know if he was in that
5  session or not?
6  A  No, I don't.
7  Q  Okay. I'm going to hand you what's marked
8  exhibit 4.
9     We marked this yesterday.
10    MR. MAY: I think you guys still have a copy,
11 okay.
12    MR. JONES: Uh-huh.
13    MR. HUNTER: If you can just give us a brief
14 idea of what it is?
15    I apologize.
16    MR. MAY: Sure, no problem.
17    This is actually the trust deed of the Brian
18 Chivas James Trust with the First Fidelity Trust
19 Company.
20    And so I believe -- and actually, this
21 document is Bates-numbered OTS - James 00006.
22 BY MR. MAY:
23 Q  So is this a document that I received from
24 Offshore Trust Services?
25 A  Yes.

Page 31

1  Q  Okay. And I'd ask you to turn in the
2  exhibit, exhibit 4, to the page fairly near the back that
3  ends with the numbers 41.
4     OTS - James, some zeros, and a 41?
5  A  Yes.
6  Q  Do you recognize this page?
7  A  Yes.
8  Q  And what is this page?
9  A  This is a compliance package that was signed
10 by clients when a trust was set up.
11 Q  And was this the standard compliance package
12 you mentioned a moment ago?
13 A  Yes.
14 Q  Did First Fidelity Trust ever modify or
15 change the package?
16 A  There might have been some tweaking, but
17 generally no.
18 Q  Basically the same?
19    Do you know, do they still use this same
20 package?
21 A  Yes, they do.
22 Q  Now, there's a signature on the next page,
23 the page that's OTS - James, some zeros and a 42. Do you
24 recognize that signature?
25 A  No. I don't know what Brian James' signature

Page 32

1  looks like.
2  Q  Sure. It purports, at least, to be Brian
3  James.
4     But I was going to ask if you had any
5  familiarity with Dr. James' signature?
6  A  No, I don't.
7  Q  Okay. But looking at that page,
8  Page OTS - James 42, as far as the compliance package
9  goes, what is the topic of that page?
10 A  It's filing the 3520 and the 3520-A.
11 Q  Okay. So it's a --
12    MR. HUNTER: Okay.
13    Yes, gentlemen, I apologize.
14    I'm going to need to leave. Miss
15 Johnson-Sardella is still here. So thank you for
16 your courtesy.
17    MR. MAY: Okay. Thank you, Mr. Hunter.
18    The record will reflect that Mark David
19 Hunter is no longer present by phone.
20 BY MR. MAY:
21 Q  Okay. So this page -- page 42, to abbreviate
22 it -- is the section of the compliance package on the
23 forms that are required by the I.R.S.
24    Is that a fair representation?
25 A  Yes.

Page 33

1  Q  And I know you said you don't know whether or
2  not that's Dr. James' signature.
3     Do you know the purpose of having a signature
4  block on this page, what First Fidelity Trust Company's
5  purpose was in having that signature block there?
6     MS. SARDELLA: Objection.
7     MR. MAY: Okay.
8  BY MR. MAY:
9  Q  You can answer.
10 A  Just so that the clients would acknowledge of
11 what forms they'd be required to file.
12 Q  Okay. And as far as Offshore Trust Services'
13 role in preparing or having a client sign this compliance
14 package, did Offshore Trust Services have any role in
15 that?
16 A  No.
17 Q  No? Okay.
18    This was purely something that the trust
19 company did?
20 A  Yes.
21 Q  I'd ask you to -- well, I think, based on
22 what you've testified, there's not a great need to look
23 at the other pages.
24    Okay. Now I'm going to hand you what's
25 marked exhibit 5.

BayAreaReporting@gmail.com,    www.bar-tampa.com                              866-240-9500

Page 34

1    MR. MAY: Miss Sardella, I've handed Mr.
2    Crithfield what's marked exhibit 5.
3        It is an e-mail with some documents attached
4    from, at least it purports to be from --
5  BY MR. MAY:
6    Q   I think from you. Is that not correct, Mr.
7  Crithfield?
8    A   Yes.
9        MR. MAY: -- from Mr. Crithfield to a Steve
10   Donaldson, on which a Chris Donaldson is copied.
11 BY MR. MAY:
12   Q   And, Mr. Crithfield, do you recognize exhibit
13 5?
14   A   Not initially. But it says that it came from
15 me.
16   Q   Okay. And there's -- I'll just read it.
17       "Steve, attached is a summary page and
18 statement for Brian James."
19       And then there's the letters "BPP"
20 underlined. What is "BPP"?
21   A   That is the business protection policy.
22   Q   Okay. And what is a business protection
23 policy?
24   A   I don't know if this is going into the area
25 of the --

Page 35

1        MS. SARDELLA: As I mentioned before off the
2    record regarding the criminal investigation, as I
3    understand it, that investigation deals with,
4    I believe, with the BPP, business protection
5    policy.
6        So, you know, I would ask that you don't
7    delve into that. And I would instruct my, you
8    know, client not to answer any questions that go
9    into that.
10       As I said, anything that's reasonably
11   related to the 3520 forms, relating to the matter
12   of James v. U.S., obviously, you know, we're
13   prepared to go into.
14       MR. MAY: So are you instructing -- just so
15   that I'm clear and the record's clear -- are you
16   instructing Mr. Crithfield not to answer any
17   questions about the business protection policy?
18       MS. SARDELLA: Yes. Yes. I believe that's
19   part of the criminal investigation and, you know,
20   not to go into that, questions on that policy.
21       MR. MAY: Okay. And so -- and just so that I
22   understand it and so the record is clear.
23       Is the basis for your instruction that you
24   believe that if Mr. Crithfield answers any
25   questions on the business protection policy, it

Page 36

1    would possibly violate his Fifth Amendment right
2    not to incriminate himself?
3        MS. SARDELLA: Correct.
4        MR. MAY: Okay.
5  BY MR. MAY:
6    Q   Mr. Crithfield, do you intend to follow that
7  instruction?
8    A   Yes.
9    Q   Okay. As far as -- and this next question is
10 not about the business protection policy, but about the
11 documents that are there behind the e-mail.
12       And I know you testified you don't really
13 remember the e-mail, but I have to ask.
14       Do you know if these documents were
15 originally attached to the e-mail, or if these are other
16 than the attachment that's identified in the e-mail?
17   A   It says there's an attachment on the cover
18 page here.
19   Q   Sure.
20   A   But I don't know if that's what this is.
21   Q   Okay. Fair enough.
22       Have you ever heard of the Big Easy Real
23 Estate, LLC?
24   A   I believe I've heard of it.
25   Q   Okay. Do you know what it is?

Page 37

1    A   No.
2    Q   Okay. What context have you heard of it?
3    A   I just remember hearing the name. I don't
4  remember what it did or its purpose.
5    Q   Okay. Did you have any involvement with the
6  Big Easy Real Estate, LLC?
7    A   No.
8    Q   Okay. All right. I'm going to hand you what
9  was marked earlier as exhibit 10.
10       MR. MAY: And exhibit 10 is the, Miss
11   Sardella, exhibit 10 is the 3520-A for the Hornsby
12   trust for the year 2003.
13       MS. SARDELLA: Okay.
14 BY MR. MAY:
15   Q   Mr. Crithfield, do you recognize exhibit 10?
16   A   Yes.
17   Q   And what is exhibit 10?
18   A   It's a 3520-A.
19   Q   Okay. And for what year?
20   A   2003.
21   Q   And for what entity?
22   A   Hornsby Trust.
23   Q   And is that Brian Chivas James' foreign
24 trust?
25   A   Yes.

BayAreaReporting@gmail.com,    www.bar-tampa.com                              866-240-9500

Page 38

1    Q  I direct your -- and the signature at the
2    bottom of the first page of exhibit 10, it's marked
3    OTS - James 00059.
4        Do you recognize that signature?
5    A  Yes.
6    Q  Whose signature is that?
7    A  That's Keithley Lake.
8    Q  And who is Keithley Lake?
9    A  He's the trustee or the director of First
10   Fidelity Trust, which is the trustee for the trust.
11   Q  The trustee.  And that's a trust company
12   that's located in Nevis, West Indies?
13   A  Yes.
14   Q  And is Keithley Lake still the director of
15   the First Fidelity Trust Company?
16   A  Yes.
17   Q  Are there any other directors of the trust
18   company?
19   A  I don't know right now.
20   Q  Okay.  I direct your attention to the second
21   page of exhibit 10 at the bottom right-hand corner.
22       It's OTS - James, some zeros, and 60.
23   A  Yes.
24   Q  And in the middle of that page, under part
25   two, Foreign Trust Income Statement, there's a line 17.

Page 39

1    A  Yes.
2    Q  And I think I'm actually referring you up to
3    about the middle of the page, under the top section,
4    which is Part II.
5    A  Oh, okay.
6    Q  Yes, it's two lines 17 on that page.
7        The I.R.S. form sometimes is a little bit
8    confusing to follow.
9        MR. DUPREE:  Thanks for admitting that.
10   BY MR. MAY:
11   Q  "Enter the fair market value of total
12   distributions from the trust to all persons, whether U.S.
13   or foreign."
14       And there's an amount there.  What is that
15   amount?
16   A  $50,025.
17   Q  And what is that?
18   A  It looks like a distribution from the trust
19   to Brian James.
20   Q  Okay.  Do you have any knowledge of whether
21   that would be taxable to Dr. James in that year?
22       MR. DUPREE:  Objection.  Legal conclusion.
23   BY MR. MAY:
24   Q  You can answer.
25   A  I don't know.

Page 40

1    Q  Okay.  I'd ask you to turn to the next page,
2    lower right-hand corner, OTS - James, 4 zeros, 61?
3    A  Yes.
4    Q  And at the very top of that page, it says
5    "2003 Foreign Grantor Trust Owner Statement"?
6    A  Yes.
7    Q  What -- do you know what that means?
8    A  No, I don't.
9    Q  Okay.  But I think you testified earlier --
10   and I don't want to testify for you, so if I'm not
11   correct please let me know -- you say a copy of this form
12   would have been provided to Dr. James?
13   A  Yes.
14   Q  At or about the time it was filed?
15   A  Yes.
16   Q  There's a paragraph just under the heading on
17   that page, the page that ends with the 61, "2003 Foreign
18   Grantor Trust Owner Statement."
19       Do you see that paragraph that begins
20   "Important"?
21   A  Yes.
22   Q  Would you read the last sentence of that
23   paragraph?
24   A  "Trustee is also required to send to each
25   U.S. owner a copy of the owner's statement.  U.S. owner

Page 41

1    must attach a copy of the statement to Form 3520."
2    Q  Okay.  Fair enough.
3        Okay.  I'd like to -- and I believe you've
4    testified that the Form 3520-A would have been provided
5    to Dr. James.  And I know I've probably repeated that
6    several times.
7        Do you know if a copy was ever provided to
8    Dr. James' CPA who prepared his personal tax return for
9    that year?
10   A  I don't know, without trying to go back
11   through e-mails and find something.
12       I don't know.
13   Q  Did you ever talk to Dr. James' CPA?
14   A  No.
15   Q  Did you ever communicate with him by mail or
16   any other way?
17   A  I don't even know his name.  No.
18   Q  Okay.  So you don't know whether or not this
19   form was ever given to his CPA.
20       Is that correct?
21   A  No.
22   Q  "No," that's not correct?
23       Or "No," you don't know if it's ever been
24   given to him?
25   A  I don't know if it was given to his CPA.

11 (Pages 38 to 41)

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR

Page 42

1    Q   Okay.  All right.  I'm going to pass the
2   witness.
3        MR. JONES:  Can we have just a couple of
4    minutes?
5        (Recess taken.)
6        MR. DUPREE:  Okay, I think we're ready.
7        MR. MAY:  We're back on the record.
8        MR. DUPREE:  Back on the record.
9             CROSS-EXAMINATION
10  BY MR. DUPREE:
11   Q   Okay.  Mr. Crithfield, I'm Dwaune Dupree.  I
12  represent Dr. James, the plaintiff in this matter.  I
13  just want to ask a few questions to follow back up on
14  what you were talking about earlier.
15       I think you testified earlier that Dr. James
16  was a nice guy.  And so I just want to pin down what you
17  said earlier.
18       Is it, did you say -- is it correct that you
19  said you didn't know his level of sophistication
20  financially?
21   A   No, I don't.  No.
22   Q   Okay.  And he gave you no basis to know that?
23   A   No.
24   Q   Okay.  You said that there was a compliance
25  presentation at the conference in Cabo San Lucas,

Page 43

1   correct?
2    A   Compliance was a part of the conference,
3   yeah.
4    Q   Okay.  Do you know how many presentations
5   there were on compliance?
6    A   Not at that specific conference.
7        But usually compliance came up a couple of
8   times.
9    Q   Couple of times.  And how many presentations
10  were there at these conferences?
11       If you specifically remember the Cabo San
12  Lucas conference?
13   A   Not specifically that one.
14       But it was normally a day and a half or two
15  days of presentations.
16   Q   How long did each presentation last, on
17  average?
18   A   It could be anywhere from 15 minutes to an
19  hour.
20   Q   Do you remember how long the compliance
21  portion of the presentation was?
22   A   No, not exactly.
23   Q   Okay.  So did you believe that clients would
24  remember everything on the presentation when they left?
25       MS. SARDELLA:  Objection.

Page 44

1   BY MR. DUPREE:
2    Q   You can go ahead.
3    A   I don't know.
4    Q   Do you remember what year the Cabo San Lucas
5   conference was?
6    A   Early years of 2000.
7        I don't -- I don't remember exactly which
8   one.
9    Q   Okay.  Could it have been in 2000?
10   A   I guess it's possible.  I just don't
11  remember.
12   Q   Okay.  So back to the compliance section of
13  the conference.
14       Did you give handouts about compliance at the
15  conference?
16   A   There were typically books or -- yeah, a book
17  of presentations that was given.
18   Q   Okay.
19   A   A copy of the presentations.
20       But I, again, I don't know what was given at
21  that conference.
22   Q   Yes, it was a long time ago.  I understand.
23       Was attendance at each presentation
24  mandatory?
25   A   I guess not, no.

Page 45

1    Q   So people could come, and they didn't have to
2   come if they didn't want to?
3    A   Yes.
4    Q   Okay.  Do you have any copies of the slides
5   that were given, the presentations that were given, at
6   the Cabo San Lucas conference?
7    A   I wouldn't have those.
8    Q   Okay. Okay.
9        I want to direct your attention to exhibit
10  11, which you might have in front of you.
11       Exhibit 11.
12       MR. DUPREE:  Again, Miss Sardella, this is a
13    letter from Mr. Crithfield to Mr. James, talking
14    about the 2005 tax forms.
15       MS. SARDELLA:  Okay.
16  BY MR. DUPREE:
17   Q   So the purpose of this letter is to trans --
18  is the purpose of this letter to transmit the 3520?
19   A   And the 3520-A, yes.
20   Q   Okay.  So could you read the last line of the
21  first paragraph?
22   A   "In addition, please inquire as to whether
23  your tax preparer has already completed the form for year
24  2005."
25   Q   Does that mean that some people already had

Page 46

1  their tax preparers complete the Form 3520 for the year?
2      A    Some clients had their accountant file the --
3  or do the 3520.
4      Q    How would the accountant know how to do that?
5      A    Based off of the 3520-A.
6      Q    And that was sent to the client earlier than
7  this letter?
8      A    In this letter they were sent together, the
9  3520 and 3520-A.
10     Q    Okay.  I'm just trying to understand, how
11 would the tax preparer have completed the form, if you're
12 sending the form with this letter?
13     A    From trust statements, an accountant could
14 easily figure out what goes onto a 3520-A or a 3520.
15          So I guess it could have been prepared.
16     Q    How did you send this letter, if you
17 remember?
18     A    We sent them all certified mail.
19     Q    All of them?
20     A    All of the ones, I would say starting when we
21 started preparing the 3520s and 3520-As.
22     Q    Okay.  So I think you testified earlier that
23 in 2004 is the year you believe that you started
24 preparing the 3520s?
25     A    Yes.

Page 47

1      Q    So everything after that would have been sent
2  certified mail?
3      A    Correct.
4      Q    What about the years 2001, 2002 and 2003?
5      A    I don't remember.  It -- yeah, I just, I
6  don't remember how it was sent.
7           It may have gone just regular mail.
8      Q    Earlier -- and correct me if I'm wrong --
9  earlier you testified that you believe Dr. James received
10 the 3520-As for 2001, 2002 and 2003?
11     A    I believe they were sent to Brian James.
12     Q    You believe they were sent?
13     A    Yes.
14     Q    But you don't know if he received them?
15     A    No, I don't.
16     Q    Because you didn't get anything like a return
17 receipt or anything like that?
18     A    Right.
19     Q    Okay, thank you.
20          If I could direct your attention back to
21 exhibit 4.
22          On exhibit 4 -- I just want to look through
23 the letter here -- I believe you testified earlier that
24 this was the compliance package that you were talking
25 about --

Page 48

1      A    Yes.
2      Q    -- that clients signed?
3      A    Yes.
4      Q    Okay.  If you will read the second paragraph
5  which starts "Section 1 provides"?
6      A    "Section 1 provides you notice of the I.R.S.
7  forms you may need to file when you're the settlor or
8  beneficiary of a foreign trust."
9      Q    So this is not telling them -- is it correct
10 that this is not telling them which forms to file; it
11 says "the forms you may need to file when you're the
12 settlor or beneficiary of a foreign trust," correct?
13     A    Yes.
14          That's what it says.
15     Q    And -- oh, I'm sorry, that was on OTS - James
16 000041.
17     A    Yes.
18     Q    And if you could turn to page OTS - James
19 000042, Section 1, Internal Revenue Service Forms.
20          Could you read the last paragraph in -- the
21 last sentence in section -- in the second paragraph?
22     A    "FFT and its employees assume no
23 responsibility for notifying you of any changes in the
24 structure of these forms or changes in the information
25 reported on them or the requirement of additional

Page 49

1  filings."
2      Q    Do you know what -- actually, strike that.
3           Could you read the sentence in the third
4  paragraph, starting "You should examine"?
5      A    "You should examine the I.R.S. Form 3520 and
6  make an annual determination on whether you or the
7  beneficiaries you have listed in your trust are required
8  to file this form."
9      Q    And what is that -- and do you know a
10 circumstance under which the owner of a foreign trust
11 would not be required to file a 3520?
12     A    Yes.  There are circumstances, such as if
13 there were less than like certain value of assets, like
14 10,000 or -- I just don't know what all the different
15 circumstances are.
16     Q    Okay.  But that's one of which you are aware?
17     A    That -- that could be one of them, yeah.
18     Q    Okay.  And the purpose of this form is not to
19 provide people with advice on what they should file,
20 correct?
21     A    Correct.
22     Q    It's just to say "This is your
23 responsibility, you should do it, and we take no
24 liability for that," correct?
25     A    I think the trust company was trying to let

Page 50

1  their clients know what was required and what needed to
2  be filed or possibly be filed.
3      Q   Okay.
4      A   But it wasn't -- ultimately, it was not their
5  responsibility to do the 3520.
6      Q   Okay.  If you will turn to the first page in
7  this document which is exhibit 4, the trust deed.  We've
8  given you this entire package as one thing.  And you
9  produced this as one sort of document.
10         Do you know if the compliance and
11 notification package on page OTS - James 000041 is part
12 of this package, is this one document?
13         Part of the trust deed?
14     A   There were -- there was three sets of
15 documents that would be signed, which was the trust deed;
16 the supporting documents, which would be after the trust
17 deed starting with 00031; and then another section would
18 be the compliance section.
19         And then all three of these would be put
20 together with the trust deed.
21     Q   Okay.  So they were three separate documents,
22 but then they were put together; was that before it was
23 signed or after it was signed?
24     A   They were all signed at the same time.
25     Q   Okay.  So I'm just trying to understand how

Page 51

1  the documents were kind of given -- how the documents
2  were given to clients in the regular course of business.
3  So would they be given three documents that were all
4  stapled separately?
5      A   I don't know.  I was usually never there
6  for --
7      Q   Okay.
8      A   -- for signing of documents.
9      Q   Okay.  But you do know that these were three
10 separate documents?
11     A   Yeah, they were.
12     Q   Okay.
13         THE REPORTER:  Could you turn towards me,
14     please?
15         THE WITNESS:  Yes.
16         THE REPORTER:  Thank you.
17         MR. DUPREE:  Just give me a moment.
18 BY MR. DUPREE:
19     Q   You mentioned earlier that OTS, Offshore
20 Trust Services, started preparing 3520s in, you believe,
21 2004, correct?
22     A   Yes, if that's --
23     Q   Yes.
24     A   -- what it is.
25     Q   I understand.

Page 52

1          And you said that some clients had been
2  having questions or getting penalties?
3      MR. MAY:  Objection.
4      MR. DUPREE:  I'll rephrase the question.
5  BY MR. DUPREE:
6      Q   Had clients been having questions before you
7  started preparing the documents 3520?
8      A   I believe there was confusion on what clients
9  needed to do.
10         And so First Fidelity Trust decided they
11 wanted to help and prepare all the forms to keep clients
12 compliant.
13     Q   Okay.
14     A   For their clients, yeah.
15         And so yes, to answer your question, I
16 believe there was confusion.  I think there were some
17 clients that didn't file things right.
18         And so that was a way to make sure you were
19 going to be compliant.
20     Q   Because that's what you wanted to do with the
21 Offshore Trust Services, is to be compliant?
22     A   Exactly.
23     Q   Okay.  If I could -- if I could turn your --
24 direct you to exhibit number 10, the exhibit that's been
25 previously marked 10, exhibit number 10.

Page 53

1          And this is a Form 3520-A for the tax year
2  2003, correct?
3      A   Yes.
4      Q   And you said that the Form 3520s were sent to
5  the clients so they could -- the 3520-As were sent to
6  clients so that they could complete the Form 3520 and
7  then file that form with the I.R.S., correct?
8      A   Yes.
9      Q   Okay.
10         MR. DUPREE:  I'd like to have this document
11     marked exhibit 12.
12         (Letter dated March 15, 2006, with
13     attachment, is received and marked exhibit 12 by
14     the court reporter.)
15 BY MR. DUPREE:
16     Q   The court reporter has handed you a document
17 marked exhibit 12, and the Bates number is OTS - James
18 000124.
19         Is that correct?
20     A   Yes.
21     Q   And could you read --
22         MS. SARDELLA:  I'm sorry to interrupt.
23         Can you just let me know what that document
24     is?
25         MR. DUPREE:  Oh, I'm sorry.

BayAreaReporting@gmail.com,   www.bar-tampa.com                               866-240-9500

## Page 54

1  This is a document, this is a letter from Mr.
2  Crithfield to Dr. James about the Form 3520-A. It
3  was sent --
4      MS. SARDELLA: Okay.
5      MR. DUPREE: -- March 15, 2006.
6  BY MR. DUPREE:
7      Q   Could you read this document for me? Just --
8  you don't have to read it out loud.
9      A   Okay.
10         Okay.
11     Q   Okay. And so I'm going to summarize this
12 document, and you tell me if my summarization is your
13 understanding of the document.
14         This document is a letter from you to Dr.
15 James informing him that you will be filing an extension
16 -- and that's Form 2758 -- to extend the time to file the
17 Form 3520-A.
18         Is that correct?
19     A   Yes.
20     Q   And in this document, you say that due date
21 for his 3520-A is March 15, 2006?
22         In this document?
23     A   Yes.
24     Q   And would March 15 generally have been the
25 due date for his 3520-A in previous years?

## Page 55

1      A   It would be the due date that the trustee has
2  to send the 3520-A to the I.R.S.
3      Q   Okay. And that's for every year, it's March
4  15?
5      A   Yes.
6      Q   Okay. And so in this document -- and you
7  tell me if I'm reading this correctly -- it says, "Since
8  this form is needed to prepare your personal tax returns,
9  please consult with your tax advisor to extend the due
10 date of your personal returns accordingly."
11         Is that correct? Is that what that says?
12     A   Yes.
13     Q   Okay. So I'm going to direct you back to
14 exhibit number 10, which is the Form 3520-A for tax year
15 2003, Dr. James' Form 3520-A. There's a lot of documents
16 over there.
17         So if you can look at the bottom right-hand
18 corner of this document. It says -- right next to the
19 signature, you said earlier was Keithley Lake's
20 signature, could you tell me what that date is?
21     A   September 15, 2004.
22     Q   So that's March, April, May, June, July,
23 August -- September is six months after the due date for
24 when his return was due?
25         MR. MAY: Objection. Form.

## Page 56

1  BY MR. DUPREE:
2      Q   So how long -- how long after March 15 is
3  that?
4      A   After March 15?
5      Q   Yes. September 15. How long after March 15,
6  '04?
7      A   Six months.
8      Q   Okay. And you testified earlier that the due
9  date for his 3520-A would have been March 15 every year,
10 correct?
11     A   It's due on March 15, unless an extension is
12 filed.
13     Q   Unless an extension is filed.
14         And this document in 2006, you sent a letter
15 telling them that you were filing an extension.
16         And you tell me if I'm correct that the
17 purpose of this letter is so he could file an extension
18 accordingly for his personal income taxes?
19     A   Yes.
20     Q   Would you have notified Dr. James of that in
21 2003?
22     A   Yes. They would have sent a copy of the --
23 this Form 2758 to Brian James.
24     Q   For the year 2003?
25     A   Yes.

## Page 57

1      Q   And the purpose of that form would be to let
2  him or his tax advisor know that they would need to file
3  an extension?
4      A   Right.
5      Q   And it would have what form that they had an
6  extension for on there?
7          It would say, for a 3520-A, "I want an
8  extension to file these forms"?
9      A   I'm sorry, could you repeat that again?
10     Q   I'm sorry.
11     A   I'm trying to --
12     Q   And I'm saying that the Form 2758 --
13     A   Yes.
14     Q   -- that would have been sent in 2003 --
15     A   Uh-huh.
16     Q   -- would have said that "We need an extension
17 to file this Form 3520-A"?
18     A   I don't know what was sent in 2003.
19     Q   Okay. Okay.
20         THE REPORTER: Could you turn towards me,
21 please?
22         THE WITNESS: Oh, I'm sorry.
23         THE REPORTER: Thanks.
24 BY MR. DUPREE:
25     Q   Was it routine to get extensions on filing

BayAreaReporting@gmail.com,    www.bar-tampa.com                           866-240-9500

Page 58

```
 1  3520-As?
 2      A   For some clients, yes.
 3      Q   And so in those cases, you would always have
 4  to inform them that they were getting an extension,
 5  because they needed it to file their personal income tax
 6  returns, right?
 7      A   Yeah.
 8      Q   Okay.
 9          MR. DUPREE:  I think we're done.
10          MR. MAY:  Okay.  I just have a couple of
11      follow-ups.
12              REDIRECT EXAMINATION
13  BY MR. MAY:
14      Q   Just the topic that Mr. Dupree was just
15  asking you about; in particular, whether an extension was
16  filed for the 2003 Form 3520-A.
17          Do you have any knowledge of whether or not
18  an extension was filed?
19      A   Was it in the production of documents?  I
20  don't know.
21      Q   Is your answer that if one was filed, it
22  would have been in the production of documents?
23      A   Yes.
24      Q   So if there's not one in the production of
25  documents, does that mean that one wasn't filed?
```

Page 59

```
 1      A   No, because it should have been filed.
 2          And whether back in 2001, 2002 there was -- I
 3  know there was a lot of -- I guess it probably wasn't as
 4  organized.  So maybe the document wasn't put in the
 5  folder.
 6          I guess you'd have to ask First Fidelity
 7  Trust or go back to old records and see what they could
 8  find.
 9          But I can't tell from --
10      Q   And all I'm really asking is, do you have any
11  personal knowledge of whether an extension was filed or
12  not in 2003?
13      A   No.
14      Q   And do you have any personal knowledge of
15  whether, if an extension was filed, whether that
16  information was given to Dr. James?
17      A   If it was filed, then a copy would have gone
18  to Dr. James.
19          That was standard procedure.
20      Q   Okay.  So the routine is that if an extension
21  was filed in '03, the routine practice of First Fidelity
22  would have been to give a copy to Dr. James at that time?
23      A   Yes, that was the routine.
24          And it looks like there was a -- there must
25  have been an extension, because of the date of the
```

Page 60

```
 1  3520-A.
 2      Q   Right.
 3      A   Probably two --
 4          MR. HUNTER:  This is Mark Hunter.  I
 5      apologize.  I just came back in the room, and I
 6      just wanted to announce I'm back.
 7          Sorry, go ahead.
 8          MR. MAY:  Thank you, Mr. Hunter.
 9          The record, I think, reflects that you are
10      present again.
11  BY MR. MAY:
12      Q   All right.  And, like I said, I'm just trying
13  to ask if you had personally sent any letters to Dr.
14  James about the '03 extension?
15      A   I don't believe so.
16          And since the September 15 is the absolute
17  deadline where a 3520 must be filed and you can't extend
18  it any further, it looks like it was only extended the
19  two times, I'm guessing.
20      Q   Okay.  And as far as the compliance package
21  that we saw in exhibit 4 that you described as being one
22  of three documents --
23      A   Yes.
24      Q   -- would a copy of -- would it have been the
25  routine practice of First Fidelity to give copies of all
```

Page 61

```
 1  three documents to the clients?
 2      A   They were signed in triplicates.
 3      Q   And so -- and what I'm really asking is, do
 4  you believe Dr. James received a copy of the compliance
 5  package?
 6      A   I don't know if he did.
 7          But standard practice is that they would get
 8  an executed copy of the trust, with all the supporting
 9  and compliance package.
10      Q   Okay.  And it was the routine practice to
11  execute or sign the compliance package at the same time
12  as the trust deed, right?
13      A   Yes.
14      Q   And the routine practice was to give copies
15  of all the documents to the settlors or grantors of the
16  trusts?
17      A   Yes.
18      Q   All right.
19          MR. MAY:  I think that's my only questions,
20      if you want to --
21          MR. DUPREE:  I think I have one more.
22              RECROSS-EXAMINATION
23  BY MR. DUPREE:
24      Q   I just want to clarify.
25          Mr. May was asking you earlier whether you
```

BayAreaReporting@gmail.com,    www.bar-tampa.com                         866-240-9500

Page 62

1  knew or didn't know whether Dr. James received the
2  extension for Form 3520-A for the 2003 tax year.  Is that
3  correct?
4      A   Yes.
5      Q   And so just to clarify.
6          It's the trustee's job to file the Form
7  3520-A, correct?
8      A   Yes.
9      Q   And so if the trustee didn't file the
10 extension for the 3520-A, that would be the trustee's
11 sort of fault, wouldn't it?
12     A   Yes.  It's his requirement.
13     Q   Okay.  And without the Form 3520-A, again,
14 Dr. -- or a client, anyone -- you need the Form 3520-A to
15 complete the Form 3520?
16         MR. MAY:  Objection to form.
17         MR. JONES:  Answer the question if you --
18         MS. SARDELLA:  Objection.  Mischaracterizes
19     his testimony.
20 BY MR. DUPREE:
21     Q   Does a person -- would one need a Form 3520-A
22 to complete a Form 3520, ordinarily?
23     A   I don't -- I don't know.
24         The 3520, all the questions on there could be
25 produced from statements from the trust company.

Page 63

1          So I don't know if -- if it could be done or
2  not.  I don't know.
3      Q   Okay.
4          MR. DUPREE:  I'm done.
5          THE WITNESS:  Okay.
6          MR. MAY:  All right.  We'll go off the
7      record.
8          (Time noted:  11:15 a.m.)

Page 64

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

   I, the undersigned authority, certify that JOSHUA CRITHFIELD personally appeared before me and was duly sworn.

   WITNESS my hand and official seal this 2nd day of October, 2011.


             Phyllis DeFonzo, RPR

             Notary Public State of Florida

             My Commission Expires:  8/1/12

             Commission No.:  DD 783768

Page 65

REPORTER'S CERTIFICATE

STATE OF FLORIDA     :
COUNTY OF HILLSBOROUGH:
   I, Phyllis DeFonzo, RPR, certify that I was authorized to and did stenographically report the deposition of JOSHUA CRITHFIELD; that a review of the transcript was requested, and that the transcript is a true and complete record of my stenographic notes.
   I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the foregoing action.

   Dated this 2nd day of October, 2011, IN THE CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.


             Phyllis DeFonzo, RPR

Page 66

```
 1
 2              ERRATA PAGE
 3   PLEASE ATTACH TO THE DEPOSITION OF JOSHUA CRITHFIELD
     TAKEN ON SEPTEMBER 22, 2011 IN THE CASE OF
 4   BRIAN CHIVAS JAMES VS. UNITED STATES OF AMERICA
 5   PAGE LINE    CORRECTION AND REASON THEREFOR
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18   I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
     CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
19   SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.
20
21
     _____   _____
22   JOSHUA CRITHFIELD          DATE
23
     _____   _____
24   WITNESS TO SIGNATURE       DATE
25
```

Page 67

```
 1
 2   October 2, 2011
 3   Mark David Hunter, Esquire
     Leser, Hunter, Taubman & Taubman, LLP
 4   255 University Drive
     Coral Gables, Florida 33134
 5
     In Re: September 21, 2011 deposition of Joshua
 6      Crithfield, James v. United States of America
 7   Dear Mr. Hunter:
 8   This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
 9   available for review.  Please contact our office to make
     arrangements for your client to read and sign, or have
10   your client sign below to waive review of this
     It is suggested that review of this transcript be
12   completed within 30 days of your receipt of this letter,
     as considered reasonable under Federal Rules*; however,
13   there is no Florida Statute in this regard.
14   The original of this transcript has been forwarded to the
     ordering party and the errata, once received, will be
15   forwarded to all ordering parties for inclusion in the
     transcript.  Thank you.
16
     Sincerely,
17
18   Phyllis DeFonzo
     Bay Area Reporting
19
20   Waiver:
21   I,_____, hereby waive the
     reading & signing of my deposition transcript.
22
23   _____  _____
     Deponent Signature      Date
24
     *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)
```