IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| BRIAN CHIVAS JAMES, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 8:11-cv-00271-JSM-AEP |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Brian Chivas James opposes Defendant's motion for summary judgment.  James

filed this action seeking a refund of civil tax penalties paid under 26 U.S.C. § 6677 with respect

to the late filing of IRS information return Form 3520, which was required to filed annually by

the owners of foreign trusts.  The facts show that due to inexperience in a complex area of the tax

law and lack of knowledge about possible filing requirements, James diligently consulted with

his accountant, tax advisor, financial adviser and book-keeper, and relied on him to advise about

the tax reporting and compliance requirements for his foreign trust in the years 2001 to 2003.

The facts do not support the government's assertion that James simply relied on his accountant to

file the required information return.  James's actions and the accountant's failure to provide

proper advice present a material question of disputed fact as to whether James acted with the

degree of business care and prudence needed to establish reasonable cause.[1]

---

[1] In support of its opposition, Plaintiff relies on the depositions of Brian Chivas James (Pl. Ex. 1), Stephen Donaldson (Gov't Ex. B,  ECF No. 17-3), Christopher Donaldson (Pl. Ex. 2), Joshua Crithfield (Gov't Ex. C, ECF

## FACTUAL AND PROCEDURAL OVERVIEW

For the 2001, 2002, and 2003 tax years, James did not timely file Internal Revenue Service ("IRS") Forms 3520, an annual information return filed by the owner of a foreign trust, but the trust in which James invested did timely file Forms 3520-A, providing the IRS with essentially the same information.  Because he lacked experience and expertise with respect to foreign trusts and did not know what the federal tax compliance or reporting requirements were, James acted diligently by arranging for the trust advisor to speak to James's accountant, and James spoke to his accountant about the trust before its creation and on many other occasions. Although the accountant was James's tax return preparer, book-keeper, and financial advisor, was intimately involved in James's business, was provided with all relevant documents, and was familiar with foreign trusts, the accountant failed to properly advise James that Forms 3520 should be filed in addition to Forms 3520-A.

This case involves the question of whether James has demonstrated reasonable cause for the late filing of an information return and presents an issue of first impression under the applicable statute for penalties that are quite substantial ($578,950 total, based on 35 percent of annual amounts contributed to the trust).[2]  Because James informed an experienced tax advisor about the trust and relied on him for advice, a question of fact exists for James's claim that the failures to file were due to reasonable cause and not due to willful neglect.  The government misconstrues the applicable case law dealing with reasonable cause, mischaracterizes James's reliance on his tax advisor, and ignores case law that permits a taxpayer to rely on a professional.

---

No. 17-4), George Famiglio (Pl. Ex. 3), and Eric Schmitz (Pl. Ex. 4).  Defendant, who is in possession of the original exhibits to the depositions, will file them forthwith.

[2] The total amount in dispute is $671,604.19, which includes additional interest and penalties imposed because James was not able to immediately pay the penalties.

**Material Facts**

James is a doctor and surgeon with an interventional pain practice in Sarasota, Florida.

(Pl. Ex. 1 James Dep. 86:3-25.)  He is unsophisticated in the tax laws and is not a tax expert.  (*Id.*

87:1-7; 11:4-18.)  After his divorce, James was concerned about asset protection and thought he

had significant exposure because he performed nerve block and spinal procedures, and a large

part of his practice was devoted to patients he considered to be litigious.[3] (*Id.* 19:17-24; 86:10-

14; 91:6-14; 93:13-94:5.)  He believed that while his assets were protected in Florida when he

was married, as a single person he had a "liability exposure."  (*Id.* 93:13-21.)

Based on input from friends, James met with Stephen and Christopher Donaldson more

than once in 2000 to discuss asset protection trusts.  (*Id.* 6:9-24; 7:13-8:3; 8:12-21; 92:10-18;

93:1-94:5; 110:18-24.)  The Donaldsons were associated with Foster & Dunhill ("F&D") in

Tampa, which unbeknownst to James was then related by ownership to Offshore Trust Services

("OTS") and Fidelity Insurance Company.  (Gov't Ex. B, ECF No. 17-3, S. Donaldson Dep.

10:12-11:25; James Dep. 103:10-104:1.)  Stephen Donaldson said it was "rare" for clients to

come to him directly rather than through their representatives, and the Donaldsons told James

that his "accountant needed to be involved in this."  (S. Donaldson Dep. 20:1-3; 24:14-20; James

Dep. 9:1-6.)  In response, James provided the Donaldsons with the name and phone number of

George Famiglio.  (James Dep. 9:7-13; 104:12-14; 118:23-119:4.)  Famiglio prepared James's

personal and corporation tax returns, served as business adviser and book-keeper for James's

_____

[3]  Defendant states that James created the trust to protect assets from "malpractice victims" – a pejorative assertion
not supported by any evidence.  (Gov't Mot. at 3, ECF No. 17.)  James never used the phrase "malpractice victims,"
and, at the deposition Defendant properly described possible litigation as "potential medical claims."  (James Dep.
93:22-24.)

medical practice, made sure James was in compliance with IRS requirements, and was "pretty intimately involved in [James's] business." (James Dep. 11:8-18; 23:11-24; 130:9-131:25.)

After his initial meetings, James informed Famiglio of the decision to create the trust with the Donaldsons' help. (*Id.* 127:15-128:10;129:1-8; 129:23-130:8.) Famiglio "wasn't happy" to hear that James chose to work with the Donaldsons because Famiglio "knew somebody [t]here in Sarasota" to whom he could have referred James to create a trust. (*Id.* 125:20-127:7-10; 129:23-130:17; 131:4-25.) Stephen Donaldson also spoke twice to Famiglio regarding the trust. (S. Donaldson Dep. 32:1-33:11.) First, he called Famiglio to advise about Form 3520 and to "make sure that his software did not accidentally check on the schedule B part 3 that he had no foreign accounts, which is how most of them have their software set up." (*Id.* 32:1-14.) At that time, Famiglio told Donaldson that he understood. (*Id.* 32:1-14.) Donaldson also called Famiglio to discuss another possible filing requirement. (*Id.* 32:15-33:11.)

The Donaldsons believed that the best locations for trusts were Nevis and the Cook Islands, and generally had clients sign trust documents in an offshore location. (S. Donaldson Dep. 16:4-18:19; Pl. Ex. 4, C. Donaldson Dep. 22:9-22.) In early 2001, James travelled to the Bahamas to sign the trust instrument in a trip that involved mostly social events as well as a medical examination. (James Dep. 112:23-113:14.) James does not remember signing documents that may have indicated the possible need to file other forms with the IRS. (*Id.* 114:14-116:21; Gov't Ex. 4, ECF No. 17-5 at 36-41.) James also did not have copies of such "compliance" documents in his files, although OTS, which is under criminal investigation, claims to have retained such documents signed by James. (James Dep. 114:10-117:7.) The documents indicated that there were "IRS forms you *may* need to file…you should consult with a professional regarding which forms to file and how to file them." (Gov't Ex. 4 at 36-37

(emphasis supplied).)  James had no expertise with respect to these types of documents and required the advice of a tax professional.  (James Dep. 120:14-121:2; errata.)  At that time, James did not know the difference between a Form 3520-A and a Form 3520.  (*Id.* 17:24-18:4.)  Because he did not understand the potential filing requirements, he relied on Famiglio for advice and spoke to him about the trust "to go over these issues."  (*Id.* 116:8-17; 117:8-22.)  In connection with the trust, James also purchased certain business protection insurance and other products through F&D.  (*Id.* 103:10-104:1; 134:1-13; S. Donaldson Dep. 50:11-18.)

After creating the trust, James attended a conference in Cabo San Lucas sponsored by F&D.  (James Dep. 95:23-96:3.)  There, James confirmed that Stephen Donaldson had spoken to Famiglio about the trust.  (*Id.* 97:3-98:2; 101:18-102:21; 104:21-25.)  In addition to providing the opportunity to meet other F&D clients, the conference may have included a segment dealing with compliance responsibilities for trust owners, but James did not attend that session or many of the other sessions.  (*Id.* 97:18-98:2.)  Attendance at the compliance sessions was not mandatory, and James "spent most of [his] time doing fun stuff" because he understood the trip to be "[m]ore social than anything else." (Gov't Ex. C, ECF No. 17-4, Crithfield Dep. 44:12-45:3; James Dep. 97:3-9; 104:2-10; 105:1-13; S. Donaldson Dep. 27:15-28:6.)

Forms 3520-A were prepared by OTS and timely filed by the trust for the years 2001 to 2003, and the IRS was aware of the existence of the trust and the identity of the owner, James. (Gov't Ex.. 10, ECF No. 17-6; Gov't Ex. 20, ECF No. 17-9; Gov't Ex. 22, ECF No. 17-10; S. Donaldson Dep. 73:1-9; Crithfield Dep. 11:8-25.)  Donaldson was positive that Forms 3520 also were prepared and believes the forms were sent directly to Famiglio.  (S. Donaldson Dep. 34:4-16; 35:5-19; 37:11-25.)  Josh Crithfield, OTS President, does not recall whether Forms 3520-A were sent by OTS or First Fidelity Trust, he does not remember if the forms were sent by regular

or certified mail in 2001 to 2003, and while he believes that the forms were sent, he does not know if James actually received them.  (Crithfield Dep. 24:22-25:6; 47:1-18).  Crithfield also believes that OTS prepared both Forms 3520-A and 3520 for James beginning in 2005, but is not sure.  (*Id.* 11:8-24; 12:18-14:20.)  Prior to 2005, there was "confusion on what clients needed to do" with respect to that form.  (*Id.* 52:6-22.)

Due to the passage of time, James does not specifically recall the details of all of the conversations he had with Famiglio or any specific advice he received from Famiglio related to the trust.  (James Dep. 18:5-19, 130:9-17; 132:16-25.)  But James is "sure" he had conversations with Famiglio about the trust because Famiglio "was intimately involved in [his] business," and served as James's CPA, bookkeeper, and business advisor.  (*Id.* 130:9-17, 131:19-132: 25.)  For instance, James's business practice was that "any financial information that came through [his] office, anything, [he] sent straight to George [Famiglio]," including any forms related to the trust.  (*Id.* 16:9-18.)  Famiglio advised James regarding how to report loans from the trust for tax purposes and advised him that trust loans did not result in taxable income.  (*Id.* 52:22-53:8.)  Famiglio advised James regarding the tax reporting for business protection insurance that was purchased and held in connection with the trust, and James relied on him to create financial reports and to periodically review the reports with him.  (*Id.* 157:20-158:24; 165:11-166:2.)  Famiglio advised James when to file his federal income tax returns on extension.  (*Id.* 65:21-67:24.)  James also relied on Famiglio to "to advise [him] in order to make the appropriate filings for [the trust]."  (*Id.* 181:21-182:9; errata 181:8-9.)   Based on the conversations he had with Famiglio, in which they "talked a pretty good bit" about the trust, James believed that "[Famiglio] had filed all the – everything required with the IRS."  (*Id.* 32:19-23.)

Despite James's and other witnesses' testimony, Famiglio has denied that he ever knew about the trust during James's 2001-2003 tax years.  (James Dep. 16:9-18; Famiglio Dep. 12:11-13; 13:1-14; 18:1-18; 15:10-14.)  Famiglio has claimed that he doesn't recall speaking to Stephen Donaldson or anyone else related to F&D.  (Famiglio Dep. 20:15-23; 68:24-69:6.)  While James testified that Famiglio was his book-keeper and that "everything was done manually" before James purchased Quickbooks in 2005 or 2006, Famiglio has claimed that James had a different book-keeper and that Famiglio received James's records directly from James's computer system.  (*Id.* 27:25-28-10; James Dep. 169:3-170:1.)  But Famiglio did not represent James in 2005 or 2006.  (Famiglio Dep. 10:13-11:8.)  Famiglio claimed that he returned all records to clients after the tax returns had been prepared and that he has not maintained any documents relating to James, but James indicated that Famiglio kept all of James's records.  (*Id.* 73:5-74-24; James Dep. 170:22-171:1.)

Famiglio also has claimed that he has "no recollection" of meeting Eric Schmitz, the former IRS revenue agent James hired to represent him during his administrative refund claim, but Schmitz has notes from May 26, 2005 when he met Famiglio in his office to review James's files (which, again, Famiglio claimed that he returned to James).  (Famiglio Dep. 78:15-17; Pl. Ex. 4, Schmitz Dep. 70:18-72:23.)  At that meeting, Schmitz reviewed a general ledger in which Famiglio kept James's financial information, and that ledger was different from the "summary of a general ledger" for which Famiglio claimed he was only responsible.  (Schmitz Dep. 104:24-107:9; 116:5-118:2; Famiglio Dep. 92:10 - 98:21).  After the meeting, Famiglio did not retain documents related to James or his trust, even though he knew that James had received an IRS penalty notice related to ownership of the foreign trust.  (Schmitz Dep. 116:5-120:10; Famiglio Dep. 83:3-5; 77:19-80:4.)  Famiglio also told Schmitz that he never gave clients advice regarding

their investments. (Schmitz Dep. 82:3-83:5.) Famiglio told Schmitz that James said "Donaldson had taken care of everything in regards to the proper forms to be filed." (Schmitz Dep. 82:10-85:13.) Schmitz did not believe that Famiglio's statements were truthful regarding Donaldson, or that he was being cooperative in providing information. (*Id.* 86:5-87:23.)

James ultimately lost the money in the trust under circumstances that he describes as "untruthful," and there is an ongoing criminal investigation of the persons who sold the business protection insurance. Crithfield declined to answer questions about James's business protection insurance, invoking the Fifth Amendment. (James Dep. 43:23-25;107:24-108:12; S. Donaldson Dep. 56:2-57-5; Schmitz Dep. 125:9-14; Crithfield Dep. 34:21-36-8.)

## ARGUMENT

The government has conveniently ignored the central factual dispute in this case, which is whether James received advice from his accountant. While James does not specifically recall all of the decade-old conversations that he had with Famiglio about the trust, the government somehow transforms James's failure to remember into the assertion that James "never asked [Famiglio] anything about the topic."[4] (Gov't Mot. at 6, ECF No. 17.) This assertion plainly misstates the facts and ignores the conflicting evidence regarding James's due diligence.

---

[4] As support, the government cites James's deposition, in which James said he did not remember discussions about filing requirements:

>    Q    And you don't remember any advice that George Famiglio ever gave you in regards to your filing requirements?
>    A    No, sir.
>    Q    You don't remember ever having any conversations with George Famiglio about what your filing requirements might be for a foreign trust?
>    A    No, sir.

(James Dep. 33:13-20.) Defendant ignores James's earlier testimony that it was possible that Famiglio provided reporting advice about filing requirements.

>    Q. *** but it's possible that he gave you some advice?
>    A. Its possible.
>    Q. And it's also possible that he didn't give you any advice?
>    A. Yes, sir.

(*Id.* 18:14-19.) James's statements do not amount to "never ask[ing] anything about the topic."

Moreover, as discussed below, the government's incorrect assertion also ignores the clear judicial authority permitting a taxpayer to rely on the advice of a tax professional.

James has specifically stated that he is certain he had conversations with Famiglio about the trust, and he relied on him for advice regarding the tax reporting of the investments held in connection with the trust, the tax reporting of loans from the trust and business insurance premiums, and to provide advice about any appropriate filings. James sent all of his business information to Famiglio and relied on Famiglio to compile and review the information with him. James also put Donaldson in contact with Famiglio to make sure that Famiglio was fully informed about the trust. These actions do not represent the actions of a taxpayer who simply delegated his obligations to his tax advisor.

Despite James's testimony, Famiglio denied *all* knowledge of the trust during the relevant time period, denied keeping James's books and records, denied knowing or ever speaking to Donaldson or Schmitz, and denied that he was ever an intimate advisor to James. Yet he also somehow has claimed, despite his lack of knowledge, that he thought Donaldson had taken care of everything with regard to the forms that needed to be filed. Famiglio's testimony is directly contradicted by at least three witness, and Schmitz noted that he believed Famiglio was being untruthful. This factual dispute is material because it is inextricably linked to whether James received the proper advice regarding his filing requirements, and, thus whether reliance on Famiglio was reasonable. There is also a factual dispute regarding whether James knew or understood his filing obligations. Despite James's numerous statements that he was unaware of Form 3520, the government assumes that since he attended a social conference in Cabo San Lucas and appears to have signed so-called "compliance" documents that he somehow had knowledge of his obligations. Summary judgment is not the proper procedure for settling these

factual disputes because determining the veracity of a witness is the province of a jury.  *See* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).  By stating that James never sought advice from Famiglio, ignoring numerous contradictions between Famiglio's and other witnesses' testimony, and assuming James had knowledge of his filing obligations the government has not accurately stated the facts.

### Reasonable Cause May Be Established by Reliance on an Expert

In addition to misstating the facts, the government also mischaracterized the standard for reasonable cause.  Relying on *United States v. Boyle*, 469 U.S. 241 (1985), the government claims that a taxpayer's reliance on an agent to *file* a tax return cannot constitute reasonable cause for late filing.  But that rule does not apply here because James did not tell his accountant to file Forms 3520, and the accountant never told James that the forms needed to be filed.  Rather, James provided all of the relevant information to and consulted with his accountant who then failed to provide the proper advice and inform James about the information return.

Although the government agrees that James was never told by his accountant that Form 3520 needed to be filed, the government inexplicably asserts that James relied on Famiglio as an agent to file the information returns – an assertion that both mischaracterizes the testimony and ignores James's statements that he spoke to his accountant repeatedly about the trust and various tax aspects related to it.  Again, James was unaware of the information reporting requirement and did not delegate it to anyone.  Based on all of his conversations with Famiglio, James was satisfied that everything that needed to filed had been filed, and that statement alone by James precludes the granting of the motion and presents a question of fact for trial, consistent with the holding in *Boyle* and the standards applied by the IRS with respect to reasonable cause.

*Boyle* held that a taxpayer's reliance on an agent to timely file a tax return does not excuse the taxpayer from late filing. *Boyle*, 469 U.S. at 251-52. In *Boyle*, the taxpayer (the executor) was told by his attorney that an estate tax return should be filed. *Id*. at 242. The Court held that a bright line test needed to be established because of the split among the courts over the issue of whether compliance with the filing requirement for a tax return could be delegated to an agent; the Court held that it could not. *Id*. at 251-52.

But in James's case, for purposes of the motion, it is a fact that James did not know a Form 3520 should be filed, and his accountant never advised that the information return was required. The government's claim that James "acknowledged" the requirement to file the form is wrong and fails to construe all reasonable inferences for the nonmoving party. *See Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996). While documents related to the trust creation indicated that certain IRS forms, including information return Form 3520, *may* need to be filed, James is not a tax expert, did not know or understand the potential filing rules, and does not recall being told about any specific requirements. The signing of various trust documents occurred in the context of a largely social outing and, as recommended, James did what any reasonable person would do in a complex area of the tax law – he consulted Famiglio.

After deciding to set up the trust through F&D, James arranged for Stephen Donaldson to talk to accountant Famiglio (Donaldson spoke to him twice). But James did not rely only on Donaldson and contacted his accountant before he set up the trust (before Donaldson spoke to him). That initial contact is important because Famiglio told James that he was disappointed that he had not been asked to help set up the trust and knew someone he could have contacted. In effect, Famiglio conveyed to James that he was familiar with offshore trusts.

But James's diligence did not end after the initial conversation with Famiglio. They had multiple conversations about the trust and discussions about IRS reporting and compliance with certain trust issues. James's testimony about these conversations is consistent with the fact that Famiglio was intimately involved in James's business. Despite James's diligence in arranging for Donaldson to communicate with Famiglio, despite the fact that James personally told Famiglio about the trust (confirmed by Donaldson when he spoke to Famiglio) and had additional conversations with Famiglio about the trust, despite transmitting the relevant documents, including Forms 3520-A, to Famiglio, despite the fact that James's records reflected offshore transfers of funds, despite specific advice given about certain trust tax questions, James was never advised by his accountant that there were other IRS requirements and that additional information return forms needed to be filed annually with the IRS. For purposes of the motion, James's testimony must be believed and all reasonable inferences therefrom should be made – and it has, therefore, been established that James did not "blindly" delegate or assign the filing of Form 3520 to an agent, as the government asserts. A reasonable trier of fact considering that evidence could find for James under these circumstances, and the motion therefore should be denied. *Duke v. Massey*, 87 F.3d 1226, 1231 (11th Cir. 1996).

Perhaps the government would require that James secure a tax degree or read the entire Internal Revenue Code and regulations to learn that foreign trust owners must file information returns, but *Boyle* does not require those steps. The government misconstrues the bright-line/agent rule, and the assertion that James should have asked his accountant specifically about potential filing requirements is legally wrong. *Boyle* held that it is proper for a taxpayer to rely on an advisor because "[m]ost taxpayers are not competent to discern error to the substantive advice of an accountant or attorney." *Boyle*, 469 U.S. at 251. In so noting, the Court cited

approvingly the Second Circuit in *Haywood Lumber & Mining Co. v. Commissioner*, 178 F.2d 769 (2d Cir. 1950) – a case that clearly delineates the difference between delegating the filing of a tax return to an agent and relying on an adviser for advice about any potential requirements.

In *Haywood*, the taxpayer was a personal holding company required to file a personal holding company tax return and pay a related surtax. The taxpayer provided all necessary information to the accountant who knew that the taxpayer was a personal holding company but failed to provide advice about the tax return. The Second Circuit held that reasonable cause was established because the taxpayer had provided all information to the tax advisor, and the taxpayer was not required to specifically ask about tax payment or filing requirements under the personal holding company act. *Id.* at 771. Similarly, because James told Famiglio about the trust and had various discussions about it, there is no requirement, as the government argues, that James make further inquiry. That is not what *Boyle* requires. In any event, James never testified that he did not ask for advice.

The government's mischaracterization of the agent rule in *Boyle* and its application to the facts in this case is at odds with courts that have considered facts similar to those here. A summary of the cases is found in *Estate of La Meres v. Commissioner*, 98 T.C. 294 (1992), where the Tax Court discussed the cases before and after *Boyle* that have dealt with reliance on agents to file tax returns and reliance on advisors for advice that would identify filing requirements. *Id.* at 314-20.[5] The Tax Court noted that in a number of cases, consistent with *Boyle*, courts have held that where the taxpayer did not know that a return was required, provided

---

[5] Pre-*Boyle*, courts made a distinction between taxpayers who knew that tax returns were due and those who did not. *See Sanderling, Inc. v. Commissioner*, 571 F.2d 174 (3d Cir. 1978). *Boyle* unambiguously cited *Sanderling*, *Haywood* and similar cases with approval (i.e., where the taxpayer was unaware of the requirement to file and relied on an expert).

all information to the tax advisor, and relied on him for advice, then reasonable cause exists. *Id.* at 316-17 (and cases cited therein).

James testified that that he did not understand the filing requirements, if any, for his new trust, and relied on his accountant to provide advice. In *Haywood*, reasonable cause was found where the taxpayer knew about the personal holding company tax but had never studied the potential filing requirements and relied on a tax expert to tell him what to do; here, James was not aware of the potential information return reporting requirement. *Haywood*, 178 F.2d. at 771. Similarly, in *Estate of Buring v. Commissioner*, 51 T.C.M. (CCH) 113 (1985), reasonable cause was found where the taxpayer informed her tax advisor about various transfers of stock and advances made to family members, but despite knowing these facts, the accountant never told her that she needed to file gift tax returns. In *Estate of Buring*, the Tax Court found that the accountant did not advise the taxpayer that she needed to file gift tax returns – nor did he provide specific advice that those tax returns did not have to be filed. In effect, the fact that he never told her to file the tax returns was the advice that he gave to her.

Consistent with *Boyle,* the courts in *Haywood, Estate of La Meres, and Estate of Buring* (and other cases cited therein) recognized that a taxpayer may establish reasonable cause by relying on a tax advisor even if there is no specific discussion of reporting requirements (as noted above, James said it is possible that such conversations occurred, and the reasonable inferences from that testimony support denial of the motion).[6] The bright-line/agent rule relied on by the

---

[6] The government relies on irrelevant cases. *A Better Plumbing Service, Inc. v. United States*, 533 F. Supp 2d 1233 (N.D. Ga. 2008), involved whether a company may establish reasonable cause the actions of its employees (agents). *Atlas Therapy, Inc. v. United States*, 66 F. Supp. 2d 1203 (N.D. Ala. 1999), involved reliance on a payroll agent that hid its noncompliance. Consistent with *Boyle*, these cases hold that companies cannot blame noncompliance on employees or agents when it is known that tax returns and payments are due. In *Wesley v. United States*, 369 F. Supp. 2d 1328 (N.D. Fla. 2005), the taxpayers knew that tax returns were required. *Cundiff v. United States*, No. 93-0016-D, 1993 U.S. Dist. LEXIS 19663 (W.D. Va. Oct. 28, 1993), involved late filing of an alleged fraudulent tax return, and it appears that there was little evidence that the taxpayer had received bad advice or consulted with an

government does not apply to our facts.  Inasmuch as the government agrees for purposes of its motion that James was never told by his accountant about Form 3520, the government has not met its burden to produce evidence showing that there is no dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 248-50.

In addition to the case law discussed above, as the government recognizes, the IRS specifically acknowledges that ignorance of the law, combined with other facts, may constitute reasonable cause for a tax compliance error.  The Internal Revenue Manual (IRM) provides that:

> 4.  The taxpayer may have reasonable cause for noncompliance due to ignorance of the law if:
>> A.  A reasonable and good faith effort was made to comply with the law, or
>> B.  The taxpayer was unaware of a requirement and could not reasonably be expected to know of the requirement.

I.R.M. 20.1.1.3.2.2.6 (11-25-2011).  The IRM provision is often discussed by courts in reasonable cause cases, and is consistent with the IRS position on reasonable cause in various Treasury regulations.[7]  *See, e.g.*, 26 C.F.R. § 1.6664-4(c)(1), which provide the most comprehensive guidance by IRS on reasonable cause, consistent with the IRM.  It is also important to note that these regulations do not require that the advice be in any particular form (i.e., written or oral, explicit or implicit).

So despite the government's claim that the *Boyle* bright-line/agent rule requires that the taxpayer specifically ask about all potential reporting requirements, the IRS unquestionably agrees with the cases holding that reasonable cause may exist in a situation where the taxpayer

---

expert; if indeed the court interpreted *Boyle* as categorically precluding reasonable cause, the opinion is inconsistent with the body of contrary case law and the IRS position on reasonable cause.

[7]  The government notes that it is not conceding whether James acted with willful neglect (i.e., the issue would be tried if the motion is denied).  Yet the government asserts that James displayed "deliberate ignorance," an assertion that ignores testimony by James and Donaldson.  Deliberate ignorance relates to state of mind and motive, which involves a question of fact.  *Miller v. United States*, 945 F.2d 1464, 1467 (9th Cir. 1991).

was unaware of the filing requirement and relied on a tax professional.  James obviously knew that he had to file annual individual and business income tax returns (and did so – there is no issue in this case about those returns), but he could not reasonably be expected to know that his trust could trigger information reporting.  That is why he consulted with his professional advisor, and a trial will determine whether James's efforts were sufficient to establish reasonable cause.

It is unreasonable – and certainly not required under *Boyle* or the IRM – to expect that a doctor with no tax expertise would be aware of the need to file a Form 3520, particularly when Form 3520-A, which contains essentially the same information (and, obviously, the forms numbers are very similar), was timely filed by the trust each year reporting that James owned the trust.  While the IRS has never issued regulations or guidance under 26 U.S.C. § 6677 addressing reasonable cause (and there are no reported cases dealing with the penalty), very recently the IRS allowed all taxpayers who are not under audit or in litigation and who failed to file Forms 3520 and other similar information returns to file the late forms with no imposition of penalties if there is no unreported income.  IRS announced "The IRS will not impose a penalty for the failure to file the information returns if there are no underreported tax liabilities and the information returns are filed."  2011 Offshore Voluntary Disclosure Initiative Frequently Asked Questions and Answers, Q. 18 - http://www.irs.gov/businesses/international/article/0,,id=235699,00.html (last visited Mar. 15, 2012).  The IRS understands that there is much confusion among tax professionals and, needless to say, taxpayers, about Form 3520 and other information returns for foreign transactions or ownership.[8]

---

[8] *See* Joint Committee on Taxation, *Selected Issues Relating to Tax Compliance With Respect to Offshore Accounts and Entities* (JCX-65-08), July 23, 2008, at 12.  The committee observed that even very recently taxpayers and their representatives were not filing Forms 3520 "because of a lack of knowledge or confusion about the filing requirements" and suggested that the forms  could be improved and perhaps additional due diligence requirements could be imposed on return preparers.  Defendant implies (fn.7) a relationship between the 1996 increase in the

### Boyle Does Not Apply to Information Returns

Setting aside the fact that the bright-line/agent test in *Boyle* would not as a matter of law preclude a finding of reasonable cause where a taxpayer consulted with a tax expert, the government recognizes (in a footnote) that there is an unresolved question as to whether the rule applies only to tax returns, not to information returns. *Boyle* dealt with late filing of a tax return – a fact that was of critical importance to the Court, which observed that our self-assessment tax system depends on adherence to due dates for tax returns. *Boyle*, 469 U.S. at 249. There is no self-assessment of tax with Form 3520, and James's determination of his tax liabilities was satisfied by the filing of his tax returns for his business and himself (and the timely filing of Form 3520-A notified the IRS about the existence of the trust). There is no one general statutory or regulatory definition of an information return, but generally information returns report transactions to the IRS. *See* A Guide to Information Returns, http://www.irs.gov/efile/article/0,,id=98114,00.html (last visited Mar. 15, 2012).

The government argues it is irrelevant that Form 3520 is an information return, not a tax return, and dismisses the issue, rationalizing that there is no authority holding that the *Boyle* agent rule does not apply to information returns.[9] Setting aside how the lack of authority can

---

penalty percentage and the increase in Form 3520 filings in 1998, but the cited IRS article does not analyze cause and effect. It is just as possible that the IRS announcement in Notice 97-34, 1997-1 C.B. 422, about the new penalty increased awareness since the notice was likely read by tax practitioners. By 2006, the number of filed Forms 3520 had grown by 242 percent from 1998; perhaps more tax practitioners are becoming aware of the form or perhaps there are more trusts? *See* Foreign Trusts, 2006, http://www.irs.gov/pub/irs-soi/09fallbulforeign.pdf (last visited Mar. 15, 2012).

[9] The government notes that several cases have applied *Boyle*'s discussion of reasonable reliance on an expert in the context of information returns; that argument is misleading. But the references to *Addington v. Commissioner*, 205 F.3d 54 (2d Cir. 2000) and *Alpha I, L.P. v. United States*, 93 Fed. Cl. 280 (Ct. Fed. Cl. 2010) are misplaced because the penalties asserted in those two cases were not late filing penalties for information returns and instead involved partnership return items reported by the partners on their own individual tax returns. While those cases do not support the application of the *Boyle* bright-line/agent rule to information returns, they do support the rule that

provide support in light of the specific, repeated references in *Boyle* to taxes and tax returns, there is no case law or IRS guidance that specifically applies the bright-line/agent test to information returns that do not report tax liabilities, and, as discussed below, there is some doubt that the IRS would do so given the apparent rejection of the bright-line test in the context of certain information returns.  (Obviously this issue does not need to be addressed if this Court denies the government's motion for the reasons discussed above.)

Recently in *Congdon v. United States*, No. 4:09-cv-2892011 WL 3880524 (E.D. Tex. Aug. 11, 2011), the court rejected the government's motion for summary judgment on a late filing penalty for an information return, Form 5471.  The government argued, in part, that at as a matter of law the taxpayer's filing of the substantially incomplete form (and therefore late under 26 U.S.C. § 6038(c)(4)) could not be excused based on lack of knowledge or complexity of the law.  The court noted that the IRS has never issued regulations addressing reasonable cause for late filing of that form, and in rejecting the government's argument applied the IRM criteria. The motion was denied because there was a genuine dispute about whether the taxpayer exercised ordinary business care and prudence for the information return.[10] The court noted that the taxpayer alleged factors such as his lack of expertise in the area of accounting or tax law, the

_____

reliance on a competent tax professional who is informed of all of the facts may establish reasonable cause.  That is exactly what James did.

[10]  The IRS has not issued reasonable cause guidance for the late filing of Form 5471, but in guidance to its own professionals has indicated that the IRM factors apply.  *See* I.R.S. CCA 200748006 (Oct. 30, 2007) (although it is not public guidance that may be relied upon by taxpayers).  Similarly, for information return Form 5472, filed under 26 U.S.C. § 6038A by owners of interests in foreign entities, IRS regulations detail when reasonable cause exists. 26 C.F.R. § 1.6038A-4(b)(2)(iii) provides that "[c]ircumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience and knowledge of the taxpayer."  The regulation provides that reliance on a tax advisor may constitute reasonable cause if the taxpayer's reliance was reasonable.  Presumably the IRS was aware of the *Boyle* bright-line/agent test and understood that, consistent with the rationale in *Boyle*, taxpayers are permitted to rely on tax professionals.  Also, taxpayers who failed to file this and other foreign reporting information returns were recently advised by the IRS to file the returns and incur no penalties if there is no unreported income.  *See, supra*, at 16.

fact that he had not dealt with the IRS form before, and the fact that the form is required in the context of a complex area of the tax law.  As it does here, the government in *Congdon* argued that ignorance of complex tax laws could not, under *Boyle*, constitute reasonable cause, and the District Court properly rejected that argument (although the taxpayer did not prevail at trial).

The IRS has never issued regulations under 26 U.S.C. § 6677 imposing the 35 percent penalty for the late filing of Form 3520 ( 26 U.S.C. § 6048), and the government concedes that there are no cases applying the reasonable cause defense to 26 U.S.C. § 6677.  In the absence of regulations, the reasonable cause criteria set forth in the IRM (discussed above) should apply.

For other late information returns, the IRS has issued regulations that specifically recognizing that reasonable cause may exists if the taxpayer has no experience with the form or relied on a tax advisor to file it.  26 U.S.C. § 6721 provides a penalty for the failure to file certain information returns such as Forms 1099, 8300, and W-2 (as with Form 3520, no tax is paid with these forms).  26 C.F.R. § 301.6724-1(b), which discusses reasonable cause for the late filing of these information returns, lists factors to be considered, including that "prior to the failure the filer was never required to file the particular type of return" and whether "the filer has incurred any such penalty in prior years."  These criteria are consistent with the IRM criteria and the reasonable cause analysis in *Boyle*.  And, significantly, the regulation does not follow the *Boyle* agent rule; it provides that the actions of an agent may be imputed to the taxpayer, providing that if the taxpayer exercised reasonable business judgment in delegating the information return filing to an agent, the agent fails to timely file the form, and the agent establishes its own reasonable cause, then the taxpayer will be found to have reasonable cause.  26 C.F.R. § 301.6724-1(c)(5).

In short, the government's assertion that the distinction between information returns and tax returns for purposes of the *Boyle* bright-line/agent test is "irrelevant" is wrong.  Given the

absence of regulations or public guidance under 26 U.S.C. § 6677, it is difficult to understand how the government can argue that its interpretation (albeit an incorrect interpretation) of the *Boyle* bright-line/agent test for a tax return should be applied as a matter of law to an information return in a case of first impression.

## CONCLUSION

James did not delegate the filing responsibility for Form 3520 to his accountant; rather, he relied on his accountant for advice. The *Boyle* bright-line/agent test relied on by the government does not apply and is incorrectly interpreted, and, in any event, there is no case law or IRS guidance holding that the test would apply to a Form 3520 information return. The factual dispute about James's communication with his tax advisor and the conflicting testimony about the advice that was or was not provided necessitates a trial. The Court should deny the motion for summary judgment and set the case for trial.

s/ Kendall C. Jones
Kendall C. Jones
Dwaune L. Dupree
Attorneys for Plaintiff Brian Chivas James
Sutherland Asbill & Brennan LLP
1275 Pennsylvania, NW
Washington, D.C. 20004
202.383.0825 (Telephone)
202.637.3593 (Facsimile)
kendall.jones@sutherland.com
dwaune.dupree@sutherland.com

Patricia A. Gorham
Florida Bar No. 0049861
Attorney for Plaintiff Brian Chivas James
Sutherland Asbill & Brennan LLP
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996
404.853.8298 (Telephone)
404.853.8806 (Facsimile)
patricia.gorham@sutherland.com

**CERTIFICATE OF SERVICE**

This is to certify that on March 16, 2012, I electronically filed the foregoing

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT with the Clerk of

the Court by using the CM/ECF system, which will give notice of such filing this day to:

> Michael W. May
> Trial Attorney, Tax Division
> U.S. Department of Justice
> Post Office Box 14198
> Ben Franklin Station
> Washington, D.C. 20044

> s/ Patricia A.. Gorham
> Patricia A. Gorham
> Florida Bar No. 0049861
> Attorney for Plaintiff Brian Chivas James
> Sutherland Asbill & Brennan LLP
> 999 Peachtree Street, NE
> Atlanta, Georgia 30309-3996
> 404.853.8298 (Telephone)
> 404.853.8806 (Facsimile)
> patricia.gorham@sutherland.com

16602222.1