# PLAINTIFF'S EXHIBIT 1
# Deposition of Brian Chivas James
# October 6, 2011
# and
# Errata Sheet

1

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF FLORIDA
2             TAMPA DIVISION
3     CIVIL ACTION FILE NO. 8:11-cv-00271-JSM-AEP
4    _____
5 BRIAN CHIVAS JAMES,
6       Plaintiff,
7       vs.
8 UNITED STATES OF AMERICA,
9       Defendant.
10    _____
11

     DEPOSITION OF BRIAN CHIVAS JAMES
12

       Thursday, October 6, 2011
13           9:22 a.m.
14      999 Peachtree Street, NE
        Atlanta, Georgia
15
16
17   Reported by:  Michelle M. Boudreaux, CCR, RPR
18
19
20
21
22
23
24
25

2

1       APPEARANCES OF COUNSEL
2
3 On behalf of the Plaintiff:
4    KENDALL JONES, Esq.
     DWAUNE L. DUPREE, Esq.
5    Sutherland Asbill & Brennan LLP
     1275 Pennsylvania Avenue, NW
6    Washington, DC 20004-2415
     202.383.0100
7    kendall.jones@sutherland.com
     dwaune.dupree@sutherland.com
8
9 On behalf of the Defendant:
10    MICHAEL W. MAY, Esq.
     United States Department of Justice
11    Tax Division
     PO Box 14198
12    Washington, DC 20044
     202.616.1857
13    michael.w.may@usdoj.gov
14
15
16
17
18
19
20
21
22
23
24
25

3

           INDEX
1
2       EXAMINATIONS
3
Witness Name              Page
4
BRIAN CHIVAS JAMES
5
   Examination By Mr. May ..................... 5
6
   Examination By Mr. Jones ................... 184
7
8        EXHIBITS
9 Exhibit   Description          Page
10 Exhibit 20  Form 3520-A, Annual Information    39
        Return of Foreign Trust with a
11       U.S. Owner, Year 2001
12 Exhibit 21  Form 3520-A, Annual Information    39
        Return of Foreign Trust with a
13       U.S. Owner, Year 2002
14 Exhibit 22  Annual Information Return of Foreign   39
        Trust with a U.S. Owner, Year 2002
15
16 Exhibit 23  Form 3520, Annual Return to Report    60
        Transactions with Foreign Trusts and
17       Receipt of Certain Foreign Gifts,
18 Exhibit 24  Form 1040, U.S. Individual Income     77
        Tax Return, Extension Granted to
19       10/15/03, Year 2002
20 Exhibit 25  Alliance Holding Company, Prepared   123
        For Brian Chivas James, Quarterly
21       Report, Hornsby Trust, December 31,
        2004
22
23 Exhibit 26  Fidelity Insurance Company Limited,   133
        St. Vincent and the Grenadines,
24       Managed Flexible Premium Variable
        Annuity Policy, Policy No: ████0002
25

4

       INDEX (Cont'd)
1
2         EXHIBITS
3
Exhibit    Description           Page
4
Exhibit 27  Affidavit of Source of Funds and    143
        Indemnification
5
Exhibit 28  Affidavit of Source of Funds and    151
6       Indemnification
7
Exhibit 29  Hornsby Trust Account Reconciliation  154
8       as of 12/31/03
9 Exhibit 30  02/13/06 Fax to Shelly from Kasey    177
        Klern
10
Exhibit 31  March 5, 2008 Letter to William H.   178
11       Simon from Keithley F.T. Lake
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1          BRIAN CHIVAS JAMES,
2   being first duly sworn, was examined and testified as
3   follows:
4                   EXAMINATION
5   BY MR. MAY:
6       Q   Dr. James, my name is Mike May.  We met a few
7   minutes ago, but just for the sake of the record -- and
8   I'm representing the United States in this case, and
9   I'll be asking you questions today.  If you answer my
10  question, I'll assume that you're answering truthfully
11  and fully, as you've sworn to do, and that you
12  understood the question.  Fair enough?
13      A   Yes.
14      Q   And one formality before we kind of get
15  started here, have you taken any medication or do you
16  intend to take any medication that would prevent you
17  from sitting here for several hours and understanding
18  and answering my questions completely and truthfully?
19      A   No, I have not.
20      Q   Okay.  Dr. James, let's just cut to the
21  chase.  We're here because you failed to file your
22  Forms 3520 for the years 2001, 2002, and 2003, at least
23  failed to file them in a timely fashion.  Why did you
24  not file those forms?
25      A   Well, to the best of my understanding, my

6

1   accountant had taken care of all of that.  You know,
2   during those time periods, I sent the information of my
3   practice to Mr. Famiglio, and I relied on him to take
4   care of those things for me.
5       Q   And your accountant was George Famiglio, Jr.?
6       A   Correct.
7       Q   And his last name is spelled F-a-m-i-g-l-i-o?
8       A   That is correct.
9       Q   Okay.  Let's talk about Mr. Famiglio and his
10  work that he did for you.  Would you please describe
11  for me the conversation where you discussed your
12  foreign trust with Mr. Famiglio?
13      A   I have a vague recollection of all of this
14  because of the time frame; and with Mr. Famiglio, with
15  regard to the trust, I did -- I remember meeting with
16  the Donaldsons to get this trust started.  I remember
17  indicating to them that Mr. Famiglio was my accountant,
18  and they had -- and this is the best of my knowledge
19  because it was a long time ago, and my focus is really
20  on taking care of patients more than this type of
21  thing, so I'm not very good at this.
22          And it was my understanding that they were to
23  get together as far as anything relating to the IRS as
24  it applied to my trust, so...
25      Q   So did you ever talk to George Famiglio about

7

1   your trust, the foreign trust?
2       A   I don't remember a specific conversation, but
3   I don't -- you know, I just have a general recollection
4   of everything.  So I don't have a specific memory of a
5   specific conversation back then.
6       Q   Okay.  So did you ever have a conversation
7   with Mr. Famiglio about it?
8       A   I would have to guess to the best -- you
9   know, I guess I may have, but I'm not certain.
10      Q   Okay.  So you just don't remember one way or
11  the other?
12      A   I don't remember specifics, no, sir.
13      Q   Okay.  You mentioned that -- you indicated to
14  the Donaldsons.  And you mean Stephen Donaldson?
15      A   Yes.
16      Q   And --
17      A   Chris.
18      Q   -- and/or Chris Donaldson?
19      A   Yes, sir.
20      Q   That you had an accountant?
21      A   Yes, sir.
22      Q   And when did -- at what time was that?
23      A   It was somewhere in the beginning whenever
24  I -- when they were first explaining to me about the
25  trust.  It was -- you know, I don't remember a date.  I

8

1   just remember telling them that somewhere in the
2   beginning of our conversations when I met with them.  I
3   think it was when I met with them in Tampa.
4       Q   And when was that meeting?
5       A   I don't know a date.  I think it was at
6   the -- like I said, the very beginning when this whole
7   process was getting started.
8       Q   And my understanding is that you established
9   the Hornsby Trust, your foreign trust, in 2001.  Is
10  that correct?
11      A   I think so.
12      Q   And so was it a single meeting with the
13  Donaldsons, or were there more than one meeting?
14      A   There was more than one meeting.
15      Q   Okay.  Would these meetings have been prior
16  to 2001?
17      A   I would say they were probably around there,
18  maybe right before 2001.  The meetings occurred before
19  the trusts were set up, and it was during those
20  meetings that I indicated that Mr. Famiglio was my
21  accountant.
22      Q   And you asked them to speak to Mr. Famiglio?
23      A   Yes.
24      Q   Did they ever talk to George Famiglio?
25      A   I think so.

9

```
1     Q    And why do you think so?
2     A    Because I think at the beginning setting it
3   up, they -- you know, I knew that they had mentioned to
4   me that they needed -- you know, my accountant needed
5   to be involved in this.  So I would -- I think they
6   spoke about it, probably more than once.
7     Q    Okay.  And so you gave them George Famiglio's
8   name and phone number?
9     A    I think so, yes, sir.  And I apologize that I
10  can't be more dead on for you.  It's just I remember
11  fragments of all of this, and I'm doing the best I can
12  to remember it for you.  So I apologize if it's not
13  like hard-and-fast answers like I wish I could give.
14    Q    Sure.  I mean, I understand many of these
15  events were 10 years ago or longer.  But you don't
16  remember any specific conversation you had with George
17  Famiglio about the -- that you had a foreign trust?
18    A    I don't remember a specific conversation, no,
19  sir.
20    Q    Okay.  But you think that Stephen Donaldson
21  or Chris Donaldson had some conversation with George
22  Famiglio?
23    A    Yes, I do.  If I had to guess -- and this is
24  terrible -- I think I did.  But like I said, I don't
25  remember the specifics of it.  I don't have a date.  I
```

10

```
1   don't know anything like that.
2     Q    Okay.  When you say you think you did, you
3   mean you think you had a conversation with George
4   Famiglio?
5     A    Yes, sir, but I can't be certain.
6     Q    Okay.  Is it possible you had conversations
7   with him after you got the IRS notice that you hadn't
8   filed Forms 3520?
9     A    I'm sure I did then.
10    Q    Okay.  And it's possible you had
11  conversations with him before?
12    A    I think so, yes.
13    Q    You think so?
14    A    But I'm not certain of it.
15    Q    Okay.  And do you have any records of
16  conversations with Mr. Donaldson?
17    A    Records as in?
18    Q    Like did you ever take notes and keep notes?
19    A    No, sir, I didn't.
20    Q    And do you have any notes or records of any
21  conversations with George Famiglio?
22    A    No, sir.  I never really kept notes of any of
23  that.
24    Q    Now, at some point, your trust filed
25  Forms 3520-A; is that right?
```

11

```
1     A    Yes, sir.
2     Q    For those years:  2001, 2002, 2003?
3     A    Yes, sir.
4     Q    And I think in your complaint and in some
5   answers to interrogatories, you mentioned that you gave
6   those forms to George Famiglio?
7     A    Yes, sir.
8     Q    How were those forms given to George
9   Famiglio?
10    A    Well, back in -- during that time frame, I
11  would send the bank statements, check stubs, receipts,
12  all that information to Mr. Famiglio.  I think I would
13  send it to him every month for him to put -- take care
14  of all of that, put my books together, keep track of
15  all of those things for me.  I am not very good at
16  doing that kind of thing, as far as the numbers and all
17  of that, unfortunately.  My skillset lies mainly with
18  patient care.
19    Q    You're a doctor, right?
20    A    Yes, sir.
21    Q    So you would say your primary focus is your
22  medical practice?
23    A    Absolutely.
24    Q    And I think a couple of times you've said
25  "this type of thing" or "that type of thing."  What are
```

12

```
1   you referring to?
2     A    Okay, can you ask me specifically which
3   instance when I used that and I'll be more specific?
4     Q    Okay, sure.  A moment ago I think you said,
5   "My forte" -- said something, and I'm probably just
6   paraphrasing, "My forte isn't that kind of thing."
7     A    Oh, okay, with putting numbers together
8   monthly, doing any type of the -- the business numbers,
9   that type of stuff.
10    Q    How about your personal finances, do
11  you handle them yourself?
12    A    Presently?
13    Q    Yes.
14    A    No, sir.
15    Q    Okay.  How about in the years 2001 through
16  2003?
17    A    Yes, I did.
18    Q    Okay.  You say you don't presently handle
19  your personal finances?
20    A    No, sir.
21    Q    Why is that?
22    A    Shelly, my office manager, does.  My
23  preference, what I like to do, is taking care of my
24  patients, operating, managing them, doing all the
25  duties I have as a physician and a surgeon.  I'm not
```

13

1  good at and I don't care to take care of those types of
2  things.
3      What I mean by "those type of things,"
4  managing the money, you know, going through the tedious
5  processes of dealing with the numbers of everything.  I
6  couldn't even tell you what I charge for a surgery.
7      Q   So that's both personal and business?
8      A   Yes.  Yes, sir.
9      Q   And that is Michelle Smith, you said?
10      A   Yes, sir.
11      Q   And she also goes by Shelly?
12      A   Yes.
13      Q   All right.  So as far as getting all these
14  bank statements and records to George Famiglio, who
15  handled that?
16      A   I would -- during that time frame --
17      Q   Yes.
18      A   -- I would just have them brought over to
19  him.  You know, it depends -- I don't know who the
20  courier was, I don't know who actually physically
21  brought them, but I would sign the checks for the
22  business expenses.  We had a three-ring binder, you
23  know, with the multiple checks per page.  I would sign
24  the checks and then have the stub, send him that
25  information.

14

1      Any correspondence that I received would go
2  straight to him regarding accounts, regarding any of
3  the financial information of the practice.  I would
4  just send it all straight to George.
5      Q   So I've seen you produced, I think, in
6  response to some of our requests, some general
7  ledgers --
8      A   Okay.
9      Q   -- for your business.  As far as the
10  recording from the check stub to the computer system,
11  was that done at your office or was that done by George
12  Famiglio's firm?
13      A   I'm not sure.
14      Q   Okay.
15      A   I don't think -- to the best of my knowledge,
16  during that time period, I don't think we had a
17  computer system.  If anything was done with that with a
18  computer, it was probably done by George.
19      Q   Okay.
20      A   I'm pretty sure everything was manual at that
21  time.
22      Q   So you just had the checkbook?
23      A   Yeah, very simple.
24      Q   And a manual ledger?
25      (Cell phone interruption.)

15

1      THE COURT REPORTER:  I'm sorry.  I
2  thought I turned that off before.
3      MR. MAY:  Let's take a break.
4      (Off the record.)
5      Q   (By Mr. May)  So you mentioned a moment ago,
6  you didn't know who the courier was that took all these
7  records to George Famiglio.
8      A   What I would have probably done is just have
9  someone from my office bring them over to him and drop
10  them off, or he would have somebody from his office
11  come and pick them up.
12      Q   And so -- so, I mean, it wasn't you taking
13  the forms and giving them to George Famiglio?
14      A   Like I said, we would -- you know, I would
15  just put it in -- everything would just go into a pile
16  to go to his office.
17      Q   Okay.  And you're certain that -- well, let
18  me ask this:  How did the Forms 3520-A go to his
19  office?
20      A   I don't remember.
21      Q   Okay.  Do you have any record of transmitting
22  the Forms 3520-A for each of the years 2001, 2002, and
23  2003 to George Famiglio?
24      A   I can't remember.  I'm sorry.
25      Q   Okay.  Are you sure that you sent those forms

16

1  to George Famiglio?
2      A   If any forms regarding any financial matters
3  came to my office, I sent them straight to him.
4      Q   And what if they came to your home?
5      A   I would send them straight to him, any
6  financial information.
7      Q   So -- but you're sure that you gave them to
8  George Famiglio?
9      A   When you say "gave them," gave what?
10      Q   Okay, very good.  You're certain that you
11  gave the Forms 3520-A for each of the years in question
12  to George Famiglio?
13      A   You know, the one thing I do feel certain
14  about is that any financial information that came
15  through my office, anything, I sent straight to George.
16  And that would include any kind of forms, any kind of
17  statements, any banking, any of that type of material,
18  I would send to George.
19      Q   But you don't remember specifically sending
20  the 3520-A's to George Famiglio?
21      A   Unfortunately, I can't remember every form
22  that I sent to him, no, sir.
23      Q   Do you remember receiving the Forms 3520-A
24  for those years, 2001 through 2003?
25      A   I don't have a specific recollection of it.

17

```
1      Q    As we're sitting here today, do you
2    understand the difference between a Form 3520 and a
3    Form 3520-A?
4      A    I've recently been enlightened to that since
5    this whole process began.  Would you like me to tell
6    you my understanding of it?
7      Q    Sure.
8      A    And this is after the notification from the
9    IRS regarding that.  Prior to that, I honestly didn't
10   have a clue about the different types of forms.  My
11   understanding is that the 3520-A is to notify the IRS,
12   the government, about any offshore trusts or monies
13   kept offshore.
14     Q    Okay.  And what about the 3520-A
15     A    I think it's the same thing.
16     Q    Okay.  Do you know whose responsibility it is
17   to file the 3520-A?
18     A    No, sir.
19     Q    Okay.  How about the 3520?
20     A    One or both of them, I think my accountants
21   were supposed to file.
22     Q    Okay.
23     A    I think that's why I got the penalty.
24     Q    Okay.  But is it a fair statement to say that
25   in the time 2001 through 2004, when your 2003 would
```

18

```
1    have actually been due in 2004, so between 2001 and
2    2004, is it fair to say that you didn't know what the
3    difference was between a 3520 and a 3520-A?
4      A    Yes, sir.
5      Q    Okay.  Now, what advice did George Famiglio
6    give you in regards to your filing requirements in
7    relation to the Hornsby Trust?
8      A    I can't remember.
9      Q    Okay.  Did he ever give you any advice in
10   relation to the trust?
11     A    I'm sorry, I can't remember.
12     Q    So you don't remember one way or the other?
13     A    No, sir, I don't.
14     Q    So it's -- and I know I may be belaboring a
15   point, but it's possible that he gave you some advice?
16     A    It's possible.
17     Q    And it's also possible that he didn't give
18   you any advice?
19     A    Yes, sir.
20     Q    In addition to transmitting your financial
21   documents to George Famiglio, what other actions did
22   you take to understand your filing requirements with
23   respect to the Hornsby Trust?
24     A    I think that was it.  It's just -- you know,
25   it was the kind of thing that, again, you know,
```

19

```
1    whenever I got into -- after finishing my training, I
2    got into private practice.  There had been no training
3    in any of the business aspects of medicine, and I
4    couldn't stand it.  You know, really, I didn't know
5    anything about it, I didn't like it, it interfered with
6    my day, it took away from me seeing my patients, and I
7    just -- I almost resented it.
8          So I really don't have a firm understanding
9    of a lot of that and, you know, focused on taking care
10   of patients and doing the best thing I could do there,
11   and I relied on professionals that I had hired to
12   address those issues, such as George Famiglio.  You
13   know, I pretty much had a reliance on him to do his job
14   in my accounting and filings and appropriately
15   addressing these issues, and he let me down,
16   obviously.
17     Q    In your conversations with Stephen Donaldson
18   and Christopher Donaldson about establishing a foreign
19   trust, what kind of discussions did you have with them
20   about your filing requirements?
21     A    Well, the initial -- I went to see them.  I
22   had gotten divorced, was concerned about -- you know,
23   the type of practice I had, I was concerned about being
24   sued and asset protection, went to them.
25          As far as filing requirements, the
```

20

```
1    conversations pretty much -- you know, I indicated to
2    them I had an accountant.  I didn't have a good grasp
3    of that, you know, to talk with them about it.  That's
4    the best I can remember because it wasn't -- there
5    weren't a lot of conversations about that at all.  It
6    pretty much was, "Here's my accountant.  You guys take
7    care of that.  This is what I'm concerned about."  You
8    know, my primary concern by going to them was asset
9    protection.
10         Being single in the state of Florida and
11   being a surgeon, I have a large exposure, a large
12   liability exposure, and I was very concerned about
13   that.  While I was married, I didn't have to worry
14   about it as much.  So that was my focus when I went to
15   them.  So I wasn't really focusing on a lot of these
16   other -- what I thought to be smaller issues, which
17   I've come to find out were not small at all.  And so,
18   again, I kind of pushed that off to George and to the
19   Donaldsons to handle that amongst themselves.
20     Q    Okay.  So is it fair to say that you didn't
21   do any extra research on what the IRS might require for
22   a foreign trust?
23     A    No, sir, I didn't.  I left it at that.
24     Q    So I'm going to ask this question, I think I
25   know the answer, but have you ever read an IRS Notice
```

21

1   No. 97-34?
2     A  I don't recall if I have.  I wouldn't know
3  what it is if it hit me in the face.
4     Q  Have you ever read any IRS notices?
5     A  No, sir, I don't think so.
6     Q  Okay.
7     A  I mean, I got the notice about the penalty.
8  Does that count?
9     Q  Okay, sure, that counts.
10     A  Okay, yeah, then I've read some notices
11  before.
12     Q  Okay.
13     A  You know, this whole experience has been very
14  eye opening to me.  Prior to this, my understanding of
15  any of it was woefully inadequate.
16     Q  So I think you've testified maybe a couple of
17  times that you asked Steve Donaldson -- or you referred
18  Steve and Christopher Donaldson to George Famiglio.
19     A  Yes, sir.
20     Q  What did they ever tell you that they had
21  told or spoken to George Famiglio about?
22     A  I can't remember anything specifically.
23     Q  Did you ever talk with them have any
24  conversation with Stephen or Christopher Donaldson
25  about any conversation they had with George Famiglio?

22

1     A  I don't recall.  I mean, the way I've done a
2  lot of things like that, I would -- you know, I would
3  hire the people that I needed to cover certain areas
4  that I'm inexperienced at, such as my accounting, and
5  then I would just rely on them to do their job.  And
6  obviously, I was let down by them and ended up losing
7  all my money anyway with the Donaldsons.  But I
8  probably relied too much on other people, in
9  retrospect.
10     Q  Okay.  So basically what you're saying is
11  that you relied on George Famiglio to take care of
12  whatever needed to be done?
13     A  Yes, sir.
14     Q  And you relied on Steve Donaldson and Chris
15  Donaldson to do whatever needed to be done?
16     A  Yes, sir.
17     Q  And with respect to whatever your IRS
18  requirements would have been, you relied on George
19  Famiglio to just take care of it?
20     A  Yes, sir.
21     Q  We've kind of delved into this a little bit,
22  but let's flush it out a little bit.  The work that
23  George Famiglio did for you and -- does George Famiglio
24  still work for you?
25     A  No, sir.

23

1     Q  Okay.  And when did -- when did you stop
2  using his services?
3     A  I think it was around '04.
4     Q  Okay.  So -- but during the years -- for the
5  years 2001 through 2003, you used him for all of those
6  years?
7     A  Yes, sir.
8     Q  And that would include filing any returns for
9  2003?
10     A  Yes, sir.
11     Q  Okay.  What other work did he do for you in
12  addition to filing tax returns?
13     A  You know, I would send all the information,
14  like we had talked about, monthly to him to take care
15  of that and pretty much manage the books to a large
16  degree and then the filing of the returns.  That's, you
17  know, in my -- what accountants do.  Because I don't
18  need -- I don't -- you know, to the best of my
19  knowledge, it was managing the books, sending him the
20  information, the financial, any financial information,
21  filing my returns, making sure all of my requirements
22  for the IRS were in order and that we were doing the
23  right thing as far as, you know, the books for the
24  practice that we have to keep track of.
25     Q  Okay.  So in addition to doing the books for

24

1  your practice, IRS filing, was there anything else that
2  George Famiglio helped you with?
3     A  I don't think so.  You know, I do -- you
4  know, the more we've talked about all this and the more
5  I've had to go over it, little things come up every now
6  and then.  You know, I do remember going to his office
7  on multiple occasions, with George Famiglio, and him
8  kind of going over where we were with things with
9  regard to my practice and the numbers.  And that
10  just -- I just -- that just came to me right this
11  second.
12     Q  Okay.
13     A  The more we talk about it, it kind of brings
14  up some of these older memories.
15     Q  Sure.  And, you know, I didn't say at the
16  beginning, but if there's ever a point during the
17  deposition if you remember something about a question I
18  asked earlier, please just say, "I remembered something
19  else that answers that question."
20     A  Sure.
21     Q  And that's more than welcome.
22     So what were those kind of things?  You said
23  you're remembering --
24     A  Just pretty much that.  I don't remember
25  anything more than what I just told you.

25

1    Q   Did he ever advise you on, "Here's a
2  particular strategy that would be helpful for your
3  business"?
4    A   Possibly.
5    Q   Okay.
6    A   You know, because, like I said, I was -- you
7  know, my understanding of that was extremely limited,
8  so I could -- that makes sense that that conversation
9  would have occurred.
10    Q   Okay, but do you remember any specific --
11    A   No, I don't.
12    Q   As far as your office's interaction with
13  George Famiglio's office, was it you and him, or were
14  there other people in your office?
15    A   It was mostly me.  I mean, I was the only one
16  that would go over there except -- unless I sent
17  someone with the monthly statements and check stubs and
18  all of that, and that would be just to drop it off.
19    Q   Okay.  And you say that during that time,
20  2001 to 2003, you signed all the checks?
21    A   Yes.
22    Q   And is that still the case?
23    A   No, sir.
24    Q   Okay.  Who signs the checks now?
25    A   Shelly.

26

1    Q   Okay.  Did Shelly work for you in the years
2  2001 to 2003?
3    A   Yes.  She's been working for me for about 14
4  years.
5    Q   Okay.  So would she have ever interacted with
6  George Famiglio's office?
7    A   During that time frame, I don't think she
8  did, to the best of my recollection, which happened
9  over the years as I've practiced.  I've been in private
10  practice for approximately 16, 17 years.  You know,
11  I've structured it now to where I do exactly what I
12  want to do, taking care of patients, operating, and I
13  really don't have to deal with any of that other stuff
14  now.
15    Q   And what -- so what was her role in that time
16  period, 2001 to 2004?
17    A   She had various roles in the office, not
18  nearly to the extent now, because I -- during those
19  years, she had only been working for me for a short
20  period of time.  But over the years, I've trusted her
21  to more and more duties as we've grown as a practice
22  together and our relationship together.
23    Q   Okay.  So what were some of those roles at
24  that time?
25    A   Specifically, you know, greeting patients,

27

1  helping out with charts, checking patients in, that
2  kind of stuff.  You know, at that point, I was still
3  more involved than I would have liked to be, you know,
4  as far as running the practice and signing checks,
5  paying bills, doing that kind of stuff, which, again, I
6  don't like doing.
7    Q   Is she a nurse?
8    A   No.
9    Q   Okay.  Does she have any kind of professional
10  license?
11    A   No.
12    Q   Okay.  As far as George Famiglio handling
13  your tax returns -- and when I say "your tax returns,"
14  I mean, you have a personal Form 1040.  I think your
15  business has filed 1120s.  That's primarily what I
16  mean.
17        During those years, 2001 to 2003, how did you
18  handle those -- having those done by George Famiglio?
19    A   I just -- it all went to him.
20    Q   Okay.
21    A   He would do what he does.
22    Q   And then how would he -- how would he get
23  those back to you for -- or would he get them back to
24  you?
25    A   You know, I remember going to his office and

28

1  signing things before or him sending it to me to sign
2  and I would send it back.
3    Q   Okay.  And then would you mail them to the
4  IRS, or would he mail them to the IRS, or do you --
5    A   I don't remember.
6    Q   Okay.  But you would always sign the return
7  before it went to the IRS?
8    A   I'm pretty sure.  I think so, yeah.
9    Q   Okay.  Now, how did you learn about the
10  Form 3520, that you had not filed those --
11    A   I learned about that, I think, from a notice
12  from the government.
13    Q   And do you remember when you received that
14  notice?
15    A   No.  I should, but I don't remember the date.
16    Q   If I represented to you that it was in
17  January of 2005, would that sound correct?
18    A   That sounds about correct or right around
19  there.
20    Q   Okay.  Maybe early February of 2005?
21    A   (No audible response.)
22    Q   Okay.
23    A   I'll definitely trust you on that.
24    Q   Okay.  What did you do when you received that
25  notice?

29

1      A   I was very unhappy about that because I -- as
2  far as what I did, I think I fired George Famiglio and
3  I went to my attorneys and asked them to refer me to
4  another accountant.  I was upset about it because I had
5  trusted him to take care of these things for me.  I had
6  relied on him.  He had let me down significantly, so I
7  was very distraught over that.
8      Q   And what accountants did your attorneys refer
9  you to?
10     A   Jamie -- Jameson Vicars is my new accountant
11 now.
12     Q   Okay.  And did they help you with reference
13 to the 3520 that you had gotten a notice about from the
14 IRS?
15     A   Yes.
16     Q   Okay.
17     A   To the best of my knowledge, I don't remember
18 the details of that.  I think at that point, I also got
19 outside help from Eric Schmitz to help deal with this.
20     Q   Okay.  And that's Eric Schmitz that's with
21 the William Simon --
22     A   Yes, sir.
23     Q   -- and Company or Associates?
24     A   Yes.  I think they're in Clearwater.
25     Q   Okay.  What work did Eric Schmitz do for you?

30

1      A   I kind of -- you know, I was flustered by all
2  of this.  I pretty much just put it in his lap and
3  said, "All right, can you help take care of this and
4  let me know what I need to do and let's do it."
5          That's pretty much -- you know, we had had
6  conversations about it.  I don't remember the specifics
7  of them.  But as far as I knew, he was helping to
8  address that, and I paid the penalty, you know, and
9  then sometime after that, then I lost all the money
10 that was in all the trusts.  So...
11     Q   Okay.  And the Jameson Vicars that you
12 mentioned a few minutes ago, what kind of work do they
13 do?
14     A   He's my accountant.  He helps with the books
15 in the office, files my returns for me.
16     Q   Okay.  So Jameson Vicars is actually an
17 individual's name?
18     A   Yes, Jamie Vicars.
19     Q   Okay.  Sometimes account -- you know, they
20 have two last names, so Jameson, I wasn't sure.
21     A   Oh, yeah, yeah.  That's his -- he's an
22 individual.
23     Q   Okay.  So are you aware of whether Eric
24 Schmitz ever met with George Famiglio?
25     A   I think he did.

31

1      Q   Okay.  What did he tell you about that
2  meeting?
3          MR. JONES:  Objection.  Work product or
4      7525 privilege.
5          MR. MAY:  So are you instructing him not
6      to answer?
7          MR. JONES:  Well, you want to go off the
8      record for a second?
9          MR. MAY:  I'd prefer to be on the
10     record.
11         MR. JONES:  Well, are you willing to
12     tell me -- where are you headed with this?  I
13     mean, at some point, he's entitled to claim
14     privileges.  I mean, if you're just trying to
15     establish and rebut Famiglio's -- what
16     Famiglio -- because Famiglio said he didn't
17     know him.
18         MR. MAY:  Right.
19         MR. JONES:  I want to give you --
20         MR. MAY:  Well, I -- we can go off the
21     record for a second.
22         (Discussion off the record.)
23     Q   (By Mr. May)  All right, Dr. James, I think a
24 moment ago we were -- I was asking you about Eric
25 Schmitz.

32

1      A   Yes, sir.
2      Q   And I believe I referenced a meeting that
3  Eric Schmitz had with George Famiglio.
4      A   Yes, sir.
5      Q   And my question to you is:  What did Eric
6  Schmitz tell you was the nature of his meeting with
7  George Famiglio?
8      A   I don't remember the specifics of that
9  conversation.  You know, I know whenever Eric Schmitz
10 became involved, that he had wanted to speak with
11 Mr. Famiglio, and he did.  I can't recall the specifics
12 of all of that, though, unfortunately.
13     Q   You weren't at that meeting, were you?
14     A   I was not at that meeting.
15     Q   Okay.  And you don't remember any of the
16 specifics that Eric Schmitz told you George Famiglio
17 told him?
18     A   No, I do not.
19     Q   So just to recap, you didn't file your
20 Form 3520 because you were trusting George Famiglio to
21 handle your filing requirements?
22     A   To the best of my knowledge, he had filed all
23 the -- everything required with the IRS.
24     Q   And during the time period in question, 2001
25 through 2004, you didn't know the difference between a

33

1   3520 and a 3520-A?
2       A   No, sir.
3       Q   Outside of transmitting your financial
4   documents to George Famiglio, you took no other actions
5   to determine what your filing requirements might be in
6   regards to a foreign trust?
7       A   No, sir.
8       Q   In your conversations with Steve and
9   Christopher Donaldson, you don't recall ever asking
10  them what your filing requirements might be; is that
11  right?
12      A   That is right.
13      Q   And you don't remember any advice that George
14  Famiglio ever gave you in regards to your filing
15  requirements?
16      A   No, sir.
17      Q   You don't remember ever having any
18  conversations with George Famiglio about what your
19  filing requirements might be for a foreign trust?
20      A   No, sir.
21      Q   You have never read any IRS documents about
22  what your filing requirements are as an owner of a
23  foreign trust?
24      A   I don't recall reading anything like that.
25      Q   Okay.

34

1       A   Typically, if I come across something like
2   that, I would send it to my accountant.
3       Q   It was your practice to just take all your
4   financial documents and information and give them to
5   your accountant?
6       A   Yes, sir.
7       Q   And let him do whatever he would do with
8   them?
9       A   That's correct.
10      Q   I think a few moments ago, you said, you
11  know, your preference is to work with the patients and
12  handle your patients --
13      A   That is true.
14      Q   -- is that fair?  And you kind of resent the
15  business side of having a medical practice?
16      A   That's a strong word.  I just -- I don't care
17  for it.  I'm not good at it and I prefer to -- you
18  know, my skillset definitely lies with patient care,
19  and that's the stuff I love to do.  I don't care for
20  doing any of the rest.
21      Q   Would you say you have the same attitude
22  towards having to deal with IRS stuff?
23      A   At this day, at this moment, oh, my God, you
24  know, having gone through everything over the last --
25  you know, since this occurred, it's -- you know, having

35

1   the penalty was shocking, having to write that check,
2   of course, was painful.
3       Then turning around and losing every cent in
4   that deal and being taken advantage of there, you know,
5   any money I make now, I tend to put it in a place
6   that's right where I can see it and, you know, I
7   just -- my understanding now is much more detailed than
8   it was before because of these proceedings, because of
9   everything that's gone on.
10      You know, as of this day, you know, I do know
11  what a 3520 is.  I do understand a lot more about this
12  than I ever had, unfortunately.  You know, I've been
13  forced to because of the lapses in the professionals
14  that I've hired to take care of these things for me and
15  the misplaced trust, to be honest.  You know, I feel --
16  I feel -- it's just -- it was a bad move.
17      In retrospect, knowing what I know now, first
18  of all, I wouldn't have gotten involved with the
19  Donaldsons.  I clearly would never have hired George
20  Famiglio as an accountant.  I can say that for sure,
21  because none of this has turned out well for me at all.
22  It's all been very horrible to go through this and to
23  plus lose -- lose all my money and to pay the penalty
24  on top of that for money that I lost.
25      You know, I don't know what happened to that

36

1   money, to be honest.  I was told a lot of things with
2   regard to this.  I've been told a ton of things by the
3   people that I relied on and trusted that let me down
4   significantly.  It's -- you know, it's embarrassing in
5   addition to painful.
6       Q   Sure.  You mentioned the penalty a number of
7   times.  What penalty are you referring to?
8       A   The one that we're talking about today.
9       Q   The penalty that was assessed against you by
10  the IRS --
11      A   Yes, sir.
12      Q   -- for the failure to timely file your 3520?
13      A   Yes, sir.
14      Q   Okay.  So -- and that's fine.  Anytime you
15  say "the penalty" --
16      A   Yes, sir.
17      Q   -- I'll assume you mean the penalties for
18  2001, 2002, and 2003.
19      A   Yes, sir.
20      Q   Okay, fair enough.  That will be easier than
21  saying the penalty that was assessed, you know, saying
22  all that.
23      A   Right.
24      Q   I think that's a fair shorthand.
25      And you've paid those penalties; is that

37

1  right?
2      A   Yes, sir, I did.
3      Q   And you mentioned the people you relied on.
4  Did you include George Famiglio as a person that you
5  relied on?
6      A   Absolutely.
7      Q   And that you trusted?
8      A   Absolutely.
9      Q   Looking back on that, would you consider your
10  reliance on Mr. Famiglio reasonable?
11      A   At the time --
12      MR. JONES:  Objection.  The issue isn't
13  reasonable cause in this case.
14      MR. MAY:  You can answer.
15      THE WITNESS:  At the time, I had no
16  reason not to trust him.  He was my
17  accountant.  He presented to me to have the
18  certifications, the qualifications to do my
19  accounting work.  I trusted him to perform to
20  the best of his ability within his specialty,
21  just as I'm expected to perform to the best
22  of my ability in my given work.
23      You know, in that sense, yes, I thought
24  it was reasonable.  In hindsight, obviously,
25  it was woefully inadequate and it's cost me a

38

1  significant amount of money, time, as well as
2  emotional distress.  I'm not the kind of
3  person that wants to be dishonest or hide
4  things.  And it's been, you know,
5  extremely -- I'm very distraught over all of
6  this, from the day I got the notice from --
7  and then having to go over all this and find
8  out, you know, a lot of the deficiencies
9  where I trusted people to do things and they
10  weren't done and then I have to -- then I'm
11  the one that -- which, you know, pays the
12  price.
13      Q   (By Mr. May)  You said a moment ago you were
14  distraught over all this.
15      A   Meaning that the Donaldsons basically took
16  all my money --
17      Q   Okay.
18      A   -- you know, and then I got penalized for my
19  accountant not doing what he was hired to do.
20      Q   Okay.  So both the IRS problems and the
21  personal financial problems?
22      A   The place that I'm upset, to be perfectly
23  clear, is, first of all, it was my mistake, but I
24  didn't -- I didn't know what was going to happen.  In
25  hindsight, it's a lot easier to see now, believe me, if

39

1  I could go back in time, is with the Donaldsons and
2  with Famiglio.  That's where I have the problem --
3      Q   Okay.
4      A   -- because if things would have been done as
5  I was told that they would be done, I don't think we
6  would be sitting here today.  I wouldn't have to
7  miss -- you know, I wouldn't have to be doing all of
8  this.  I would be taking care of patients and doing
9  stuff I love, not staying -- not losing sleep and
10  spending the money that I'm having to spend.
11      Q   Okay.
12      MR. JONES:  Michael, if you're changing
13  topics, can we take like a
14  two-and-a-half-minute break so I can find the
15  secret room?
16      MR. MAY:  Sure.
17      (Recess taken.)
18      (Exhibits 20, 21, and 22 marked for
19  identification.)
20      Q   (By Mr. May)  Dr. James, I'm going to hand
21  you what's been marked Exhibit 20, and do you
22  recognize Exhibit 20?
23      A   I see at the top left it says, "3520-A."
24      Q   Okay.  Is this the 3520-A for the Hornsby
25  Trust for 2001?

40

1      A   Yes, sir.  I'm reading that at the top of the
2  page.
3      Q   Okay.  Do you remember having seen Exhibit 20
4  before?
5      A   No, sir, I don't remember.
6      Q   Okay.  Now, I'll represent to you this
7  copy -- you'll see in the lower right-hand corner is
8  the marking OTS-James --
9      A   Yes, sir.
10      Q   -- 000049.  I think that indicates that this
11  was -- this copy was actually provided to my office by
12  Offshore Trust Services.
13      A   Okay.
14      Q   But did you receive a copy of the Hornsby
15  Trust 2001 3520-A at some time?
16      A   I don't remember.
17      Q   Okay.  So you may have, you just don't
18  remember?
19      A   Yes, sir.
20      Q   Okay.  If you had received a copy of this
21  Exhibit 20, what would you have done with it?
22      A   I would have sent it over to George Famiglio.
23      Q   Okay.  Would you have done anything else?
24      A   No, sir.
25      Q   When you receive a document like this, do you

41

1   usually -- do you scan it, do you read it in detail?
2       A   I'll take a look at it.  You know, I just --
3   about like this (indicating), I'll review it.  I mean,
4   in detail -- like most things, you know, I'll take a
5   look at it and then I'll send it over to him.  That's
6   pretty much it.
7       Q   I'll direct your attention in Exhibit 20 to
8   the third page, at the lower right-hand corner is
9   OTS-James 000051.
10      A   Yes.
11      Q   And I'll direct your attention to the top
12  where it says "2001 Foreign Grantor Trust Owner
13  Statement."
14      A   Yes, sir.
15      Q   During the year 2001, were you the grantor of
16  a foreign trust?
17      A   You know, I know I had this trust, but as far
18  as -- am I the grantor of it?
19      Q   Yes.
20      MR. JONES:  Objection.  You asking for a
21  legal conclusion, aren't you?
22      THE WITNESS:  I don't -- I mean, I know
23  I had this offshore trust set up.
24      Q   (By Mr. May)  Okay.  I was going to ask:  Do
25  you know what "grantor" means?

42

1       A   Could you explain it to me again, please?
2       Q   It's all right.  It's -- we're here just to
3   find out whatever it is that you know or remember, so
4   my understanding of it really isn't relevant at this
5   point.
6       A   Okay.
7       Q   But you were the owner of the Hornsby Trust
8   in 2001; is that right?
9       A   Yes, sir.
10      Q   Okay.  I'll direct your attention back to the
11  third page up at the top there where it says "2001
12  Foreign Grantor Trust Owner Statement."
13          Do you see the paragraph just below the title
14  there at the top where it says "Important," colon?
15      A   Yes.
16      Q   Would you read for me the last sentence of
17  that paragraph?
18      A   "U.S. owner must attach a copy of each
19  statement to Form 3520."
20      Q   Do you remember reading that sentence when
21  you received this form?
22      A   No, sir, I don't -- I don't recall.
23      Q   Okay.  So do you recall if you had any
24  thought about what that might mean?
25      MR. JONES:  Objection.  He says he

43

1   doesn't remember.
2       THE WITNESS:  I don't remember.
3       MR. MAY:  Okay.
4       Q   (By Mr. May)  So I'm going to ask it -- I
5   think I know the answer -- do you remember what, if
6   any, action you took when you read that paragraph?
7       A   I can't remember reading it.
8       Q   Okay.  So -- all right, fair enough.
9           Do you know if Offshore Trust Services sent a
10  copy of this Form 3520-A to George Famiglio?
11      A   I don't know.
12      Q   Okay.  We'll come back to that.  Okay.
13      A   You want this back?
14      Q   You can just leave it there.
15          I'm now handing you what's already been
16  marked as Exhibit 21.  Dr. James, what is Exhibit 21?
17      A   From reading the form, it appears to be a
18  3520-A dated 2002 --
19      Q   Yes.
20      A   -- for the Hornsby Trust.
21      Q   And is the Hornsby Trust your trust?
22      A   Yes, sir.
23      Q   Okay.  Do you still have the Hornsby Trust?
24      A   I think -- you know, after they, you know,
25  lost all my money in it, I think it's gone.

44

1       Q   Okay, fair enough.
2           Now, Exhibit 21 is not signed.  Is that fair?
3   Is that a fair statement?
4       A   Yes, sir.
5       Q   Are you aware if the trust filed a signed
6   copy?
7       A   I'm not aware.
8       Q   Okay.  Do you remember receiving Exhibit 21?
9       A   No, sir.
10      Q   Do you know if you ever read Exhibit 21?
11      A   I don't recall.
12      Q   Okay.  I'll direct your attention to the
13  third page again.  It's similar to the third page in
14  Exhibit 21 -- in Exhibit 20, excuse me.  And this is
15  the page OTS-James 000055.  And at the top, it says
16  "Foreign Grantor Trust Owner Statement."  Do you see
17  that, Dr. James?
18      A   Yes, sir, I see it.
19      Q   And do you see again the paragraph that
20  begins "Important," colon?
21      A   Yes.
22      Q   And would you read the last sentence of that
23  paragraph?
24      A   It says the same as the last one, "U.S. owner
25  must attach a copy of the owner's statement to Form

45

1    3520."
2    Q   Do you remember reading that sentence?
3    A   I don't remember.
4    Q   Okay.  And I know you said you don't
5    remember, but if you received a copy of this document,
6    would you have -- what would you have done with it?
7    A   I would have reviewed it, sent it to my
8    accountant, and that would have been it.
9    Q   Okay.  But you don't recollect receiving a
10   copy?
11   A   I can't remember off the top of my head.  You
12   know, I have a busy practice.  We get a lot of mail.
13   You know, I'm in the process of balancing day-to-day
14   many aspects of that practice.  I'll review a lot of
15   documents, including patient charts, over the course of
16   the day.  Some of if I delegate to Shelly to do.  Forms
17   like this, I would delegate to my accountant.  You
18   know, while I oversee the whole process, I review it
19   and send it to the appropriate place for them to -- or
20   to do their job with.
21   Q   Okay.  Looking on the second page of Exhibit
22   21 -- that's OTS-James 000054 -- the bottom half of
23   that page, I think, says, "Part III, Foreign Trust
24   Balance Sheet."  About middle way of the page, it says
25   "Part III."

46

1    A   Yes.
2    Q   Mr. Jones has indicated that to you.
3    A   I see.
4    Q   Okay.  I'm looking in that Part III at Line
5    17, "Contributions to trust corpus."
6    A   Yes, I see it.
7    Q   And the first column, B -- it's, I guess,
8    the second column, Column B, indicates at the beginning
9    of the year, there were contributions of 192,000.
10   A   Yes, sir.
11   Q   And then at the end of the tax year, 863,821.
12   A   Yes, sir.
13   Q   Do you think that -- does that accurately
14   reflect the contributions that you had made to the
15   Hornsby Trust by the end of the 2002 tax year?
16   A   According to this document, it appears so.
17   Q   Okay.  Do you know if it's accurate?
18   A   I don't.  I don't know 100 percent.  I'm
19   assuming that these figures are correct, and if they
20   are, then that would be accurate.
21   Q   Okay.  Do you remember how much you
22   contributed to the trust from 2001 to 2002?
23   A   No, sir.  I don't remember off the top of my
24   head, but I'm sure we have documentation of that, I
25   would guess.

47

1    Q   Okay, fair enough.
2    And just to kind of -- Dr. James, I've just
3    handed you what's marked Exhibit 22.  What is Exhibit
4    22?
5    A   It -- the top of it on mine doesn't have the
6    number, so something -- it's a number, then an A.
7    Q   Right.
8    A   I can't read it.  And it's '02.  It says
9    "Annual Information Return of Foreign Trust with a U.S.
10   Owner."
11   Q   Okay.  Would you compare it to Exhibit 21 for
12   a second, just kind of look at the first pages of each
13   document.  Does Exhibit 22 appear to be basically
14   similar to Exhibit 21?
15   A   It does appear to be similar.
16   Q   Okay.  What, if any, difference is there
17   between Exhibit 21 and Exhibit 22?
18   MR. JONES:  Could you be more specific
19   in that question?
20   Q   (By Mr. May)  Is one of them a signed copy
21   and one unsigned?
22   A   Yes.
23   Q   Okay.  And I think you indicated already on
24   Exhibit 22 that the -- some of the numbers appear
25   missing in the upper left-hand corner of the first

48

1    page --
2    A   Yes, sir.
3    Q   -- which is SAB0114.
4    A   Okay.
5    Q   Okay.  Is that a correct characterization?
6    A   For the numbers missing?
7    Q   Yes.
8    A   Oh, I don't know what they are.  I can't read
9    them.
10   Q   Okay.  But just that there are some numbers
11   missing; is that right?
12   A   Yes, sir.
13   Q   And that page is SAB0114 in the lower
14   right-hand corner?
15   A   Yes.
16   Q   Okay.  Do you know if that represents that
17   this was a copy that was in your files?
18   A   I don't know.
19   Q   Okay.
20   MR. JONES:  For the record, that's where
21   it came from.
22   THE WITNESS:  Okay.
23   MR. MAY:  Okay, sure.
24   Q   (By Mr. May)  But again, with reference to
25   Exhibit 22, do you remember receiving Exhibit 22?

49

1    A   Like I had stated earlier, you know, I
2  receive a lot of forms, go over a lot of paperwork
3  during the course of just a single day.  Literally, I
4  go over hundreds of pages of paperwork a day.  So I
5  don't recall specifically receiving this.  If I had
6  received it, I would have reviewed it and sent it to
7  the appropriate channels.  And in this instance, it
8  would have been Mr. Famiglio.
9    Q   Okay.  Sure, and that's fair enough.  I think
10  that's fair.
11    And again, are you aware whether Offshore
12  Trust Services provided a copy of the Hornsby Trust
13  3520-A for 2002 to George Famiglio?
14    A   I'm not -- I don't recall.
15    Q   Okay.  I'm going to hand you what's been
16  previously marked as Exhibit 10.  Do you recognize
17  Exhibit 10, Dr. James?
18    A   Yes, sir.
19    Q   And what is Exhibit 10?
20    A   3520-A dated 2003.
21    Q   Okay.  And I'll direct your attention to the
22  third page of Exhibit 10, the lower right-hand corner,
23  OTS-James 000061.
24    A   Yes.
25    Q   And the top of that is -- under 2003,

50

1  "Foreign Grantor Trust Owner Statement."  Is it the
2  same paragraph that we saw beginning "Important" --
3    A   Yes.
4    Q   -- is it the same that we saw in the other
5  three exhibits, the previous three exhibits?
6    A   Yes.
7    Q   Do you remember reading Exhibit 10?
8    A   No, sir.
9    Q   Do you remember reading this paragraph, in
10  particular this statement, "U.S. owner must attach a
11  copy of its statement to Form 3520?"
12    A   No, sir.
13    Q   Okay.  And with reference to any actions you
14  might have taken when receiving Exhibit 10, would your
15  answer be the same as it was in reference to Exhibits
16  20 and 21?
17    A   Yes, sir.  With regard to these, I mean, I
18  had had the conversations with the Donaldsons at the
19  beginning of this.  I trusted that they talked to
20  Mr. Famiglio.  And, I mean, at that point, I didn't --
21  you know, what more did I need to do?  They -- you
22  know, Mr. Famiglio was handling this for me, and I
23  would review these and trust that he was doing what he
24  was supposed to be doing.
25    Q   Okay.  Directing your attention back to

51

1  Exhibit 10, the second page of Exhibit 10, it's marked
2  OTS-James 000060.  There is a Part II, the top half of
3  that page, "Foreign Trust Income Statement."
4    A   Yes.
5    Q   And in that section, there is a Line 17A.
6    A   Yes.
7    Q   "Enter the fair market value of total
8  distributions."
9    A   Yes.
10    Q   Do you know what that line represents?
11    A   According to what it says, it appears -- I
12  can just read it, "Fair market value of total
13  distributions from trust to persons."
14    Q   Okay.  Did you receive a distribution from
15  the Hornsby Trust in 2003?
16    A   I know that with the trust, I would borrow
17  money against my principal and pay it back.  That was
18  outlined to me at the beginning, that I would be able
19  to do that, and I had done it on several occasions
20  where I would -- I needed money for one thing or
21  another, I would borrow the money against the offshore
22  money, and then I would pay it back.  And usually I
23  paid it back within, you know, less than six months, I
24  think.
25    Q   Okay.  I think we'll probably explore that a

52

1  little bit farther.
2    Do you believe that this $50,025 of
3  distribution was borrowing against the principal of the
4  trust?
5    A   Yes, sir, I think that's what that was.
6    Q   Okay.  Do you remember specifically what it
7  was?
8    A   I don't remember specifically what I used it
9  for, but I know I did borrow money on more than one
10  occasion from the trust and then paid it back.
11    Q   Okay.
12    A   I do recall that.
13    Q   Do you know whether this distribution of
14  $50,025 was taxable to you in the year 2003?
15    MR. JONES:  Objection, calls for a legal
16  conclusion.
17    Q   (By Mr. May)  I'm just asking if you know.
18  Do you know?
19    A   Do I --
20    MR. JONES:  You can answer.
21    MR. MAY:  You can answer.
22    THE WITNESS:  Again, I thought that was
23  a loan, so no.  You know, as long as I
24  borrowed it and paid it back, I didn't -- it
25  was my understanding from the advice of the

53

1    Donaldsons and Famiglio, if I did that, as
2    long as I paid it back, it wasn't considered
3    taxable income.
4        Q    (By Mr. May)  Okay.  So you understood that
5    it was not taxable?
6        A    To the best of my knowledge, yeah, when I
7    borrowed the money and I paid it back, yes, sir, that
8    was my understanding, that it was not taxable income.
9        Q    Okay.  So do you know whether you reported
10   this 50,025 or any distribution in the year 2003 on
11   your Form 1040 individual tax return?
12       A    I don't know.  You know, with the loans, I
13   was told how to do it, you know, and I paid it back,
14   and that information was given to my accountant, and I
15   trusted him to handle it appropriately.
16       Q    I'll direct your attention to the fifth page
17   of the -- of Exhibit No. 10.  At the top, it's 2003
18   Form 3520-A attachment.
19       A    Yes.
20       Q    And the lower right corner, it's OTS-James
21   000063.
22       A    Yes.
23       Q    There's a Big Easy Real Estate, LLC.
24       A    Yes.
25       Q    What was that, or what is that?

54

1        A    Big Easy is a nickname for New Orleans,
2    where I went to medical school, and I had a condo in
3    New Orleans.  And again, for the same reason that I had
4    money in those accounts -- it was not my primary
5    residence, so I was concerned as far as if any possible
6    litigation occurred, that it could be taken from me.
7    So that condo was placed in the Big Easy, LLC, which
8    was in the trust in order to protect it.
9        Q    Okay.  And American Vantage Company, what is
10   that?
11       A    I don't remember.
12       Q    Okay.  What about Fidelity Insurance Company?
13       A    They were the people in the West Indies, I
14   think where the trust was set up.
15       Q    There's a column for "Description of
16   Transfer."  Do you see that?
17       A    Yes.
18       Q    And I think in the line under "Fidelity
19   Insurance Company," it says "annuity premium."
20       A    Yes.
21       MR. JONES:  I seem to have lost my last
22   page.
23       MR. MAY:  Okay, sure.
24       MR. JONES:  I'll take the copy.
25       Q    (By Mr. May)  "Annuity premium," what was

55

1    that?
2        A    According to this description, it was a
3    premium paid to Fidelity trust for 130,000.
4        Q    Okay.  Do you remember what the annuity was?
5        A    No, sir.  I had bought several products from
6    the Donaldsons.  I think it was an insurance product,
7    though.
8        Q    Okay.
9        A    That's what I thought it was.
10       Q    Okay.  And so that 130,000 was for the
11   premium of some insurance product?
12       A    I think so.
13       Q    Okay.  And are you aware of whether or not
14   Offshore Trust Services provided a copy of Exhibit 10
15   to George Famiglio?
16       A    I'm not aware if they did.
17       Q    Okay.  You wouldn't know one way or the
18   other?
19       A    No, sir.
20       Q    Okay.  Now, ultimately, you received a notice
21   from the IRS, I think we had talked about earlier, that
22   you had not filed Form 3520 as the owner of the Hornsby
23   Trust --
24       A    Yes.
25       Q    -- is that fair?

56

1        But at some point, did you file Forms 3520?
2        A    I think so.  I mean, I had that discussion
3    with Mr. Famiglio regarding the penalties, and I don't
4    remember the specifics of any conversation, but I think
5    they were filed after that, I'm pretty sure.
6        Q    Did Eric Schmitz have any role in helping you
7    prepare Forms 3520?
8        A    I don't remember the -- again, I'm sorry, I
9    apologize.  You know, I had had conversations with
10   Mr. Schmitz about this and hired him.  I had
11   conversation with Mr. Famiglio, as well as the
12   Donaldsons, regarding all of this, because when the
13   penalty came up, obviously I was distraught and wanted
14   to -- we did whatever -- I did what I was told by them
15   to do.  I paid the penalties and, again, relied on
16   Mr. Schmitz to help out in this scenario to help make
17   things right.
18       Q    You mentioned you spoke with Steve Donaldson
19   after you got the notice from the IRS.
20       A    Yes.  He referred me to Simon, William
21   Simon's business, and that's where I engaged Mr. Eric
22   Schmitz.
23       Q    And when was that conversation with
24   Mr. Donaldson?
25       A    Probably right around when I got the penalty,

57

1  shortly after, I would imagine.
2      Q   Okay.  And in addition to referring you to
3  Bill Simon and Eric Schmitz, what else did you discuss
4  with Mr. Donaldson in that conversation?
5      A   I don't recall the specific conversation,
6  unfortunately.  You know, I know that we had talked
7  about Famiglio was my accountant.  They -- you know, I
8  wish I could remember more.  You know, I can't -- I
9  remember being upset about it.  I remember being upset
10 at Mr. Famiglio.  I remember wanting -- asking
11 Mr. Donaldson what I should do.  And that's when he
12 referred me to Mr. Simon.  I remember talking to them.
13 They wanted to talk to Mr. Famiglio.  And that's -- you
14 know, that's the extent of what I can remember
15 regarding those conversations.
16     Q   Okay.  Do you know if Steve Donaldson ever
17 followed up with George Famiglio after that?
18     A   Well, I know -- you know, like I said, at the
19 beginning, when I first set things up, I had given the
20 information regarding my accountant, Mr. Famiglio, that
21 he was going to speak with him.  I trusted him to do
22 that.  And, you know, I don't know what more -- what
23 more did you want me to do?  It's like -- you know,
24 that's all I can remember about that.
25     Q   Was it about that time -- you mentioned

58

1  earlier another accountant.
2      A   Shortly after that, I went to my attorneys in
3  Sarasota and asked for a referral for a new accountant,
4  obviously upset with what had happened with
5  Mr. Famiglio, and that's when I hired Jamie Vicars.
6      Q   Okay.  And did you refer Mr. Donaldson to
7  speak with Jamie Vicars?
8      A   At this time, I think -- you know, I let
9  Jamie Vicars know of the entire situation, gave him the
10 Donaldsons' phone numbers.  But yep, yeah, I had given
11 him that information, because obviously, you know,
12 getting that penalty notice, I contacted everybody
13 involved, and then that's when Donaldson sent me to
14 Schmitz, got the new accountant, let him know my entire
15 situation.  That's pretty much the whole deal, told
16 them -- you know, when I hired the new accountant, I
17 told him everything going on with the Donaldsons, with
18 Famiglio, with Schmitz, what was happening.
19     Q   Do you know if Mr. Vicars ever spoke with
20 Steve Donaldson?
21     A   I don't know that.  I don't know.  I think I
22 was more concerned about this penalty and taking care
23 of that matter it really -- you know, it was a
24 surprise when that occurred.  So my primary concern at
25 that point was addressing these issues, figuring out

59

1  what had happened, why these things weren't -- these
2  forms weren't sent in, why was I being penalized, what
3  was going on with that.
4      Q   Okay.  Now, I think you've testified, but
5  again, do you believe you filed Forms 3520 for the
6  years 2001, '2 and '3 after you received the notice
7  from the IRS?
8      A   I had -- you know, again, going back to the
9  conversation, I'd -- regarding, you know, any of the
10 filings for the IRS, I entrusted Mr. Famiglio to do
11 that.  When I received information, I reviewed it, sent
12 it to him.  I trusted those filings were done
13 appropriately.  You know, I know that I put
14 Mr. Donaldson -- had given him the information
15 regarding my accountant, Mr. Famiglio.  I trusted that
16 they had had conversations to cover these issues, you
17 know.
18        And I don't know what more -- you know,
19 honestly, what -- I didn't know what more -- at that
20 point, I didn't know what else I was supposed to do at
21 that point.  You know, I put them in touch with each
22 other.  They handled that kind of stuff.  I relied on
23 them to do that.  I generally would oversee, and
24 information would go back and forth, but I -- that was,
25 you know, the extent of it, as far as I can remember

60

1  right now.
2      Q   Okay.
3      A   I don't know any more.
4      Q   And now I'm really kind of asking about more
5  like after you got the notice from the IRS and you
6  started working with Eric Schmitz.  And it's my
7  understanding that Eric Schmitz helped prepare the
8  Forms 3520 that were filed.  Is that correct?
9      A   Yes, sir.
10     Q   Okay.
11     A   I think so.
12     Q   Okay.  And as far as those forms, 3520, that
13 I think Eric Schmitz helped you prepare, what do you
14 remember about that process?
15     A   I don't remember any more than we've already
16 talked about.
17     Q   Okay.
18        MR. MAY:  Let's go ahead and mark this
19 as 23.
20        (Exhibit 23 marked for identification.)
21     Q   (By Mr. May)  All right, Dr. James, you've
22 been handed what's marked Exhibit 23.  What is Exhibit
23 23?
24     A   3520 dated 2003.
25     Q   And is this your Form 3520 for 2003?

61

1    A   Yes, sir.
2    Q   This is marked -- Exhibit 23 is marked "Copy"
3  in a couple of places and is not signed.  Do you
4  believe you filed or submitted a signed copy to the IRS
5  at some point?
6    A   It's my understanding that it was being done.
7    Q   Okay.  Do you remember signing a form such as
8  this for the year 2003?
9    A   I've signed a -- you know, I've signed a lot
10 of documents that come across my desk.  I can't
11 remember every one of them.
12   Q   Okay, sure, that's fair.
13       Do you believe that the Form 3520 that you
14 submitted for 2003 was materially correct in all
15 respects?
16   A   To the best of my understanding.
17   Q   I'll direct your attention in Exhibit 23 to
18 the fourth page.  And in the lower right-hand corner,
19 there's letters SAB0140.  Do you see that page?
20   A   Yes.
21   Q   And now I'm directing you back up to the top
22 third of the page, Part III, "Distributions to U.S.
23 Person From a Foreign Trust During the Current Tax
24 Year."
25   A   Yes.

62

1    Q   And under Line 24 in Column A, there's an
2  N/A.  Do you see that?
3    A   I do.
4    Q   Does Part III, Line 24, reflect the 50,025
5  distribution that we saw in Exhibit 10, Line 17 of
6  Part II of that exhibit?
7    A   Wait.  Can you ask me that again, please?
8    Q   Sure.  I understand it's -- we saw in Exhibit
9  10 a --
10   A   Right.
11   Q   And you can look there if you'd like.
12   A   Yep.
13   Q   A distribution on the second page, Line 17 of
14 Part II --
15   A   Right.
16   Q   -- the 50,025.
17   A   Yes, I see it.
18   Q   Is that distribution reflected in your Form
19 3520 for that year?
20   A   So when you're saying the 3520 for that year,
21 you're talking about Exhibit 23?
22   Q   Yes, sir.
23   A   In that line that you pointed me out to, 24,
24 it says "N/A."
25   Q   So is the distribution that the 3520-A

63

1  reflects also reflected in the Form 3520-A?
2    A   It does not -- if it's supposed to be on that
3  line right there, it's not on it.
4    Q   Okay.  And you can take a moment and glance
5  through Exhibit 23.  Do you see the distribution
6  reflected anywhere else?
7    A   I don't see that number anywhere else on the
8  form.
9    Q   Okay.  Is it your understanding that Eric
10 Schmitz prepared what is now Exhibit 23, or do you
11 remember?
12   A   I don't recall.
13   Q   Okay.  And do you recall whether you ever
14 signed Exhibit 23 or a similar document?
15   A   I don't recall.
16   Q   Okay.
17   A   As I had said, you know, I have a lot of
18 documents go across -- a lot of paperwork all day.
19 And, you know, I delegate it, I oversee the entire
20 process, I review them, but I would have relied on him
21 to address that.
22   Q   Okay.  Do you know why Exhibit 23 doesn't
23 reflect the distribution of $50,025 that's shown in
24 Exhibit 10?
25       MR. JONES:  Objection to the

64

1  characterization as a distribution.  He
2  testified it was a loan.
3        MR. MAY:  Okay.
4    Q   (By Mr. May)  You can answer the question.
5    A   No, I don't have -- I mean, I don't have a
6  complete understanding of all of these.  And again, you
7  know, when we discussed the 50,000 earlier, I had taken
8  out multiple loans from the company.  I believed that
9  to be a loan from the company that I would repay.
10   Q   Okay.  So your understanding of the reason
11 for the distribution not being in Exhibit 23 is that it
12 was a loan from the trust?
13   A   I don't understand why it's under a
14 distribution.  I don't have a full understanding of
15 these forms.  I can read what it says here.  It says
16 not applicable, N/A, under "Date of Distribution."  I
17 wish I could be of more help to you on this and be able
18 to give you a more detailed answer.  I just don't have
19 it.
20   Q   Sure.  And I'm just asking for your
21 understanding, and that's fine.  Okay.
22       Now, along with the Forms 3520 and 3520-A,
23 you also personally file a Form 1040 tax return, don't
24 you?
25   A   Yes, sir.

65

```
 1      Q   And you file that form every year?
 2      A   Yes, sir.
 3      Q   And you filed it every year from 2001 to
 4   2003?
 5      A   To the best of my knowledge, yes, sir.
 6      Q   When, in general, is a Form 1040 tax return
 7   due?
 8      A   April 15th.
 9      Q   Okay.  And is it conceivable that sometimes
10   you get an extension?
11      A   I usually do.
12      Q   Okay.  Now, when you get an extension, what's
13   your understanding of when the taxes would be due?
14      A   I think it's in August, and I've gotten
15   extensions till October, middle of October before.
16      Q   Okay.  So in your understanding, if you get
17   an extension to file the return, is it your
18   understanding that the tax then is also not due until
19   the return is due?
20      A   Yes, sir.
21      Q   Okay.  So with respect to your habit of
22   filing 1040s and in particular for the years 2001
23   through 2005, was it your habit to get extensions for
24   each year?
25      A   I think I have most of the time.
```

66

```
 1      Q   Okay.  Was it a habit to pay when you filed
 2   the return?
 3      A   I think I did.  It was usually at the
 4   recommendation of my accountant, when we would go over
 5   the books together and look at what I owed, how we'd
 6   want to structure the payment.  I would usually
 7   follow -- you know, I would follow the recommendation
 8   of my accountant in those respects.
 9      Q   Okay.  And when you say "it was at the
10   recommendation," was getting the extension the
11   recommendation of your accountant?
12      A   Yes, sir.
13      Q   Okay.  And how about paying the tax at the
14   time of the extension and not on April 15th?
15      A   However we would work it out depending on
16   that year and how the books looked as far as money
17   coming in and all of that, then a decision would be
18   made, you know, how much we could pay now, how much --
19   you know, how long it would take to pay it off
20   completely.  Those kind of decisions would be made
21   between myself and my accountant.
22      Q   Okay.  Did George Famiglio in particular ever
23   advise you as to when you should pay the tax that was
24   due?
25      A   Absolutely.
```

67

```
 1      Q   Okay.  And what would his advice to you be?
 2      A   It depended on that year.  I think he had
 3   advised me to get extensions before.  This is off the
 4   top of my head.
 5      Q   Okay.
 6      A   To the best of your recollection, I would pay
 7   what I could as soon as I could and then, you know,
 8   finish paying it off as quickly as I could.
 9      Q   Okay.  So were there some years -- and we're
10   still speaking in general.  We may get to specific
11   years in a minute, but were there some years where you
12   didn't pay it all when you filed the return because
13   maybe you didn't have enough money to fully pay at that
14   time?
15      A   That sounds like that could certainly have
16   happened.
17      Q   Okay.  But it was your habit under those
18   circumstances to pay as soon as you had the money
19   available; is that right?
20      A   Yes, sir.
21      Q   Okay.  What, if anything, did George Famiglio
22   ever tell you with respect to perhaps paying the tax
23   before you filed the return?
24      A   I don't remember us having that discussion.
25      Q   Okay.  Was it customary, when filing your
```

68

```
 1   returns, would you speak with him, or did you just get
 2   a call to come and sign the return?
 3      A   We had -- you know, in both scenarios.  I've
 4   talked to him on the phone before about that, and I had
 5   gone over to his office to sign them, to go over that
 6   information with him.
 7      Q   Okay.
 8      A   Typically, he would -- you know, he would
 9   usually let me know, you know, "We need to meet about
10   this," so I would come over and we would go over it.
11      Q   And you say "meet about this" --
12      A   As far as my tax returns, tax stuff.
13      Q   Okay.  So would you actually go through the
14   Form 1040 with Mr. Famiglio and talk about particular
15   items?
16      A   The conversations were typically he would
17   talk to me about how much I would owe and then how much
18   could I pay then and then how we could set up paying
19   the rest off.
20      Q   Okay.  So it was more about like the total
21   due and how you were going to pay it?
22      A   I think so.  There may have been more to it,
23   but that's what I remember.
24      Q   Okay.  Now, with reference to your
25   particular -- your 2001 Form 1040, I'll represent to
```

69

1  you that in the documents you produced to the United
2  States, there was a copy of your -- a couple of copies
3  of your 2002 and 2003 Forms 1040.  There was not a copy
4  of your 2001 Form 1040.  Does that sound correct to
5  you?
6      A  I don't remember.
7      Q  Okay.  Do you remember if you still have a
8  copy of your 2001 Form 1040?
9      A  I don't.  I'm sorry.
10     Q  Okay.  That's fine.  But you're sure you
11 filed a 1040 for the year 2001?
12     A  You know, I would assume that I did.  You
13 know, every year when it was tax time, I would meet
14 with my accountant, we would go over these things.  I
15 have no reason to believe it wasn't filed.  That was my
16 habit, to pay my taxes, to file what was necessary, you
17 know, working with my accountant to do that.
18     Q  Sure.
19        MR. MAY:  Let the record reflect that
20     Mr. Dupree stepped out for a minute.
21     Q  (By Mr. May)  Okay.  Dr. James -- and that's
22 fair.  I mean, I'm just asking because -- just so that
23 our record is complete.  Do you remember anything
24 specific about your 2001 Form 1040?
25     A  I do not.

70

1      Q  Okay.  I'm now handing you what's been marked
2  previously as Exhibit 16.  Do you recognize Exhibit 16,
3  Dr. James?
4      A  It's a, yes, sir, 1040 U.S. individual tax
5  return, 2002, extensions filed certified.
6      Q  Okay.  So is this a copy of your 2002 Form
7  1040?
8      A  Yes, sir.
9      Q  Now, there are -- on this first page of
10 Exhibit 16, there's what appear to me to be a number of
11 stamps.  For instance, in the middle, it looks like,
12 it's kind of hard to read, but "Received February 27,
13 2006."
14     A  Yes, sir.
15     Q  And then just kind of to the right and below
16 that, there's a number 79 selected, "Aug 27, 2004."
17     A  Yes.
18     Q  And then some other stamps and maybe some pen
19 markings.  Do you know what those are --
20     A  No.
21     Q  -- what those stamps and markings are?
22     A  Other than what they specifically say, no.
23     Q  Okay.  As you glance through, and maybe take
24 a moment and glance through Exhibit 16, you might
25 notice that there are some other -- appear to be some

71

1  other markings.  For example, in the page numbered IRS
2  Admin 000009, which is the fourth page of Exhibit 16,
3  there's two long marks, kind of a large X kind of
4  across the -- almost the entire page.  Do you see that?
5      A  I do.
6      Q  Okay.  Do you know what that was for?
7      A  No, sir.
8         MR. JONES:  Objection.  We've already
9      agreed, haven't we, this is IRS markings from
10     your file?  Haven't we?
11        MR. MAY:  Okay.  I didn't know that we
12     had agreed.  I was trying to establish that,
13     but I'm willing to stipulate that those are
14     all IRS markings.  At least I believe them to
15     be IRS markings.
16     Q  (By Mr. May)  Dr. James, these markings that
17 appear to be IRS markings, do you believe they
18 materially alter the return that you filed?
19        MR. JONES:  Objection.  That calls for a
20     legal conclusion.
21     Q  (By Mr. May)  You can answer.
22     A  The mark -- so can you repeat the question
23 real quick?
24     Q  I just asked if you think any of these
25 markings alter the return as you filed it, materially

72

1  alter it?
2      A  I don't think I put an X on it.
3      Q  Okay.  Are any of the numbers that you put in
4  your return changed by any of these markings?
5      A  You know, I can't recall the specific numbers
6  from 2002 to know if -- I mean, I have to -- if I can
7  assume that this document is the actual one that I
8  filed and it's the appropriate one and that those
9  numbers were put in, then I assume I can believe this
10 document is -- you know, I'm not sure what you're
11 asking exactly.
12        MR. JONES:  Nor am I.
13        MR. MAY:  Sure, I'll rephrase it.
14     Q  (By Mr. May)  Do you have any reason to
15 suspect the IRS would have changed any of the numbers
16 that your accountant put on your return?
17     A  I don't think they do that.
18     Q  Okay.
19     A  Do they?
20     Q  I don't think so, but I'm asking if you have
21 any reason to suspect that.
22     A  I don't think so either.
23     Q  Okay.
24     A  I would agree with you on that.
25     Q  Okay.

73

1    A    I bet you would know before I would.
2    Q    And then my real question is -- if you'll
3  turn to the second page of Exhibit 16, IRS Admin page
4  7.
5    A    Okay.
6    Q    There's a place for "sign here" near the
7  bottom of the page.
8    A    Yes.
9    Q    Is that your signature?
10    A    Yes.
11    Q    Okay.  And the statement, would you read the
12  statement that's just above your signature?  It begins
13  "Under penalties of perjury..."
14    A    "Under penalties of perjury, I declare that I
15  have examined this return and accompanying schedule and
16  statements.  To the best of my knowledge and belief,
17  they are true, correct, and complete.  Declaration of
18  preparer" -- can't read the next few words.
19    Q    Okay.
20    A    It's got my signature of -- what's it say?
21    Q    I think it's says "other than taxpayer."
22    A    "Other than taxpayer, is based on all
23  information of which preparer has any knowledge."
24    Q    Okay.  And is the return also signed by
25  George Famiglio?

74

1    A    Yes, it is.
2    Q    Okay.  And are you familiar with George
3  Famiglio's signature?
4    A    I wouldn't have been able to tell you what it
5  looked like until I saw this.
6    Q    Okay.  And then turning to the fourth page,
7  IRS Admin 000009 --
8        MR. JONES:  The page with the X through
9    it?
10        MR. MAY:  Yes.
11        THE WITNESS:  Got it.
12    Q    (By Mr. May)  Near the bottom or at the
13  bottom, there's a Line 8.  Would you read line 8?
14    A    "During 2002, did you receive a distribution
15  from or were you the grantor of or transferor to a
16  foreign trust?  If yes, you may have to file a Form
17  3520.  See page B2."
18    Q    And there's a box -- two boxes to the left of
19  that, one for "yes" and one for "no."  Which box is
20  selected?
21    A    No.
22    Q    In 2002, were you the grantor or owner of the
23  Hornsby Trust?
24    A    I was the owner of the Hornsby Trust.
25    Q    So is Line 8 on page IRS Admin 000009

75

1  incorrect?
2    A    Yes, sir.
3        MR. JONES:  Well, objection.  That calls
4    for a legal conclusion.
5        MR. MAY:  It's been asked and answered.
6    Q    (By Mr. May)  I direct you back to the second
7  page of Exhibit 16, the IRS Admin 007.  And just to --
8  just above the signature block, there's a Line 74.  Do
9  you see Line 74?
10    A    Yes.
11    Q    "Estimated tax penalty."
12    A    Yes.
13    Q    And the amount there is $4,537.92?
14    A    Yes.
15    Q    What is that penalty for?
16    A    I think that's for paying late.
17    Q    Okay.  And then below the signature block,
18  there's two lines that appear to have been added by the
19  accountant with two asterisks.  There's an "interest
20  not included" and two asterisks, "penalty not
21  included"?
22    A    Correct.  I see it.
23    Q    And then some amounts over to the left of
24  that -- or to the right of that, excuse me.
25    A    Yes.

76

1    Q    Do you know what those amounts were for?
2    A    It's interest from putting off -- from filing
3  the extension.
4    Q    And the penalty, that penalty?
5    A    I think that's the penalty for paying late.
6    Q    Okay.  And was that because you paid after
7  the extension or after the due date, if you know?
8    A    I think it's for paying after when they're
9  due.
10    Q    Okay.  Was there -- were there other years
11  when you incurred some of these two -- the estimated
12  tax penalty and this other penalty and the interest?
13    A    I think so.
14    Q    Okay.
15    A    Anytime I filed an extension, I think I had
16  those.
17    Q    And it's your understanding that those were
18  from filing late?
19    A    Yes, sir.
20    Q    And/or paying late?
21    A    Yes, sir.
22    Q    Okay.  In your mind, do you distinguish
23  between filing late and paying late, or is it all, I
24  mean --
25    A    Well, I equate filing late with paying late.

77

1     Q   Okay.  And I think you testified earlier that
2  you've routinely filed with extensions and paid late;
3  is that fair?
4     A   Yes, sir.
5     Q   Okay.  So it wouldn't surprise you if you had
6  incurred these similar penalties in other years?
7     A   Yes, sir.
8     Q   And again, what's the reason for paying late?
9     A   At this point, I think I didn't -- it was
10  something -- you know, my accountant and I would look
11  at the books, like I said, and he would recommend that
12  I file an extension, and then we -- we would go over,
13  like I said earlier, what we could pay then and how we
14  could pay it out.  I remember him saying that that's
15  not a -- you know, that's okay to do, to file an
16  extension.
17     Q   Okay.
18        (Exhibit 24 marked for identification.)
19     Q   (By Mr. May)  All right, Dr. James, you've
20  been handed what's marked Exhibit 24.  What is Exhibit
21  24?
22     A   1040 U.S. individual tax return for 2002,
23  extensions filed certified, it says.
24     Q   Okay.  And in the lower right corner, there's
25  a number, SAB0028.

78

1     A   Yes.
2     Q   I'll ask you to turn back in this document,
3  Exhibit 24 -- there is a -- excuse me, SAB0049.
4     A   I see it.
5     Q   And what does that page begin?
6     A   It says "Extension Granted."
7     Q   And is this a Form 10 -- your Form 1040 for
8  the year 2003?
9     A   Yes.
10     Q   Okay.  So -- and I'll just represent to you,
11  this is how the United States received these two
12  documents in -- kind of collected together this way,
13  and that's why I brought it this way to you.
14        And in particular, my question is directed
15  toward the fax header at the tops of the pages, do
16  you see that, or what I think is a fax header with
17  a March 23, 2005, 9:05 a.m., Medical Records,
18  No. 3323" --
19     A   Wait, where are you reading this?
20     Q   You can look at the first --
21     A   Oh, I see it at the top, March 23rd.
22     Q   Yeah.  And I think each page has a header.
23        MR. JONES:  I'm sorry, Michael, I think
24  he's looking at the wrong return.
25        THE WITNESS:  I'm on 24.

79

1        MR. MAY:  Okay.
2        THE WITNESS:  Oh.
3        MR. JONES:  And he's talking about --
4        THE WITNESS:  That one.
5        MR. JONES:  Correct, Michael?
6        MR. MAY:  Yes.  Yeah, I'm actually
7  talking in general.  Each page seems to have
8  what appears to me to have a fax header.
9        MR. JONES:  Oh, anywhere on the
10  document, okay.
11        MR. MAY:  Yeah --
12        MR. JONES:  Okay.
13        MR. MAY:  -- it has a fax header.
14        THE WITNESS:  Yes, I see it.
15     Q   (By Mr. May)  Okay.  Directing your attention
16  now in particular to the first page of Exhibit 23 --
17     A   Back to the first page.
18     Q   Yep, SAB0028.
19     A   Yes.
20     Q   And it begins -- the header begins up in the
21  right-hand corner "P. 2/76."  Do you see that?
22     A   Yes, sir.
23     Q   Okay.  Does that represent that this was the
24  second page of 76 on a fax that was transmitted?
25     A   I think so.

80

1     Q   Okay.  Do you know what page 1 would have
2  been or is?
3     A   I would assume it's a cover page, maybe.
4     Q   Okay.  But do you have any reason to know for
5  sure one way or the other?
6     A   No, sir.
7     Q   Okay.
8     A   That would be my best guess.
9     Q   Okay, just a guess.  Okay.  Now turning back
10  to the page SAB0048 --
11     A   I see it.
12     Q   -- again, the fax header at the top, it
13  appears to me to be "P. 22 of 76."
14     A   Yes.
15     Q   Is that fair?
16     A   Yes.
17     Q   And then turning to the next page, the header
18  is marked "P. 47 of 76."
19     A   Yes.
20     Q   Do you know -- do you know if the 47 of 76
21  and the remainder of the document were originally with
22  the 2 through 22 of 76?
23     A   No, sir.
24     Q   Okay.  Do you know -- if they were all
25  together, do you know what could have happened to pages

81

1    23 through 46 of 76?
2        A    No, sir.
3        Q    Okay.  But is Exhibit 24, in your
4    understanding, an accurate -- a true and correct copy
5    of your Forms 1040 for 2002 and 2003?
6        A    Yes, sir, that's what you had said earlier,
7    that it was -- you represented that that was my copy of
8    my 1040.
9        Q    Okay.
10       A    Yes, sir.  And I believe you.
11       Q    Okay.  Do you know where the source of these
12   documents was?
13       A    Can you explain?
14       Q    Did this copy come from your files?
15       A    I don't know where this particular copy came
16   from.
17       Q    Okay, fair enough.
18            I'm going to hand you what was previously
19   marked as Exhibit 19.  And I think maybe after we look
20   at this document, maybe would be a good time to take a
21   break.  Do you recognize Exhibit 19, Dr. James?
22       A    I recognize it as a 1040 form for U.S.
23   individual income return.
24       Q    Okay.  Is it your 2003 Form 1040?
25       A    Yes, sir, it appears so.

82

1        Q    Okay.  And I'll direct your attention to the
2    second page, IRS Admin 000032.
3            MR. JONES:  Well, objection.  I mean,
4        have you clarified that this is the copy of
5        the return that you got from the IRS files?
6            MR. MAY:  I have not said that, but I'll
7        represent to you that it is the copy that I
8        obtained from the IRS files.
9            MR. JONES:  And the same objection we
10       had before, as long as we make the record
11       clear that the numbering and that that stuff
12       comes from the IRS, apparently.
13           MR. MAY:  Yeah, the markings --
14           MR. JONES:  The markings.  I'm sorry.
15           MR. MAY:  There are markings and
16       stamps --
17           MR. JONES:  And lines.
18           MR. MAY:  -- and lines that appear to be
19       from the IRS, yes, but that there does not
20       appear to be any alteration to the numbers
21       that were included on the return.
22           THE WITNESS:  Does not appear.
23           MR. MAY:  Okay.
24       Q    (By Mr. May)  And then directing your
25   attention again to the "sign here" block.

83

1        A    Yes, sir.
2        Q    Is that your signature?
3        A    Yes, sir.
4        Q    Okay.  And does the signature block include
5    the same statement, "Under penalties of perjury, I
6    declare I have examined this return and accompanying
7    statements" --
8        A    Yes, it does.
9        Q    Okay.  And I'll direct your attention to the
10   fourth page of Exhibit 19, IRS Admin 000034, Line 8.
11   Would you read Line 8?
12       A    "During 2003, did you receive a distribution
13   from or were you the grantor of or transferor to a
14   foreign trust?  If yes, you may have to file a 3520."
15       Q    Is that marked yes or no?
16       A    No.
17       Q    So is Line 8 on Exhibit 19, page IRS Admin
18   000034, correct?
19           MR. JONES:  Objection.  That calls for a
20       legal conclusion.
21       Q    (By Mr. May)  You can answer the question.
22       A    No.
23       Q    Okay.  It's -- okay.  No, it's not correct,
24   is that what you -- is that your answer?
25       A    (Witness nods head affirmatively.)

84

1        Q    Okay.  And returning you back to the
2    statement on IRS Admin 000032, where you signed the
3    return --
4        A    Okay.
5        Q    -- "I declare that I have examined this
6    return and accompanying schedules and statements, and
7    to the best of my knowledge and belief, they are true,
8    correct, and complete."
9        A    We just read that.
10       Q    Yes.
11       A    Yes, I signed it.
12       Q    So -- okay.  And you signed that statement,
13   correct?
14       A    Yes.
15       Q    And were all of the statements and schedules
16   correct?
17       A    Well, looking --
18           MR. JONES:  Are you asking him to review
19       the return now or --
20       Q    (By Mr. May)  Well, in particular, we've
21   identified one statement on the Schedule B, Line 8,
22   that's not correct; is that true?
23       A    Yes.
24           MR. JONES:  I objected to that before as
25       calling for a legal conclusion.

85

1     MR. MAY:  Okay.
2     Q    (By Mr. May)  So at least one statement in
3  the return is not correct; is that a fair statement?
4     A    I think we've gone over that several times
5  now.  You've asked --
6     Q    Is that true?
7     A    Yeah.
8     Q    Okay.  And on this return, the 2003 return,
9  do you see the Line 73, "Estimated Tax Penalty," on the
10 second page of Exhibit 19, just above the signature?
11    A    Yes.
12    Q    And then the two lines below the signature
13 block, "Interest Not Included, Penalty Not Included"?
14    A    Yes.
15    Q    And there's some amounts on all three of
16 those lines?
17    A    Yes.
18    Q    With respect to your statements about your
19 2002 return, would your -- let me just rephrase the
20 question.
21         Is it your understanding those penalties and
22 interest are for paying the tax late?
23    A    Yes.  It would be the same answer as for the
24 last one.
25    MR. MAY:  All right, I think probably

86

1  now is a good time to take a short break.
2     (Recess taken.)
3     Q    (By Mr. May)  Okay.  Dr. James, we've been
4  talking about a lot of 3520s and 1040s, but let's back
5  up a little bit and just kind of get an idea of who you
6  are and your background and experience before you
7  established the Hornsby Trust.  I understand that
8  you're a medical doctor?
9     A    Yes.
10    Q    What kind of medicine do you practice?
11    A    I do interventional pain, which is surgery to
12 help relieve chronic pain, involves nerve blocks,
13 implanting devices in the spinal canal to reduce
14 chronic pain.
15    Q    Okay.  And how long have you been practicing
16 that kind of medicine?
17    A    Since -- in private practice, since 1995.
18    Q    Okay.  And before that?
19    A    Was in a fellowship at Mayo Clinic, and prior
20 to that was in anesthesia residency at Ochsner New
21 Orleans, and then LSU and medical school in New
22 Orleans.
23    Q    Okay.  And if I had to put a label on your
24 specialty, what would that label be?
25    A    Interventional pain.

87

1     Q    Okay.  And as far as education, I assume you
2  have a medical-school degree?
3     A    Yes, sir.
4     Q    And you went to undergrad there?
5     A    LSU in Baton Rouge for undergrad.
6     Q    Okay.  And also for medical school?
7     A    Medical school at LSU, New Orleans.
8     Q    New Orleans, okay.  In addition to your
9  medical practice, are you an owner of any other
10 businesses?
11    A    I have part ownership in a surgery center
12 where I do procedures.
13    Q    Okay.  And how many other owners of that
14 business are there?
15    A    Six, I think it's six other owners, or seven.
16    Q    What's the name of the surgery center?
17    A    Surgery Partners.
18    Q    Okay.  What form of entity is Surgery
19 Partners?  Is it a partnership, an LLC?
20    A    It's an LLC, I think.
21    Q    Are the other owners, are they all doctors
22 also?
23    A    All of them but one, is a general partner.
24    Q    Okay.  And who is the general partner?
25    A    It's a private equity firm, bought out that

88

1  general partner some time ago.  I don't know if it's
2  still called -- I think it's HIG, owns the remainder of
3  the stock other than the stock that's owned by us
4  doctors.
5     Q    Okay.  And what percentage ownership do you
6  have?
7     A    Twelve point something percent.
8     Q    So in addition to your practice -- and what's
9  the name of your personal practice?
10    A    Pain Medicine Consultants.
11    Q    Okay.  At some time in the past, was it
12 Brian C. James, M.D., P.A.?
13    A    I'm sorry.  It's Brian C. James, M.D., P.A.,
14 doing business as Pain Medicine Consultants.  Thank
15 you.
16    Q    Okay.  For how long have you been doing
17 business as Pain Medicine Consultants?
18    A    I started in private practice in '95, but I
19 think that entity was started in '98 or '99.
20    Q    Okay.  So for the years 2001 through 2003,
21 was your practice always the Brian C. James, M.D.,
22 P.A.?
23    A    Yes.  And the surgery center was not an
24 entity back then.
25    Q    Okay.  When was the surgery center founded?

89

```
 1      A   Five years ago.
 2      Q   Okay.  In addition to those two businesses,
 3  are there any other businesses that you're an owner of?
 4      A   I just became a part owner in Infinity Labs.
 5  I have 7 percent ownership, and that just happened.
 6      Q   Okay.  Within the last six months?
 7      A   Oh, yeah.  Yes.
 8      Q   And what's the nature of Infinity Labs?
 9      A   It's a toxicology lab for urine and blood
10  testing.
11      Q   Okay.  Have you ever been a beneficiary or a
12  settlor of a trust besides the Hornsby Trust?
13      A   No.
14      Q   Okay.  Prior to establishing the Hornsby
15  Trust, what kind of investments did you have?
16      A   I don't really think I really had a lot of
17  investments.  I was getting started.  I'm trying to
18  think.  Maybe a small amount in the stock market, and
19  what I mean by "small," maybe 30- to 50,000 dollars,
20  something like that.
21          Oh, I think I had either a Universal Life or
22  some type of -- I have a policy now, and it was an
23  investment, Equitable Life.  I think that was -- we had
24  just set that up back then or a little before those
25  years, and that was it.
```

90

```
 1      Q   Okay.  And what other assets did you have
 2  besides your stock market and besides this Universal
 3  Life policy?
 4      A   Prior to the setting up of this trust?
 5      Q   Correct.
 6      A   I'd have to pull up a financial statement
 7  from back then, but they were very scarce.  I don't
 8  think I had many.  I think that probably was it, to the
 9  best of my understanding.
10      Q   Okay.  Did you have cash in bank accounts
11  or --
12      A   Not a lot.
13      Q   Not a lot, okay.  Any real estate?
14      A   During those years, I think I had just bought
15  a house, which was sold during the process of my
16  divorce.
17      Q   Okay.
18      A   And that was right before the trusts were set
19  up.
20      Q   Okay.  And that house, where was that house?
21      A   It was in Sarasota.  And then I bought
22  another house in Sarasota where I lived.
23      Q   Okay.  You mentioned your divorce a couple of
24  times.  When was that?
25      A   It was 11 years ago.
```

91

```
 1      Q   Okay.  And I think earlier you mentioned it
 2  as part of the reason for establishing the Hornsby
 3  Trust.
 4      A   Yes, sir.
 5      Q   And how are those two connected?
 6      A   As I mentioned earlier, it was a liability
 7  issue.  Being single in Florida, being a surgeon in my
 8  specialty, or being a surgeon in general and being
 9  single, you have a lot of exposure, and that's why I
10  sought asset protection.
11      Q   And so would you say that your motivation in
12  establishing the Hornsby Trust was primarily asset
13  protection?
14      A   Yes.
15      Q   Was there any motivation to have any sort of
16  tax benefits in establishing the trust?
17      A   The motivation was an investment tool, asset
18  protection.  I think when they presented the whole
19  package, I went to them with the primary motivation of
20  asset protection.  They did mention that there were
21  some tax benefits, the specifics of which I don't
22  remember.
23      Q   When you say "them," do you mean Steve
24  Donaldson?
25      A   I'm sorry, yeah, the Donaldsons.
```

92

```
 1      Q   Okay.  And which of the Donaldsons did you
 2  meet first?
 3      A   Steve -- I think it was Steve and Chris.
 4  Steve appeared to be the one that was in charge and the
 5  one that seemed to handle the majority of the things.
 6  I know Chris was his son, was also involved, but not to
 7  the extent that Steve was.
 8      Q   Do you remember the name of their company?
 9      A   Sure.  Foster & Dunhill.
10      Q   Okay.  And who referred you to Steve
11  Donaldson or Foster & Dunhill?
12      A   I had been talking to a group of friends
13  sometime in -- around my divorce, probably during the
14  separation and during that time period.  And one of
15  them had mentioned, "You need to look into asset
16  protection" -- I don't remember which one -- and had
17  mentioned their name.  It came up in conversation, so I
18  looked them up and called them myself.
19      Q   Okay.  How did you look them up?
20      A   I don't remember exactly.
21      Q   Okay.
22      A   I found --
23      Q   Google, phone book?
24      A   You know, I don't even know if we had Google
25  back then.
```

93

1    Q   Okay.  Where was your initial meeting with
2  Steve Donaldson?
3    A   You know, the more we talk about this, the
4  more does come back.  The first meeting, I want to say,
5  was off of West Shore in Tampa in an office there.
6    Q   Steve Donaldson's office or some --
7    A   Yes.
8    Q   Okay.
9    A   That was my understanding, it was his office.
10   Q   Sure, sure.
11   A   I'm concerned at this point -- I don't know
12  what was true and what wasn't that he said, but...
13   Q   Okay.  You mentioned that part of the
14  motivation of asset protection was, as a single person,
15  you face more liability.  Why is that?  What's your
16  understanding about why that's the case?
17   A   In Florida, I know if you're married, what
18  you have is under your name and your wife's name, it's
19  protected from litigation to a large degree.  And then
20  when it's not in her name anymore, it's just yours, you
21  do have a liability exposure.
22   Q   And is your concern -- and don't let me put
23  words into you mouth.  I'm just trying to understand.
24  As a doctor, you face potential medical claims?
25   A   Absolutely.  At that point in time, a portion

94

1  of my practice was involved in personal injury and
2  workers' compensation, so those types of patients
3  statistically are more litigious, so you definitely
4  have a significant risk when those patients are part of
5  your patient population.
6    Q   And so the friends that you were talking
7  about offshore trust and protection, were most of them
8  doctors?
9    A   Doctors, businessmen, you know, friends from
10  around.
11   Q   And you understood that at least the one who
12  mentioned Steve Donaldson may have established a
13  foreign trust with Steve Donaldson or talked to him
14  about that?
15   A   I would expect that he had, yeah, but I don't
16  remember any specifics about that.
17   Q   Okay.  And as far as, you know, going to talk
18  to Steve Donaldson, what kind of investigation, if any,
19  did you do of Steve Donaldson before going to talk to
20  him?
21   A   I really didn't.  You know, I went there with
22  an open mind.  He was -- seemed to be very sharp.  I
23  learned -- I felt like I was -- you know, he showed me
24  a little bit about this is how you go about protecting
25  your assets and this is what we need to set up.

95

1    Q   Okay.  Other than Steve Donaldson and Chris
2  Donaldson, was there anyone else you met with prior to
3  establishing the Hornsby Trust?
4    A   I'm not sure if I met the Critchfields (sic)
5  before or after.  It was somewhere around the
6  beginning -- it may have been after, but I don't
7  remember if it was before or after that I met Josh and
8  Duane Critchfield (sic).
9    Q   Okay.  Is that Crithfield,
10  C-r-i-t-h-f-i-e-l-d?
11   A   Yes.  Crithfield, yes.
12   Q   Okay.  I was just spelling it mainly for the
13  court reporter's benefit.
14        And that was Duane and Josh?
15   A   Yes, Josh was Duane's son.
16   Q   Okay.  And at some point in the process of
17  establishing the trust, you met the Crithfields; is
18  that a fair statement?
19   A   Yes.
20   Q   But you're not sure if it was before or after
21  you established the trust?
22   A   That is correct.
23   Q   Okay.  At some point, did you attend a
24  conference sponsored by Foster & Dunhill with respect
25  to establishing a foreign trust?

96

1    A   I did.  In Cabo San Lucas.
2    Q   Okay.  When was that conference?
3    A   That was after the trust had been set up.
4    Q   Okay.  Do you remember the year?
5    A   No.
6    Q   Okay.  Would it have been within six months
7  of setting up the trust or more than that, more than
8  six months?
9    A   I can't tell you with certainty.
10   Q   Okay.
11   A   I remember it was afterwards, though, because
12  we had -- I, you know, felt like I knew them a little
13  better.  All I can tell you with certainty is it was
14  after, to the best of my understanding.
15   Q   Okay.  A moment ago you said you felt like
16  you knew them better.  Do you mean you knew them better
17  before you went to the conference or after the
18  conference, you --
19   A   After the conference.
20   Q   -- you felt like you knew them better?
21        But you know for sure that the conference was
22  after you established the trust?
23   A   Yes, sir.
24   Q   Do you think the conference in Cabo San Lucas
25  was before 2003?

97

1    A   Again, I couldn't -- I don't know how else to
2  say it.  I don't remember the dates.  Sorry.
3    Q   Okay.  All right.  What do you remember about
4  the conference at Cabo San Lucas?
5    A   You know, they introduced me to other
6  physicians, talked to them.  Spent most of our time
7  doing fun stuff.  We went on four-wheelers, lot of
8  dinners, went out at night.  More social than anything
9  else.
10   Q   Okay.  Were there any presentations at the
11  conference?
12   A   There were presentations there.  I didn't
13  make a lot of them.  Like I said, it was -- I remember
14  Chris and Josh and I would go out at night on the town,
15  and there were often other clients or potential clients
16  with us, basically just, you know, had a lot of fun.  I
17  had never been to Cabo before.  It was a great time.
18   Q   Okay.  Did you attend the presentation on IRS
19  compliance with respect to having a foreign trust?
20   A   I don't think so.  Like I said, I didn't make
21  very many presentations.  I can't recall sitting down
22  in any of them, to be honest, because, like I said, we
23  were -- seemed to be more of a social thing where, you
24  know, we were out and about a lot.  And during the day,
25  we were on the four-wheelers or out by the pool, things

98

1  of that nature.  That's what I remember the most about
2  that trip.
3    Q   Okay.  Did anyone attend the conference with
4  you?  And let me rephrase that.  Did you take anyone
5  with you to the conference, or did you go by yourself?
6    A   I went with them.
7    Q   Okay.  And "them" is?
8    A   The Donaldsons and Crithfields.
9    Q   Okay.
10   A   We actually flew and met them there, now that
11  I remember.
12   Q   Okay.
13   A   But I didn't bring anyone else with me.
14   Q   Okay.  Did you know -- in addition to the
15  Donaldsons and -- and were both Josh and Duane
16  Crithfield at the conference?
17   A   I know Josh was for sure, I know Chris, I
18  know Steve was.  Duane may or may not have been.
19   Q   Did you know anyone else at the conference in
20  addition to those three that you named?
21   A   I met a lot of people there.  I didn't know
22  any of them prior to the conference.
23   Q   Okay.
24   A   Like I said, I think it was mostly other
25  doctors.  I can't remember any of their specific names,

99

1  though.
2    Q   Okay.  I was going to ask if you'd kept in
3  contact with any of those people.
4    A   No, I have not.
5    Q   Do you remember receiving any handouts at the
6  conference?
7    A   No.
8    Q   So do you know you didn't get any
9  handouts, or you just don't remember?
10   A   I don't think I got any handouts.
11   Q   Okay.
12   A   I don't remember coming home with any kind of
13  paperwork or anything like that.
14   Q   Okay.  So how would you describe -- I mean,
15  the conference, you said, was primarily social?
16   A   From my standpoint, it was.
17   Q   Okay.  And as far as whatever presentations
18  were given at the conference, how would you describe
19  your interest in those presentations?
20   A   I remember one where a gentleman was talking
21  about -- the story stuck out in my head, that his
22  children had had a party at his house while he was out
23  of town.  I think he was a physician maybe, maybe not.
24  Someone had been drinking at that party, got into a car
25  accident, they got sued, lost everything, so it was

100

1  about asset protection.  I remember hearing that story
2  in a meeting there --
3    Q   Okay.
4    A   -- because it stuck out.  I remember going --
5  thinking, you know, how unfortunate for this family,
6  had nothing -- the parents were out of town when it all
7  happened.  And so I do remember that, but that's -- I
8  don't think I went to any other meetings.
9    Q   Okay.  I mean, would you describe your
10  interest as high, medium, low, in the topics of the
11  presentations?
12   A   At that point, I felt that, you know, I was
13  there to meet other people and kind of tell them about
14  the product and stuff.  But, I mean, not really just to
15  meet them, tell them my experience more than anything
16  else, and I was happy at that point.
17   Q   Okay.  Did you ever attend any other
18  conferences sponsored by Foster & Dunhill?
19   A   No.
20   Q   Okay.  Did you attend any other programs or
21  presentations or symposia on establishing foreign
22  trusts?
23   A   No, sir.
24   Q   In addition to your meetings with the
25  Donaldsons and perhaps subsequently with the

101

1   Crithfields, did you do any other research, prior to
2   establishing the trust, with respect to establishing
3   foreign trusts?
4       A   No, I did not.  In retrospect, you know, I
5   was somewhat naive, I guess, to some degree.  You know,
6   I remember the -- like I said earlier, the
7   conversations with the Donaldsons, as I mentioned
8   earlier.
9       Q   So is it fair to say you didn't meet with any
10  attorneys with respect to establishing a foreign trust
11  prior to establishing the Hornsby Trust?
12      A   I don't recall.  I'm trying to think.  I
13  don't know if they had attorneys for that or -- I think
14  I just -- you know, I remember signing documents with
15  them.  I don't remember sitting down with any attorneys
16  specifically for this purpose.
17      Q   Okay.  Any CPAs?
18      A   The CPA that was involved was George.  And
19  actually, at the conference, Steve had -- I think he
20  had talked to George when we were at the conference,
21  had mentioned that.
22      Q   And just so I understand -- well, tell me
23  about that.  What did Steve tell you?
24      A   It just popped into my head.  I don't
25  remember anything else other than that, but I believe

102

1   at that point, he had mentioned something about that,
2   that he had spoken with him.  I can't remember anything
3   else.  Just some of this is coming back as we're going
4   and it just pops in there.
5       Q   Sure.
6       A   It's been so long.  I can't remember any
7   specifics about it.
8       Q   Okay.  You just remember that at the
9   conference in Cabo --
10      A   Yeah, it seems like he mentioned to me about
11  following up with George.
12      Q   Steve Donaldson mentioned that he had
13  followed up with George Famiglio?
14      A   Yeah, I think so.
15      Q   At the conference in Cabo San Lucas?
16      A   Seems like it was then.  I remember him
17  mentioning it.  I think it was then.
18      Q   Okay.  But you don't remember what Steve told
19  you that he told George or what George told him?
20      A   I wish I could.  I can't remember.  If it
21  comes up, I'll tell you.
22      Q   Sure, okay.  And at some point, you became
23  acquainted with Duane Crithfield?
24      A   Yes.
25      Q   Do you remember how you became acquainted

103

1   with Mr. Crithfield?
2       A   Steve introduced him, Steve Donaldson.
3       Q   Okay.  So in person, a meeting with you and
4   Steve Donaldson and Duane Crithfield?
5       A   I forgot where we were.  You know, I had seen
6   them on a social basis.  I had been to the Donaldsons'
7   house before, they had been to mine.  So I think I met
8   Duane.  It wasn't in an office setting, I don't think.
9   It may have been in a social setting first.
10      Q   Sure.  With respect to establishing a foreign
11  trust, what did you understand Duane Crithfield's role
12  to be?
13      A   I don't remember what his role was.
14      Q   Okay.  How about Josh Crithfield?
15      A   I don't remember what his role was
16  specifically.  I thought they were all involved in
17  Foster & Dunhill, partners or associates or something.
18      Q   Okay.
19      A   That was my understanding.
20      Q   But there was -- was there any distinction in
21  your mind as to what each person was doing?
22      A   No, I don't recall.  I know -- I do remember
23  that Duane and Steve had different functions, but I
24  can't remember the specifics of what those were or how
25  their relationship was.  It was all through Foster &

104

1   Dunhill, though.
2       Q   Okay.  What information, if any, did Duane
3   Crithfield ever give you about IRS requirements with
4   respect to foreign trusts?
5       A   He was very boisterous, usually drinking, fun
6   kind of guy to be around.  And I don't remember him
7   talking about anything other than social issues.
8       Q   Okay.  So as far as you remember, Duane
9   Crithfield never told you anything about IRS
10  requirements?
11      A   Not that I recall.
12      Q   Okay.  How about Steve Donaldson, what did he
13  ever tell you about IRS requirements?
14      A   I don't remember specifics.  We did talk
15  about setting up the trust, that conversation that we
16  had, something about that, and I had given him George's
17  number to talk to him about -- you know, I wish I could
18  remember the specifics of that.  I know it was at the
19  very beginning, and he said he would follow up with my
20  accountant regarding those issues.
21      Q   Okay.  And then at the conference in Cabo, he
22  mentioned he had followed up --
23      A   I think it was at the conference.  I remember
24  him mentioning it at some point, and I think it was
25  that conference.

105

1    Q   Okay.  Are you a hundred percent sure that it
2  was at the conference?
3    A   I'm not a hundred percent sure it was at that
4  conference.  I remember him mentioning it, that he had
5  followed up with him.  I think it was at that
6  conference.  You know, we spent a lot of time together
7  at that conference out and about.  You know, it was
8  probably more time than I had spent with the Donaldsons
9  at any other time since we met.  You know, it was
10  primarily under social circumstances.  Like I said, we
11  did a lot of dinners, we were out and about a lot, but
12  we were around each other a whole lot during that
13  conference.
14    Q   At some point, did you become aware of
15  Offshore Trust Services?
16    A   I heard that before.  I don't know where that
17  fit in to the whole picture, though.
18    Q   Okay.
19    A   And I remember seeing it, coming across it on
20  documents, Offshore Services, I remember that.  I
21  remember, you know, when I would -- I would briefly
22  scan over these documents.  Like we talked earlier, I
23  go over a lot of paperwork during the course of the
24  day.  I do my best to delegate it, and I oversee those
25  people that I've hired to execute their jobs with it.

106

1  I remember seeing that, though, Offshore Services, more
2  than a few times.
3    Q   Okay.  But do you remember what their role --
4  what its role was in the whole process?
5    A   I can't recall.
6    Q   Okay.  Did you ever have any meetings with
7  Offshore Trust Services?
8    A   I don't think so.  I don't recall having any
9  meetings with any Offshore Services.
10    Q   Okay.  Was there a time when Offshore Trust
11  Services began preparing your Form 3520?
12    A   I couldn't tell  you.  I'm not sure.
13    Q   Okay.  So if there was a time that Offshore
14  Trust Services began preparing your Form 3520, would
15  you know the reason why?
16    A   No, sir.
17    Q   And First Fidelity Trust Company, what is
18  that?
19    A   I recall that name too.  I think that was
20  where the trust -- these -- it was First Fidelity, and
21  it was in Nevis in the West Indies or Lesser Antilles,
22  but I remember that's where the services that the
23  Donaldsons were providing was going through.
24    Q   Okay.  And so what role did the First
25  Fidelity Trust Company play?

107

1    A   I think that's where the money went.
2    Q   Okay.  You mean which money?
3    A   My money, the money I invested through them
4  or gave to the Donaldsons or put with them for these
5  different products that they had sold me.
6    Q   Okay.  Okay.  Did First Fidelity Trust
7  Company ever give you any information about IRS filing
8  requirements for a foreign trust?
9    A   I don't recall if they did.  If they had,
10  because I did get information in the mail from them, I
11  would review it and then send it over to George.
12    Q   Okay.  What about Fidelity Insurance Company?
13    A   Sounds familiar as well.
14    Q   Okay.  Do you know what it is?
15    A   I couldn't tell you the specifics.  To the
16  best of my limited understanding regarding these
17  things, it was a type of insurance company, not to
18  be...
19    Q   Okay.  Did Fidelity Insurance Company ever
20  give you any information about IRS filing requirements
21  for a foreign trust?
22    A   I don't recall.  Again, if they had, I would
23  have reviewed it and sent it over to my accountant.
24    Q   Now, with respect to Steve Donaldson -- we've
25  talked a great deal about him already -- do you have an

108

1  opinion as to his character for truthfulness?
2    A   You know, it's -- I think he is truthful with
3  regard to a lot of things.  I think possibly, you know,
4  with the investments I made, he was not truthful about
5  some things.  That's as far as I can go with that.  You
6  know, I'm very disappointed that my money is gone, and
7  I would like to have some answers.
8    Q   Okay.  What --
9    A   I don't know those answers, though.
10    Q   Okay.  What things in particular do you think
11  he was not truthful about?
12    A   You know, where all my money went.
13    Q   Well, what explanation has he given you for
14  where your money went?
15    A   When I talked to him, he had mentioned that a
16  lot of the money was invested in a type of mortgage
17  security or some type of investment tool that was based
18  on the mortgage industry, and that when all of that
19  crashed with the housing and -- decreased in value,
20  that I had lost my money.
21    Now, you know, I'm aware that that did
22  happen, but I have a very limited understanding of that
23  whole entire -- you know, basically the financial
24  industry.  So I would like to know more answers about
25  that.

109

1    Q   And have you asked him for more information
2  about that?
3    A   I asked him, and he said that's pretty much
4  the long and short of it.
5    Q   Okay.  Have you -- well, strike that.
6       Are you aware of Mr. Donaldson's reputation
7  in the community?
8    A   Not really.
9    Q   Okay.
10   A   He's in Tampa, I'm in Sarasota, not really
11 that close of a community.
12   Q   Okay.  With reference to Christopher
13 Donaldson, do you have an opinion as to his character
14 for truthfulness?
15   A   You know, it's -- we -- you know, the strange
16 thing is we got along great, I considered him my
17 friend, but in the long run, I don't believe that was
18 the case and I've lost a lot of money because of this.
19 I don't have all the answers.  I would like some
20 answers.
21   Q   Have you asked Christopher Donaldson for
22 information?
23   A   No.  I haven't been in touch with him.
24   Q   Okay.  When you said you thought that was the
25 case, that that wasn't the case, did you mean him being

110

1  your friend --
2    A   Yes.
3    Q   -- or something else?  Okay.
4       How about Duane Crithfeld, do you have an
5  opinion of his character for truthfulness?
6    A   I never knew him.  You know, it was -- like I
7  said, it was usually a social setting, he was usually
8  drinking, and the conversation really wasn't around
9  financial products.
10   Q   Okay.
11   A   It was usually on some of his recent
12 escapades.
13   Q   All right.  Now, we discussed you had some
14 meetings with Steve and Chris Donaldson at some point,
15 you may have met with the Crithfields, with Duane
16 and/or Josh Crithfeld.  At some point, you established
17 the Hornsby Trust.
18      Would you just briefly describe the
19 circumstances of that, of establishing the trust?
20   A   Well, again, it was -- you know, I had gone
21 through the -- I was going through the divorce, and I
22 was concerned about my exposure to litigation and was
23 concerned with asset protection, particularly as I
24 proceeded forward.
25      It was my understanding from the input I had

111

1  gotten from multiple people that I needed to establish
2  some type of asset protection before I started
3  accumulating assets in order for it to be effective.
4    Q   Okay.  And how did you go about establishing
5  the Hornsby Trust?  I mean, what did you do in
6  particular?
7    A   I met with Mr. Donaldson first, Steve.  I
8  think Chris was there, maybe not, but Steve was the one
9  that was explaining to me, and then we set up the
10 trust.
11   Q   Okay.  And -- well, here, this might be an
12 easier way to go about it.  I'm going to hand you
13 what's previously been marked as Exhibit 4.
14      MR. JONES:  Do you want to have a
15 stopping point for lunch or --
16      MR. MAY:  Are we --
17      MR. JONES:  Well, it depends on how much
18 more you have.
19      MR. MAY:  I was thinking after this
20 would probably be a good point.
21      MR. JONES:  Oh, okay.
22      (Discussion off the record.)
23   Q   (By Mr. May)  All right, Dr. James, do you
24 recognize Exhibit 4?
25   A   It says "Trust Deed" on the front.

112

1    Q   Okay.  For what trust is it a deed?
2    A   First Fidelity Trust Limited.
3    Q   Okay.  Is this the trust deed that
4  established the Hornsby Trust?
5    A   I'm reading off of the document.  It looks
6  like it says "Hornsby Trust" on the third page, yeah.
7    Q   Okay.
8    A   Yes.
9    Q   And that third page is marked in the lower
10 right-hand corner OTS-James 000008?
11   A   Yes.
12   Q   Do you remember executing Exhibit 4?
13   A   No, sir.
14   Q   Okay.  Do you --
15   A   There were a lot of documents that they had.
16 I signed a lot of them.  I can't recall each one.
17   Q   Okay.  As you're probably aware, we -- I took
18 Steve Donaldson's deposition a couple of weeks ago.  He
19 said that you probably signed this document in the
20 Bahamas.
21   A   I did sign some documents in the Bahamas.  I
22 do remember that, yes.
23   Q   Tell me about that trip to the Bahamas.
24   A   Gambling, dinners, drinks.  I had a physical
25 exam by a doctor in the Bahamas, some blood work, and

113

1 signed documents.
2     Q    Okay.  And the physical, what was the purpose
3 of the physical?
4     A    And the blood work/physical, I think, was for
5 an insurance program that they had wanted me -- that I
6 was buying from them.
7     Q    Okay.  So it was related to the establishment
8 of the foreign trust and the asset protection?
9     A    Yes, sir.  All of that went through the
10 Donaldsons, and they had different products they sold
11 me, and the insurance product was one.
12     Q    Okay.  And it was at that trip to the Bahamas
13 that you established the Hornsby Trust?
14     A    I think so.
15     Q    Okay.  I direct your attention in Exhibit 4
16 to -- it's the page marked OTS-James 000028.
17     A    Okay.
18     Q    And it's, the top of the page, "Execution of
19 Deed of Settlement."
20     A    Yes.
21     Q    And then there's a block on the right-hand --
22 upper right quadrant of the page, "Settlor's
23 Signature."
24     A    Yes.
25     Q    Is that your signature?

114

1     A    Yes.
2     Q    Okay.  Is the witness signature Stephen
3 Donaldson's signature, the left-hand column?
4     A    I believe it is.
5     Q    Okay.  Do you remember being there and
6 signing it and him signing it?
7     A    No, sir.
8     Q    Okay.  If you'll turn back a few more pages,
9 the page marked OTS-James 000041.
10     MR. JONES:  I'm just going to make an
11     objection as to foundation here.  There's no
12     evidence that this was attached to it.  It
13     appears to be a separate document.
14     Q    (By Mr. May)  Do you recognize page OTS-James
15 000041?
16     A    I don't recognize it.  I can't read what's on
17 the top of it, just like with the other forms.
18     Q    Okay.  There's a signature on the page marked
19 OTS-James 000042.
20     A    Yes.
21     Q    Is that your signature?
22     A    It appears to be.
23     Q    And do you remember signing this form on
24 January the 4th of 2001?
25     A    No, sir.

115

1     Q    Was that the time frame that you remember
2 being in the Bahamas?
3     A    Roughly.
4     Q    If I had asked you what day were you in the
5 Bahamas --
6     A    I wouldn't be able to tell you.
7     Q    Okay.  But you think it was around January of
8 2001?
9     A    Yes, sir.
10     Q    Turning to the next page, the page that ends
11 43, there's a signature about halfway down the page.
12     A    Yes.
13     Q    Yeah, that page.  Is that your signature?
14     A    It appears to be.
15     Q    Okay.  And then on to the page marked -- that
16 ends with 46, at the top, it says "Warranty of
17 Understanding and Compliance."  Is that your signature
18 on that page?
19     A    It appears to be.
20     Q    Okay.  Do you remember signing this page?
21     A    No, sir.
22     Q    Would you read the paragraph that's numbered
23 5 on the page that ends 46?
24     A    "I hereby warrant that I understand that
25 establishing a foreign trust can obligate me to file

116

1 certain Internal Revenue Service and Treasury
2 Department forms, including but not limited to IRS
3 Forms 3520 and IRS Forms 3520A."
4     Q    Did you understand at that point that you
5 were establishing a foreign trust?
6     A    To the best of my belief, I was.  Again, I'm
7 not an authority on this, but it was my belief I was.
8     Q    And did you understand that establishing a
9 foreign trust might obligate you to file forms with the
10 IRS?
11     A    With regard to the contents of all of these
12 and understanding them, I don't know if I had a
13 complete understanding of all of this.  I -- you know,
14 I relied on the Donaldsons for the information and then
15 my accountant for it.  I had -- it was my belief that I
16 had set up this trust and these insurance mechanisms
17 through the Donaldsons, based on what they had told me.
18     Q    Okay.  So when you signed this document, did
19 you understand that establishing a foreign trust might
20 require you to file certain forms with the IRS?
21     A    I don't remember signing the document.
22     Q    Okay.  Do you think that's not your
23 signature?
24     A    It appears to be my signature.
25     Q    Do you have any reason to suspect that it's

117

1  not your signature?
2      A   No, sir.
3      Q   Okay.
4      A   Not to my knowledge.
5      Q   Do you have any suspicions that someone
6  forged your signature on these pages we've just seen?
7      A   I do not have any suspicions of that.
8      Q   Okay.  When you established the Hornsby
9  Trust, did you understand that as the owner of a
10  foreign trust, you would be required to file certain
11  documents with the IRS?
12      A   Yes.  It was my belief when it was set up --
13  I remember initially, with Steve Donaldson
14  specifically, talking briefly about that.  I think that
15  was when I gave him my accountant's name and number.
16  Once he mentioned any IRS issues, at that point we
17  talked about my accountant, George, and he indicated
18  that he would contact him to go over these issues with
19  him, and I felt comfortable with that.  You know, the
20  discussion regarding any of the IRS issues was had, and
21  that was the direction that we went in, and I don't
22  know what else to say about it.
23      Q   Okay, sure.
24          Did you understand that if your accountant
25  didn't file some form that was required, that you were

118

1  still responsible to file those forms?
2          MR. JONES:  Well, objection.  You're
3      asking him for his legal opinion as to the
4      law?
5          MR. MAY:  I'm just asking for what he
6      understood.
7          THE WITNESS:  I believed my accountant
8      to be doing his job for me, and if he hadn't
9      done -- you know, I'm not sure what you're
10      asking exactly.
11          MR. MAY:  Okay.
12          THE WITNESS:  Are you saying -- I'm
13      sorry.  Could you repeat it?
14          MR. MAY:  Sure.  I'll maybe try to
15      rephrase it or I may simply repeat it.  If I
16      do, I apologize.  I'm not trying to be
17      redundant.  I'm just trying to get some
18      clarity.
19      Q   (By Mr. May)  Did you understand when you
20  establish a foreign trust that as the owner of the
21  foreign trust, you personally were required to ensure
22  that certain forms were filed with the IRS?
23      A   It was my belief that there would be IRS
24  requirements, and that's when I gave Mr. Donaldson the
25  phone number for my accountant, and that's when he

119

1  indicated that he would contact my accountant to go
2  over those requirements with my accountant so that they
3  would be filed and done appropriately.  And at that
4  point, I trusted that that would be done.
5      Q   Okay.
6      A   That's pretty much all I can tell you about
7  that.  I mean, what else did you want me to do?
8      Q   Sure.  No, go ahead, please.
9      A   I don't know what else -- you know, I don't
10  know what else to do at that point.
11      Q   Okay.  Do you understand today that because
12  apparently your accountant didn't file a Form 3520 --
13  is that true, that George Famiglio did not file a Form
14  3520 for you?
15      A   It's my belief that he did not.
16      Q   Okay.  And when the penalty was assessed,
17  against whom was the penalty assessed?
18      A   Me.
19      Q   Okay.  And so based on that, what is your
20  understanding about who is responsible --
21          MR. JONES:  Same objection.  You're
22      asking him for a legal conclusion about legal
23      responsibility under the law.
24      Q   (By Mr. May)  I'll repeat the question, and
25  you can answer it subject to the objection.

120

1      A   Okay.
2      Q   Based on that, do you understand that the
3  responsibility for filing the Form 3520 was ultimately
4  yours?
5      A   It's my understanding and it's my belief that
6  it is my responsibility.  I had hired the accountant to
7  perform his duties, to file those filings.  Once he was
8  hired to do that, I trusted that he did.
9      Q   Okay.  But he did not file them, did he?
10      A   Apparently not.
11      Q   And you didn't file them either until
12  subsequent to the notice from the IRS?
13      A   The accountants do that.  I mean, I --
14      Q   Okay.  Let me -- I'm just trying to
15  understand.
16          Is it your belief that that's the
17  accountant's responsibility to file the forms?
18      A   It's my understanding of this process now
19  that it's my responsibility to do it.  I don't have the
20  know-how to do it.  I'm not an authority on this.  I
21  wouldn't know the first thing about filing a return.
22  That's why I have to rely on professionals such as a
23  CPA to do this for me.  I don't know what -- you know,
24  I don't know what else to say.  I wouldn't know -- I
25  would have to have someone's help to do this.  I don't

121

1  know how to file a return on my own or to do any of
2  this without the help of an accountant.
3      Q   Okay, I think -- after this, I think we're
4  about ready for a break.
5          Just one last question on Exhibit 4, the page
6  marked OTS-James 000042.  What is the subject of this
7  page that ends in No. 42?
8      A   I can read the top.  It says "Internal
9  Revenue Service Forms."
10     Q   Okay.  And would you read the paragraph
11 that's numbered 1 above the signature block?
12     A   Form 3520, quote, Annual Return to Report
13 Transactions with Foreign Trusts and Receipt of Certain
14 Foreign Gifts.
15     Q   Okay.  And the paragraph that's numbered 2.
16     A   Form 3520-A, quote, Annual Information Return
17 of Foreign Trust with a U.S. Owner."
18     Q   Okay.  And then the bold paragraph just above
19 those two numbers, "by signing below."
20     A   "By signing below, you acknowledge that you
21 have been notified of the following forms and
22 possibility that one or more of these forms must be
23 filed.  You also acknowledge that additional IRS forms
24 may be required depending on the assets held by trust
25 and business dealings of the trust."

122

1      Q   And the signature page on that page is your
2  signature?
3      A   Appears to be mine.
4      Q   Okay.  And do you have any reason to suspect
5  it's not?
6      A   No, I do not.
7          MR. MAY:  All right.  I think this is a
8  good stopping point if y'all want to take a
9  break.
10         (Lunch recess taken.)
11     Q   (By Mr. May)  All right, Dr. James, now, as
12 far as the Hornsby Trust goes, the trust itself held
13 assets; is that right?
14     A   To the best of my belief, yes.
15     Q   Okay.  And what was the structure of the
16 Hornsby Trust?
17     A   What do you mean by "structure"?
18     Q   How was it set up?  I mean, what I'm saying
19 is, I guess you were the grantor of the trust, is that
20 right, or the owner of the trust?
21     A   The owner of the trust.
22     Q   And then the trust had various assets, I
23 assume?
24     A   Yes, it had assets in it.
25     Q   Okay.  And was there any -- what was the

123

1  design of the way in which the trust held the assets?
2      A   I don't know.
3      Q   And who determined the manner in which the
4  trust held the assets?
5      A   It's my understanding that the Donaldsons put
6  that together, Foster & Dunhill.  That was -- it's my
7  belief that that's what their job was.
8      Q   So the structure of the trust itself, as far
9  as how it held the assets, was designed by Steve
10 Donaldson?
11     A   I think so.
12     Q   Okay.
13         (Exhibit 25 marked for identification.)
14     Q   (By Mr. May)  All right, Dr. James, you've
15 been handed what's been marked Exhibit 25.
16     A   Yes.
17     Q   Do you recognize Exhibit 25?
18     A   I recognize the name Alliance on it.
19     Q   Okay.  What is that name?
20     A   I've seen it on documents with Foster &
21 Dunhill before, seems like.
22     Q   Okay.  Do you know what Alliance Holding
23 Company is?
24     A   No.  I just know that I've seen that name
25 before on this stuff.

124

1      Q   Okay.  And is Exhibit 25 -- it appears to me
2  to purport to be a quarterly report for the Hornsby
3  Trust.
4      A   Yes.
5      Q   Do you remember receiving a copy of
6  Exhibit 25?
7      A   I don't remember the specific one, but it
8  looks familiar.
9      Q   Okay.  Was it customary that you would
10 receive reports, quarterly reports or year-end reports,
11 for the trust?
12     A   Yes, intermittently I would receive reports.
13     Q   Okay.  But you don't remember this report in
14 particular?
15     A   No, sir.
16     Q   Okay, that's fine.
17         Looking at the third page of Exhibit 25, it's
18 SAB0325, what is -- there's kind of a graph or diagram
19 there.  What is that, as far as you understand it?
20     A   It looks like what assets are underneath the
21 Hornsby Trust.
22     Q   Okay.  Is it like an organizational chart of
23 the trust?
24     A   Yes, it appears to be.
25     Q   Okay.  And I see Big Easy Real Estate, LLC.

125

1    A    That's correct.
2    Q    I think you described that earlier as owning
3    a condo in New Orleans?
4    A    That's correct.
5    Q    And then there's FIC Annuity Policy No.
6    ▌▌▌▌0002.
7    A    Yes.
8    Q    What was that?
9    A    I'm not sure what that -- I think that was
10   the insurance policy or -- I'm pretty sure that's what
11   that was.
12   Q    Okay.  And it was owned by the trust?
13   A    Correct.
14   Q    Okay.  And under that "FIC Annuity Policy,"
15   there is "SA" and then those same numbers 1600 -- five
16   zeroes and a 2, LLC?
17   A    Yes.
18   Q    Do you know what that is?
19   A    No, I do not.
20   Q    Okay.  But your testimony is that all of this
21   design is what Steve Donaldson came up with?
22   A    Yes.
23   Q    Okay.
24   A    That reminds me, when we were setting it up,
25   I remember him drawing something like this.  He used a

126

1    white board with a magic mark -- or with felt tips to
2    draw out how these things are structured.  It was a
3    block thing just like this when he laid it out in the
4    beginning.
5         I also remember -- speaking of the
6    conversation with Donaldson about getting in touch with
7    Famiglio, I remember following up with that and talking
8    to Famiglio.  I don't remember the time frame, but it
9    was after that, that whenever I told him I was setting
10   up this trust with the Donaldsons in Tampa, he was --
11   he said, "I could have referred you to a guy here in
12   town that you should have gone with."  I don't remember
13   the guy, but I remember him being a little ticked off
14   that I went and did this on my own and told him about
15   it after the fact.
16   Q    Okay.
17   A    Yeah.
18   Q    Let's flush that out a second.
19   A    Sure.
20   Q    You said that after you spoke with Steve
21   Donaldson about talking to George Famiglio --
22   A    After I met with him in the beginning, he was
23   drawing out all of this stuff on this chart.  We were
24   going over the structure of the trust, and he was
25   explaining to me all the stuff on that initial big

127

1    sit-down where we spent a period of time, and he had
2    this big white board, I remember, at the office off of
3    West Shore by Don Shula's Steak House, and he would
4    draw out this stuff and go over the different parts of
5    what he was telling me about, about the protection,
6    about all of these things.
7         After that, after I decided to go with them,
8    I called George to tell him about it, and that's when
9    he said, "I could have referred you to a guy here in
10   town."
11   Q    Okay.
12   A    And he wasn't very happy that I had already
13   decided to go with the Donaldsons for this and that I
14   was setting up these trusts.
15   Q    Okay.  So at the time you had this
16   conversation with George Famiglio --
17   A    Yes.
18   Q    -- when was that conversation?
19   A    That was not long after the meeting with
20   Donaldson.
21   Q    Okay.
22   A    I don't remember how -- I don't remember the
23   specific dates or when it was, but I remember him going
24   over these box structures on that board and then going
25   over all of these issues, and then when I -- and at the

128

1    end of it, I was like, "Yes, you know, I want to do
2    this."  And then it wasn't long after that that I
3    called George to tell him about it.
4    Q    Okay.
5    A    Because I remember he wasn't that happy with
6    me about this.  He said, "I've got" -- you know, "I
7    know somebody here in Sarasota I could have referred
8    you to that could have done a better job for you.  It
9    would be in Sarasota, so you wouldn't have to go to
10   Tampa."
11   Q    Okay.  I'm going to come back to that part of
12   it, but I just want to make sure I understand the
13   chronology.
14        At some point, you were considering
15   establishing a foreign trust; is that right?
16   A    Right after the divorce.
17   Q    Right after your divorce.  And so you went to
18   Steve Donaldson?
19   A    Right.
20   Q    And he had a meeting, he kind of drew out a
21   structure similar to what we see on SAB0325?
22   A    Yes.
23   Q    And after that meeting, you spoke with George
24   Famiglio?
25   A    Yes.

129

1    Q   And when you spoke with George Famiglio, what
2  did he say?
3    A   He said, "I could have referred" -- when I
4  told him what I wanted and what I -- you know, that I
5  had decided to go with Foster & Dunhill, said he'd
6  never heard of him, said he had a guy here in town, in
7  Sarasota, that he could have referred me to that could
8  have done that for me.
9    Q   Okay.  And you don't remember the exact date
10 of that conversation with George Famiglio?
11   A   No.  But it wasn't long after this because I
12 was pretty -- I was excited.  I was like, okay, I feel
13 a lot better.
14   Q   And was that prior to the time that you made
15 the trip to the Bahamas to sign the trust documents?
16   A   Yes, I think it was.
17   Q   So had you established the foreign trust at
18 the point you had that conversation?
19   A   I hadn't signed all of those documents yet.
20   Q   Okay.
21   A   Because I remember signing a stack of
22 documents in the Bahamas.
23   Q   Okay.  And when you had that conversation
24 with George Famiglio, you said you thought he wasn't
25 that happy?

130

1    A   Yeah.
2    Q   And why do you say that?
3    A   He said, "I've never heard of them, Foster &
4  Dunhill," that, "I have a guy here in town I could have
5  referred you to right here in Sarasota.  You didn't
6  have to go to Tampa."  I remember that because...
7    Q   And who was the guy in Sarasota?
8    A   Oh, I don't know.
9    Q   Okay.  After that conversation, did you have
10 any more conversations with George Famiglio about the
11 foreign trust, about the Hornsby Trust?
12   A   I'm sure I did because he was intimately
13 involved in my business.  I mean, we -- in addition to
14 being my CPA, he was the bookkeeper, you know, advisor
15 on a lot of the business stuff.  You know, we talked a
16 pretty good bit.  Specifically about this, I'm sure I
17 did, but I don't recall specifically.
18   Q   And seeing this chart that's on page SAB0325
19 is what refreshed your recollection?
20   A   Yeah, because I remember the white
21 chalkboard, he used blue ink, a blue felt tip on one of
22 those erasable boards, and he would draw out this is --
23 you know, the boxes, and he would use circles and boxes
24 and connect them like this, just like that.
25   Q   Okay.  But after the conversation with George

131

1  Famiglio where you -- let me back up.
2      You said you thought he wasn't that happy.
3    A   Correct.
4    Q   And you said it was because he knew another
5  guy that he would have referred you to.
6      Was there anything else that you thought
7  made -- was there anything else that made you think
8  George Famiglio was not happy about the situation?
9    A   No.  I think it surprised him.
10   Q   Okay.
11   A   I mean, that's just my personal opinion.
12   Q   Was there anything in the tone of voice or
13 just were there any particular words?
14   A   It was -- I just remember he came across --
15 because, you know, we -- I had seen him and talked to
16 him for years, he had been doing my books, that he
17 wasn't happy that I had done that without going --
18 without talking to him about it first.
19   Q   Okay.  And do you know -- I mean, why do you
20 think he wasn't happy about that?  And I --
21   A   I think it was because I didn't talk to him
22 first about it --
23   Q   Okay.
24   A   -- you know, because he was pretty intimately
25 involved in my business.

132

1    Q   Okay.  So it's your opinion that he was --
2  maybe had his feelings hurt?
3    A   Possibly that.
4    Q   Okay.
5    A   I know also, you know, he wanted to refer me
6  to somebody else.  You know, it just came across that
7  way.
8    Q   Okay.  And that conversation was in person or
9  on the phone?
10   A   That was on the phone.
11   Q   And after that conversation --
12   A   I'm pretty sure -- yeah, I'm pretty sure it
13 was on the phone.
14   Q   It was on the phone?
15   A   Yeah.
16   Q   And after that conversation, you don't
17 remember any other specific conversations with George
18 Famiglio about your foreign trust?
19   A   Not specifically.  I'm sure we had them,
20 though.  I don't remember specifically, though.  It may
21 come back to me more.  I'll think about it more.  You
22 know, I haven't thought about most of this stuff for
23 years, but it's -- you know, the more we talk about it,
24 the more I look at this stuff, you know, it does --
25 things are coming back.

133

1     Q   In Exhibit 25, I think --
2        MR. JONES: I'm just going to note an
3 objection. I gave you some leeway on the
4 chart. There's no dispute that he got these
5 reports, but this is not the year in issue.
6 So I'm going to object on foundation and
7 relevance.
8        MR. MAY: Sure, and that's...
9     Q   (By Mr. May) As far as the structure of the
10 trust, do you believe it was any different in 2004 than
11 it was in 2003?
12     A   No, sir.
13     Q   Okay.
14     A   I don't think it was.
15     Q   Okay. Do you know for sure?
16     A   To the best of my understanding --
17     Q   Okay.
18     A   -- it's my belief that there wasn't a change.
19     Q   Okay. And I understand this report is from a
20 later quarter -- well, yeah, actually, it is. That's
21 the only question I have about Exhibit 25.
22        (Exhibit 26 marked for identification.)
23     Q   (By Mr. May) Dr. James, you've been handed
24 what's marked Exhibit 26.
25     A   Yes, sir.

134

1     Q   Do you recognize Exhibit 26?
2     A   It does look familiar. It's the insurance
3 product that I bought from them.
4     Q   And "from them," you mean --
5     A   I mean the Donaldsons, Foster & Dunhill.
6     Q   Okay. And just looking at the title,
7 "Fidelity Insurance Company Limited" --
8     A   Yes.
9     Q   -- what does that indicate?
10     A   It indicates the insurance company, and I do
11 remember discussions with them about this insurance
12 product for asset production that could also be used as
13 an investment tool.
14     Q   Okay.
15     A   And that was what this annuity thing was, was
16 the insurance thing as well.
17     Q   Okay.
18     A   And that's what I would borrow money against
19 and pay it back.
20     Q   This annuity policy?
21     A   I'm pretty sure.
22     Q   And you think this is the organizational or
23 formation document of the policy that you had?
24     A   It appears to be.
25     Q   Okay. Do you remember getting this document?

135

1     A   What I remember, it's familiar seeing
2 Fidelity Insurance Company, St. Vincent and Grenadines,
3 the variable annuity policy, those terms sound familiar
4 and look familiar. It's not the first time I've seen
5 that.
6     Q   Okay. But do you remember this particular
7 document, Exhibit 26?
8     A   Those words definitely are familiar in
9 this -- you know, I probably have seen this before, but
10 I couldn't tell you with a hundred percent certainty.
11 I know that looks familiar, that I recognize those
12 words for sure.
13     Q   Okay. Why was the annuity policy with a
14 company in St. Vincent and the Grenadines?
15     A   I don't know that.
16     Q   Do you know if your business deducted on its
17 income tax any payments for this annuity policy?
18     A   Again, you know, I'm sure I had discussions
19 about that. I would give that information, again, to
20 George, and he would do what was appropriate with it.
21 I wouldn't know personally whether -- you know, I'd
22 have to rely on him for that.
23     Q   And is it your understanding that this
24 annuity policy held various investments or assets?
25     A   The -- it's my understanding that -- from the

136

1 flow chart that we just looked at, that that was in the
2 trust.
3     Q   Okay.
4     A   That's my understanding of it.
5     Q   When you say "that was in the trust," you
6 mean the annuity policy was in the trust?
7     A   The insurance annuity policy.
8     Q   Okay. Was there another insurance -- were
9 there any other insurance products that you purchased
10 from the Donaldsons or Fidelity Insurance Company?
11     A   I think there was a -- I think they were all
12 under that, to the best of my recollection. I remember
13 something about a disability policy, insurance. I
14 can't remember specifics.
15     Q   Okay. But it's your understanding of the
16 annuity policy, that was the investment vehicle?
17     A   I don't know that. I know when I
18 look at that title on there, it's familiar to me, and
19 then I remember I had this insurance product that I
20 bought from them. They explained it to me, that it was
21 an investment tool, it was also great asset protection,
22 plus it would function as an insurance policy. You
23 know, I remember them saying, you know, if something
24 happened -- I ride motorcycles -- "If something happens
25 on your motorcycle, you know, this will also function

137

1 as a disability policy to where you'll receive
2 benefits."
3     Q   Okay.
4     A   But it was also an investment tool and asset
5 protection.  That was what I liked about that one.
6     Q   Okay.  And you think that -- the policy you
7 were just describing, is that this policy or some other
8 policy?
9     A   I think it's with that.
10    Q   Okay.  And when I say "this policy," I mean
11 the annuity policy represented by Exhibit 26.
12    A   I think so.
13    Q   Okay.
14    A   It's -- to the best of my recollection.
15    Q   Okay.  I'm going to hand you what was
16 previously marked as Exhibit 8.  Do you recognize
17 Exhibit 8?
18    A   That was at the end of things when -- yeah,
19 from the fifth paragraph, it says, "You would have
20 received a trust termination" -- I think that was -- I
21 think that's after I lost all my money, and then they
22 wanted me to give them more money.
23    Q   And there's some writing on Exhibit 8.  Do
24 you know whose handwriting that is?
25    A   I'm not sure.

138

1     Q   Okay.  In the -- this is an -- Exhibit 8 is
2 an email.  Is that a fair characterization?
3     A   Yes.
4     Q   From Deborah Tyrell?
5     A   Correct.
6     Q   And who is Deborah Tyrell?
7     A   She's -- and I'm referring to this, is with
8 First Fidelity Trust.
9     Q   Okay.  Have you ever met Ms. Tyrell?
10    A   No, I have not.
11    Q   Okay.  The "to" line, there's a number of
12 email addresses, bcjames65@aol.com --
13    A   That's me.
14    Q   Is that you?  Okay.  I assume that
15 steve.donaldson is Steve Donaldson?
16    A   I would assume so.
17    Q   Do you know if that's his email address?
18    A   I couldn't confirm or deny that or not.
19    Q   Shelly Lee Smith, is that the Shelly that you
20 referenced earlier?
21    A   Yes, that is.
22    Q   Okay.  And is this her -- is this her work
23 email or her personal email?
24    A   I think it's both.
25    Q   Okay.  Do you know why she is in the "to"

139

1 line of the email?
2     A   At this point in '09, she is my office
3 manager at that point for sure, so she was included on
4 this.
5     Q   Okay.  Was she also managing your personal
6 finances in May of 2009?
7     A   Yes.  I would oversee it, she would take care
8 of the day-to-day tediousness of it.  We would have
9 meetings, you know, to go over each week's finances and
10 whatnot.
11    Q   Okay.  So did she have interactions with the
12 trust company and dealings with the trust during that
13 time?
14    A   Yeah, I think so.  The emails would come
15 through, she would go -- I would ask her to go through
16 my emails sometimes when they're overloaded and I'm
17 super busy.  You know, there's a lot to do with the
18 practice between dealing with insurance companies,
19 seeing patients, paying vendors, dealing with all of
20 those things, and she would bring whichever ones were
21 important to me because you get a lot of junk email.
22 And so I would include her, and she'd kind of help me
23 out with that, and then we'd go over it if necessary.
24    Q   Okay.  Do you know -- behind the first page
25 of Exhibit 8, which is SAB0615, there are one, two,

140

1 three more pages.  Do you know if those were the
2 attachments that are referred to on the email?
3     A   I don't know.
4     Q   Okay.  But basically, at this point you think
5 you were in the process of terminating the Hornsby
6 Trust?
7     A   Yes, or terminate -- I thought the basic
8 assets were gone, money has been lost, then they
9 apparently wanted some more money.  Yeah, I wasn't real
10 happy.  Very difficult time.
11    Q   Did you pay them the money they were asking?
12    A   I don't think so.
13    Q   Okay.  We saw in the organizational chart
14 that the Big Easy Real Estate, LLC may have been held
15 by the trust.
16    A   Yes, sir.
17    Q   Is that still held by the trust?
18    A   No.  That's gone.
19    Q   Does it still exist?
20    A   I don't own the condo anymore.
21    Q   Oh, okay.  So as you currently understand it,
22 does the Hornsby Trust still exist?
23    A   It's -- I think it's negative.  There's
24 nothing there, as far as I know.
25    Q   Okay.  It may exist, but there's nothing in

141

1    it?
2        A   Yeah.
3        Q   Or it may not exist?
4        A   I mean, I don't know.
5        Q   Okay.  Now, as far as making contributions to
6    the trust and whether those were -- how did that work,
7    how did you put assets into the trust?
8        A   Usually a wire transfer.
9        Q   Okay.  And when you sent a wire transfer, did
10   you direct how it would be placed into the trust, or
11   how did that work?
12       A   It would just go into the trust.
13       Q   Okay.  And then as far as into this annuity
14   policy or maybe another insurance policy, did you send
15   directions with the wire transfer, or did you just kind
16   of leave that up to the trustee?
17       A   We sent it to an -- you know, to the address
18   and to the account number that we were given for the
19   trust, where to send it.
20       Q   Okay.  And did anyone help with you that
21   process?  Did you do the wire transfers?  Did someone
22   else kind of take care of the paperwork?  How did that
23   work?
24       A   My office, we would do the transfers, you
25   know, then that would go in with the package of

142

1    information that I would send over to George.
2        Q   Okay.  And when did you begin making
3    contributions to the trust?
4        A   Shortly after it was set up.
5        Q   Okay.  So in 2001?
6        A   I don't remember the dates of those, but, you
7    know, it was -- that was shortly after -- you know,
8    soon after it was set up, we began -- I began making
9    contributions.
10       Q   Okay.  And so do you remember in -- was there
11   ever any distinction between wire transfers that went
12   to First Fidelity Trust as opposed to wire transfers
13   that went to Fidelity Insurance Company?  Was there any
14   difference in your mind?
15       A   Well, the insurance policy was one thing, so
16   they were different.  As far as to the best of my
17   knowledge, I did have this insurance product, but we
18   also had the trust.
19       Q   Okay.
20       A   You know, and that was -- yeah, I think there
21   was a difference.
22       Q   So there would have been -- in the records,
23   there might be a wire transfer to First Fidelity Trust
24   and there might be another wire transfer to Fidelity
25   Insurance?

143

1        A   There may be.  I don't remember specifically
2    writing, you know, the specific addresses or headings
3    for that, but that makes sense.  You know, as I recall
4    this, that makes sense that that would have happened,
5    but I'm telling you just to the best of my recollection
6    that.
7        Q   Okay.
8            MR. MAY:  Let's mark this.  It may
9    refresh your recollection a little bit.
10           (Exhibit 27 marked for identification.)
11       Q   (By Mr. May)  All right, Dr. James, you've
12   been handed what's marked as Exhibit 27.  Do you
13   recognize Exhibit 27?
14       A   I don't recognize it, but I can read what's
15   at the top.
16       Q   Okay.  And just flipping through Exhibit 27,
17   what is it?  What do you think it is?
18       A   I can't -- it's a really poor copy.
19       Q   Yeah.
20       A   I can't read most of the words.  I can't --
21   on the backs of these pages, there's something.  I
22   can't even tell what they are.  It looks like -- I
23   don't know what it is.
24       Q   Okay.
25       A   I have trouble seeing anything really on any

144

1    of these copies.
2        Q   Okay.  Do you know who collected Exhibit 27?
3        A   What do you mean?  I'm sorry.
4        Q   Okay.  I'll represent to you that this -- my
5    office got this from the production that you-all
6    provided to the United States.
7        A   Okay.
8        Q   So I was wondering, you know, who may have
9    collected it, why it -- it appears to me at least to be
10   a collection of the affidavits of source of funds or
11   the source of funds affidavits that accompanied some of
12   the wire transfers to the Hornsby Trust.
13       A   Okay.
14       Q   Is that a fair characterization?
15       A   I believe you.
16       Q   Okay.  I mean, I don't know because all I
17   know is I received these documents.  They were kind of
18   collected in this fashion.
19       A   Yeah, I can't really make anything out on
20   them.
21       Q   Okay.  And I understand the quality is poor
22   and --
23           MR. JONES:  For the record, we did not
24   have them intentionally --
25           MR. MAY:  Sure.

145

1      MR. JONES: -- made worse. What you see
2  is what we got.
3      MR. MAY: I assume it probably came off
4  a fax machine, somewhere like that, but I
5  don't know. I have no idea.
6      Q  (By Mr. May) But I do have a question about
7  a couple of pages that I think maybe are a little more
8  legible.
9      A  Okay.
10     Q  SAB0305.
11     A  Yes.
12     Q  And this appears to me to be an email. Is
13  that a fair characterization of what this page is?
14     A  Yes.
15     Q  And do you recognize page SAB0305?
16     A  I don't recognize it off the top of my head.
17  It's got a lot of familiar words on it.
18     Q  Okay.
19     A  But I don't remember receiving that
20  specifically.
21     Q  Okay. Do you know who Gigi Garrett is?
22     A  No, I do not.
23     Q  Okay. Her email address or -- well, the
24  address down at the -- on her signature block, Fortress
25  Family Office Group --

146

1      A  Okay.
2      Q  -- do you know -- what is that? Do you know
3  what that is?
4      A  No, sir.
5      Q  Okay. The "to" line, I think, says to
6  Michelle Smith; is that right?
7      A  Yes.
8      Q  And is that the Shelly Smith that's your
9  office manager?
10     A  Yes.
11     Q  Okay. But do you remember seeing this email
12  before?
13     A  I don't recall off the top of my head. It
14  doesn't mean I didn't see it. I just don't remember.
15     Q  Okay. Now, this email, there seems to be a
16  file structure on the left-hand side of the page --
17     A  Yes.
18     Q  -- inbox, junk, drafts, sent, and then a
19  number of words.
20     A  Right. I'm not sure what all that means.
21     Q  Okay.
22     A  It may be other emails to that email address.
23  Does that make sense?
24     Q  Sure. I was wondering if you knew if this is
25  how Shelly Smith, at least in February of '09, kept her

147

1  email structure.
2      A  It says at the top left "Inbox," so maybe --
3  and "Deleted," so it looks like there's -- and airline --
4  it looks like there's other emails.
5      Q  Okay. Do you know -- just looking at some of
6  these words coming down the list alphabetically, BPP
7  policies --
8      A  Business protection plan, I recognize that.
9      Q  Okay.
10     A  That was a product from Foster & Dunhill.
11     Q  Okay. And what was that product?
12     A  I think that was one of the insurance
13  products.
14     Q  Okay. Was that the same as the annuity that
15  we saw, or different?
16     A  I don't know if it was part of that. From
17  the best that I can recall, it was a portion of the --
18  the business protection plan was part of one of the
19  insurance tools, insurance products.
20     Q  Okay. I'm looking down this list, again, the
21  First Fidelity.
22     A  First Fidelity, from what I remember, is in
23  the islands, in Nevis.
24     Q  Okay.
25     A  It's a trust company.

148

1      Q  Okay. There's some other things here. All
2  right, let's -- I think that's all the questions I had
3  on that page. Just to be clear, you don't remember
4  seeing this email before, 0305?
5      A  I don't recall, but it doesn't mean I didn't
6  see it.
7      Q  Okay.
8      A  I just don't -- I don't remember.
9      Q  Okay. You don't know if Michelle Smith or
10  Shelly showed it to you?
11     A  I mean, the usual practice would be for her
12  to show me stuff like this, but I don't recall.
13     Q  Okay. There's a -- I said that was all the
14  questions, but I just recognized something.
15         The second sentence of the body of the email,
16  "There wasn't a wire received for exactly 282,000."
17  Did I read that sentence correctly?
18     A  Yes.
19     Q  Then, "It was a combination of funds that
20  made up the 282 used for the BPP." Did I read that
21  correctly?
22     A  Yes.
23     Q  Do you know what that's a reference to?
24     A  Business protection plan.
25     Q  Okay. And what is the -- do you know why

149

1 there -- or what the question is or what -- this
2 appears to be an answer, maybe, to a question.  I don't
3 know.  Do you know what the 282 -- 282,000 is?
4     A    It was funds that were wired to, I guess,
5 First Fidelity Trust most likely for the products that
6 Foster & Dunhill had sold me.
7     Q    Okay.  Was there -- was Shelly Smith, at your
8 behest, making an inquiry about funds that had been
9 wired for the business protection policy?
10    A    I don't know.  I can't remember.
11    Q    Okay.  All right.  We're going to have a
12 look.  I'm not sure -- SAB0316.
13    A    Okay.
14    Q    Can you make out the -- does this also appear
15 to be an email to you, this page SA --
16    A    Yes.
17    Q    Okay.  Can you make out the text of the
18 email?
19    A    Not really.
20    Q    Okay.  Can you make out -- is there a word
21 "FIC escrow"?
22    A    Where would that be?
23    A    Oh, in the sentence that --
24    A    The first sentence, "FIC escrow."
25    Q    Okay.  Do you know what FIC escrow is?

150

1     A    No, sir.
2     Q    Okay.  I know this is somewhat grainy.  Does
3 it appear to you to be from a Jennifer Webster?
4     A    Yes.
5     Q    Do you know who Jennifer Webster is?
6     A    No.
7     Q    Okay.  Do you know anything about this email,
8 what it was?
9     A    I can't really decipher it.  I'm sorry.
10    Q    Okay.  Turning back a few pages, SAB0322.
11    A    Where is that, SAB --
12    Q    It should be the final page --
13    A    Oh.
14    Q    -- of Exhibit 27.
15    A    0322?
16    Q    Yes.
17    A    Okay, I have it.
18    Q    Do you know what this letter is in reference
19 to?
20    A    Appears to be from American Express Purchase
21 Protection.
22    Q    Does this have anything to do with the
23 Hornsby Trust?
24    A    No, it does not.
25    Q    Okay.  I really meant just did you know what

151

1 it was.  Do you have any remembrance about this letter,
2 about what it's for, what it is?
3     A    No.  It appears to be a purchase protection
4 program that I get with my American Express unrelated
5 to what we're doing.
6     Q    Okay, very good.
7     A    I mean, that's what it appears like.
8     Q    That's fine.
9         MR. JONES:  Hey, just for the record,
10 client turns over documents of things that
11 are unrelated, we give them to you.
12        MR. MAY:  I didn't -- personally, I
13 didn't see the connection; that's why I had
14 to ask.
15        MR. JONES:  I didn't either.
16        THE WITNESS:  No problem.
17        (Exhibit 28 marked for identification.)
18    Q    (By Mr. May)  All right, Dr. James, you've
19 been handed what's marked Exhibit 28.
20    A    Yes.
21    Q    What is Exhibit 28?
22    A    From reading the top of the page, "Affidavit
23 of Source of Funds and Indemnification."
24    Q    Okay.  And in Exhibit 28, are there more than
25 one of those affidavits?

152

1     A    Yes, sir, there's multiple affidavits.
2     Q    Okay.  Are there other documents as well in
3 the exhibit?
4     A    Yes.
5     Q    Okay.  Do you know who collected Exhibit 28
6 in this fashion?
7     A    No, sir.
8     Q    Okay.  I direct your attention to the page
9 marked SAB0573.  It's pretty near the back in
10 Exhibit 29 -- 28.
11    A    What is it again, please?
12    Q    SAB0573.
13    A    Okay, I have it.
14    Q    Okay.  And what is page SAB0573?
15    A    It's a fax transmittal form, from reading off
16 the document.
17    Q    Do you remember receiving this fax from Chris
18 Donaldson?
19    A    I don't have a specific recollection of it.
20    Q    Okay.  The second sentence of the text of the
21 fax, "Please wire $60,000 to Fidelity Insurance Company
22 and the balance to First Fidelity Trust."
23    A    Yes.
24    Q    What was that in reference to?
25    A    A wire transfer.

153

1  Q.  Okay.  Do you know why it was 60,000 to
2  Fidelity Insurance and the balance to First Fidelity
3  Trust?
4  A.  No.
5  Q.  Okay.  Do you know why Chris Donaldson would
6  have been faxing you this type of instruction?
7  A.  They offered -- either Chris or Steve would
8  send the wire instructions, where to send the money,
9  which was usually First Fidelity Trust or Insurance.
10  Q.  Okay.
11  A.  And that's where I would send it.
12  Q.  Okay.  So that wasn't uncommon for you to
13  receive a fax of this nature?
14  A.  It was not uncommon to receive directions,
15  you know, for the wiring instructions.
16  Q.  Okay.  Would they also sometimes give you a
17  phone call?
18  A.  I think so.
19  Q.  Okay.  Were there times when they would send
20  emails?
21  A.  Probably.
22  Q.  Probably?
23  A.  Yeah.
24  MR. MAY:  I think -- let's do these next
25  two documents, then it might be a good time

154

1  for a break.
2  THE WITNESS:  Okay.  That sounds good.
3  (Exhibit 29 marked for identification.)
4  Q.  (By Mr. May)  All right, Dr. James, you've
5  been handed what's marked Exhibit 29.  Do you recognize
6  Exhibit 29?
7  A.  Just from reading the top of it.
8  Q.  Okay.
9  A.  I don't remember specifically receiving this,
10  though.
11  Q.  Okay.  So I was going to ask:  Do you know
12  who assembled this record?
13  A.  No, sir.
14  Q.  Okay.  So it probably -- I probably know the
15  answer.  Do you know why it was assembled?
16  A.  From reviewing it right now, it looks like --
17  and this is just to the best of my knowledge, as it
18  says on the top, "Portfolio Distribution Summary" --
19  Q.  Okay.
20  A.  -- of the Hornsby Trust.
21  Q.  Okay.  And the first page says "Hornsby
22  Trust Account Reconciliation as of 12/31/03."
23  A.  Yes.
24  Q.  Do you remember the circumstances of the
25  creation of a reconciliation?

155

1  A.  No, sir.
2  Q.  Okay.  So looking at the second page,
3  SAB0674, the top section of that page, it's tax savings
4  12/31/01, tax savings 12/31/02, tax savings 12/31/03.
5  Do you know what that's in reference to?
6  A.  Only what it says.
7  Q.  Okay.  So -- okay, we've talked about that.
8  And now I'm going to hand you what was
9  previously marked as Exhibit 5.  All right, turning in
10  Exhibit 5 to the page marked SAB0654 --
11  A.  Oh, I just noticed on the front page, Josh
12  Crithfield was with Offshore Trust Services.  No wonder
13  it sounded familiar.
14  Q.  Okay.  Earlier you said it sounded familiar.
15  A.  Yeah, that's why, because -- that makes
16  sense.
17  Q.  Okay.
18  A.  I'm sorry, what page to turn to?
19  Q.  SAB0654.
20  A.  Okay.
21  Q.  And I think the top of the page says,
22  "Quarterly Investment Summary, March 31, '04 to June
23  30, '04."
24  A.  Yes.
25  Q.  And then "trust contribution/distributions."

156

1  A.  Yes.
2  Q.  And "since inception."
3  A.  Yes.
4  Q.  Do you believe the chart there or table to be
5  an accurate depiction of the contributions you made to
6  the trust?
7  A.  I don't -- I mean, I can just read what's
8  there.
9  Q.  Okay.
10  A.  That's about as good as I can do with that.
11  I don't remember exactly.
12  Q.  Okay.  Do you remember getting a summary like
13  this?
14  A.  You know, I would get these types of
15  summaries quarterly or yearly.
16  Q.  Okay.  And then at the first page of
17  Exhibit 5, the email, to me it looks like an email from
18  Josh Crithfield to Steve Donaldson on which Chris
19  Donaldson was copied.
20  A.  Yes.
21  Q.  Do you remember how you came into possession
22  of this email?
23  A.  No.
24  MR. MAY:  All right, I think that's a
25  good place for us to take a break, if y'all

157

1    would like.
2        (Recess taken.)
3    Q    (By Mr. May)  Dr. James, I'll refer you back
4    to Exhibit 5 that we were just looking at and that
5    front page of Exhibit 5, SAB0628, and the email there
6    that appears to be to Steve Donaldson.
7    A    Yes.
8    Q    And there's some text, "BPP."
9    A    Yes.
10   Q    And do you know what BPP refers to?
11   A    Business protection plan.
12   Q    Okay.  And is that the insurance product you
13   were mentioning a little bit earlier?
14   A    Yes, I believe it is.
15   Q    Okay.  And there's some numbers there for the
16   three years at issue, or at least it looks like to me
17   as if they are related to those three years:  2001,
18   2002, 2003.  Do you know what this email was about?
19   A    No, I do not.
20   Q    Okay.  Well, in reference to the business
21   protection policy, just in general, what was it, what
22   was the business protection policy?
23   A    Pretty much, like I had said earlier, what I
24   remember about it was that there was a disability
25   policy in it and other insurance policies that I could

158

1    borrow against, that were for asset protection, that
2    were also -- could be -- were used as an investment
3    tool, but that would function as -- it was an insurance
4    policy.  If I was injured, it would cover part of the
5    disability insurance coverage.
6    Q    Okay.  And was it your understanding that --
7    let me back up.
8        I'm assuming you paid premiums for the
9    business protection plan?
10   A    Yes, sir.
11   Q    And were there any other monies that you paid
12   to the insurance company related to the business
13   protection plan or policy?
14   A    I don't recall specifically, but it was an
15   investment tool, so there may have been monies
16   transferred there to invest.
17   Q    Okay.  And what was your understanding would
18   be done with the insurance premiums that you paid for
19   the policy?
20   A    Part of them would cover the cost of the
21   actual policy, part of it would be invested.
22   Q    Okay.  And how would it be invested?
23   A    That was -- I don't remember specifically how
24   it would be invested.
25   Q    Would that be up to the insurance company to

159

1    decide?
2    A    I think it was the -- Foster & Dunhill made
3    those decisions.
4    Q    Okay.  Would any of that money ever come back
5    to the trust after having been paid to the insurance
6    company?
7    A    I don't know.
8    Q    Okay.  I'm handing you what was previously
9    marked as Exhibit 6.  Do you recognize Exhibit 6,
10   Dr. James?
11   A    I recognize the name on it.
12   Q    Okay.
13   A    Fidelity Insurance Company.
14   Q    Okay.
15   A    Business protection insurance policy.
16   Q    Okay.  But do you remember this particular
17   document?
18   A    No, sir.
19   Q    Okay.  So do you remember what kinds of
20   things your business protection policy covered?
21   A    Not specifically at this point.
22   Q    Okay.  Exhibit 6, I think, purports to be a
23   declaration.  If you'll turn to the third page --
24   A    Oh, I see it, yes.
25   Q    -- SAB0421 --

160

1    A    Yes.
2    Q    -- there's a bunch of "Scheduled Coverage"
3    sections.
4        Did you select these coverages or -- were
5    these coverages you selected or --
6    A    They were offered and suggested to me, I
7    remember that, from looking at this, because I didn't
8    know which ones to pick.  The ones that made the most
9    sense to me was the business protection disability.
10   Q    Okay.  And you're referring there to the
11   first item under "Scheduled Coverage" section?
12   A    Yes.
13   Q    Do you remember selecting a business
14   protection disability?
15   A    Yes.
16   Q    Okay.  The other ones in this list of 19
17   items, there are several with Xs to the right.
18   A    Yes.
19   Q    Are those other coverages that you recall
20   selecting for your business protection policy?
21   A    Not particularly.
22   Q    What was it about the business protection
23   disability that caused you to think that would be a
24   good coverage to have?
25   A    I skydive and, you know, scuba dive.  If

161

1   something were to happen, I like to have the disability
2   policy, made a lot of sense.
3       Q   Okay.  But you don't remember this particular
4   document?
5       A   Not specifically.
6       Q   Okay.  Do you remember making some selections
7   of coverages with someone?
8       A   You know, I remember thinking about this with
9   the disability part, and they made some other
10  suggestions.  I don't remember the justifications or
11  the rationale behind them.  But I remember that one
12  sticking out for sure because it was a big concern of
13  mine.
14      Q   Sure.  And who was the "they" that made the
15  suggestions?
16      A   It was, I think, Steve and Chris.
17      Q   Okay.  Donaldson?
18      A   Yes.
19      Q   Do you remember any of the other features of
20  the business protection policy?
21      A   No, sir, I can't recall.
22      Q   Okay.  What was your understanding of the tax
23  effect of the business protection policy?
24      A   You know, that's complicated and that's why I
25  had George involved.  I don't understand -- have a

163

1       A   It was a general ledger and financial
2   statement prepared by Mr. Famiglio.
3       Q   Okay.  And for what entity?
4       A   Brian C. James, M.D., P.A.
5       Q   And that's your business, right?
6       A   Yes, it is.
7       Q   Okay.  Direct your attention to the page --
8   it's the second page of the statement of revenue and
9   expenses.  It's marked SAB0918.
10      A   I have it.
11      Q   Okay.  And at the top column, there's
12  "Insurance - Malpractice."
13      A   Yes.
14      Q   And I think we know what
15  "Insurance - Malpractice" is.  And then there's an item
16  "Insurance - General."
17      A   Yes.
18      Q   What was "Insurance - General"?
19      A   I don't recall off the top of my head.  You
20  know, we had health insurance in the practice,
21  disabilities, all of those things.
22      Q   Okay.
23      A   Without seeing a specific breakdown of this,
24  I couldn't tell you.
25      Q   Okay.  Let's turn -- I'm not sure if this

162

1   thorough understanding of that.  I don't really -- that
2   would be one of those things that I would need his help
3   for.
4       Q   Okay.  Did you discuss the business
5   protection policy with Mr. Famiglio?
6       A   The specifics of it, I don't recall.
7       Q   Was this -- excuse me.  If Exhibit 6 was a
8   document that had been in your files, would it have
9   been the kind of thing you would have passed along to
10  George Famiglio?
11      A   Yes.
12      Q   Do you remember passing along Exhibit 6
13  specifically to George Famiglio?
14      A   I don't.
15      Q   How many years did you maintain the business
16  protection policy?
17      A   I can't recall.
18      Q   Did you maintain it for all the years:  2001,
19  2002, and 2003?
20      A   I think so.
21      Q   I'm going to hand you what's previously been
22  marked as Exhibit 13.  Do you recognize Exhibit 13,
23  Dr. James?
24      A   Yes.
25      Q   And what is Exhibit 13?

164

1   will really be -- SAB0923, so that would be about four
2   pages over.
3       A   Okay.
4       Q   There's a line item, "545.1,
5   Insurance - General."
6       A   I'm sorry.  Could you tell me that one more
7   time, please?
8       Q   The line "545.1, Insurance - General."
9       A   Yes.
10      Q   And is this the amount -- what's the amount
11  there?
12      A   Sixty thousand.
13      Q   And is that the same as the amount we saw on
14  page SAB0918?
15      A   Those two figures are the same.
16      Q   Okay.  Is this the same expense or item, do
17  you know?
18      A   I'm not certain.
19      Q   Okay.  Does this page of the general ledger
20  refresh your recollection at all as to what that
21  "Insurance - General" was for?
22      A   No, sir.  I would have to see a specific
23  breakdown of that.  You know, we would -- my office
24  would get the information together, financial
25  information, all of these types of figures you see

165

1   here.  It would be -- I would send it to George, we
2   would talk about it, and then he would create this
3   ledger for me and then bring up any pertinence in that
4   to me.
5       Q   Okay.  Is it possible -- is it possible that
6   this 60,000 is the premium for the business protection
7   policy in 2001?
8       A   It's -- I don't really know, to be honest.
9   You know, I would have to see a more specific breakdown
10  to answer that with certainty.
11      Q   Okay.  Do you still have the records from
12  2001 that would have the more specific breakdown?
13      A   I don't think so.  We've given you guys
14  everything that we had --
15      Q   Okay.
16      A   -- as far as to the best of my knowledge.
17      Q   Okay.  So you couldn't say for a certainty
18  what that 60,000 was for?
19      A   Other than saying it's "Insurance - General,"
20  as labeled there.
21      Q   Okay.
22      A   You know, George would put these together and
23  he would put it under these different headings.  I
24  would give him all the specific information.  You know,
25  a lot of that was complicated to me, and I would rely

166

1   on him to put these reports together and go over them
2   with me.
3       Q   I'm going to hand you now what was previously
4   marked Exhibit 14.  Do you recognize Exhibit 14?
5       A   Again, it's a ledger, financial statements
6   prepared by George for December 31st of '02.
7       Q   Okay.  And I direct your attention to the --
8   I guess it's the fifth page of Exhibit 14.
9       A   Where?
10      Q   It's the fifth page of the exhibit.  It's
11  SAB0932, "Revenue Statement and Expenses."
12      A   Okay.  Thanks.
13      Q   And the top line there, "Insurance -
14  General."
15      A   Yes.
16      Q   And I think for the year 2002, it indicates
17  an expense of $832,767.32.
18      A   I see that.
19      Q   Okay.
20      A   Yeah, that appears to be most likely -- and
21  again, it's the best of my recollection of this, but
22  when looking at insurance, a figure like that, I'm
23  pretty sure that was for the investment tool, the
24  insurance policy and everything.
25      Q   Okay.

167

1       A   That would make sense.  I mean, in thinking
2   back, you know, I know my malpractice wasn't that much.
3       Q   I'll refer you to the page before.  There's
4   an item for "Insurance - Malpractice."  SAB0931.
5       A   Right, yeah.
6       Q   So would there be any malpractice coverage in
7   this "Insurance - General"?
8       A   No, that would -- to the best of my
9   knowledge, would probably be the disability, the other
10  parts of that insurance policy.
11      Q   That we saw the declaration sheet for?
12      A   Yes.  That would make the most sense to me
13  right now.
14      Q   Would it include any of the payments for the
15  annuity policy that we saw earlier?
16      A   I'd have to defer to George for that because
17  he would have the breakdown of all of this information.
18  Because when I would make these payments, he would
19  usually get, you know, a copy of the wire transfer for
20  the -- any of the information regarding these payments.
21  And then how he put it in the ledger usually was up to
22  him.  But when I look at that kind of figure under
23  "General Insurance," that makes the most sense.
24      Q   Yeah.
25      A   But you would have to talk to George to get

168

1   the specifics of this.  He would know that.
2       Q   Okay.  But you don't remember specifically
3   what "Insurance - General" is, or are you --
4       A   No.  I'm looking at it, and that's what I'm
5   saying, is that I think that's what it was.
6       Q   Okay.  Are you saying you remember it being
7   that, or are you saying that because you're deducing
8   from the other numbers that that's what it has to be?
9       A   I'm deducing from the other numbers.
10      Q   Okay.
11      A   And knowing that I was putting money into
12  these accounts at that period of time, I can't see
13  where I would have been putting these kind of numbers
14  anywhere else.  I wish George had broke it down more
15  specifically so that I could look at this and tell you,
16  but he has it lumped under just a general insurance.
17      Q   Okay.  Did your business keep a more detailed
18  general ledger for the years 2002?
19      A   I would -- what I would do is, you know, I
20  would sign the checks, go over the payments, get my
21  statements, all of these things, put it in one package,
22  and I would send it to George, and he would prepare
23  these ledgers, and then he would label them however he
24  would want to.  So he would have that information.
25      Q   So in the year 2002 in particular, your

169

1  recollection is that your office didn't use QuickBooks
2  or some kind of software like that?
3      A   We definitely did not use QuickBooks back
4  then.  It wasn't until '05 or '06 that we put that
5  program in.
6      Q   Okay.  You seem very certain about that.
7      A   It was around -- yeah, everything was done
8  manually prior to that, which was kind of -- you know,
9  it was more cumbersome.
10      Q   Okay.  Do you remember a particular event as
11  to when you installed the QuickBooks software?
12      A   I can tell you it was around '05 or --
13  somewhere in '05 or '06.  I don't remember
14  specifically.
15      Q   Okay.  And when you say the statements that
16  you sent to George Famiglio, you mean the bank
17  statements?
18      A   Bank statements, any kind of financial
19  information I would send over to him.
20      Q   Okay.  Invoices?
21      A   Any of that stuff, receipts, you know,
22  payments for the insurances, the wire transfers.  Any
23  of that information that had to do with financial
24  issues, I would put together and get it over to George,
25  and then he would put together the general ledger, like

170

1  you see here.
2      Q   Did he keep a -- was there a monthly ledger?
3      A   He got them ever month.  You know, he
4  would -- we would talk about that.  I don't think I got
5  a monthly ledger, no.
6      Q   Okay.  He'd just do the year-end?
7      A   Yeah, I think so.  I mean, I could pull up
8  the records.  You know, nine years ago, I don't recall
9  him giving me something like this every month, but he
10  may have.  Just because I don't remember it doesn't
11  mean it didn't happen on this particular issue.
12      Q   Okay.  You don't remember one way or the
13  other?
14      A   No.  We talked on the phone, though, go over
15  stuff, but this -- I don't remember getting something
16  like this every month.  It may have been something more
17  simplified; but, you know, it should have been included
18  in all these records that came over to you.
19      Q   Okay.  Whatever you had that you had kept?
20      A   Yeah, absolutely.  Everything we had, we sent
21  to you.
22      Q   Okay.  Do you ever -- have you cleaned out
23  records from older years, or do you just keep
24  everything?
25      A   Well, typically, we would send it over to him

171

1  and he would keep it.
2      Q   Okay.  Looking in Exhibit 14 at SAB0936, this
3  appears to me to be a slightly more detailed ledger.
4      A   Definitely, probably from my American
5  Express.
6      Q   Okay.  Looking about two-thirds of the way
7  down the page -- and all of these are dated 12/31/02.
8  This one has a reference "T of 12 LB."
9      A   Yeah, I see it.
10      Q   Okay.
11      A   570,000.
12      Q   Right.  What was that?
13      A   According to what he put down under the
14  description, to read that, it says "to record personal
15  expenses for business insurance for '02."
16      Q   Okay.  So what do you understand that to
17  mean?
18      A   Again, just part of that business insurance
19  plan would make the most sense to me.
20      Q   Okay.
21      A   You know, without having a more -- you know,
22  I would have to ask George to try to pull up those
23  records and see what he came up with, you know, during
24  this time period as to what -- a more specific
25  explanation of what that was.  But here today, it's my

172

1  impression, to the best of my belief, that that's what
2  that's for, part of the insurance plan.
3      Q   When you made wire contributions -- and I may
4  be -- I don't want to assume facts not in evidence.
5  When you sent money for the insurance, did you send it
6  by wire transfer?
7      A   I think so.
8      Q   When you made those wire transfers, from what
9  accounts were the transfers?  Were they from your
10  personal account or from your business checking
11  account?
12      A   I don't recall.  We would have to -- I'm sure
13  that's all on the wire transfer that was done, whatever
14  that says.
15      Q   Okay.
16      A   It would speak for itself.
17      Q   Okay.  But -- and again, I'll ask a similar
18  question to what I asked in reference to the 2001.  I
19  think you're testifying that you believe this 570,000
20  to represent -- something with the foreign
21  insurance product--
22      A   That's my impression at this point, to the
23  best of my knowledge.  That makes the most sense
24  sitting here looking at this right now.
25      Q   Okay.  But again, is that from your memory of

173

1   it, or is that what you're deducing just based on
2   this --
3       A   It's what I'm deducing looking at this
4   report.
5       Q   Okay.  Do you know how your business would
6   have reported these expenses on its tax return?
7       A   That's one of the questions that I would have
8   to defer to George.  How he goes about preparing that
9   is -- that's one of the reasons I hired him.
10      Q   Okay.  I'm going to hand you what has been
11  previously marked as Exhibit 17, and do you recognize
12  Exhibit 17?
13      A   Yes, I do.  It's a financial statement and
14  general ledger, December '03, prepared by George
15  Famiglio.
16      Q   Okay.  And for your business?
17      A   Yes.  Brian C. James, M.D., P.A.
18      Q   Okay.  And I'll refer your attention to,
19  again -- well, this time the sixth page -- seventh
20  page, SAB --
21      MR. JONES:  Do you have a spare?
22      MR. MAY:  Oh, yes.
23      (Discussion off the record.)
24      THE WITNESS:  That was SAB what?
25      MR. MAY:  SAB09 -- oh, this one is hard

174

1   to -- 0949.  It's the statement of revenues
2   and expenses.
3       MR. JONES:  The line goes right through
4   where these numbers are.
5       THE WITNESS:  I think it's that one
6   (indicating), right?
7       MR. JONES:  No, I think it's the one on
8   the left side, isn't it?  Give him the
9   number --
10      THE WITNESS:  What's the number at the
11  top left, 259 or 171?  Because the line at
12  the bottom of the page goes right through
13  your SAB number.
14      MR. MAY:  Yes, it does.
15      MR. JONES:  There are page numbers at
16  the bottom.
17      THE WITNESS:  I have 49 -- is it 2?
18      MR. MAY:  It's page 2 of the revenue
19  statement.
20      THE WITNESS:  171 is at the top left?
21      MR. MAY:  Yes, "Insurance -
22  Malpractice."
23      THE WITNESS:  Okay, I see.
24      MR. MAY:  Yeah.
25      Q   (By Mr. May)  And comparing "Insurance -

175

1   Malpractice" and "Insurance - General" in this 2003
2   ledger, do you know why the "Insurance - General" was
3   so much less in 2003 than we saw in the 2002 ledger a
4   moment ago?
5       A   No, I do not know why.
6       Q   Okay.  This number -- this amount for
7   "Insurance - Malpractice," I understand it to say that
8   the expense for malpractice insurance was $320,000 in
9   2003.  Is that -- how does that --
10      A   That seems high.  That does seem high to me.
11      Q   Okay.  What was your malpractice insurance
12  last year, do you recall?
13      A   I think it was around 200, maybe.  And I
14  would refer -- look, I don't want to tell you something
15  and be wrong on that.
16      Q   Sure, sure, sure.
17      A   You know, we have records on that that I
18  could get you the exact figure.
19      Q   Okay, sure.  Well, and we could look back at
20  Exhibit -- the last ledger that we saw.  I believe the
21  number was about 93,000 and some change.
22          So do you remember an increase in your
23  insurance -- malpractice insurance from 2002 to 2003 of
24  that -- of three times?
25      A   When I look at this, you know, I certainly

176

1   see that on here.
2       Q   Okay.
3       A   I know that I was not getting my malpractice
4   insurance from First Fidelity, Foster & Dunhill.  I've
5   always -- to my memory, I think I've always gotten it
6   through FPIC, a Florida physicians malpractice carrier,
7   unrelated completely to anything that I was doing with
8   Foster & Dunhill.
9       Q   Okay.  Do you know if this insurance
10  malpractice item includes some of the business
11  protection policy?
12      A   I would -- we'd have to get George to pull up
13  his records for that, but I can tell you that my
14  malpractice, I know I don't -- I have never gotten
15  malpractice insurance through anything to do with
16  Foster & Dunhill.
17      Q   Okay.  Do you know, was your malpractice
18  premium $320,108.13 in 2003?
19      A   I'm looking at it, and that's what it says,
20  but I would have to -- again, we would have to have
21  George pull the records and look over that to see where
22  that -- you know, where that came from, what was
23  that -- what was the reason.  Because right now, I'm
24  just looking at that number and going, "It looks a
25  little high."

177

1    Q   Now, in 2003, did you still have the business
2  protection policy?
3    A   I don't know when that ended.  I would have
4  to -- I would have to look at the documents to see when
5  that ended.  I don't remember off the top of my head.
6    Q   Okay.  Would anyone else besides George
7  Famiglio know what numbers were included in this item
8  for malpractice insurance?
9    A   I think he would be the only one --
10   Q   Okay.
11   A   -- as far as I know.
12   Q   Would anyone at your office know what would
13 be included in this?
14   A   I don't think so.
15   Q   I just have a couple more documents.
16       (Exhibit 30 marked for identification.)
17   Q   (By Mr. May)  You've been handed what's
18 marked Exhibit 30, Dr. James.  Do you recognize
19 Exhibit 30?
20   A   Not -- no, I do not, but I'm just reviewing
21 it right now.
22       From looking at the document, reading what's
23 on it, it appears to be one of my -- a repayment for
24 one of the loans I took out against the trust or the
25 insurance policy.

178

1    Q   Okay.  And are you just -- are you deducing
2  that from what you're reading on the exhibit?
3    A   Yes, I am.
4    Q   Okay.  So in the second page of Exhibit 30,
5  which is SAB0218, which is titled "Loan Schedule," do
6  you remember this loan?
7    A   No, I don't specifically, but I do remember
8  borrowing money against these offshore entities and
9  then paying it back.
10   Q   Okay.  And what was the -- in general, what
11 was the purpose of the loans?
12   A   I don't remember, whatever needs I had right
13 then financially.
14   Q   Okay.  And when you paid the loan back to the
15 trust, you paid with interest; is that right?
16   A   Yes, it appears so.
17   Q   Okay.  Do you know if the interest went to
18 the trust or to the trust company?
19   A   I think it went to the trust, but again, I
20 can't tell you that with a hundred percent certainty.
21   Q   Okay.
22       (Exhibit 31 marked for identification.)
23   Q   (By Mr. May)  Okay, Dr. James, you've been
24 handed what's marked Exhibit 31.  Have you ever seen
25 Exhibit 31 before?

179

1    A   I don't recall seeing it before, but I'm
2  reading it right now.
3    Q   Okay.  Yeah, just take a moment and read the
4  letter.
5        Okay.  Have you read Exhibit 31?
6    A   Yes.
7    Q   Does it -- does the -- well, who is
8  Keithley F.T. Lake?
9    A   I don't know exactly.  I've seen his name
10 before.
11   Q   Okay.
12   A   Apparently he's the director of the First
13 Fidelity Trust Company.
14   Q   Okay.  Have you ever met Keithley Lake?
15   A   No, I have not.
16   Q   Okay.  But you've never seen this letter
17 before today?
18   A   I don't recall ever seeing it.
19   Q   Okay.  But the contents of the letter, does
20 it comport with your understanding about the annuity
21 policy that you had in your trust?
22   A   My understanding wasn't as specific as this
23 letter states, but as a general understanding, yes,
24 that I can borrow against the policy.  But the
25 specifics of this are too complicated for me.  You

180

1  know, I'm reading it now.  That's why I had, you know,
2  Foster & Dunhill, that's why I had George Famiglio, to
3  help me understand things like this, and Mr. Simon.
4    Q   And do you believe this to be -- well,
5  that -- never mind.
6        I'd ask you to turn back to Exhibit 29 -- not
7  29, I'm sorry, Exhibit 28, and the page SAB0563.
8    A   Okay.
9    Q   Do you know whose handwriting that is on that
10 page?
11   A   No, I do not.
12   Q   Okay.  There's a -- kind of a written
13 statement, "Chris, we also need the 50,000 from the
14 deposit written back as soon as possible.  Thanks."
15 Did I read that correctly?
16   A   Yes.
17   Q   What is that in reference to?
18   A   I'm not sure.  "Chris, we will" -- let me
19 read it.
20   Q   Okay.
21   A   "Chris, we will also need the 50,000 from the
22 deposit written back" -- no, I'm not sure what that's
23 in reference to, other than what it says.
24   Q   Okay.  And then turning to page SAB0570, do
25 you recognize that handwriting?

181

1      A   No, I do not.
2      Q   Okay.  And do you know what the subject of
3  this writing is?
4      A   Other than what it says on it, no other
5  things come to mind.
6      Q   Okay.
7          MR. MAY:  All right, if I could just
8      have a moment to glance back through these
9      notes.
10     Q   (By Mr. May)  I do have just a general
11  question.
12         In reference to the establishment of the
13  foreign trust and the filing of the required IRS
14  filings, I think you've said a number of times -- and
15  correct me if I'm mischaracterizing anything you've
16  said, but I think you've said that your approach was to
17  hire advisors that you trusted and to allow them to
18  deal with the details of the trust and whatever filings
19  had to be done.  Is that -- is that a fair
20  characterization?
21     A   Well, in general, with my business, I would
22  oversee the operations of things, the review, and send
23  documents to the appropriate people that I've hired to
24  handle those types of -- those aspects of my business.
25  I went to Donaldson to set up the trust for the asset

182

1  protection.  I relied on him to do that job.  I had --
2  George Famiglio, my accountant, had given Steve his
3  information.  I called George afterwards to go over
4  this, you know, and I didn't -- at that point, I sent
5  all the documents to them.  You know, he had referred
6  me to someone else to do it, so I assumed he knew what
7  this was about, an offshore trust, sent him all of the
8  information regarding that and relied on him to make
9  the appropriate filings for it.
10     Q   Okay.  And in reference to the structure of
11  the trust, likewise you relied on Steve Donaldson that
12  the structure that he had designed would be appropriate
13  and effective for you?
14     A   Yes.  I told him what my needs were, it was
15  for asset protection primarily, and he drew out on the
16  white board how it would be, similar to what we saw
17  earlier, I forgot which exhibit, and we discussed --
18  you know, he did go over, you know, this is what the
19  trust is.  He went over and explained it to me as best
20  he could, went over the IRS requirements.  That's when,
21  you know, I had given him my information on my
22  accountant.  He wanted to talk to him because, you
23  know, I'm not an accountant, so he wanted to talk to
24  him.
25         He went over, you know, where the trust would

183

1  be.  He went over a lot of that information with me,
2  and after which the initial meeting I decided that,
3  yes, this would be something I wanted.  Shortly after
4  that, I called George and let him know that this was
5  something I was going to do and made him aware of that.
6         And that's pretty much how it went.  And then
7  I relied on them to do, you know, what they did.  I
8  talked to George regularly.  You know, I gave him all
9  of my information regarding wire transfers, as well as
10  all the other products, basically every financial
11  aspect of my practice.  And he was more than just a
12  CPA.  You know, he was involved in advising me on my
13  business, the money aspect of my business and my
14  personal life.  And I didn't know what else to do.  I
15  mean, it's -- I think I -- you know, I'm not sure what
16  else.
17     Q   Okay.
18     A   In hindsight, it's easy to see, but, you
19  know, going back to that point in time, you know, we
20  had reviewed stuff that -- I listened to what Steve had
21  said, it all made a lot of sense at the time, and at no
22  point was there any intention to do anything or hide
23  anything at all.
24     Q   And when you made the contributions to the
25  trust or payments for insurance product, you would wire

184

1  the funds to either First Fidelity Trust or Fidelity
2  Insurance and trust that they would handle them
3  appropriately?
4      A   Yes, sir.
5      Q   And you were relying on them to invest it as
6  you directed or --
7      A   I think -- you know, it was my understanding
8  that Foster & Dunhill was directing on how to invest
9  it.
10         MR. MAY:  I think at this point, I'm
11     going to pass the witness.
12         MR. JONES:  Okay.  Could Dwaune and I
13     take a few seconds here.
14         (Recess taken.)
15              EXAMINATION
16  BY MR. JONES:
17     Q   Just for the record, my name is Ken Jones
18  with Sutherland Asbill & Brennan in Washington, DC, and
19  I represent Dr. James in this matter that we've been
20  dealing with all day long here.  Just a couple of
21  questions, actually.
22         And I apologize, I don't think Mr. May pinned
23  this down -- I just want to be clear -- roughly when
24  did you first start using George Famiglio to keep books
25  and records and do tax compliance, do you recall?

185

1      A    It was in the '90s.  I started in '95, so
2    late '90s.
3      Q    Okay.
4      A    Probably '98, '99, maybe.
5      Q    Okay.  And I'm not going to make you go back
6    through a lot of these numbers.  There were questions
7    about numbers and deductions and so on and so forth.
8    When all was said and done, and I mean over all the
9    period of years you were in the trust, how would you
10   characterize your experience?  Was this a money maker
11   or a money loser?
12     A    I lost everything.  It was a money loser.
13     Q    So any suggestion you were getting money back
14   somehow from these offshore trusts, that's not correct?
15     A    No.  I've lost all the money I put into it.
16          MR. JONES:  No further questions.
17          MR. MAY:  None from me either.
18          (Deposition concluded at 2:51 p.m.)
19
20
21
22
     _____
23   BRIAN CHIVAS JAMES
24
     Subscribed and sworn to before me
25   this ____ day of _____ 20___.

---

186

1            C E R T I F I C A T E
2
3    STATE OF GEORGIA
4    COUNTY OF FULTON
5
6         I HEREBY CERTIFY that the foregoing
7    deposition was taken down by me in stenotype, and the
8    questions and answers thereto were transcribed by means
9    of computer-aided transcription, and that the foregoing
10   transcript represents a true and correct transcript of
11   the testimony given by said witness.
12
13        I FURTHER CERTIFY that I am not kin or
14   counsel to the parties in the case; am not in the
15   regular employ of counsel for any of said parties; nor
16   am I in any way financially interested in the result of
17   said case.
18
19          _____
            MICHELLE M. BOUDREAUX, RPR
20          CCR-B-2165
21
22
23
24
25

# ERRATA SHEET

**ERRATA SHEET**

| Case: | Brian Chivas James |
| | Middle District of Florida |
| | Civil No. 8:11-cv-00271-JSM-AEP |

| Deposition: | Brian Chivas James |

| Deposition Date: | October 6, 2011 |

| Page | Line | Transcript | Change to | Reason |
|------|------|-----------|-----------|--------|
| 37 | 25 | it was woefully inadequate and it's cost me | Famiglio was woefully inadequate and it's cost me | Clarification |
| 75 | 2 | Yes, sir. | Yes, sir.  But at the time, I did not know it was not correct. | Clarification |
| 83 | 22 | No. | No.  But at the time, I did not know it was not correct. | Clarification |
| 83 | 25 | (Witness nods head affirmatively.) | But at the time, I did not know it was not correct. | Clarification |
| 120 | 21 | wouldn't know the first thing about filing a return. | wouldn't know the first thing about filing this type of return. | Clarification |
| 121 | 1 | know how to file a return on my own or to do any of | know how to file this type of return on my own or to do any of | Clarification |
| 130 | 6 | I remember that because … | I remember that because we met at his office and I  recall the look of anger on his face. | Clarification |
| 182 | 5 | all of the documents to them. You know he had referred | all of the documents to him. You know, he wanted to refer | Clarification |
| 182 | 8-9 | information regarding that and relied on him to make the appropriate filings for it. | information regarding that and relied on him to advise me in order to make the appropriate filings for it. | Clarification |

Signed:                                                           Date: 11/17/11

Page 185

```
 1      A    It was in the '90s.  I started in '95, so
 2   late '90s.
 3      Q    Okay.
 4      A    Probably '98, '99, maybe.
 5      Q    Okay.  And I'm not going to make you go back
 6   through a lot of these numbers.  There were questions
 7   about numbers and deductions and so on and so forth.
 8   When all was said and done, and I mean over all the
 9   period of years you were in the trust, how would you
10   characterize your experience?  Was this a money maker
11   or a money loser?
12      A    I lost everything.  It was a money loser.
13      Q    So any suggestion you were getting money back
14   somehow from these offshore trusts, that's not correct?
15      A    No.  I've lost all the money I put into it.
16           MR. JONES:  No further questions.
17           MR. MAY:  None from me either.
18           (Deposition concluded at 2:51 p.m.)
19
20
21
22
23   BRIAN CHIVAS JAMES
24
25   Subscribed and sworn to before me
     this 17th day of November 2011.
```

MICHELLE SMITH
MY COMMISSION # EE 117234
EXPIRES: September 18, 2015
Bonded Thru Notary Public Underwriters

Michelle Smith