# PLAINTIFF'S EXHIBIT 2
## Deposition of
## Christopher D. Donaldson
## September 21, 2011

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


-------------------------- :

BRIAN CHIVAS JAMES,               :

     Plaintiff,             :   Civil No.
                                      8:11-cv-00271-JSM-AEP
vs.                               :

UNITED STATES OF AMERICA,         :

     Defendant.             :

-------------------------- :



DEPOSITION OF:   CHRISTOPHER D. DONALDSON

PURSUANT TO:     Notice by Counsel for Defendant

DATE:            September 21, 2011

TIME:            2:00 p.m. to 3:30 p.m.

PLACE:           Offices of the U.S. Attorney
                 400 North Tampa Street
                 Tampa, Florida 33602

REPORTED BY:     PHYLLIS DEFONZO, RPR
                 Notary Public
                 State of Florida at Large



Pages 1 - 76

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

---

Page 2

1  APPEARANCES:
2
3     KENDALL JONES, ESQUIRE
      DWAUNE L. DUPREE, ESQUIRE
      Sutherland, Asbill & Brennan, LLP
4     1275 Pennsylvania Avenue NW
      Washington, D.C. 20004-2415
5        Appearing for Plaintiff
6
7     MICHAEL W. MAY, ESQUIRE
      United States Department of Justice
8     Tax Division
      P.O. Box 14198
9     Washington, D.C. 20044
         Appearing for Defendant
10
11
12  Also Present:
    Stephen P. Donaldson
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1
2        I N D E X
3
4  TESTIMONY OF CHRISTOPHER D. DONALDSON      PAGE
5  DIRECT EXAMINATION BY MR. MAY             4
6  CROSS-EXAMINATION BY MR. JONES            62
7  CERTIFICATE OF OATH            73
8  CERTIFICATE OF REPORTER            74
9  ERRATA SHEET            75
10 WITNESS LETTER            76
11
12
13        E X H I B I T S
14
15  NO.   DESCRIPTION            PAGE
16   1   Copy of Brochure            19
17   2   Fax Transmittal Form            41
18   3   Insurance Policy Application       44
19   4   Trust Deed            48
20   5   E-mail with attachments            52
21   6   Business Protection Policy            59
22
23
24
25

---

Page 4

1              CHRISTOPHER D. DONALDSON,
2   the witness herein, being first duly sworn on oath, was
3   examined and deposed as follows:
4                DIRECT EXAMINATION
5   BY MR. MAY:
6       Q   All right.  Mr. Donaldson, we've already met
7   earlier.  But we're now on the record in your deposition.
8            And for the record, my name is Mike May.  I'm
9   an attorney with the U.S. Department of Justice.  And I'm
10  representing the United States in the case that has
11  brought us here today, the case of Brian Chivas James
12  versus U.S.A.
13           Would you please state your name and address
14  for the record?
15      A   Full name, Christopher D. Donaldson.
16          Physical address, ███████████████████
17  ████████████████   Tampa, Florida ████████
18      Q   Have you ever had your deposition taken
19  before?
20      A   One other time.
21      Q   In what kind of --
22      A   Divorce action.
23      Q   Okay.
24      A   Not mine.
25      Q   All right.  Thank you.

---

Page 5

1            As I said earlier, perhaps, I'm going to be
2   asking you some questions today.  A little later on, Mr.
3   Jones and Mr. Dupree may ask you some questions as well.
4            While I'm asking you questions, if at any
5   point you're not clear what I mean by the question, just
6   ask me to explain or clarify it and I'll be happy to do
7   so.
8       A   Okay.
9       Q   If you answer, I'll assume it's because you
10  understood the question.
11      A   Okay.
12      Q   And if at some point later on as we're going
13  and asking other questions you remember something about
14  an earlier question, and you'd like -- I'd love for you
15  to just feel free to say, you know, say something and
16  say, "About this question you asked earlier, I remembered
17  something else."
18      A   Okay.
19      Q   And that would be great.
20           As you probably noticed, the court reporter
21  is taking down every word that we say so that there will
22  be a record of the deposition.  And so there's a couple
23  of things because of that.
24           It's important that you answer out loud,
25  verbally and audibly.  So if an answer is yes, "yes"

---

---

Page 6

1  instead of "uh-huh."  And if it's no, "no" instead of
2  "uh-uh" or something.
3      A   Understood.
4      Q   And another thing.  Because she is writing
5  everything down, it makes her job a little bit easier if
6  you wait until I finish asking the questions to answer.
7  Fair enough?
8      A   Fair enough, sir.
9      Q   Okay.  If at any point you need a break --
10  and I'm not sure how long we'll be here -- but if you do
11  need a break we can, of course, take a break.  The only
12  catch to that is that if I've asked a question, go ahead
13  and answer the question, then we can take a break.
14      A   Understood.
15      Q   The last kind of introductory question I need
16  to just ask you for the sake of, you know, making sure
17  everything's on the table.
18       Have you taken or do you intend to take any
19  medication that would prevent you from sitting here for
20  an hour or two and understanding and answering my
21  questions?
22      A   No.
23       Would you like me to identify the medication
24  that I'm currently under?
25      Q   If you're taking --

---

Page 7

1      A   No, no problem.
2       I'm taking blood pressure medication.
3      Q   Okay.
4      A   And then Mucinex for cold.
5      Q   Okay.
6      A   Other than that, nothing.
7      Q   And what's the name of the blood pressure
8  medication?
9      A   Oh.  Losartan.
10      Q   Okay.  That's fine.  If you know how to spell
11  it?  If not --
12      A   L-o-s-a-r-t-a-n.
13      Q   Okay.  In regards to Losartan, do you feel it
14  has any effect on your ability to understand or answer
15  questions?
16      A   No.  Keeps me alive, so.
17      Q   Okay.  Very good.
18       And one last kind of instruction is, if at
19  any point I'm asking questions and Mr. Jones makes an
20  objection, I'd just ask you to just go ahead and answer
21  the question and not to worry about that.
22       Same thing if he's asking the question and I
23  object, you could just answer the question.
24      A   Understood.
25      Q   All right.  Now, Mr. Donaldson, what is your

---

Page 8

1  occupation?
2      A   Currently I'm a wholesaler for a registered
3  investment advisory firm.
4       And I also do work for a firm called Chase,
5  which is involved in doing introductions for firms that
6  are looking to raise debt and equity.
7      Q   Okay.  So if I was going to put a label on
8  that?
9      A   Financial consultant, I guess.
10      Q   Okay.  And how long have you been a financial
11  consultant?
12      A   Since March/April of this year.
13      Q   And prior to that time, what was your
14  occupation?
15      A   I worked for a firm for two years, we did
16  international and domestic work.  We were in a sense
17  doing a family office-type business.
18       Didn't work out too well.  A lot of people
19  don't understand the family office-type concept where you
20  have clients who have attorneys, they have CPAs, they
21  have insurance agents, they have financial consultants
22  and so forth.  But they don't have one individual, in a
23  sense, quarterbacking the whole situation, trying to be
24  able to gather everyone together and be able to work in a
25  streamlined fashion.

---

Page 9

1       Prior to that, since '95, I was working
2  exclusively in the offshore side of the business.  I was
3  doing U.S. compliant consultant for those who are looking
4  to do asset protection and tax mitigation.  And I was
5  primarily being a liaison between the -- my father, Steve
6  Donaldson, and the advisors, with the clients themselves.
7       He was the one who would go out and actually
8  like recruit other advisors.  These are primarily other
9  professionals, which would be CPAs and attorneys.
10      Q   Okay.  And backing up a little bit.
11       The firm you work with now, what's the name
12  of that firm?
13      A   The registered investment advisory firm, it's
14  called Paul Ellis, E-l-l-i-s, Investment Associates, LLC.
15      Q   Okay.  And then the family office concept,
16  what --
17      A   That was called Fortress Family Office Group.
18      Q   Okay.  And what were the years that you were
19  involved with Fortress Family --
20      A   Fortress was about -- about May of -- May or
21  June of 2008 till about March of this past year.
22      Q   Okay.  So from 1995 to about May of 2008?
23      A   Prior -- yeah.
24       Prior to that, I was with Foster & Dunhill.
25      Q   Okay.  And that was where you did the

Page 10

1   offshore compliance work?
2       A   The consulting.
3           We didn't actually do the forms and such. We
4   were being consulted to see what the benefits would be to
5   utilizing these types of structures in a compliant
6   manner.
7       Q   Okay. And so for the purposes of this
8   lawsuit, Dr. James, Brian Chivas James, has filed against
9   the United States, the years at issue are the years
10  really 2001, 2002 and 2003. There's probably some years
11  on either side of that.
12          But during those years, 2001 let's say really
13  through 2005, were you with Foster & Dunhill during those
14  years?
15      A   Yes, sir.
16      Q   And was your occupation and role the same for
17  that entire period?
18      A   Primarily, yes.
19      Q   And again, how would you describe your role
20  during those years, 2001 through 2005?
21      A   Well, I was working based on the parameters
22  which Steve would say, "I need you to contact this
23  particular advisor, this particular client may need
24  this."
25          You need to be able to interface with them to

Page 11

1   help; in a sense, ask them to send over the information
2   that we need to take a look at to do planning on. That
3   was most of the type of information I was doing.
4           Other than that, participating in
5   conferences, doing a presentation and so forth.
6       Q   Okay. We'll probably come back to that.
7           Well, let's delve into that a little bit now.
8   You know, you described your role in one sense as a
9   liaison. And is that a liaison between the clients and I
10  think you said other professional advisors?
11          I think you've mentioned so far attorneys and
12  accountants. Is that fair?
13      A   Let me clarify that.
14          What I mean by that is that I'm not
15  necessarily going out there and planning a particular
16  thing for a client. I'm not saying, you know, "Provide
17  me all the data, I'm gonna plan the case."
18          I'm going to, based on an order, say "Please
19  help me get this information. Either go to the advisor
20  to get it or go to the client to gather all the pertinent
21  information. Bring it back, we'll have the planning
22  department review it and come back with an analysis on
23  cost benefit and say, 'This is what would be possible.'"
24      Q   Okay. For that particular client?
25      A   Correct.

Page 12

1       Q   Okay. You also mentioned conferences?
2       A   Yeah. We would put on usually between three
3   to four conferences per year. They would be held in
4   various locations.
5           We held some in the Bahamas, some in Aruba,
6   some in Mexico and some other locations. And those were
7   put on to allow a gathering of other professionals to
8   come down, be able to, over a two-day period, to be able
9   to review and see what it is that we're, you know,
10  talking about; whether or not they agree with it and
11  everything else.
12          And then the same time, they may have clients
13  coming down to them so they can have an opportunity to
14  talk to all the different presenters that are there, and
15  be able to come away with some idea whether or not they
16  wanted to move forward.
17      Q   Okay. And are those conferences sponsored by
18  Foster & Dunhill?
19      A   Yes, they were.
20      Q   And what -- do these conferences have a name
21  or some kind of title?
22      A   I think they were just like U.S.-Compliant
23  Offshore Planning International.
24          I could, obviously, get you a copy of the
25  title of what we had in the past, if that would help.

Page 13

1           I don't remember the exact title. Steve may
2   know what it was.
3       Q   Okay. But -- and just to see if I'm
4   understanding what these conferences were; in my words,
5   kind of summarize what I think you said and you tell me
6   if it's correct. Okay?
7           It sounds like you would host a conference.
8   And people who are interested in having an offshore trust
9   or having offshore investments would come to the
10  conference. And also there would be there, I guess, a
11  faculty of various advisors, like perhaps attorneys and
12  accountants, that would explain the benefits and
13  advantages and nuances of having an offshore trust?
14      A   Well, the -- on the conference itself, there
15  were a number of different speakers there.
16          You had various members of law firms. You
17  may have some CPAs, business valuation specialists. You
18  may have members of trust companies, insurance companies.
19          They'd be going down there to be able to talk
20  about their specific area of specialization.
21      Q   Okay. And -- but the people that were
22  attending were people who were interested in having
23  offshore trusts?
24      A   Yeah, you had -- no, I mean, it's hard to say
25  what they wanted.

Page 14

1   Obviously, they had an interest in some type
2  of U.S.-compliant planning.
3      Q   Okay.
4      A   I don't know.
5      I mean, I'm sure a lot of 'em did have issues
6  about asset protection, potentially.  Some may have been
7  tax mitigation.  It could have been all over the board.
8      It could have been about providing some type
9  of a benefit for inheritance.  It's -- it's all specific
10 to that particular person.
11     And a lot of times you would just say, "I
12 have other professionals going down as doing their own
13 due diligence, to verify that what they were doing was
14 within the law."
15     So you had a lot of those people coming down
16 as well.
17     Q   Okay.  So, I mean, it sounds like it catered
18 to a pretty large demographic or a wide array of kinds of
19 people?
20     A   Yes, sir.
21     Q   On the average, how many people would attend
22 one of these conferences?
23     A   It's all over the board.
24     We've had anywheres from maybe 10 up to like
25 70 or 80 people.

Page 15

1      Q   Okay.  And I think most of the places you
2  mentioned were overseas, or not inside the United States?
3      A   Correct.
4      Q   And what was the purpose for holding the
5  conferences in those places?
6      A   Well, in case some of the people wanted to
7  have a more direct conversation with the trust company,
8  the insurance company and so forth.
9      Q   Okay.  Because those companies are typically
10 located in those places?
11     A   They're typically located in the Caribbean,
12 that's correct.
13     Q   Okay.  And then you mentioned also that you
14 sometimes did presentations?
15     A   Yeah.  They'd ask me to do a presentation on,
16 let's say, an insurance structure of some sort.  It was
17 just more of an explanation of what's going on.  I've
18 done some of 'em on the compliance side of it.
19     It's just all over the board, depending upon
20 who's going to be there and who wants to do what
21 particular topic.
22     Q   Okay.  And when you use the term
23 "compliance," what do you mean?
24     A   Well, you're going over forms as a way of
25 showing people that the U.S. government, they need to

Page 16

1  know where all your assets are so they can tax you
2  accordingly.  You're required to file all the proper
3  forms.
4      They don't have an issue about you having a
5  foreign trust because, obviously, they provide a form to,
6  you know, let you know where the trust is and so forth.
7      The same thing with the 3520-As.  You need to
8  make sure you're using a foreign trust company that does
9  these forms.  You need to make sure you're doing the
10 FBARs and everything else.  So we'd be able to go
11 through, as part of the comfort phase, by saying that
12 we're doing everything within the law.
13     You can't hide anything from the U.S.
14 government.  And everyone can see that now, based on
15 everything you read in the papers and everything else.
16 You need to allow them to be able to see the roadmap to
17 where you're going, be able to look through.  That way,
18 they can be able to say, "Yes, these are the taxes that
19 are due at these particular junctions" and everything
20 else.
21     So to be table to, in a sense, show them what
22 some of these forms are; and to say, "These are the forms
23 that gotta be filed, and these are the penalties that
24 would be associated with not filing these things on a,
25 you know, continuous basis."

Page 17

1      Q   And are some of those forms the Form 3520?
2      A   Yes.  3520, a 3520-A, and the Treasury
3  Department form -- a lot of other forms, depending
4  upon --
5      THE REPORTER:  I'm sorry, can you --
6      THE WITNESS:  I'm sorry.
7      THE REPORTER:  -- repeat that again?
8      A   The TD F 90-22.1.  And that's the Treasury
9  Department form that you have to file by June 30 of every
10 year, listing your secret foreign bank account; which you
11 need to be able to let them know exactly where the
12 account is located at, what the highest balance --
13 actually, up until the penny now -- that you've had in
14 it, the account number, the address, everything.
15     So, I mean, it's -- it's what you're supposed
16 to do.
17 BY MR. MAY:
18     Q   And so would these presentations be at one of
19 these conferences?
20     A   Yes.
21     Somebody would be going over the compliance
22 requirements.
23     Q   Okay.
24     A   As well as when you actually set up a trust,
25 there is a compliance package that also lays out in

BayAreaReporting@gmail.com,   www.bar-tampa.com                              866-240-9500

Page 18

1   details, "These are the forms that you'll be responsible
2   for, for taking care of" -- provided by the trust
3   company, whoever they have their trust with.
4       Q   Okay.  So from your standpoint, when you use
5   the word "compliance," you're primarily referring to the
6   -- complying with the United States Internal Revenue laws
7   and Treasury Department regulations?
8       A   Yes.
9       Q   Okay.  With respect to having an offshore
10  trust or offshore investment?
11      A   Anything relating to foreign, it's gotta be
12  -- it's gotta be done properly, and the government has to
13  know what you're doing.
14      Q   And as far as -- what training did you
15  receive to be able to give these presentations?
16      A   I guess having just been with them and being
17  experienced and being involved with the other
18  professionals, the other attorneys who specialize in
19  taxation, the CPAs and so forth.
20          It's a -- it's a very narrow area in which
21  you have to, you know, know a number of things.  So as
22  long as you comply with -- obviously, you guys have to
23  know a huge amount.
24          We have to know a much smaller area.
25      Q   So are you an accountant?

Page 19

1       A   I am not a CPA.  I am not an attorney.
2       Q   Okay.  Are you a registered investment
3   advisor or anything --
4       A   Yes.  I just --
5       Q   -- along those lines?
6       A   Yes.  I have the Series 65.  Now I just got
7   the Series 7, the 63, and working my way through all
8   those.
9       Q   Okay.
10          MR. MAY:  All right.  Can we go off the
11      record for a second?
12          (Copy of Brochure, is received and marked
13      exhibit 1 by the court reporter.)
14          MR. MAY:  All right.
15  BY MR. MAY:
16      Q   All right.  Mr. Donaldson, I'm handing you
17  what's marked exhibit 1.
18          And do you recognize exhibit 1?
19      A   Yes.  It's our brochure.
20      Q   Okay.  And I apologize, I'm sure the original
21  was a much nicer copy than the one that I have here
22  today.
23          But it's a Foster & Dunhill brochure?
24      A   That is correct.
25      Q   And what would you -- how would you use this

Page 20

1   brochure?
2       A   As a, maybe a -- just a handout piece at
3   various conferences.
4           You would have meetings with professional
5   advisors.  It's just a, sort of a leave-behind, in a
6   sense.
7       Q   Okay.  So would these be available at the
8   conferences?
9       A   Yes, sir.
10      Q   And -- that you'd hand it to people when you
11  would meet them, perhaps?
12      A   Yes.
13          If you had a one-on-one meeting with
14  somebody, you would probably -- that is a, like a
15  business card or something else, a brochure, and who you
16  are and so forth.
17      Q   Okay.  I direct your attention in the
18  brochure, if you'll look, there's some numbers in most of
19  the pages.
20          You can see them.
21          In some of the ones that are --
22      A   Okay.
23      Q   -- entirely photographs, they're not visible.
24  But I'm looking at SAB0718.
25      A   Okay.

Page 21

1       Q   And then kind of a big bullet in the middle
2   says, "Our Methods."
3           And if you'll take a minute just to kind of
4   look over that page, SAB0718.  And it kind of describes
5   that process.
6           I'm sorry.
7       A   No, go ahead.
8       Q   And was this the standard process that you
9   used with every client, maybe varying it from time to
10  time depending on the client's needs?
11      A   I'd say that would be typical.
12      Q   Okay.  And I'm looking in the third
13  paragraph, it talks about "the preliminary evaluation."
14  And then after that point, it looks like then there would
15  be a retainer.
16          What was the purpose of the preliminary
17  evaluation?
18      A   To lay out for them, based on reviewing their
19  information, where we thought, based on what they were
20  looking for, what would apply to them.
21          What the benefit would be for doing this,
22  what the cost would be, what the compliance requirements
23  would be and so forth.
24      Q   Okay.  And then after -- over in the second
25  column, this kind of narrow column, the first full

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 22

1  paragraph then talks about after that initial phase being
2  completed, that then the meeting is held in an offshore
3  jurisdiction.
4        Do you happen to know, was this procedure
5  followed with Brian Chivas James?
6        A  I don't know.  You'd have to -- Steve might
7  know.
8        Sorry, I just can't recall.
9        Q  Okay, sure.
10       What is the purpose of having this, after the
11 initial phase, having the meeting in the offshore
12 jurisdiction?
13       A  Well, a lot of the times it was based on the
14 trust having jurisdiction over the corpus itself and not
15 wanting to have it dragged into the U.S. jurisdiction
16 court-wise.  So a lot of times they would go off, execute
17 a trust over there, and be able to prove that they were
18 outside the U.S. when they executed the trust.
19       This is another barrier, in a sense.  If
20 somebody's saying, "Well, you signed it here in Florida,"
21 you know, we're just gonna go ahead and, you know, break
22 it right now.
23       Q  Okay.  So would it be necessary to sign the
24 trust document -- let me kind of back up.
25       Is it you usually start a -- excuse me -- you

Page 23

1  usually create a trust with a trust deed?  Is that the
2  typical procedure?
3        A  By that, what they're doing is filling out an
4  application --
5        Q  Okay.
6        A  -- that the trust company that they're
7  selecting to use.  It's -- could be anywheres up to, you
8  know, more than a dozen pages, which will lay out who the
9  grantor is gonna be; who the beneficiaries are gonna be;
10 the assets, making sure that they're not making
11 themselves insolvent.
12       Asking a whole bunch of questions and so
13 forth, to verify that this person has a legitimate
14 purpose for setting up a trust; they're not doing it to
15 evade or, you know.
16       And then based on that, then the foreign
17 trust company would draft an agreement -- well, draft the
18 trust document itself.
19       Q  Okay.
20       A  And if the client so wished, then they would
21 have their own legal counsel review the trust to make
22 sure that it had every little thing that they wanted in
23 it.
24       Q  Okay.  So this meeting that's described here
25 on this page SAB0718, is that the application meeting, or

Page 24

1  is that the "We're executing the trust agreement"
2  meeting, or both?
3        A  Well, that would be where they actually are
4  executing the trust itself.
5        Once they reviewed all the stuff, if their
6  CPA or their attorney signed off on it, then they would
7  execute a trust.
8        Q  Okay.  And you described that as needing to
9  occur offshore so that --
10       A  It didn't always happen.
11       But that was for people who were wanting to
12 have a, you know, additional barrier, in a sense.
13       Q  If -- in this case I believe Dr. James' trust
14 was established in Nevis, West Indies.
15       A  Okay.
16       Q  Would it be necessary for him to be in Nevis?
17       Or could he be in some other offshore
18 location?
19       A  He could be anywhere outside of the U.S.
20       I mean, he could even be in the U.S., if he
21 wanted to sign it.
22       Q  Okay.  All right.  Let's turn over in this
23 brochure to a couple of pages down to the page that's
24 marked SAB0722.
25       And the top of this page, I think, reads

Page 25

1  "Selecting the Offshore Jurisdiction."
2        And I think there's a paragraph and some
3  bullet points.  The second bullet point is "No exchange
4  of confidential information through treaties with any
5  other country."
6        What's the purpose of that?
7        A  That is more related to civil matters, not
8  anything to do with government taxation or anything else.
9        That's to make it tougher for a plaintiff to
10 attack somebody's trust.
11       Q  Say, for instance -- and I'm just kind of
12 throwing this out there -- but I mean, is it fair to say
13 that the purpose of some people in establishing an
14 offshore trust is to protect it from perhaps personal
15 injury creditors or plaintiffs or perhaps maybe business
16 liabilities?
17       A  Talking about in advance of an event
18 occurring?
19       Or something -- the kind of event that has
20 already occurred?
21       Q  Right.  Like in advance.  Prospectively.
22       A  Well, let's -- are you saying -- for
23 instance, XYZ, you know, businessman.  He sets up a
24 trust.  And then like six months down the road, he runs
25 over some guy and gets involved in a lawsuit.

Page 26

1    Are you saying he ran the guy over and said
2    "I need to go set up a trust"?
3        Q    No.  I'm actually saying before he ever runs
4    over anybody, he decides, in the unlikely event that he
5    does run over somebody.
6        A    Well, he would set one up to, obviously,
7    protect it from an event like that occurring.  But also
8    trying to design it so that he can pass on the assets to
9    who he wants to at his death.
10       It's a much easier proposition passing on to
11   next generations, versus the U.S.
12       People in the U.S. can always challenge what
13   a court says based on "Well, this guy left me out of the
14   will.  I believe I'm owed something, so I'm gonna cause
15   problems."
16       Versus on the foreign side, it's a much
17   difficult proposition to get somebody to do that.  It's
18   "What's in there is in there."
19       Q    Okay.  So I mean -- so it's fair to say that
20   in addition to any tax benefit or --
21       A    Well, there's no tax benefit --
22       Q    -- tax --
23       A    -- so --
24       THE REPORTER:  Could I have one at a time,
25   please?

Page 27

1    "In addition to any tax benefit"?
2        MR. MAY:  Okay.
3    BY MR. MAY:
4        Q    -- in addition to any tax benefit, people set
5    up offshore trusts for greater asset protection?
6        A    Well, they do it for greater asset
7    protection.  But there's absolutely zero tax benefit on a
8    trust.  They're tax-neutral.  So it all passes through.
9        People do it as a -- as a, almost like a
10   startover fund.  They want to be able to hold onto what
11   they have.  They've seen all the papers, all the
12   outrageous judgments, all the issues of what, you know,
13   judges are doing, and people suing at the drop of a hat.
14       And the fact that you also have -- may have
15   children who need to be protected from themselves.  They
16   may have a spouse who, you know, may not be doing things
17   correctly.  Might have children that have, you know,
18   issues themselves.  They're just trying to make sure that
19   they're gonna be protected.
20       And you have a business, you know, shares you
21   wanna have in there; so that in the event if somethin'
22   goes wrong, you get to determine who's gonna have
23   control.
24       Q    Okay.  And then the third bullet point on
25   this page in exhibit 1 we've been looking at, page

Page 28

1    SAB0722.
2    "No taxes on foreign trusts or foreign
3    corporations."
4        And that -- is that referring to the fact
5    that many of these jurisdictions or the offshore trusts
6    that are established don't have taxes?
7        A    That is correct.
8        Q    Okay.  Or they don't tax people who are
9    foreign to them on their foreign trust there?
10       A    Yes.
11       Q    Okay.  I think these other questions relate
12   to Steve.
13       During your time with Foster & Dunhill, were
14   there any other companies that you worked with in regard
15   to helping people establish offshore investments or
16   trusts?
17       A    Are you talking about providers of trusts and
18   investment products?
19       Are you talking about working with other
20   professionals who would like to utilize Foster & Dunhill
21   to help design plans for their clients?
22       Q    I'm really talking about both of those.
23       A    Okay.
24       Q    So let's break them up.
25       First of all, let's talk about the providers

Page 29

1    of offshore investment vehicles and trusts.
2        Who were -- what were some of those companies
3    or entities?
4        A    Well, on the trust -- on the insurance side,
5    there was -- well, it's obviously up to a client who
6    would they look at.  But predominantly, most of the
7    clients were using First Fidelity Trust.
8        And for those who were looking for tax
9    mitigation, using those non-MEC policies, they would be
10   using companies like Fidelity Insurance Company or
11   Citadel Insurance Company.
12       Q    Okay.  So did you, when you had helped people
13   or when Foster & Dunhill helped people establish offshore
14   trusts, did you use exclusively First Fidelity Trust
15   Company?
16       A    Well, that's who the clients selected to go
17   with.
18       Some of them would use other ones based --
19   either they had -- some had it in the Bahamas, some may
20   have had it in Cook Islands.  It's wherever they wanted
21   to.
22       But I'd say predominantly the clients
23   selected First Fidelity Trust.
24       Q    Okay.  Do you remember the names of any of
25   the other trust companies?

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 30

```
 1        A   Oh, it's a big one out of the Cook Islands.
 2        MR. JONES:  I didn't hear that, sorry.
 3        THE WITNESS:  I was trying to think of the
 4   large trust company that's out of the Cook Islands
 5   that also has an operation in Nevis.
 6        A   I'm sorry, I don't.
 7        Steve may recall.  I'm sorry, I just can't
 8   remember.
 9   BY MR. MAY:
10        Q   That's fine.
11        But you said predominantly, most of the
12   clients at Foster & Dunhill used First Fidelity Trust
13   Company?
14        A   They used that, based on the fact that one of
15   the issues you have is, working with a lot of the foreign
16   trust companies, you know, they would not follow the
17   letter of the law in providing all the tax forms to the
18   government.
19        Way back when they changed the laws, you
20   know, come up with the 3520-A, you know, a U.S. citizen,
21   you had a foreign trust, you wanted to do one, you either
22   had, you know, one of three choices.
23        One is to work with a trust company that did
24   all the compliance work the right way.
25        Two, you know, work with a trust company
```

Page 31

```
 1   that's not, and face the consequences.
 2        Or three, the trust company themselves
 3   decided not to work with U.S. citizens anymore.
 4        Q   Okay.  And so -- but First Fidelity Trust
 5   Company --
 6        A   That was one of the main points for them, is
 7   that they were extremely compliant with U.S. government
 8   regulations.
 9        Q   And that is a -- First Fidelity Trust Company
10   is a -- what kind of entity is that?
11        A   It's a Nevis-based trust company.
12        Q   Okay.  Do you know if it's a partnership or a
13   corporation?
14        A   I believe it's a corporation.
15        Q   Okay.  Then you mentioned Fidelity Insurance
16   Company and Citadel Insurance Company?
17        A   Right.
18        Q   And what products did those companies
19   provide?
20        A   They were providing either foreign
21   tax-deferred annuities or they were providing foreign
22   non-MEC, which is modified endowment contracts.
23        In a way, it's just like you're taking your
24   -- if you bought an annuity, or let's say it's a 401(k)
25   plan, obviously you're deferring the taxes to a point in
```

Page 32

```
 1   time where you're able to pull 'em out and pay the
 2   capital gains on it.
 3        There is a code section, it's called the
 4   non-MECs, where you have to have a certain amount of
 5   death benefit based on the age and yada-yada on the
 6   client themselves.  And by putting in the certain amount
 7   of premium in it, it tells you "This is the amount of
 8   death benefit you need to have on hand."
 9        And when you transfer an asset into this
10   structure, you're drawing a line in the sand.
11        Obviously, any taxes or any gain that was
12   built up before you transferred it in would have to be
13   paid.  It's considered a deemed disposition.  So if you
14   had $100,000 in it, inside the non-MEC contract, and it's
15   gotta be reviewed on an annual and quarterly basis to
16   make sure it complies with 817(h) of the code which deals
17   with the diversification and investor control issues,
18   then when that grows to whatever is -- whatever stocks
19   and bonds and other investments invested into, it grows
20   in a tax-free thing.  And when you pull money out, it's
21   considered a withdrawal from an insurance policy,
22   nontaxed.
23        So a lot of people are usin' it.  Just like
24   you could buy a policy from a U.S. insurance company to
25   do the exact same thing.
```

Page 33

```
 1        Q   Okay.  And you referred to those as
 2   "non-MEC," M-E-C?
 3        A   Yes, sir.  Non-MEC, M-E-C.
 4        Q   Okay.
 5        A   The MEC ones would be just like having a
 6   regular annuity or a 401-type thing.
 7        It's just deferred till you pull it out, and
 8   you pay your ordinary income taxes when you pull it out.
 9        Q   Okay.  And you think that code section that
10   governs those is 817(h)?
11        A   727702, and then 817(h).
12        Q   Okay.
13        A   Those deal with annuities, insurance, and
14   then the investor control and diversification.
15        Q   Do you know if Brian Chivas James had a
16   non-MEC policy?
17        A   I can't recall if he had the non-MEC or he
18   had an annuity.
19        They would be able to tell you which one that
20   they had, or Steve probably would know.
21        Q   Okay.  In addition to First -- excuse me.
22        In addition to Fidelity Insurance Company and
23   Citadel Insurance, were there any other insurance
24   providers?
25        A   They were out there.  You'd have to ask Steve
```

Page 34

1  what they were.
2      I'm sorry, I just don't recall off the top of
3  my head.
4      Q   Sure.  And then you also mentioned that there
5  was -- you would also work with U.S. advisors, I guess
6  attorneys or accountants?
7      A   Well, Steve would be meeting with them, and
8  then I would have interface with them afterwards.
9      He was obviously going through, explaining to
10  'em what Foster & Dunhill does, what kind of benefits it
11  could have, what kind of compliance, how you can legally
12  do this and so forth.
13      Q   And so were there -- there were attorneys?
14      A   Attorneys, CPAs, financial advisors and --
15      Q   Okay.
16      A   -- so forth.
17      Q   And would Foster & Dunhill refer clients to
18  these advisors?
19      Would these advisors refer clients to Foster
20  & Dunhill?
21      Would --
22      A   Well, the advisors were always considered to
23  be the client of Foster & Dunhill.
24      They'd be working through those guys, doing
25  all of the work; and then presenting it to the

Page 35

1  professional for him to review and sign off on before
2  presenting it to his client.
3      Q   Okay.
4      A   But to answer the part of your question is,
5  that always would go from -- I can't think of very many
6  cases at all that would be us in a sense going out and
7  recruiting end users.
8      Q   Okay.
9      A   It would have to be a very small number.
10      Q   So these professionals would refer the people
11  to you guys?
12      A   Yes.
13      I mean, part that of is, obviously, when
14  you're working in this field, when they hear the word
15  "international," "offshore" or anything else, obviously,
16  you know, they get a little, you know, bristly a little
17  bit; little concerned and everything else.
18      So they understand that you're following the
19  letter of the law with the government and so forth.
20      Q   Was it always a priority with Foster &
21  Dunhill to do things in accordance with the laws of the
22  United States?
23      A   Extremely.
24      Q   And you mentioned these conferences that you
25  all would sponsor for people interested in offshore

Page 36

1  investments and trusts.
2      In those conferences, were there present -- I
3  think you said this already, but I just want to clarify
4  -- were there presentations geared towards helping the
5  people understand the requirements of the United States
6  laws?
7      A   Yes, there were.
8      Q   During those sessions, was it the routine
9  practice for the presenters to give information on both
10  the Form 3520-A and the Form 3520?
11      A   I'd say it was, at least minimum, gone over
12  once, and sometimes twice in two separate presentations.
13      There was one I think specifically geared
14  towards talking about the compliance forms.
15      And then sprinkled through maybe two or three
16  other presentations -- 'cause, obviously, the trust
17  company --
18      THE REPORTER:  I'm sorry, "sprinkled
19      throughout"?
20      THE WITNESS:  I'm sorry.
21      A   Sprinkled throughout the conference -- I'm
22  sorry -- there would be other mentions of the forms and
23  so forth.
24      I believe they would be in some of the trust
25  PowerPoint presentations, too.

Page 37

1  BY MR. MAY:
2      Q   And that there's a distinction between the
3  3520-A and 3520 would be made clear during those
4  presentations?
5      A   Well, they were explained, obviously.  They
6  had two separate slides.
7      And "Here is the one when you create the
8  trust, the 3520, here's the 3520-A," and then a couple of
9  other forms as examples.
10      Q   Do you know which conference Brian Chivas
11  James attended?
12      A   I know he went to the one that was in Mexico.
13  I don't remember the date of that.  And I don't remember
14  if he was at any other conference, or.
15      What happens sometimes when you have the
16  conferences -- not surprising -- you may have an
17  individual who may not actually end up showing up to some
18  of the meetings.
19      So I -- I wouldn't be able to -- but I know
20  that he was at the conference.
21      Q   You know that he attended at least one
22  conference?
23      A   Yes.
24      Q   And that at that conference, the explanation
25  was given of the difference between the 3520 and --

BayAreaReporting@gmail.com,   www.bar-tampa.com                                    866-240-9500

Page 38

1    A  I --
2    Q  -- 3520-A?
3    A  -- I don't recall.
4       And I also can't guarantee that he may have
5  been in that particular segment when it was done.
6    Q  Sure.  So --
7    A  But if he had been there, I almost guarantee
8  you that somebody would have probably have, you know,
9  seen -- I believe at that conference we had -- I can't
10 imagine any conference we did not have explanation of
11 compliance.
12      That's a mantra of ours; is compliance,
13 compliance, compliance.
14   Q  I mean, at the very least, it was the habit
15 and routine at these conferences to give the explanation
16 of the forms that were required?
17   A  And to the advisors as well.
18   Q  Now, I'm guessing -- and you can correct me
19 if I'm wrong -- but the people that come to Foster &
20 Dunhill, or came to Foster & Dunhill -- I'm going to back
21 up yet again.
22      Is Foster & Dunhill still in business?
23   A  No.
24   Q  Okay.  So the people that came to Foster &
25 Dunhill -- especially in the relevant years, 2001 through

Page 39

1  2005 -- how would you characterize those people's level
2  of sophistication?
3    A  I'd say it's all over the board.
4       I mean, you have -- you have those who are, I
5  wouldn't say had a lot of, you know, higher education;
6  but in their own right were geniuses, hard-working
7  people, and had done extremely well for themselves.  I
8  mean, it's -- you had those that may not even graduated
9  high school, and you've got guys who have, you know,
10 multiple degrees.  It's all over the board.
11      But that's why they're bringing in their, you
12 know, their trusted professionals with them; their CPAs,
13 their attorneys and so forth.
14   Q  Okay.  How would you characterize Brian
15 Chivas James' level of sophistication?
16   A  It's kind of subjective.
17      I mean, you might have a guy who's, you know,
18 a rock star in his specialty; doesn't mean he bleeds over
19 into other areas, whether it's tax, whether it's
20 accounting or somethin' else.
21      I do believe that he's a very smart
22 individual.
23   Q  Okay.  I think he's a surgeon of some kind.
24 Is that correct?
25   A  Yeah.  I think he's a pain medicine

Page 40

1  specialist or something, and does back surgeries and
2  other stuff.
3       Complicated stuff that would scare me.
4    Q  Yes.  Me, too.
5       But as far as his financial acumen and
6  investment acumen, how would you characterize him?
7    A  I didn't really get involved in terms of the
8  investment side of it with him.
9       You'd have to ask Steve whether or not he had
10 those types of things.
11   Q  Okay.
12   A  But I mean, somebody that's highly
13 intelligent, I think, can be able to make a decision
14 based on whether or not something's good for them or not.
15      In a perfect world.
16   Q  Sure.  When -- when did you meet Brian Chivas
17 James?
18   A  I'm sorry, I don't recall.
19      I think Steve -- I was introduced to him by
20 Steve.  So he may have a clearer idea of when it was.
21   Q  Okay.  And you mentioned the conference in
22 Mexico.
23      Were you at that conference?
24   A  Yes, sir.
25   Q  Okay.  Do you remember -- and do you remember

Page 41

1  seeing Brian Chivas James at that conference?
2    A  I remember seeing him at the conference
3  grounds.
4       I don't remember off the top of my head
5  whether or not he was in the meetings themselves.  I
6  assume that he was.
7    Q  Sure.
8    A  It's a long time ago.
9    Q  Sure.  So if I asked you was he at the tax
10 compliance presentation, what would your answer be?
11   A  I could not guarantee that he was.
12   Q  Okay.
13   A  I couldn't even guarantee if I was in that
14 meeting.
15   Q  Sure.  Well, I imagine you went to a large
16 number of these conferences, right?
17   A  Yes, sir.
18   Q  Yes, so you probably attended different
19 sessions at different conferences?
20      Okay.
21      MR. MAY:  All right.  We'll mark another
22 exhibit.
23      (Fax Transmittal Form, is received and marked
24 exhibit 2 by the court reporter.)
25 BY MR. MAY:

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR

Page 42

1    Q   All right, Mr. Donaldson.  I'm handing you
2  what's marked exhibit 2.
3        Do you recognize exhibit 2?
4    A   I see my name on it.
5        I don't recognize it.
6    Q   So do you remember sending this fax to Brian
7  James?
8    A   I don't recall.
9        I don't under -- I don't know what context it
10  was under, either.
11    Q   Okay.
12    A   I don't know if it was for a contribution or
13  what it was for.
14        I don't know.
15    Q   Okay.  I'm just going to read --
16    A   It looks -- I'm sorry to interrupt you.
17        Maybe it looks like it was for setting up the
18  trust as well as funding the insurance, but I'm not sure.
19    Q   Okay.  I notice the date is December 17 of
20  2001?
21    A   Uh-huh.
22    Q   Is that about the time Dr. James was funding
23  his trust?
24    A   I don't know.
25        I guess you'd have to take a look at the

Page 43

1  documentation from the trust company in terms of when it
2  was funded and so forth, to be precise.
3    Q   Sure.  The paragraph -- and, you know, at
4  least it purports to be from you, I think.
5        Is that a fair characterization?
6    A   I would -- fair to say that, yes.
7    Q   It seems to be some directions about making
8  some wire transfers.
9        Was this kind of a routine practice to assist
10  clients, you know, letting them know when and where to
11  send money to make contributions to their trusts?
12    A   I wouldn't say it's a regular occurrence.
13        But obviously, when they're setting up the
14  trust and beginning to fund it, you need to let 'em know
15  where to send the funds to and so forth, by providing
16  them the wire directions, having to provide the source of
17  funds or where the funds are coming from and so forth.
18    Q   Okay.  Now, I'll just represent to you that I
19  don't have anything that may have been attached to this
20  fax.  So I'm not sure exactly what that might have been.
21        But when you're wiring money to -- from I
22  guess a U.S. account to some offshore place, just how
23  does that happen?
24    A   Well, there, obviously, with the wire
25  instructions, it's gonna say on there, it's gonna say

Page 44

1  "XYZ Trust Company, here's the routing number, for the
2  benefit of XYZ trust name" and so forth.
3        Along with that'll be a source of funds
4  they'll have to fill out, certifying to the bank that
5  this was the source of the funds.  Otherwise, the bank
6  will kick it back within 24 hours unless they have, you
7  know, were these monies -- wanna make sure they're not
8  ill-gotten gains.
9        Was this monies from the sale of, you know, a
10  property, was this after-tax money, whatever it may have
11  been.
12        They need to understand what it is to make
13  sure that, before they would clear it.
14    Q   Okay.  Is that also known as a source of
15  funds affidavit?
16    A   Yes, sir.
17    Q   Okay.
18        (Insurance Policy Application, is received
19        and marked exhibit 3 by the court reporter.)
20  BY MR. MAY:
21    Q   All right, Mr. Donaldson.  I'm handing you
22  what's marked exhibit 3.
23        Do you recognize exhibit 3?
24    A   Yes.
25    Q   And what is exhibit 3?

Page 45

1    A   It is an insurance policy application to
2  acquire business lines of coverages.
3    Q   Okay.  And was it to Dr. James?
4    A   This was sent to him to be filled out, policy
5  be acquired by his practice.
6    Q   Okay.  Was this a policy that he had with the
7  Fidelity Insurance Company?
8    A   I don't know.  This one says Citadel.
9    Q   Okay.
10    A   So I do not know whether or not he had one
11  with Fidelity.
12    Q   Okay.  So just so I'm clear, Fidelity
13  Insurance Company and Citadel Insurance Company are
14  different entities?
15    A   Yes, sir.
16    Q   Okay.
17    A   One is a -- Citadel is a 953(d) company,
18  which is a foreign insurance company that has filed forms
19  with the U.S. government to be taxed as a U.S. entity.
20    Q   Okay.  And what about Fidelity Insurance
21  Company?
22    A   They're just foreign.
23        Because there are certain benefits that can
24  be derived for the underlying policyholders from a
25  Citadel.  That, plus the fact that based on where the

Page 46

1  government's been going the last several years, it's much
2  better to have a U.S.-registered entity.
3      Q   And why is that?
4      A   Because they find any way they can to attack
5  and be able to disallow things.
6      Q   And in particular, you mean the I.R.S.
7  disallow things?
8      A   Yeah.  I mean, they could say that -- it's
9  just like way back when you had, they weren't paying the
10  excise tax on policies; whether it was for an annuity or
11  life, you're required to do that.
12          And you had some people who were skirting,
13  you know -- not the people that we work with, other
14  people you hear about out there -- and they would just
15  come back and say, "Well, you didn't file the excise tax.
16  We'll just consider this to be, you know, fully taxable,
17  then."
18          You didn't pay the ticket to play the game
19  right.
20      Q   So if a company -- if a foreign insurance
21  company is a 953(d) --
22      A   They don't have -- they have to pay the
23  excise tax at all.
24      Q   Okay.  Do you know what these business
25  protection plans covered?

Page 47

1      A   Doesn't have it in here, but I'm assuming
2  that he was reacquiring the coverages that he had the
3  prior year.
4      Q   Okay.  Do you have any idea what kind of
5  coverage he had?
6      A   No, sir.
7      Q   Okay.  All right.
8          Now, you mentioned the presentations you gave
9  at the conferences, and that there would be sessions
10  perhaps either by other presenters or the trust company.
11          Did you ever give Dr. James any --
12  personally -- any advice about tax reporting requirements
13  for his offshore trust?
14      A   I can't recall.
15      Q   So you may have?
16      A   It's a possibility, in terms of reminding
17  him, but maybe talking about the compliance form, I just
18  don't know.
19          Steve may know something more about --
20  because he had more of interaction on the -- that level.
21      Q   Now, you referenced the trust company.
22          What was the routine practice of First
23  Fidelity Trust Company in regards to advising its clients
24  to file the required forms?
25      A   Well, as part of filling out the application,

Page 48

1  you had to also do the compliance package; which is
2  having the client certify they understand these are all
3  the forms needed to be filed on a continuous basis, this
4  is the form that we'll be responsible for doing and
5  providing to you and so forth.
6      Q   Okay.
7          (Trust Deed, is received and marked exhibit 4
8  by the court reporter.)
9  BY MR. MAY:
10      Q   Okay.  Mr. Donaldson, I've handed you what's
11  marked exhibit 4.
12          Do you recognize exhibit 4?
13      A   Yeah.  It appears to be a trust deed for
14  Brian Chivas James.
15      Q   Have you ever seen this trust deed before?
16      A   Possibly.
17      Q   Okay.  Just not sure?
18          Well, if you would, turn in the exhibit 4 to
19  a page, and it's marked at the bottom right corner
20  OTS - James, and then four zeros, 41.
21          Is that a copy of the standard Compliance and
22  Notification Package that First Fidelity Trust Company
23  asked for its grantors to sign?
24      A   Yeah, looks like it is, sir.
25      Q   Okay.

Page 49

1          (Phone interruption.)
2          MR. MAY:  Let's take a break.  I'm going to
3  get that, because it may be his dad.
4          MR. JONES:  That's what I was thinking, yes.
5          (Off the record.)
6          (Stephen Donaldson joins deposition room.)
7          MR. MAY:  Okay.  We're back on the record.
8  BY MR. MAY:
9      Q   All right.  Mr. Donaldson, I'm -- we've taken
10  a little break.  But just before the break, I was
11  referring you in the exhibit 4 to the page marked
12  OTS - James 000041.
13          MR. JONES:  Excuse me.
14          I just want to make sure, Mike, that the
15  record reflects that the second Donaldson is in the
16  room.
17          MR. MAY:  Yes.
18          MR. JONES:  Okay.
19          MR. STEPHEN DONALDSON:  I'll cover my ears,
20  if you would like.
21          MR. MAY:  That's fine.
22          And your name is Stephen Donaldson?
23          MR. STEPHEN DONALDSON:  It is.
24          MR. MAY:  And that's spelled "p-h"?
25          MR. STEPHEN DONALDSON:  P-h-e-n, middle

Page 50

```
 1      initial P.
 2          MR. MAY:  Okay.
 3   BY MR. MAY:
 4      Q   All right.  Mr. Donaldson, looking at these
 5   pages in the exhibit 4 that I've referred to, the
 6   Compliance Notification Package for United States
 7   Taxpayers, are you familiar with this package?
 8      A   I have seen it, yes.
 9      Q   And in what context have you seen it?
10      A   Well, when all individuals who are setting up
11   a trust would be getting this form to fill out, so.
12      Q   And this is a form put out by First Fidelity
13   Trust Company?
14      A   Yes, sir.
15      Q   And if you look to the next page, down in the
16   lower right-hand corner it's marked OTS - James, four
17   zeros, 42.  And it's titled "Section 1, Internal Revenue
18   Service Forms."
19          As you understand it, what's the purpose of
20   this page of the package?
21      A   This is an acknowledgment that the grantor
22   has a responsibility to file forms.
23      Q   And does it specifically mention the Form
24   3520?
25      A   Yes, it does.
```

Page 51

```
 1      Q   And does it also mention the Form 3520-A?
 2      A   Yes.
 3      Q   And there's a signature there.  Do you
 4   recognize that signature?
 5      A   Looks like all the other ones, so I'm
 6   assuming that it's Brian James.
 7      Q   Do you have any reason to know whether that's
 8   Brian James' signature?
 9      A   No, I don't.
10      Q   Okay.  But in comparing it with the other
11   signatures in this package --
12      A   They all look very similar.  So whoever
13   signed this -- I have to assume that it would be him.
14          It matches the settlor's signature, so I'd
15   say it's probably a good bet.
16      Q   Just for the sake of the record, do you have
17   any training or expertise in identifying signatures?
18      A   Absolutely not, sir.
19      Q   Okay.  But from your observation as a layman,
20   they appear to be similar?
21      A   Yes, sir.
22      Q   Okay.  All right.
23          Now, as I understand it -- and actually,
24   what's at issue in this case is that Dr. James failed to
25   file his Form 3520 for the years 2001, 2002 and 2003 in a
```

Page 52

```
 1   timely fashion.
 2      Q   Were you aware of that?
 3      A   After the fact.
 4      Q   When did you become aware of it?
 5      A   When there was mention to me that he'd been
 6   hit with a penalty --
 7      Q   Okay.
 8      A   -- of 30 or 35 percent of the value of the
 9   trust.
10      Q   And was he he one that told you that?
11      A   Steve Donaldson.
12      Q   Okay.
13          MR. MAY:  All right.
14          (E-mail, with attachments, is received and
15          marked exhibit 5 by the court reporter.)
16   BY MR. MAY:
17      Q   Okay.  Now, we've been marking another
18   exhibit.  But I have another question -- I apologize --
19   on exhibit 4 for you.
20          And if you just turn to the very back, the
21   second-to-last page.  So flip back over into the page
22   that's marked OTS - James 000046.  And it's Warranty of
23   Understanding and Compliance.
24          And paragraph 5, "I hereby warrant that I
25   understand that establishing a foreign trust can obligate
```

Page 53

```
 1   me to file certain Internal Revenue Service and Treasury
 2   Department forms, including but not limited to I.R.S.
 3   Form 3520 and I.R.S. Form 3520-A."
 4          Did I read that correctly?
 5      A   Yes, sir.
 6      Q   And do you understand that that paragraph
 7   is -- purports to be signed by Dr. James, warrants that
 8   he understands that he may be obligated to file a Form
 9   3520?
10      A   Yes, sir.
11      Q   As well as there may be some responsibility
12   in regards to a Form 3520-A?
13      A   Yes, sir.
14      Q   And that those are two different forms?
15      A   Yes, sir.
16          One's filed by him, and one's filed by the
17   trust company.
18      Q   Okay, thank you.
19          All right.  Now I'm handing you what's marked
20   exhibit 5.
21          And it appears to me to be an e-mail from a
22   Josh Crithfield to Steve Donaldson on which you were a
23   copy --
24      A   Uh-huh.
25      Q   -- cc'ed.  Is that correct?
```

Page 54

1    A   Yes, sir.
2    Q   Do you remember this e-mail?
3    A   No, sir.
4    Q   Do you know what "BPP" is in the text of the
5    e-mail?
6    A   Yes. It's a business protection plan. It's
7    the insurance for his business.
8    Q   Okay.
9    A   That he would acquire certain coverages.
10   Q   So is this the insurance policy with First --
11   excuse me -- Fidelity Insurance Company?
12   A   I believe this one is detailing Citadel.
13   Q   Okay. So this may be a Citadel insurance
14   policy. Okay.
15       Do you know if Dr. James had any policy with
16   Fidelity Insurance Company?
17   A   I'm not sure if he had an annuity or an
18   insurance.
19   Q   Okay.
20   A   So I do not -- I can't verify.
21   Q   And I may have already asked you that
22   question.
23   A   Let's see. Looks like from -- he has an --
24   it's an FIC annuity.
25   Q   Okay. Where -- and what page are you

Page 55

1    referring to?
2    A   That would be SAB0635.
3    Q   Okay. And so "FIC" there is Fidelity
4    Insurance Company?
5    A   Yes, sir.
6    Q   And then that number 16, and five zeros and a
7    2?
8    A   That is the underlying segregated account of
9    the policy itself.
10   Q   Okay.
11   A   And the policy number, too.
12   Q   All right. And there's the Hornsby trust.
13   That's Dr. James' trust.
14       Is that right?
15   A   Yes, sir.
16   Q   And what is Westminster Hope & Turnberry?
17   A   They were an investment company.
18   Q   And do you know where they're located?
19   A   At the time, I believe they were located --
20   they were located out of Freeport, Bahamas.
21   Q   And so any reference to the SA 16 followed by
22   five zeros and a 2, LLC, do you know what that is?
23   A   That would be the segregated account of the
24   insurance policy.
25   Q   Okay. And what is a segregated account?

Page 56

1    A   It's just like if you have a policy with a
2    MetLife and you have -- it's a segregated policy. So
3    that they have it as a segregated account. It's the
4    policy itself.
5        This -- all of the investments are on that
6    side of that, that structure.
7    Q   Okay. So within the policy, there may be
8    investments and --
9    A   Various. Whatever his investment advisor
10   selected.
11   Q   Okay. And that would -- and this SA 16, five
12   zeros and a 2, is the overall policy?
13   A   Yes, sir.
14   Q   Okay. All right. Now, if you'll turn in
15   this exhibit 5.
16       Now, do you recall -- there's a number of
17   pages following the e-mail -- do you know if these pages
18   were the attachment to the e-mail?
19   A   I would have no way of knowing, sir.
20   Q   Okay. If you'll turn back to the page marked
21   SAB0654.
22       And this Investment Summary seems to me to
23   have, I guess, four different sections; the top being the
24   Trust Contributions and Distributions, and then the Trust
25   Structure, and then Annuity Structure.

Page 57

1        And then at the bottom, Total Holdings?
2    A   Uh-huh.
3    Q   What is the difference between Trust
4    Structure and Annuity Structure?
5    A   The -- it would be the assets owned directly
6    by the trust outside of an insurance structure. So the
7    annuity structure is a qualified tax-deferred annuity.
8    These are all the assets owned inside of that policy.
9        The trust structure are the assets that are
10   not inside the annuity structure which were under --
11   underneath the trust.
12   Q   Okay. I see a Real Estate there under Trust
13   Structure, it's the fourth item, with a gross asset value
14   of just over --
15   A   562.
16   Q   -- 562,000.
17       Do you know what that is?
18   A   I believe that was a condo.
19   Q   Okay.
20   A   But you have to double-check with the trust
21   company.
22   Q   Okay. And again, what's the purpose for
23   holding some of the assets in the annuity structure?
24   A   Tax benefits.
25   Q   Okay.

Page 58

```
 1      A   You would hold the trust for asset
 2  protection, and then you hold it inside of the insurance
 3  structure for tax mitigation purposes.
 4      Q   And is this -- okay.
 5          Because the -- I think you were explaining
 6  earlier that this was the kind of annuity that would grow
 7  tax-free, and then there would be tax on the
 8  distributions?
 9      A   Correct.
10          On the insurance, on the annuity.
11      Q   Okay.  But it would not be one of the non-MEC
12  types --
13      A   No --
14      Q   -- of structures?
15      A   -- this is -- this says "annuity," so this is
16  not a non-MEC.
17      Q   Okay.  Referring back to the front page of
18  exhibit 5, SAB0628.
19          This Steve Donaldson, is this your father?
20      A   Yes, sir.
21      Q   And who's in the room with us now?
22      A   That is correct.
23      Q   Okay.  And Josh Crithfield, who is that?
24      A   Josh Crithfield, at the time of this, he was
25  the vice-president of Offshore Trust Services.
```

Page 59

```
 1          THE REPORTER:  I'm sorry, "the vice-president
 2  of"?
 3          THE WITNESS:  Offshore Trust Services.
 4      A   They were the U.S. agent for foreign trusts,
 5  as well as providing compliance and doing the -- some of
 6  the forms for the government.
 7  BY MR. MAY:
 8      Q   Do you know why he was sending this e-mail to
 9  Steve Donaldson?
10      A   I think he was just verifying that the
11  premiums were being -- no.  That doesn't make sense.
12          You need to ask Josh.
13      Q   Okay.
14          (Business Protection Policy, is received and
15      marked exhibit 6 the court reporter.)
16  BY MR. MAY:
17      Q   Okay.  Mr. Donaldson, I've handed you what's
18  marked exhibit 6.
19          Do you recognize exhibit 6?
20      A   Yes, sir.
21      Q   And what is exhibit 6?
22      A   It is a Business Protection Policy issued by
23  Fidelity Insurance Company to Dr. James' company.
24      Q   Okay.  And is this the declarations of the
25  policy?
```

Page 60

```
 1      A   It says the declarations, correct.
 2      Q   So this basically details what the policy
 3  protects?
 4      A   This is the coverages that his business
 5  purchased, that is correct.
 6      Q   Okay.  And if you'll turn to the third page
 7  of the document, of exhibit 6, the page is marked
 8  SAB0421.  And it's kind of a table, Scheduled Coverage
 9  Section.
10          And then there's 19 listed items.  I notice
11  Xs beside the first, second, third, eighth, ninth, and
12  eleventh items on that list.
13          Is that --
14      A   That is correct.
15      Q   Would these Xs signify that those are the
16  selected coverages?
17      A   Those are the coverages that his business
18  were looking to acquire, that is correct.
19      Q   Okay.  And those that don't have an X --
20      A   Were the ones that he selected not to buy.
21      Q   Okay.  Are you familiar with what these items
22  cover?
23      A   Some of them, I'd have to look to the back
24  for the description of the coverages.
25      Q   Okay.  You believe this document details in
```

Page 61

```
 1  length what each particular item covers?
 2      A   It should, yes.
 3      Q   Okay.
 4      A   Yeah.  There's a scheduled coverage section
 5  which lays out the description of the coverage and the
 6  limitations, exclusions and so forth.
 7      Q   Okay.
 8      A   And that would be listed in -- starting on
 9  page SAB0422 all the way through OP00459.
10      Q   Okay.  And just for the sake of the record,
11  is "OP00" --
12      A   I'm sorry.
13      Q   -- "459" the same as "SAB0441"?
14      A   Yes.
15      Q   Okay.  That's fine.  There's a couple of sets
16  of numbers on all of these, I think.
17          And now, how is this policy related to the
18  annuity that Dr. James had with Fidelity Insurance?
19      A   It's not.  It's completely separate.
20          He has an annuity set up for his own personal
21  growth of his retirement on a non -- you know --
22  tax-deferred basis.
23          The other one was acquiring additional lines
24  of insurance coverage for his business, just like if he
25  was going to State Farm or Chubb or somebody else.
```

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 62

```
 1      Q   Okay.  And they just both happen to --
 2  they're just two different products that are --
 3      A   Right.  One for the business, yes, and
 4  one his own personal.
 5      Q   Okay.  So this would have been for his
 6  S corporation?
 7      A   Yes, sir.
 8      Q   I think it's --
 9      A   It's an S or --
10      Q   -- an S corporation?
11      A   I'm not sure what it is, right.
12      Q   Right.  But his medical practice?
13      A   Yes, sir.
14      Q   Okay.
15          MR. MAY:  I think at this time I'm going to
16  pass the witness to Mr. Jones.
17          MR. JONES:  Okay.  Can we go off the record
18  for one second?
19          MR. MAY:  Sure.
20          (Off the record.)
21            CROSS-EXAMINATION
22  BY MR. JONES:
23      Q   Okay.  Good afternoon, Mr. Donaldson.  We've
24  already met.
25          I'm Ken Jones with Sutherland, Asbill,
```

Page 63

```
 1  Brennan.  And as we indicated earlier, I represent --
 2  along with Mr. Dupree here -- Dr. James.  I just have a
 3  few questions for you here, so it shouldn't be too much
 4  longer.
 5          Do you know, are you familiar with an
 6  accountant in Sarasota, Florida named George -- it's
 7  either pronounced "Famiglio" or "Famiglio"?
 8      A   It doesn't ring a bell, sir.
 9      Q   Okay.  Have you had other clients -- when I
10  say "you," I'm referring --
11      A   The company itself.
12      Q   The company.
13      A   Okay.
14      Q   Have you had any other clients contact you
15  about I.R.S. penalties in relation to any of their
16  offshore trusts?
17      A   Not on the trust.
18          I can think of maybe one instance on
19  something, but Steve may remember what that was.
20      Q   And I believe you said -- correct me if I'm
21  wrong -- in your response to one of Mr. May's questions
22  that you note -- you recall that Dr. James contacted you,
23  but he may have spoken to your father.
24          Or do you recall that?
25      A   Oh, are you talkin' about --
```

Page 64

```
 1      Q   About the penalty.
 2      A   -- the penalty?
 3      Q   Yes.
 4      A   I was hearing that from my father.
 5      Q   Okay.  That's what I thought.  I just wanted
 6  to clarify that.
 7          You indicated that compliance -- "compliance,
 8  compliance, compliance" was, I think you said, your
 9  mantra.
10          And that there were presentations during
11  these meetings or these seminars -- whether they were in
12  Mexico or wherever -- that there would have been
13  presentations where you discussed what was needed from a
14  U.S. tax compliance point of view?
15      A   Yes, sir.
16      Q   Do you have copies of any of the slides or
17  presentations that would have been used during those
18  years?
19      A   I might have some more recent ones, but I
20  don't think for 2001 through 2005.
21      Q   Don't have any of those?
22      A   I could -- I'd have to look.
23          I'm just not --
24      Q   Would you?
25      A   Yes, sir.
```

Page 65

```
 1      Q   If you'd take a look again -- you still have
 2  the exhibits there in front of you -- and this was
 3  exhibit 4 that Mr. May asked you some questions about.
 4          And specifically, if you would look at -- the
 5  last three digits are 004.  It's the Section 1, Internal
 6  Revenue Service Forms, towards the back of the document.
 7      A   41?
 8      Q   Pardon me?
 9      A   41?  The Compliance Notification Package?
10      Q   The next one, section -- well, either --
11  let's just go to the next page.
12          Internal Revenue Service Forms, Section 1.
13      A   Oh, okay.
14      Q   Okay?  Yes, that page right there.
15          I just wanted to be clear on what you said,
16  and looking at the language here in this document.
17          As I read the language, it says that -- it
18  says, "You should examine I.R.S. Form 3520 and make a
19  determination" -- if you could go ahead and read that
20  part?
21      A   "On whether you or any of the beneficiaries
22  you have listed in your trust deed are required to file
23  this form."
24      Q   Right.  So there's a bit of a hedge there,
25  isn't there, in terms of whether it is or it is not
```

Page 66

1   required?
2       A    The way it's written, that would be correct.
3       Q    And if you could read the next paragraph?
4       A    "By signing below" --
5       Q    Yes.
6       A    -- "you acknowledge that you have been
7   notified of the following forms and the possibility that
8   one or more of these forms must be filed.  You also
9   acknowledge that additional I.R.S. forms may be required,
10  depending upon the assets held by the trust and the
11  business dealings of the trust."
12      Q    So the words were poss -- key words there
13  were "possibility" and "may."
14           And my question is, do you have an
15  understanding as to why a form might not be required in
16  some circumstances?
17      A    I'm sorry, I didn't hear the question.
18      Q    Do you have any understanding as to why
19  particular forms might not be required?
20      A    Not in relation to the 3520 or 3520-A.
21           There may be some other forms that are
22  required to be filed with the government.  There may be,
23  under certain situations, where you may not have to file
24  them.
25      Q    Okay.

Page 67

1       A    'Cause they don't apply to what you're doing.
2       Q    Okay.  Sticking with, specifically with Dr.
3   James for a little while here.
4            When Dr. James, I guess the descriptive term
5   would be engaged or signed up with Foster & Dunhill to
6   set up an offshore trust, he paid fees to Foster &
7   Dunhill?
8       A    I'd have to -- I'm sure that he may have.
9            I just can't verify that he had.  I don't
10  have --
11      Q    Would a typical --
12      A    -- any documentation.
13      Q    -- client who was setting up an offshore
14  trust and went -- came to Foster & Dunhill pay fees?
15      A    They would pay a consulting fee, that is
16  correct.
17      Q    And what is that consulting fee -- what are
18  they getting for that consulting fee?
19      A    For the design of the plan itself.
20           Not for the structure, but for the design.
21      Q    And are they getting tax compliance advice
22  for that consulting fee?
23      A    They are letting it be known what is
24  required.
25           But then when they're using that various

Page 68

1   trust company, like Offshore Trust Services, providing
2   all the compliance and everything else.
3       Q    Well, you anticipated my next question.
4            So Offshore Trust Services, in your view,
5   was responsible for the tax compliance forms, not
6   Foster & Dunhill?
7       A    We don't do tax compliance forms.
8       Q    Okay.  Have you had to produce -- have you
9   been required to produce documents relating to the
10  establishing of foreign trusts or offshore trusts in
11  connection with any civil litigation going on either in
12  the federal or state court?
13      A    Me personally, no.
14           But I'd have to check with Steve on that one.
15      Q    Do you know whether Foster & Dunhill or you
16  personally have been required to produce documents to any
17  federal or state government agency in connection with
18  clients establishing offshore trusts?
19      A    I guess I have to say that's -- I personally
20  haven't seen any.
21           It doesn't mean that -- I'd have to ask Steve
22  that question.
23      Q    Okay.  Well, again, I'd ask you to go back
24  and take a look and see if you can find any PowerPoint
25  presentations during the years --

Page 69

1       A    2001 through two thousand and?
2       Q    Yeah, I don't know that we've established in
3   the record when Dr. James actually attended --
4       A    Okay.
5       Q    -- the Mexico conference.  But that might be,
6   you know, might be something that we can talk about off
7   to the side.
8            But I think that's the rough time frame,
9   yeah.
10      A    Okay.
11      Q    Have you been contacted as a potential
12  witness in the United States government injunction action
13  in the District Court in Chicago, Illinois?
14           MR. MAY:  Objection.
15  BY MR. JONES:
16      Q    You can answer the question.
17      A    Me personally?
18      Q    Have you been contacted as a witness in an
19  injunction suit of the United States -- I'll be more
20  specific --
21      A    I -- I --
22      Q    -- against an entity called Sunderlage?
23      A    I personally have not.
24      Q    Okay.  You indicated, I think -- and I want
25  to -- that's what I want to make sure -- I want to make

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

Page 70

```
 1   sure we have this exactly correct.
 2          Mr. May asked you a question about the
 3   seminars, and you referred to the compliance package.
 4   And I want to clarify on that point.
 5          And the compliance package is referenced --
 6   again, you had that document in front of you a second
 7   ago, exhibit 4, 0041.
 8      A   Yes, sir.
 9      Q   Is there -- are there any documents separate
10   and apart from this particular document, page 0041, that
11   would have been provided to clients?
12      A   Just those six pages.
13      Q   So there's no separate package that's given
14   to the clients, of documents?
15          That's what I'm trying to clarify.
16      A   No, sir.
17      Q   Okay.
18          THE REPORTER:  Excuse me.  Could you turn
19   towards me, please?
20          Thank you.
21          MR. JONES:  Okay?
22          THE REPORTER:  Yes.
23   BY MR. JONES:
24      Q   Why is Foster & Dunhill no longer in
25   existence?
```

Page 71

```
 1      A   Well, for me, I left in 2008 to form a new
 2   company, to be involved more of the global domestic side
 3   of it, not just international side of it.
 4          So we wanted to get involved in the family
 5   office business.  We thought it would be a good way of
 6   starting a new venture, and that there was a need out
 7   there for that, being the quarterback for all those
 8   different professionals.
 9      Q   Uh-huh.  And to clarify another question that
10   Mr. May asked.
11          You were asked about Dr. James attending a
12   conference in Mexico.
13      A   Yes, sir.
14      Q   Again, we're a little uncertain as to the
15   date, but we believe he attended one, as far as you
16   recall?
17      A   Yes, sir.
18      Q   You were at that conference?
19      A   In Mexico, Los Cabos, yes, sir.
20      Q   Okay.  And would there be any sort of record,
21   documenting what clients were there?
22      A   Back then, I don't think so, sir.
23      Q   Any idea how many -- is "clients" the right
24   word?  Or "potential clients"?
25          How many --
```

Page 72

```
 1      A   Clients or advisors who were there.
 2      Q   How many people attended?  Do you have any
 3   recollection?
 4      A   No, sir.
 5          MR. JONES:  I think that's all.
 6          MR. MAY:  I don't have any other questions.
 7          THE REPORTER:  And are you ordering the
 8   transcript?
 9          MR. MAY:  Yes.
10          Just need the original and an E transcript.
11          THE REPORTER:  And, sir?
12          MR. JONES:  Yes.
13          THE REPORTER:  Same?
14          MR. JONES:  Uh-huh.
15          THE REPORTER:  Thank you.
16          (Time noted:  3:30 p.m.)
17
18
19
20
21
22
23
24
25
```

Page 73

```
 1
 2              CERTIFICATE OF OATH
 3
 4   STATE OF FLORIDA
 5   COUNTY OF HILLSBOROUGH
 6
 7      I, the undersigned authority, certify that
 8   CHRISTOPHER D. DONALDSON personally appeared before me
 9   and was duly sworn.
10
11      WITNESS my hand and official seal this 29th day of
12   September, 2011.
13
14
15
16
17
18
19
20          Phyllis DeFonzo, RPR

             Notary Public State of Florida
21
             My Commission Expires:  8/1/12
22
             Commission No.:  DD 783768
23
24
25
```

BayAreaReporting@gmail.com, www.bar-tampa.com                 866-240-9500

Page 74

2       REPORTER'S CERTIFICATE

5   STATE OF FLORIDA     :
6   COUNTY OF HILLSBOROUGH:
7       I, Phyllis DeFonzo, RPR, certify that I was
    authorized to and did stenographically report the
8   deposition of CHRISTOPHER D. DONALDSON; that a review of
    the transcript was requested, and that the transcript is
9   a true and complete record of my stenographic notes.
10      I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties, nor
11  am I a relative or employee of any of the parties'
    attorneys or counsel connected with the action, nor am I
12  financially interested in the outcome of the foregoing
    action.
13
        Dated this 29th day of September, 2011, IN THE
14  CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.

17      Phyllis DeFonzo, RPR

Page 76

1
2   September 30, 2011
3   Mr. Christopher D. Donaldson
    112 West Comanche Avenue
4   Tampa, Florida 33604
5   In Re: September 21, 2011 deposition of Christopher D.
        Donaldson, James v. United States of America
6
7   Dear Mr. Donaldson:

    This letter is to advise that the transcript for the
8   above-referenced deposition has been completed and is
    available for review.  Please contact our office to make
9   arrangements for read and sign, or sign below to waive
    review of this transcript.
10
    It is suggested that review of this transcript be
11  completed within 30 days of your receipt of this letter,
    as considered reasonable under Federal Rules*; however,
12  there is no Florida Statute in this regard.
13  The original of this transcript has been forwarded to the
    ordering party and your errata, once received, will be
14  forwarded to all ordering parties for inclusion in the
    transcript.  Thank you.
15
    Sincerely,
16
17  Phyllis DeFonzo
    Bay Area Reporting
18
19  Waiver:
20  I,_____, hereby waive the
    reading & signing of my deposition transcript.
21
22  _____   _____
    Deponent Signature          Date
23
24  *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)

Page 75

1
2           ERRATA PAGE
3   PLEASE ATTACH TO THE DEPOSITION OF CHRISTOPHER D.
    DONALDSON TAKEN ON SEPTEMBER 21, 2011 IN THE CASE OF
4   BRIAN CHIVAS JAMES VS. UNITED STATES OF AMERICA
5   PAGE LINE     CORRECTION AND REASON THEREFOR

18  I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
    CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
19  SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

22  _____   _____
    CHRISTOPHER D. DONALDSON       DATE
23
24  _____   _____
    WITNESS TO SIGNATURE           DATE