# PLAINTIFF'S EXHIBIT 3
## Deposition of
# George V. Famiglio, Jr.
# September 22, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


--------------------------- :

BRIAN CHIVAS JAMES,                :

     Plaintiff,                    :   Civil No.
                        8:11-cv-00271-JSM-AEP

vs.                                :

UNITED STATES OF AMERICA,          :

     Defendant.                    :

--------------------------- :



       DEPOSITION OF:   GEORGE V. FAMIGLIO, JR.

       PURSUANT TO:    Notice by Counsel for Defendant

       DATE:           September 22, 2011

       TIME:           1:15 p.m. to 3:30 p.m.

       PLACE:          Famiglio & Associates
                     1634 Main Street
                     Sarasota, Florida 34236

       REPORTED BY:    PHYLLIS DEFONZO, RPR
                     Notary Public
                     State of Florida at Large



       Pages 1 - 114

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 2

```
1   APPEARANCES:
2
3       KENDALL JONES, ESQUIRE
        DWAUNE L. DUPREE, ESQUIRE
        Sutherland, Asbill & Brennan, LLP
4       1275 Pennsylvania Avenue NW
        Washington, D.C. 20004-2415
5           Appearing for Plaintiff
6
7       MICHAEL W. MAY, ESQUIRE
        United States Department of Justice
8       Tax Division
        P.O. Box 14198
9       Washington, D.C. 20044
            Appearing for Defendant
10
11
12
13
    Also Present:
14  George V. Famiglio III
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            GEORGE V. FAMIGLIO, JR.,
2   the witness herein, being first duly sworn on oath, was
3   examined and deposed as follows:
4                DIRECT EXAMINATION
5   BY MR. MAY:
6       Q   All right.  Good afternoon, Mr. Famiglio.
7   We've spoken before, but we're now on the record in your
8   deposition.
9           And for the record, my name is Mike May.  I'm
10  representing the United States in the matter that's
11  brought us here today, which is the case of Brian Chivas
12  James versus U.S.A. which is pending in the Middle --
13  U.S. District Court for the Middle District of Florida.
14          Would you please state your name for the
15  record?
16      A   George V. Famiglio, Jr.
17      Q   And also with you today is your son.  Is that
18  correct?
19      A   Yes.
20      Q   And his name is?
21      A   George V. Famiglio III.
22      Q   Okay.  Thank you.
23          Have you ever been deposed before, Mr.
24  Famiglio?
25      A   Oh, yes.
```

Page 3

```
1
2              I N D E X
3
4   TESTIMONY OF GEORGE V. FAMIGLIO, JR.      PAGE
5   DIRECT EXAMINATION BY MR. MAY                4
6   CROSS-EXAMINATION BY MR. JONES             69
7   CERTIFICATE OF OATH                111
8   CERTIFICATE OF REPORTER                112
9   ERRATA SHEET                       113
10  WITNESS LETTER                     114
11
12
13           E X H I B I T S
14
15  NO.  DESCRIPTION                      PAGE
16  13   Financial Stmts and General Ledger, 12/31/01   20
17  14   Financial Stmts and General Ledger, 12/31/02   32
18  15   2002 Corporation Tax Return          38
19  16   2002 Individual Tax Returns          43
20  17   Financial Stmts and General Ledger, 12/31/03   51
21  18   2003 Corporation Tax Return          54
22  19   2003 Individual Tax Return           58
23
24
25
```

Page 5

```
1       Q   Okay.  How many times?
2       A   Never counted.
3       Q   Okay.
4       A   I've been in practice 30 years.
5       Q   Okay.  So I don't need to explain to you --
6       A   No.
7       Q   -- what a deposition is.
8           But I'd just like to lay out a couple of
9   things before we really get started in earnest.
10      A   Sure.
11      Q   If at any point I ask you a question that
12  isn't clear or you're not sure exactly what I'm asking,
13  feel free to ask me to clarify it or explain, okay?
14      A   Okay.
15      Q   I'm sure you've noticed the court reporter is
16  taking down every word that we say.  So it's important,
17  when you answer, that you answer out loud.  Also, if it's
18  a "yes" or "no" question, say "yes" or "no," not
19  "uh-huh," "uh-uh," nod a head, shake your head, things
20  like that.  Okay?
21          Also, if you'll wait until I finish asking
22  the question before you begin to answer, that'll make it
23  simpler for her.
24          Does that seem fair enough?
25      A   Seems fair.
```

Page 6

1     Q   Okay.  If you need a break at any time, we
2   can take a break.
3     A   Okay.
4     Q   Only one catch to that is, if I've asked a
5   question and the question is pending, you need to answer
6   the question and then take a break.
7     A   I understand.
8     Q   Okay.  Now, I know you've had some health
9   problems recently.
10        What is the nature of that, your health
11  concerns?
12    A   All right, yes.  It's pretty private, but I
13  don't mind saying it.
14        I -- I had endocarditis earlier this year
15  that caused paralyzation of my right side, and that was
16  reversed.  And I had a brain bleed, unfortunately.  It
17  was because of some drugs that were administered.  And
18  that caused a complete paralysis on my left side.
19        In other words, I had a stroke.
20    Q   Okay.
21    A   Two types of strokes.
22    Q   Okay.  And are you on any medication
23  currently?
24    A   Some, but not much.
25    Q   Okay.  And this is the last question just

Page 7

1   kind of for the sake of the record.
2         Is there any reason, because of your recent
3   illness or the medication that you're taking, that you
4   would not be able to be here for a little while and
5   understand and answer the questions?
6     A   I should be okay.
7         I'm not without symptoms, but I should be
8   okay.  I will let you know if I have a problem.
9     Q   Okay, thank you.
10        All right.  So just as a kind of
11  introduction, I understand that you are a CPA.  Is that
12  right?
13    A   Yes.
14    Q   And for how long have you been a CPA?
15    A   Licensed as a CPA?  I've been practicing
16  since earlier.
17        But I believe 1977.
18    Q   And you've been practicing continuously since
19  that time?
20    A   Yes.  Yes, sir.
21    Q   And what are the nature of the work that you
22  do as an accountant?
23    A   Well, we do a lot of tax prep.  We have
24  small, you know, business clients.  We have individual
25  clients.

Page 8

1         We're pretty much a -- you know, we do tax
2   returns, for the most part.
3     Q   Okay.  And I know today that we're at the
4   offices of your business?
5     A   That's correct.
6     Q   How long have you owned this business?
7     A   At this location, since 1987.
8     Q   Okay.  So for the relevant -- and just to
9   kind of inform you, you may already be aware -- the years
10  at issue in the lawsuit that has brought us here today
11  are the years specifically 2001, 2002 and 2003.
12    A   Okay.
13    Q   During those years, were you continuously
14  operating this business?
15    A   Oh, yes.
16    Q   Okay.  And into -- some of the facts we may
17  ask about go into -- may be a little bit before then, may
18  go a little bit later.
19        Would you say that from the time period 1998
20  to 2006, you've been operating this business?
21    A   Oh, yes.
22    Q   Okay.  Now, as a part of your business, do
23  you ever prepare Forms 3520?
24    A   I don't do too many.  I have done a few in
25  the past.

Page 9

1     Q   Okay.  And for how long have you been -- have
2   you done 3520s?
3     A   Oh, I -- I really don't know.  Five years,
4   six years, maybe.  Seven.
5         I'm not so sure.
6     Q   But would you say it's been a more recent
7   thing that you've done?
8     A   Oh, more recent, yes.
9     Q   Okay.  So you haven't been doing 3520s
10  since --
11    A   Oh, no --
12    Q   -- 1977?
13    A   -- not at all.
14    Q   But currently, you're familiar with the Form
15  3520?
16    A   I'm somewhat familiar with it, yes.
17    Q   Okay.  Have you ever completed Forms 3520-A
18  for foreign trusts?
19    A   Yes, I have.
20    Q   Okay.  And would that have been in about the
21  same time period as you've done --
22    A   Oh, yes.
23    Q   -- 3520s?
24    A   Most recently, yeah.
25    Q   Okay.  Brian Chivas James is the plaintiff in

Page 10

1  this case.
2        How do you know Brian Chivas James?
3     A   Well, I did his personal return for a number
4  of years.
5        And, you know -- so I know him, you know,
6  professionally, because he was a client of mine.
7     Q   Okay.  Did you ever know him outside of as a
8  client?
9     A   No.
10    Q   Okay.  So your relationship with him was
11 strictly professional?
12    A   Oh, yes.
13    Q   In what time period was Brian Chivas James a
14 client of yours?
15    A   I don't remember per se.  I mean, this was a
16 long time ago, so.
17       But probably in the nineties, late nineties.
18 I guess until he, you know, went with another partner and
19 merged.  And they -- you know, he stopped using me around
20 that time.
21    Q   And when you say "he went with another
22 partner," you mean in his medical practice?
23    A   Yes.
24    Q   He joined a new partnership?
25    A   Yes.  Something like that.  Or he made a part

Page 11

1  -- I'm not -- see, I'm not, I was -- they kept me out of
2  the loop at that point.
3     Q   Okay.
4     A   So that's what happened.
5        He had a partner and, you know, I think the
6  partner's accountant got all the work.
7     Q   And when was that?
8     A   2003-ish, 2004 maybe.
9     Q   Okay.  And what kind of work did you do for
10 Mr. James?
11    A   Doing his taxes.
12    Q   Okay.  And did you do both his personal
13 income tax as well as his business income tax?
14    A   Yeah.  I believe my firm.
15       I didn't -- when I say "I," I don't even know
16 if I did it.  But I believe my firm also did the -- he
17 probably had a corporation, most likely.
18    Q   Okay.  So you think -- you believe your
19 company at least did his personal and his corporate
20 returns?
21    A   Most likely, yeah.
22    Q   Do you remember how you first came to know
23 Brian Chivas James?
24    A   I think it goes way back to sometime in the
25 nineties.

Page 12

1        He was probably a referral.
2     Q   Okay.  From another client -- another
3  accountant, or?
4     A   I'm trying to think.  This goes way back.  I
5  really don't remember much.
6        I'm sure it was another -- a referral from
7  another, you know, maybe another doctor, maybe another
8  client.
9     Q   Okay.  Fair enough.  That's fine.
10    A   Yeah.
11    Q   When did Brian James inform you that he was
12 the grantor of a foreign trust?
13    A   He never did.
14    Q   Okay.  Are you aware that he is the -- he is
15 or was the grantor of a foreign trust?
16    A   Only through, you know, hearsay.  And I use
17 that term loosely.  I don't mean a legal term.
18       But only through maybe, you know, talking to
19 you.  And I know probably got a call from an agent, oh,
20 about two, three years ago, and might have even informed
21 me about that.
22       And, you know, and I had a few questions.  I
23 don't even remember what, you know, what we even talked
24 about.  It was super-brief.
25       You know, so that's about it.

Page 13

1     Q   So just so I'm clear, Dr. James never told
2  you he owned a foreign trust?
3     A   No.  Not at all.
4        Let me clarify that, because memory just came
5  back to me.
6     Q   Okay.
7     A   After he left me, he did contact me and said
8  he got some -- got a letter from the I.R.S. sometime, you
9  know, about this.  I had a very limited conversation with
10 him, because he was using somebody else.
11       And then he decided -- I was gonna look into
12 it, but he basically didn't hire me at all to do it.  So
13 I think he found some group out of St. Pete or Tampa to
14 help him out.
15    Q   And when you say "help him out," you mean
16 help him with the I.R.S. penalty?
17    A   Well, I don't know if there was a penalty.
18    Q   Okay.
19    A   I don't remember per se.
20    Q   Okay.
21    A   It's going back a number of years.
22       I assume by a letter there's some "Hey, did
23 you not file this form" or whatever the case is.  I'm
24 assuming that's what it's mostly about.
25       But, you know, there could have been a

Page 14

1  penalty.
2       Q   Okay.  But from the conversation that you
3  just remembered with Dr. James, was there some discussion
4  of you helping him prepare 3520s?
5       A   No.  Because I told him I wasn't doin' 'em.
6       Q   Okay.
7       A   I said, "I don't do them."
8           And that's why he asked -- I did -- he did
9  ask me about the, you know, this form.
10          I said, "What do you have a" -- you know, I
11  said, "This has to do with some foreign situation."
12          And, you know -- and it just really -- pretty
13  much went nowhere.
14          He says, "Well, I got" -- as a matter of
15  fact, the name just came back to me.  I guess Bill Simon,
16  maybe.  Is that a name of a guy out of -- he advertises
17  for I.R.S. matters.  So I think that's who he said he
18  might use -- he was dealing with.
19          And, you know, that's about it.  I mean, it's
20  really extremely vague to me right now.
21       Q   Okay.  But from your recollection, in that
22  conversation Dr. James said he had been contacted by the
23  I.R.S.?
24       A   Well, he said he got a letter.
25       Q   Okay.

Page 15

1       A   But there could have -- he could have faxed
2  that letter to us, quite frankly.  But I have a whole
3  staff.
4           And, you know, maybe -- you know, they
5  usually will talk to him, get a power of attorney.  I
6  don't know how far it actually even got.  I don't even
7  know if a power of attorney was ever filed.
8           Because we weren't paid.  We weren't hired to
9  do anything.
10       Q   Do you remember when that conversation was?
11       A   Whenever that letter would have came out.
12  Whatever that may be.
13          I'm not so sure.  It would have been after
14  this time zone, probably 2004/2005.
15       Q   Okay.
16       A   I'm guess -- I'm only guessing.
17       Q   Okay, sure.
18          But at the time of the conversation, Dr.
19  James had received a letter from the I.R.S.?
20       A   I'm going to assume he did.
21          Because that's why -- he says he got
22  correspondence and, you know, wanted, you know, to help
23  -- possibly, I was lookin' for work, so I would have
24  probably said, "Hey, let me help you."
25          But I never went any farther than that.

Page 16

1       Q   Okay.  And you understood that he had hired a
2  Bill Simon or --
3       A   Well, he mentioned the guy Bill Simon.  He
4  was famous at the time.  He was famous at the time.
5           Because I know he had advertisement around, I
6  don't know if he was on the radio or he was on TV or
7  maybe in the magazines.  He's -- he advertises for I.R.S.
8  problems.
9       Q   Okay.
10       A   You know, solely in an I.R.S. type of form --
11  firm, too.
12          I guess collections and audits and
13  everything, so.
14          That's who he picked.
15       Q   But prior to that conversation with Dr.
16  James, you had no knowledge that he had --
17       A   No.  Not at all.
18       Q   You mentioned an agent.
19          Did you also get a phone call a few years ago
20  from an agent?
21       A   Yeah.  I don't remember his name.
22       Q   Okay.  Was that an I.R.S. agent?
23       A   I.R.S. agent, that's who I meant, yeah.
24       Q   Okay.  A revenue agent?
25       A   I would assume it would have to be a revenue

Page 17

1  agent.
2       Q   Okay.  All right.  So when you were preparing
3  Dr. James' 2001 -- let's back up, because we haven't
4  established.
5           Did you prepare Dr. James' 2001 personal and
6  corporate tax returns?
7       A   I believe I did.
8       Q   And did you prepare his 2002 returns?
9       A   Yes.
10       Q   And --
11       A   The personal.
12          I don't -- you know, the corporate's another
13  story, but.
14       Q   You're not sure?
15       A   No, I'm not sure about the corporate.
16       Q   Okay.
17       A   I think our firm might have done it at the
18  time.
19          But I -- you know, I wasn't workin' on it.
20       Q   Okay.  And did your firm also prepare his
21  2003 personal one?
22       A   Most likely.
23       Q   And corporate?
24       A   Most likely, if we were still engaged back
25  then.

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 18

1  Q  Okay.  Now, at the time your firm prepared
2  the 2001 returns, both Dr. James' 1040 and any corporate
3  return, did he provide you with a copy of the Horn -- of
4  his trust's Form 3520-A for that year?
5  A  No.  Never.
6  Q  And you seem very certain.
7     How are you so certain?  I mean --
8  A  Because if I saw it, I'd say "Wait a minute.
9  This is gonna be a lot more complicated."
10    Obviously, if you have something foreign, you
11 just don't, you know, take it -- you know, you don't take
12 it with a grain of salt.
13 Q  So that would have alerted you that there was
14 other --
15 A  Oh --
16 Q  -- things to take care of?
17 A  -- I would think so, especially with his
18 personal.
19    Not his corporate.  But his personal, yeah.
20 Q  Now, you mentioned it may be possible that
21 someone else prepared the returns?
22 A  Well, my staff would normally go through that
23 process.  And I'd probably take a, you know, final check
24 and look at it.
25    I probably signed it most likely, because

Page 19

1  that was our procedure at the time.
2  Q  Okay.  So someone else kind of maybe does the
3  detail --
4  A  The balancing and doing -- you know, putting
5  all the numbers on the return and that type of thing,
6  yes, absolutely.
7  Q  But then your practice is that you reviewed
8  the returns?
9  A  I take a quick look, yes.
10 Q  Okay.
11 A  Make sure it balances, you know, that type of
12 thing, checklist.
13 Q  Okay.  And look at -- do you look at the file
14 when you kind of review it to see if there would be
15 something like a 3520-A, or?
16 A  I would always do that.
17    But you -- we -- it would be highly unlikely
18 for us to have a 3520-A for a corporate return.
19 Q  Okay.  And what about for a personal --
20 A  Well --
21 Q  -- individual?
22 A  -- it's normally highly unlikely, 'cause I've
23 only been associated with maybe two or three at the most
24 over my life -- you know, my lifetime, more recent than
25 not.

Page 20

1     But -- so I would know what we're looking
2  for, and it would alert me in about two seconds.
3  Q  Okay.  And I'm going to ask the same question
4  in regards to the 2002 individual and corporate
5  returns.
6     At the time that you prepared Dr. James'
7  individual and corporate returns for 2002, did he provide
8  you with a copy --
9  A  No.
10 Q  -- of his trust's 3520-A?
11 A  No.
12 Q  And the same question with regard to his 2003
13 personal and corporate returns?
14 A  No.
15 Q  Okay.  Do you know a Steve Donaldson?
16 A  No, I do not.
17 Q  Okay.  I'm going to ask a follow-up question
18 that probably doesn't make much sense, but I need to ask
19 it anyway.
20    Have you ever spoken to Steve Donaldson?
21 A  No.
22 Q  Okay.
23 A  Not that I remember.
24 Q  Right.  Okay.
25    (Financial Statements and General Ledger

Page 21

1  dated December 31, 2001, are received and marked
2  exhibit 13 marked by the court reporter.)
3  BY MR. MAY:
4  Q  Mr. Famiglio, I'm going to hand you what's
5  been marked exhibit 13.
6     Do you recognize exhibit 13?
7  A  Yes, I do.
8  Q  And what is exhibit 13?
9  A  Exhibit 13 is a financial statement of Brian
10 C. James, M.D., P.A.
11 Q  Okay.  And what is Brian C. James, M.D.,
12 P.A.?
13 A  It's Brian James' corporation.
14 Q  Okay.  And I direct your attention back to
15 the front page --
16 A  Okay.
17 Q  -- that kind of cover-looking page?
18    I notice between the "Brian C. James, M.D.,
19 P.A." and "Financial Statements" is the word "Revised"?
20 A  Okay.
21 Q  Is that -- do you know why, or what the
22 revision was from?
23 A  I have no idea.
24 Q  Okay.  So -- okay.  If you don't remember,
25 that's fair enough.

Page 22

1   Sometimes you go back and revise when you've
2   gotten additional information?
3       A   It's a possibility.
4       Q   Okay.  Looking, turning into exhibit 13, that
5   first page on the inside, there's a signature down --
6   signature about two-thirds of the way down the page?
7       A   Yes.
8       Q   Okay.  And that's your signature?
9       A   That would be my signature, unless it's our
10  old stamp.
11      Q   Okay.  And that would be page number SAB0913,
12  or 914.  The number's a little bit difficult to read.
13  There's some numbers at the very bottom right-hand
14  corner.
15      In the first paragraph of this, that first
16  page there, that SAB0914, what is that page?
17      A   That's an extremely common and required
18  statement.
19      You know, basically set -- AICPA set
20  standards.  This is probably the same statement that's on
21  every single one of our clients' financial statements.
22  You know, basically, you know, outlines -- just like it
23  says -- "we did a compilation" means just make sure that
24  everything balances and everything is in, you know,
25  halfway decent shape.

Page 23

1       Q   And so -- I think you used the term
2   "compilation"?
3       A   "Compilation."
4       Q   And so is that different than an audited
5   financial statement?
6       A   Night and day.  Major difference.
7       Q   Okay.  And just briefly, what are the
8   differences?
9       A   Well, compilations is, number one, that's the
10  only thing we do.  We have -- I have -- I've never done
11  an audit, never want to do an audit.  It's night and day.
12      You're required to, you know, have outside
13  verification.  You try to -- you're required to do, in a
14  sense, do a lot of work.  You have to verify figures from
15  outside sources, you know, get attorney letters, get
16  accounts receivable letters, all that type of stuff.
17      And we're not in the business where any of
18  our clients ever required one.  So we just -- a lot of
19  accountants just won't do any audits.  So a compilation
20  is a lower form of service.  It's the most common type of
21  service there is.
22      Q   And you just -- is it fair to -- and I'm
23  going to characterize it, and you tell me if my
24  characterization is correct.
25      Is it fair to characterize a compilation as

Page 24

1   really just a representation that's been made by the
2   owner of the business?
3       A   Absolutely, yes.
4       Q   Okay.
5       A   It's his numbers, it's not our numbers.  It's
6   his numbers.
7       Q   Right.  So you're not certifying necessarily
8   the accuracy of the numbers?
9       A   Absolutely not.  Just to make sure they're in
10  proper format according to AICPA, you know, standards for
11  compilations.
12      In other words, they balance, they're current
13  assets to current asset, you know; you know, equipment's
14  under "equipment," that type of thing.
15      Q   Okay.  And is this a -- in the process of
16  then preparing a return, how would this be used?
17      A   Well, that would be used to prepare the
18  return.
19      Q   Okay.
20      A   Maybe not that statement.  A trial balance
21  normally would be used.
22      But this statement per se wouldn't be exactly
23  used.
24      Q   Okay.  But the process of putting this
25  together is --

Page 25

1       A   We would do this first.
2       Q   Okay.  All right.  And so as far as exhibit
3   13 goes, do you have any doubt that it's Dr. James'
4   business' statement as produced by your firm?
5       A   Yes.
6       No, not at all.
7       Q   Okay.  We'll turn there to the page -- and
8   these numbers are in the lower right-hand corner of each
9   page.
10      A   Okay.
11      Q   I'm really looking at the statement of
12  revenues and expenses, the second page of that, which the
13  page number in the lower right corner is SAB0918.
14      A   Okay.
15      Q   And we're not going to go through every line
16  on this.
17      A   I assume that.
18      Q   This is basically just an income statement,
19  right?
20      A   That's right.
21      Q   And I'm looking at the line, the second line
22  in the actual table of the statement.
23      It says Insurance General just below
24  Insurance Malpractice.  And I think it means that there
25  is $60,000 spent on general insurance in 2001 by Dr.

Page 26

1   James' business.
2        Is that what that represents?
3        A   That's what it says.
4        Q   Do you know what that insurance was?
5        A   I have no idea.
6        Q   Okay.  So you would have just -- this is some
7   number that Dr. James had?
8        A   It would be off their accounting system.
9        You know, their bookkeeper would have given
10  us that.
11       Q   Okay.  And then if you'll turn over -- that's
12  the revenue or income statement -- into the general
13  ledger section.
14       A   Okay.
15       Q   Page SAB0921.
16       A   Okay.
17       Q   And this is in the section of the ledger that
18  is denoted 305 Dividend Distribution?
19       A   Okay.
20       Q   I think it starts on the page before and goes
21  onto the -- one, two, three, four, five, six -- seventh
22  item on that page, SAB0921.
23       There's a, what appears to me to be a
24  negative or a reclaimed insurance premium from 305 to
25  545.1?

Page 27

1        A   Right.
2        Q   And what is that?
3        MR. JONES:  Object.
4   BY MR. MAY:
5        Q   You can answer.  What is that?
6        A   I don't really know what it is.  It's
7   $60,000.
8        Q   Okay.  But "FRM 305 to 545.1," what's the
9   significance of that part of that line?
10       A   Well, they -- the bookkeeper would have moved
11  it from -- let's see -- 305, to insurance.
12       Q   Okay.  So is that a reclassification of
13  $60,000?
14       A   That might be.  That's what it looks like it
15  is.
16       Q   From a dividend distribution to --
17       A   Well, the --
18       Q   -- an insurance?
19       A   -- dividend account is just the account that
20  when -- it's like a catchall account.
21       Like if you don't know where to put anything,
22  you put it there.  Then you, you know, basically, you
23  know, clean it up.  So, you know, you just -- that's like
24  a catchall account.
25       So a lot of times, when the -- I don't know,

Page 28

1   see, I don't know whether they were using Quicken or
2   QuickBooks at the time.  Because the bookkeeping -- I
3   remember there was -- I'm sure there was a bookkeeper
4   there.
5        I have a vague recollection there's some
6   bookkeeper there, 'cause there normally would be.
7        Q   Okay.
8        A   And they would do all this.
9        And this would come in on our system from
10  their QuickBooks.
11       Q   Okay.  I mean, I'm looking at dividend
12  distribution in general.  I see there's some -- there's
13  something to Porsche; there's something to City of
14  Sarasota; Charlotte James is on there a couple of times.
15       I mean, I understand that this business was
16  owned by -- or maybe still is owned by -- Dr. James as a
17  pass-through entity?
18       A   Oh, yes.
19       Q   So if the business wrote a check that was for
20  Dr. James' benefit, that -- it would be proper to
21  categorize that as a dividend?
22       A   Yes, it could be.
23       Q   Okay.  But you're not sure exactly what this
24  $60,000 that's being reclassified --
25       A   If it's --

Page 29

1        Q   -- is?
2        A   -- moved over to insurance, you know.
3        The only thing I do remember, Dr. James, his
4   -- he was sloppy in terms of, you know, if they -- if the
5   bookkeeper moved it over, it's because maybe he could
6   have paid for some insurances out of his personal
7   account.
8        Q   Okay.
9        A   And the reason it would be moved is because
10  they would, you know, they would move it to properly
11  categorize, you know, the insurance.
12       And they might have put it under General.
13  His malpractice insurance is pretty low.  It's -- usually
14  for a pain management doctor, it's usually very high.  So
15  it could be an additional, you know, you know,
16  malpractice type of thing that he was -- that he had
17  there.
18       But, you know, it's so long ago, the
19  bookkeeper is the one that would really know.
20       Q   Okay.  And I think just one more question --
21       A   Go ahead.
22       Q   -- on that.
23       Moving that item from dividend to insurance,
24  what would be the tax effect of that?
25       A   Well, you'd probably categorize it, you know,

Page 30

1  if it is insurance, you'd probably categorize it as
2  insurance.
3      Q   Okay.  And is that a deductible expense --
4      A   It should be --
5      Q   -- for the business?
6      A   -- yes.
7      Q   So would then a net effect tax-wise of moving
8  something from dividend to insurance be to take it from
9  something that's basically income to something that's a
10  deduction?
11     A   Well, something like that.
12         What this tells me if I'm looking at it --
13  and knowing Dr. James, you know, remembering what I
14  remember of him -- he might have had, you know, monies
15  that he paid personally.  And he would be far from the
16  first one, unfortunately.
17         I -- us accountants, we hate it when clients
18  do this.  Sometimes they have money in their personal
19  account, they'll pay for a bill out of their personal
20  account.
21         I mean, it happens more often than I'd even
22  like to say, because I -- it makes it tough for us, you
23  know, or tougher for the bookkeeping element.
24         So if, let's say he had $60,000 that he paid
25  toward insurances, okay?  Then this is the way -- how you

Page 31

1  would do it.  You got it -- because it didn't come out of
2  his account, evidently.
3      Q   Okay.
4      A   'Cause it says "reclassify insurance
5  premium."  So it has to be an insurance premium of some
6  sort.
7      Q   Okay.  And then if we'll just kind of close
8  the loop.
9      A   Okay.
10     Q   Turn to the page two pages over, SAB0923.
11  And there's a line there, 545.1.
12         I'm sorry.
13     A   Okay, no problem.
14     Q   Item 545.1, Insurance General.  And here's
15  the 60,000.
16     A   Okay.
17     Q   Should I understand that to reflect the
18  movement from the dividend to this category?
19     A   That's exactly right.  That's what that would
20  mean.
21     Q   Okay.  You know, I don't want to spend a lot
22  of time on this.
23         But as you have looked at this -- and maybe
24  the revenue, revenue and expenses income statement sheet
25  is maybe the best place to just peruse -- is there

Page 32

1  anything in this financial statements, this exhibit 13,
2  that indicates that Dr. James established a foreign
3  trust?
4      A   Nothing whatsoever.
5         (Financial Statements and General Ledger
6      dated December 31, 2002, are received and marked
7      exhibit 14 by the court reporter.)
8  BY MR. MAY:
9      Q   Mr. Famiglio, I'm going to hand you what's
10  marked exhibit 14.
11         And what is exhibit 14?
12     A   It's the same thing, for 2002.
13     Q   Okay.  Now, looking here in the, really the
14  third page of the exhibit, I think the number in the
15  lower right corner is SAB0930.  I think that's right,
16  yes.
17         Under the section -- now, this is the balance
18  sheet, correct?
19     A   Uh-huh.
20     Q   Under the Stockholders' Equity, Dividend
21  Distribution, negative 450,619.06?
22     A   Yes.
23     Q   What is that?
24     A   Well, that's his dividend distribution or the
25  final number after all adjustments for the year.

Page 33

1      Q   Okay.  And so does that represent money out
2  or money in to the corporation?
3      A   Oh, no.  That would be -- that's reducing
4  equity.
5      Q   Okay.
6      A   That's basically -- I'm not -- I don't wanna
7  say money out, but it could be money out, but it's
8  adjustments.
9         Money and adjustments out.
10     Q   Okay.  And then turning to the, really the
11  next set of pages --
12     A   Okay.
13     Q   -- the beginning of the income statement,
14  SAB0932.
15         And here at the top of this page -- and these
16  are in the order we received them -- there's, again, the
17  side of Insurance General.
18         And for the month of December, I think it
19  says 682,732.32.  Is that right?
20     A   That's right.
21     Q   And for the 12-month period.  So that's for
22  the entire year of 2002?
23     A   That's for the whole year.
24     Q   Okay.  $832,767.32?
25     A   Yes.

Page 34

1   Q   Do you know what that is?
2   A   Don't know.  Would be some type of insurance.
3   Q   Okay.
4   A   You know, again, it would come off their
5  bookkeeping system.
6   Q   Okay.  So that's some way that their
7  bookkeeping system recorded these payments?
8   A   Yes.
9   Q   And these are payments being made?
10   A   I would assume so --
11   Q   Okay.
12   A   -- yeah.
13   Q   Okay.  Some kind of money out or some kind
14  of -- something going out?
15   A   Something going out.
16       I'd have to assume that, because I -- you
17  know, I don't personally know that, but.
18   Q   Sure.  Now, if we'll turn again to the
19  general ledger then, SAB0939.
20       And here I think -- is this the 545.1
21  Insurance General item in the general ledger?
22   A   I don't know.  Let's see here.
23       Yes.
24   Q   Is this similar to what we saw in the 2001
25  statements?

Page 35

1       And by that I mean --
2   A   Yes.
3   Q   -- the category.  Okay.
4       So it's a similar, I mean -- and again, you
5  don't -- you're not aware of what insurance that would
6  be.
7       Is that right?
8   A   No, I'm not aware of it.
9   Q   Okay.
10   A   It would have -- you know, most likely would
11  be type of -- he's in pain management -- it would be some
12  type of pain management insurance, because they're
13  ridiculously high.
14   Q   Okay.  So something like a malpractice
15  insurance?
16   A   Yeah, in the nature of that.
17   Q   Okay.
18   A   That's what I'd have to assume at this stage.
19   Q   Okay.  Even though, if we look up one line, I
20  think 545 Insurance Malpractice, looks like the
21  year-to-date paid there was 93,940?
22   A   It would have to be some insurance related to
23  something like that.
24   Q   Okay.  Did you ever have any conversation
25  with Dr. James --

Page 36

1   A   No, never.
2   Q   -- about what that insurance was?
3   A   No.
4   Q   Okay.  And this entry "To Record Personal
5  Expenses for Business Insurance, what is -- what do --
6  what's the meaning --
7   A   That's something --
8   Q   -- of that?
9   A   -- that was typed in by a bookkeeper,
10  probably some kind of adjustment.
11       But basically, like that's what I was saying,
12  there could have been something that he paid on his own
13  that he didn't pay through the practice; especially if
14  that was -- that was a large amount.
15   Q   Okay.  And if initially, as we saw in '01 --
16  and actually just, again, to kind of close the loop -- if
17  you'll turn back to SAB0936.
18       And this is under the category 305 Dividend
19  Distributions?
20   A   Just give me a second to find it.
21   Q   Sorry.  A lot of flipping of pages.
22   A   That's okay.  I'm okay.
23   Q   And almost three-fourths of the way down the
24  line, there's -- I think you see the 570,000?
25   A   Right.

Page 37

1   Q   And the same notation, To Record Personal
2  Expenses --
3   A   Yes.
4   Q   -- for Business Insurance.
5       Now, we're not sure exactly what that
6  transaction is.  Is that --
7   A   No.  Just some type of insurance that he was
8  paying for.
9   Q   But really my question is -- and I don't know
10  whether, I don't know -- I personally don't have any idea
11  what this insurance was, either.  I have some suspicions
12  about what it was, but I don't know for sure.
13       MR. JONES:  Objection.
14  BY MR. MAY:
15   Q   But what I'm curious about -- what I think
16  maybe you can answer -- is the effect of moving it on the
17  balance sheet from dividend distribution to insurance.
18       What is the effect of that --
19   A   That's to make --
20   Q   -- on the bottom line?
21   A   -- a deduction.
22       But this is -- this would indicate that he
23  paid for this personally, you know.  It might have been a
24  large premium or whatever the case is.
25       And he didn't have the money in his account,

Page 38

```
 1   and so he paid it out of his personal account.
 2       Q   Sure.
 3       A   So the bookkeeper would book that like, you
 4   know -- I mean, there's a number of clients that, you
 5   know, they have money in their personal account and they
 6   figure "Oh, I gotta pay an expense for the business."
 7           It happens more often than not.  We don't
 8   like it at all.  But it does -- it's, unfortunately in a
 9   small business world, it's more common than not.
10       Q   Okay.  But the insurance, insurance is
11   generally deductible.  Is that correct?
12       A   It should be, yes.
13       Q   For businesses.
14           Okay.
15           (2002 Corporation Tax Return, is received and
16   marked exhibit 15 by the court reporter.)
17   BY MR. MAY:
18       Q   Mr. Famiglio, you've been handed what's
19   marked exhibit 15.
20           Do you recognize exhibit 15?
21       A   Yes.  It's a tax return for the business for
22   2002.
23       Q   And which business?
24       A   Brian C. James, M.D., P.A.
25       Q   Okay.  And this kind of -- I mean, this is
```

Page 39

```
 1   your name --
 2       A   Yes.
 3       Q   -- your company's name, right?
 4       A   Yes.
 5       Q   Is it -- I mean, it's just a corporate
 6   return, right?
 7       A   Normal corporate return.
 8       Q   For an S corporation?
 9       A   Yes.
10       Q   I mean, and this top section shows the
11   income.
12           And then the section that's deductions and
13   taxes and payments, that's pretty standard; I mean,
14   that's just the form?
15       A   Yes.
16       Q   That's the way the I.R.S. lays out the form,
17   correct?
18       A   That's correct.
19       Q   And you just put the numbers in the
20   right-hand column?
21       A   Well, you have software that does it.
22       Q   Okay.
23       A   I personally don't do that.
24       Q   Right.
25       A   Yes.
```

Page 40

```
 1           But my -- you know, my staff member, whoever
 2   it was at the time, would have done this.
 3       Q   And then these numbers basically come from
 4   these financial statements?
 5       A   They're supposed to, yes.
 6       Q   Okay.  If you'll turn to the second page of
 7   the Form 1120.
 8           And I think this top section is labeled Cost
 9   of Goods, and there's a hole punch there, but that's Cost
10   of Goods Sold, isn't it?
11       A   Yes.
12       Q   On the form?
13           Okay.
14           And line 5, Other Costs and it refers to a
15   statement 4, and then a total number there of
16   $1,161,499.68?
17       A   Yes.
18       Q   Okay.  And just as simply as you can, what is
19   Cost of Goods Sold?
20       A   Well, it's different.  This form, the I.R.S.
21   uses this form for all types of businesses.
22           A lot of times this system, especially under
23   -- or this section, especially under Other Costs, we'll
24   use, you know, direct costs.  Like in a retail business,
25   it's going to be the, you know, the cost of purchases and
```

Page 41

```
 1   inventory and everything like that.
 2           In a medical type of business, it could be
 3   like supplies -- like -- there's costs that are
 4   associated directly, you know, heavy costs that are
 5   associated directly with the operation; like, you know,
 6   professional fees that are for other doctors, medical
 7   costs, things of that nature.
 8           A lot of times we'll put malpractice under
 9   that, you know, that type of thing, especially when it's
10   -- when it's very -- what can I -- what word do I want to
11   use -- very important to the business.
12       Q   Okay.  And this number of Cost of Goods Sold,
13   where does that show up on the front page?
14       A   It'll show up on, I guess, line 2.
15       Q   Okay.  And so the effect is basically -- and
16   I know I'm oversimplifying, but just for our conversation
17   here -- the effect of Cost of Goods Sold is basically
18   subtracted from the gross receipts, and along with a
19   couple of other items, to get the total income of the
20   business?
21       A   Well, the total income -- the total gross
22   income in a medical practice, it will be line 1-A.  You
23   know, that would be more accurate.
24       Q   Okay.
25       A   You know, 2.9 million there.
```

Page 42

1    Q   Okay.
2    A   That would be the total income.
3    Q   Okay.
4    A   It says Total Income there.
5       But you also have if you -- that section also
6  has if you sell equipment or if you had a CAT scan or you
7  had, you know, a piece of equipment that you sold and you
8  had it recaptured.
9       There's other income that goes in there
10 that's -- that's not really gross income.
11   Q   Okay.  So the top line there, 1-A --
12   A   That's the main --
13   Q   -- is the gross receipts?
14   A   That's the gross receipts.  That's the main
15 number.
16   Q   But the effect of these other numbers that
17 are subtracted from that --
18   A   There are other costs or expenses that reduce
19 that, yes.
20   Q   Sure.  And ultimately, you know, helps
21 determine the correct taxable --
22   A   Yes.
23   Q   -- income?
24      Okay.  Turn in exhibit 15 to the page marked
25 SAB0880.

Page 43

1    A   Okay, I think I'm there.
2    Q   Okay.  And the top, it's kind of slanted, but
3  it has the title in the center, Cost of Goods Sold -
4  Other Costs?
5    A   Okay.
6    Q   And there's Statement, and then there's no
7  number there.
8       But if you look below, there's Statement 5,
9  Statement 6, Statement 7?
10      And on the --
11   A   Yes, I see that.
12   Q   -- previous page there's a Statement 3?
13   A   Yeah, must -- must be Statement 4.
14   Q   Is it Statement 4 that's referred to --
15   A   Yes.
16   Q   -- that we saw on the other page?
17      And there's an item here, Operations and
18 Insurance Program Costs?
19   A   That's right.
20   Q   Do you believe that the number we saw from
21 the ledger, Insurance General, is reflected in that
22 number?
23   A   It should be, yes.
24   Q   Okay.
25      (2002 Individual Tax Return, is received and

Page 44

1  marked exhibit 16 by the court reporter.)
2  BY MR. MAY:
3    Q   Mr. Famiglio, I'm handing you what's been
4  marked exhibit 16.
5    A   Okay.
6    Q   And what is exhibit 16?
7    A   The tax return for 2002 for Brian C. James.
8    Q   And is it his personal return?
9    A   Personal return.
10   Q   Would you look to the second page of that?
11 It's marked, I believe, I.R.S. admin, five zeros, and a
12 number 7?
13   A   Yes.
14   Q   There's some signatures at the bottom?
15   A   That's correct.
16   Q   There's a line here, Preparer's Signature?
17   A   Yes.
18   Q   Whose signature is that?
19   A   Most likely mine.
20   Q   Okay.  Do you have any -- is it -- is it
21 yours?
22   A   I believe it is.
23   Q   Okay.
24   A   I sign a number of different ways, but it
25 looks like mine.

Page 45

1       I mean, I would -- I would normally sign
2  this.
3    Q   Okay.  And when your company prepares them, I
4  think you said earlier you usually sign the returns?
5    A   I usually sign the returns.
6    Q   That's your routine practice?
7    A   Absolutely.
8    Q   The signature for the taxpayer is just above
9  that, correct?
10   A   I assume so.
11   Q   At least the space there --
12   A   Yeah.
13   Q   -- is for the taxpayer --
14   A   Yes.
15   Q   -- to sign on?
16   A   Yes.
17   Q   Is that Brian James' signature?
18   A   I really don't know.
19   Q   Okay.  So you're not familiar with Dr. James'
20 signature?
21   A   Well, it's very rare for me to have the
22 client sign in front of me.
23      We just -- we give 'em the returns, they take
24 it home, and they do what they have to do with them.
25   Q   All right.  So you let them mail it in or do

Page 46

1  whatever?
2      A   A hundred percent of the time.
3      Q   Okay.  Because whose responsibility is it to
4  file the return?
5      A   Oh, the client's.
6          MR. JONES:  Objection.
7  BY MR. MAY:
8      Q   Do you have any doubt that this is a return
9  you prepared for Brian James in 2002?
10     A   I can't doubt -- it's obviously that return.
11 I don't have a doubt.
12     Q   Okay.  And we didn't look at every item in
13 the 1120.
14         But I understand Dr. James, as the owner of
15 the business that filed the 1120 for Brian C. James,
16 M.D., P.A., he has some obligation to report the income
17 from that business?
18     A   Absolutely.
19     Q   Where would that be on this Form 1040?
20     A   It would be on Schedule E, page 2.
21     Q   Okay.  And --
22     A   Your Form 12, our form -- our page 13 at the
23 bottom.
24     Q   Okay.  Okay.  The I.R.S. admin --
25     A   Yeah.

Page 47

1      Q   -- 012?  Okay.
2          And it's just -- does the computer just move
3  the numbers from one to the other?  I mean, does your
4  software do that?  Or does someone manually go through
5  and --
6      A   Well, it actually does.  We do -- we do have
7  that facility.
8          And then -- but it would -- it would move it
9  right in here.
10     Q   Okay.  So once the -- I mean, just kind of --
11 again, I'm sure this is all oversimplification.
12         But once the financial statements are
13 prepared, it's really basically just a simple matter of
14 software completing the 1120 and the 1040 from those
15 numbers?
16     A   Yeah, for the most part.
17         It doesn't really come from that.  It comes
18 from their books, their books and records.  But I mean,
19 it's supposed to be the same numbers as our -- as our
20 financial statement, but it comes from a trial balance.
21         I'm just being maybe overly technical.
22     Q   Sure, no, that's fine.  I appreciate that --
23     A   Yeah.
24     Q   -- because that's -- I'm not an accountant,
25 so --

Page 48

1      A   Yeah, I understand.
2      Q   -- I'm not sure exactly how that works.
3          Okay.  If you'll look in exhibit 16, turn
4  there to the page Schedule B.  It's I.R.S. admin 0009.
5      A   Okay.
6      Q   And what's reported on a Schedule B?
7      A   Interest and dividends.
8      Q   Okay.  And those represent forms of income to
9  the taxpayer, generally?
10     A   I'm sorry, I missed that.
11     Q   Interest and dividends are generally forms of
12 income --
13     A   Yes.
14     Q   -- to the taxpayers?
15         If you'll look at the bottom of the page,
16 there are these two lines, 7-A, 7-B, and 8.
17         Would you mind reading the line that's
18 marked -- that's line 8?
19     A   The one that's highlighted here?  Okay.
20     Q   Yes.
21     A   "During 2002, did you receive a distribution
22 from, or were you a grantor of, or transferor to, a
23 foreign trust?  If 'Yes,' you may be" -- "may have to
24 file Form 3520.  See page B-2."
25     Q   Okay.  So -- and there's a place at the end

Page 49

1  of that line marked "yes" or "no"?
2      A   It's marked "no."
3      Q   And it's marked "no."
4          So what is the meaning of that, the fact that
5  it's marked "no" at line 8?
6      A   That means the taxpayer is saying that during
7  that year, he didn't receive a distribution from a trust
8  or was a grantor of or transferred money to a trust and,
9  you know -- and that's pretty much it.
10     Q   Okay.  And I mean, are you aware now of
11 whether Dr. James had a foreign trust during the year
12 2002?
13     A   Only because, you know, you made me aware of
14 it, you know, for the most part, yeah.
15     Q   Okay.  So should that box have been checked
16 "yes"?
17     A   Oh, most likely, yes.
18     Q   Because he would have been -- he was at least
19 the grantor of a foreign trust during 2002?
20     A   It should have been marked "yes" if he was a
21 grantor of a trust.
22     Q   Okay.  And do you know why that box was
23 marked "no"?
24     A   Because we had -- we would have marked it
25 "yes" if we had any idea that the client had a foreign

Page 50

1    trust, or put money in a foreign trust.
2        I mean, it's marked "no" because that's what
3    it should be marked, "no," because to our knowledge there
4    was no foreign trust.
5        Q   Okay.  So --
6        A   He didn't have a foreign bank account, you
7    know.
8        Q   So when your firm prepared the Form 1040 with
9    the Schedule B, if your firm had known of the foreign
10   trust, you would have made sure the box --
11       A   Oh, absolutely.
12       Q   -- was checked "yes"?
13       A   Yes.
14       Q   So the fact that it's checked "no" means to
15   you, at least, that you didn't know of the trust?
16       A   Didn't know about it.
17       Q   Okay.  On the jurat, the signature part of
18   the Form 1040?
19       A   Yes, sir.
20       Q   The taxpayer affirms under penalty of perjury
21   that he has examined the return and the company's
22   schedules and statements, and that they're true and
23   correct?
24       A   That's correct.
25       Q   I know you testified you weren't sure if that

Page 51

1    was Dr. James' signature or not.
2        A   Well, I -- that was never signed in front of
3    me.
4            And I wouldn't --
5        Q   Okay.
6        A   -- most likely, if it happened to be, which
7    is extremely unlikely, I would not even have been there
8    to witness it and I wouldn't know it, you know.
9        Q   Right.  But the taxpayer signs under --
10       A   That's where they're supposed to sign.
11       Q   Right.  Okay.
12           (Financial Statements and General Ledger
13       dated December 31, 2003, are received and marked
14       exhibit 17 the court reporter.)
15   BY MR. MAY:
16       Q   All right.  Mr. Famiglio --
17       A   Yes.
18       Q   -- I'm handing you what's marked exhibit 17.
19   What is exhibit 17?
20       A   Financial statements for 2003.
21       Q   Okay.  Is this basically the same thing we
22   saw for 2001 --
23       A   Yes.
24       Q   -- and 2002?
25       A   Yes, sir.

Page 52

1        Q   And I'll direct your attention to the fifth
2    page of the general ledger.
3            It is SAB0955, Insurance - Malpractice.
4        A   Yes.
5        Q   And just below that is the Insurance -
6    General item, right?  That's similar to the other years?
7        A   Yes.
8        Q   Only I notice here in 2003 that that number
9    is much lower for the year; just a little more than
10   $2,000?
11       A   Yes.
12       Q   In the Insurance - Malpractice, the total for
13   the year is a little more than $320,000?
14       A   That's correct.
15       Q   Do you recall -- I think we looked at the
16   2002 malpractice number -- do you remember what that was?
17       A   600-something.  I'm not so sure.
18       Q   Okay.  Was the -- when we looked at 2002 --
19       A   Oh, no.  That was the malpractice.  I'm
20   thinking the other number, okay.
21           I don't recall.
22       Q   If I represented to you that it was
23   $93,940 --
24       A   Yes.
25       Q   -- does that sound right?

Page 53

1        A   That sounds right.
2        Q   Do you know why Dr. James' malpractice
3    insurance went up almost three times --
4        A   Well, I wouldn't --
5        Q   -- that year?
6        A   -- necessarily put much weight in the
7    difference between general and malpractice; because, see,
8    that comes from their coding of the bookkeeping system.
9    And the bookkeeper changed during those years.
10           And it's common for some things to be
11   classified differently, I don't want to say on a whim,
12   but it's -- these bookkeepers, you know, they put it --
13   they put it in the QuickBooks, whatever they're using
14   to -- you know, at the time.
15           One year it could be malpractice, the next
16   year it's general, so.
17       Q   Okay.
18       A   That's -- that's what happens.  It happens to
19   a lot of clients.
20           And sometimes, you know, they try to fix it,
21   sometimes.  Because it's deductible one way or the other.
22   So we really don't necessarily always care if it's
23   perfect like that.
24       Q   Okay.  At the end of the day, it doesn't
25   really matter?

Page 54

1    A   That's the point, yeah.
2    Q   I mean, if it's general, some general
3  business insurance, that would be deductible?
4    A   Yeah.  Sometimes these bookkeepers aren't
5  really -- you know, maybe they know, maybe they don't
6  know -- they put it in as, you know.
7        I've seen over the years different things in
8  different categories and -- you know, just because a
9  bookkeeper might think that's the way it's supposed to
10  go.
11       But it has no effect on the bottom line.
12   Q   Okay.  Okay.  Fair enough.
13       (2003 Corporate Tax Return, is received and
14  marked exhibit 18 by the court reporter.)
15  BY MR. MAY:
16   Q   Mr. Famiglio, I'm handing you what's marked
17  exhibit 18.
18       And do you recognize exhibit 18?
19   A   Yes.  It's the 2003 corporate return.
20   Q   Okay.  Now I'll turn your attention again to
21  the second page, the Cost of Goods.
22       And that refers us there to a "See Statement
23  4"?
24   A   Yes.
25   Q   And so I'll just kind of refer us back to the

Page 55

1  page that's marked SAB0903.  It's the page 8 of the
2  statements.
3    A   I'm sorry, I lost you.
4        I got it, I got it.
5    Q   You found Statement 4?
6    A   Yes, I got it.
7    Q   Okay.  And there's Malpractice and Protection
8  Costs?
9    A   Yes.
10   Q   320,178.13?
11   A   Right.
12   Q   Is that about what we saw in the financial
13  statement?
14   A   Pretty much, yes.
15   Q   And explain to me purpose of, you know,
16  why is this put in Cost of Goods Sold, and maybe not into
17  some other deduction --
18   A   Well, there's --
19   Q   -- category?
20   A   -- there's two -- you know, in general
21  methods -- I mean in general accounting principles,
22  there's two waves of thought.
23       See, cost of goods sold originally, you know,
24  was in the maybe traditional view was more so, you know,
25  purchases in an inventory situation and could be used for

Page 56

1  that.
2        But there's also types of businesses, like
3  construction and other types of businesses, where you
4  have some costs that are so strong and so large that it
5  becomes what we call a direct type of cost, or so -- you
6  know, you wouldn't put like auto expense up there.
7        But -- and like with a lot of physicians that
8  we do, if they have some heavy cost of maybe they share
9  professionals, so they, you know, maybe they'll pay fees
10  out to other medical doctors, that's not part of the
11  firm.  That we basically call coming off the top, you
12  know.  Mentally they like to think that way, so they see
13  their gross and then the hard costs, the heavy costs.
14       Sometimes, like malpractice because it's so
15  large, especially with OB/GYNs and pain management
16  people, it's huge, you know, and certain surgeons, it's
17  so heavy that mentally it just -- for reporting purposes
18  for them, they like to see it basically off the top,
19  'cause they want to know what's the bottom line after
20  their hard costs, the heavy costs.
21   Q   Okay.
22   A   They're usually larger numbers.
23   Q   Okay.  As far as the tax effect of putting
24  this here --
25   A   There's no difference, no.

Page 57

1    Q   No tax difference?
2        Does it -- I mean, I guess I'm trying to
3  understand then from a business perspective, what's the
4  -- what's the value of having it here as opposed to
5  somewhere else?
6    A   Mentally, the doctors like it per se.
7        But see, because they're usually costs that
8  are like -- you know, like an accounting firm, it could
9  be that, okay, we heavily used the computer to process --
10  like especially in the old days -- a lot of tax returns.
11  So we might have 40, $50,000 of computer processing
12  charges.  And we like to put it close to the gross,
13  because it's not an operate -- it's -- you know, it's
14  such a heavy cost that it's -- it's not a secretary, it's
15  not, you know, rent.  It's more like directly related.
16       This is a good term, directly related to the
17  source of the generation.
18   Q   Okay.  So it's really more of a philosophical
19  difference --
20   A   Well --
21   Q   -- than a practical one?
22   A   -- it's practical for them --
23   Q   Okay.
24   A   -- you know.
25       And I tend to be biased in that direction,

Page 58

1   too.  Some accountants are.  And some older type of
2   agents are.  You know, it's more of a direct cost type of
3   approach.  You know.  And it's basically optional.
4          There's no -- you could do whatever you wanna
5   do, pretty much.
6       Q   Okay.
7       A   But the lawyers -- no -- the doctors usually
8   drive that, because they like to have their statements a
9   certain way and to see certain hard costs, you know,
10   associated with the gross as opposed to, you know,
11   purely, you know, office expenses and things of that
12   nature.
13       Q   Okay.  Now, we've looked at the financial
14   statements for 2002 and 2003.  We've seen Dr. James'
15   corporate returns for 2002, 2003.
16          Is there any indication in any of those
17   documents that Dr. James owned a foreign trust?
18       A   None whatsoever.
19          (2003 Individual Tax Return, is received and
20          marked exhibit 19 by the court reporter.)
21   BY MR. MAY:
22       Q   Okay.  All right, Mr. Famiglio.  I'm going to
23   hand you what's marked exhibit 19.
24          And what is exhibit 19?
25       A   Exhibit 19 is the -- his personal return for

Page 59

1   2003.
2       Q   And by "his," you mean Dr. Brian --
3       A   Dr. --
4       Q   -- James?
5       A   -- James, yes.
6       Q   And again, I'll refer you to the second page
7   of the return.  It's marked I.R.S. admin zero zero zero
8   zero --
9       A   Yes.
10       Q   -- 32.
11          And is that your signature under the
12   Preparer's Signature?
13       A   Yes, it is.
14       Q   And there is a signature there for the
15   taxpayer.
16          Do you know if that's Dr. James'?
17       A   I'd have to assume that, because that's where
18   the taxpayer is supposed to sign.
19          But I can't tell you for sure.
20       Q   Okay.  And when a taxpayer signs a tax
21   return, a Form 1040 tax return in particular, they do so
22   declaring that it's true and accurate --
23       A   Yes.
24       Q   -- under penalty of perjury?
25       A   Yes.

Page 60

1       Q   I'll direct your attention again to the
2   Schedule B.
3          MR. JONES:  Mike, I'm just going to object.
4       We're not -- we're using a document we haven't
5       seen.  This is obviously the Service Center
6       document.
7          It has things that are altered from the
8       purported originally-filed return; numbers crossed
9       out, circled.
10          So I just want to make an objection.  This is
11       -- this has markings from the I.R.S. on it.
12          MR. MAY:  Okay.
13   BY MR. MAY:
14       Q   Mr. Famiglio?
15       A   Yes.
16       Q   Directing your attention to I.R.S. admin
17   00034?
18       A   Yes.
19       Q   And the line 8?
20       A   It's marked "No."
21       Q   Okay.  And is that line 8 the same as we saw
22   in the 2002 return?
23       A   Absolutely.
24       Q   And so again, is this -- I mean, the fact
25   that that's marked "No," is that an error?

Page 61

1       A   No.  No, it wouldn't be.
2       Q   Okay.  I mean, did -- okay.
3          Did Dr. James have a foreign trust in the
4   year 2003?
5       A   Not that I knew of, not that --
6       Q   Okay.
7       A   -- we knew of as a firm.
8       Q   Okay.  But -- and I'll represent to you that,
9   in fact, Dr. James did have a trust in 2003.
10       A   Right.
11       Q   Should he have checked that box "Yes"?
12       A   He should have -- if he had a foreign trust,
13   he should have said "Yes."
14       Q   Okay.  And does line 8 -- the last sentence
15   of line 8, "If 'Yes,' you may have to file Form 3520."
16          Is that the Form 3520 we referred to earlier?
17       A   I believe so, yes.
18       Q   Okay.  And when your firm was preparing --
19   and your firm did prepare this --
20       A   Yes.
21       Q   -- return, correct?
22          When your firm was preparing this return, if
23   you had known of the existence of Dr. James' trust, how
24   would that box on line 8 have been checked?
25       A   That would have been checked "Yes."

Page 62

1    Q   Okay.
2    A   And we also would have figured out there
3  could have been some income from that trust from interest
4  income or dividends that would probably also be on
5  Schedule B, if we did know about it.
6    Q   Okay.
7    A   If there was money in there.
8    Q   Mr. Famiglio, I'm handing you what's marked
9  exhibit 10.  It's been previously marked.
10        Do you know what exhibit 10 is?
11    A   Well, it's a Form 3520-A and the annual
12  information return for a foreign trust with a U.S. owner.
13    Q   Okay.  And for what foreign trust?
14    A   It says here the Hornsby trust.
15    Q   And does this return identify who the owner
16  of the Hornsby trust is?
17    A   Let me check, take a look.  Give me a second
18  on this.
19        Brian Chivas James.
20    Q   Okay.  So as you understand it, is exhibit 10
21  the Form 3520-A for Brian Chivas James' foreign trust?
22    A   Yes.
23    Q   For the year 2003?
24    A   Yes, for the Hornsby trust.  Yes.
25    Q   Okay.  I'll direct your attention in

Page 63

1  particular to the second page of the Form 3520-A.  It's
2  marked OTS - James, some zeros, and 60?
3    A   Right.
4    Q   And the top half of this page is the Foreign
5  Trust Income Statement?
6    A   That's correct.
7    Q   And on line 17 of the Foreign Trust Income
8  Statement, what is line 17?
9    A   It shows 50,025.
10    Q   And what does that 50,025 represent?
11    A   It shows -- that's on line 17 -- it's the
12  fair market value total distributions from the trust to
13  persons, whether U.S. or foreign.
14        And so it's distributions, evidently, that
15  Brian James took out of the trust.
16        For that year.
17    Q   Now, you've testified you've never seen this
18  document.
19        Is that correct?
20    A   Never seen it at all.
21    Q   And so -- and we've kind of belabored the
22  point.
23        But Mr. -- Dr. James did not provide you with
24  this document when you were preparing his 2003 returns,
25  the other returns, the 1120 and the 1040?

Page 64

1    A   Absolutely not.
2    Q   If you had seen -- if you had seen this
3  return when you were preparing his Form 1040 return, what
4  would you have done about the $50,025 distribution?
5    A   Well, the distribution in itself, by itself,
6  doesn't make it taxable.
7        But I would look over to the grantor trust
8  owner's statement, which shows the same figure.  Those
9  figures, we would have put the 50,061 on his return,
10  personal returns; and also taken a deduction for the
11  trustees and advisor fees of $13,207.
12    Q   And where on the 1040 would those have been
13  reflected?
14    A   Well, this says Annuity Income.
15        I'll assume that number is correct for a
16  second.  Because just monies taken from a normal annuity
17  is not all taxable.  It could be, but most of the time
18  you have a return of capital.  That's another issue.
19  Let's not -- so let's assume -- I'll assume that the
20  50,000 is pure profit.
21    Q   Okay.
22    A   Okay?  From the -- I use that term loosely --
23  from the annuity.
24        If that's the case, it probably should go on
25  the return like a 1099R, which is a retirement statement,

Page 65

1  you know, 1099 from annuity or a pension as that type --
2  as annuity income.
3    Q   Okay.  At a minimum, is it fair to say you
4  would have investigated this further to figure out what
5  category this was?
6    A   Oh, absolutely.
7    Q   So --
8    A   Especially this one statement.
9        Because this foreign grantor trust statement
10  would be -- would be like a -- it's not a 1099, but it's
11  like, you know, a source document; say "Hey, you got some
12  income, we gotta put it on your return."
13    Q   Okay.  And, in fact, is the owner of the
14  trust required to attach this page 3, the grantor trust
15  owner's statement, to his Form 3520?
16    A   It might -- it might be.
17        But in any case.  Normally it would be nice,
18  too.  But you're supposed to do it.  But the most
19  important thing is for that number to be reported.
20    Q   Okay.
21    A   You know.
22    Q   And it may or may not be taxable?
23    A   It might -- well, we don't -- I don't really
24  know.
25        I mean, if this came to me, I'd say the 50 --

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 66

1  because this says annuity. If it said interest income or
2  dividends, okay, I would know -- you know, I would say it
3  would be all taxable.
4        But annuity income, sometimes, you know,
5  in the -- if we got a 1099R from like Sun Life or
6  Allstate or some other, State Farm or some annuity
7  company, it would say, okay, gross distribution, 70,000,
8  taxable 50.
9        Because there might be a return of capital.
10     Q   Okay.
11     A   So just saying annuity income, I can't really
12  determine whether the 50 should be -- if I had no other
13  evidence and I was preparing this return, I probably
14  would err on the side of caution -- especially that it's
15  a foreign trust -- I would probably put the $50,000 down.
16     Q   You mean report it as --
17     A   Yeah.
18     Q   -- income?
19     A   That's what I would -- that's a judgment call
20  inside, though.
21     Q   Okay.
22     A   Unless -- if I couldn't get anything else.
23     Q   Okay.
24     A   But, see, the person preparing this return
25  should have, if 50,000 wasn't taxable, completely, should

Page 67

1  have just maybe put a different percentage. But, see,
2  distribution was 50,000, yet taxable was exactly the
3  same.
4        So, you know, maybe just -- maybe it is all
5  taxable, it's just a profit portion taken out. But we
6  really -- you really don't know.
7     Q   Okay. Do you think there's any significance
8  in the difference between $50,025 and $50,061?
9     A   Oh, no. Not at all.
10     Q   Okay.
11     A   The reason -- well, there's also, see, fees
12  that came out of it of 13,207. That's what makes me, you
13  know, wonder, did the fees come out of the annuity or did
14  it come out of a checking account?
15        I mean, obviously, you know, we don't know.
16        But if it came out of the annuity, it would
17  be difficult for me -- I guess they could do that, if
18  it's a foreign annuity, you would think that maybe the
19  whole thing would be taxable.
20     Q   Okay. I'm going to refer you back to, it was
21  exhibit 17, the financial statement for 2003. I think
22  it's right here.
23        And back to -- if you remember, we were
24  looking at the insurance malpractice category --
25     A   Right.

Page 68

1     Q   -- in the general ledger, which is SAB0955.
2     A   Yes.
3     Q   And there's a line there, I think it's dated
4  December 25, 2003?
5     A   Yes.
6     Q   "Outgoing Fed Wire DR TRN"?
7     A   Right.
8     Q   Is that a wire transfer?
9     A   It looks like it is.
10     Q   And of $150,000?
11     A   Yes.
12     Q   How many -- how many of your clients are
13  doctors?
14     A   A hundred and some.
15     Q   Okay. How many of them pay their malpractice
16  insurance by wire transfer?
17     A   Some could.
18     Q   Okay. Some do?
19     A   I would -- I would not know per se, 'cause I
20  don't look at that kind of stuff. I mean, that's detail
21  stuff that would be in their office.
22        But there are a lot of people that do wire
23  transfers for many different purposes.
24     Q   Okay. Okay.
25        And have you ever spoken to a Joshua

Page 69

1  Crithfield?
2     A   Don't even know who he is.
3     Q   Okay. And how about a Duane Crithfield?
4     A   Never heard of him.
5     Q   How about Christopher Donaldson?
6     A   No.
7     Q   Okay.
8        MR. MAY: I'm going to pass you over to these
9  guys. I think they have some questions for you.
10        I may have some other questions --
11        THE WITNESS: Okay.
12        MR. MAY: -- after they've done.
13        THE WITNESS: Okay.
14        (Recess taken.)
15        MR. JONES: Okay. Are we back on the
16  record?
17        THE REPORTER: Yes.
18        MR. JONES: Thank you.
19        CROSS-EXAMINATION
20  BY MR. JONES:
21     Q   Good afternoon again, Mr. Famiglio. And
22  again, my name is Ken Jones with Sutherland, Asbill,
23  Brennan in Washington, D.C., representing Dr. James.
24        And I have a couple of questions here. We
25  may go back over some of the exhibits. And I won't

Page 70

```
 1   promise that I'll move it in an orderly fashion, but I'll
 2   try to.
 3          Near the very end, right before we took a
 4   break, you said you -- and I want to make sure I
 5   understood -- you said you have roughly 150 doctors who
 6   are clients?
 7      A   There's over a hundred medical people;
 8   nurses, veterinarians, chiros, dentists, you know, lab
 9   technicians.
10          We just -- we do a lot.  In this area, you
11   normally do.
12      Q   Okay.  And how many clients would you have --
13   say today, for example -- in total where you're doing tax
14   compliance or tax return preparation?
15      A   Okay.  Would that be pertinent to this?
16      Q   Well, if you'd rather, I'll ask how many you
17   had in -- during the years at issue?
18      A   No, I'll tell you.  I just don't know, I
19   mean, it's like personal information.
20          We probably have, you know, well over a
21   thousand.
22      Q   Would that have been true during the years --
23      A   Oh --
24      Q   -- that are relevant to this case?
25      A   -- most likely, yes.
```

Page 71

```
 1      Q   And I think you indicated -- I was trying to
 2   take notes -- that for many of the returns -- I don't
 3   want to put words in your mouth -- but that you would
 4   give the return a quick look, but the staff actually
 5   prepared the return?
 6      A   Well, the staff would prepare the input, and
 7   then I would go over the return.
 8      Q   Okay.  Do you specifically recall preparing
 9   the tax returns for Dr. James?
10      A   Well, I would do a pretty intensive review of
11   his personals, definitely.
12      Q   So you specifically recall reviewing his
13   returns back in 2001?
14      A   I would have --
15      Q   -- 2 and 3?
16      A   -- it was our policy a hundred percent of the
17   time.
18      Q   Okay.  Okay.  Well, let's talk about policy
19   here at your firm.
20          Mr. May asked you questions about Schedule B,
21   and specifically part 3, with the answers to the
22   questions about offshore accounts "Yes" and "No."
23          How do you typically capture that
24   information?
25      A   Well --
```

Page 72

```
 1      Q   For a hypothetical client who would come in
 2   and wants you to prepare their tax return?
 3      A   Well, a hypothetical and typical client would
 4   not have a foreign trust.
 5      Q   Well --
 6      A   So the answer would be "No" like 99.9 percent
 7   of the time.
 8      Q   So you assume the answer is "No" 99 --
 9      A   Well, we don't --
10      Q   -- percent of the time?
11      A   -- we don't assume.  We look at the work they
12   give us.
13      Q   Do you provide the client with any kind of a
14   checklist or --
15      A   Yes.  Yes, we do.
16      Q   -- or an organizer?
17      A   An organizer.
18      Q   And would that organizer ask the question --
19      A   Yes, it does.
20      Q   Did that organizer in those years ask whether
21   there was an offshore account?
22      A   I believe it did.
23      Q   Okay.  And I believe you've indicated to Mr.
24   May and to me -- I think you did to me in a voicemail, to
25   Mr. May in response to a subpoena -- that you have no
```

Page 73

```
 1   documents relevant --
 2      A   Yes --
 3      Q   -- to these years?
 4      A   -- that's true.
 5      Q   What is your general recordkeeping practice
 6   in terms of -- again, we're talking about tax compliance
 7   work.
 8      A   Okay.
 9      Q   Tax returns.
10      A   Well, generally as you probably know, you
11   know, there's a statute of limitations, three.  So we
12   usually save four years, five years sometimes.
13          But we have a different role when a client is
14   no longer our client.  We do get rid of their work right
15   away.  Now, does that mean the first year they leave, no.
16   Usually after three years.
17          There are some clients that are currently our
18   clients here that I might have their tax return back
19   five, six years.  There -- you know, there might be a
20   real estate client with a lot of depreciation schedules
21   or, you know, clients that are maybe more involved, that
22   I need to have some permanent records.  We would keep
23   that.  But they're current clients.
24          Now, a client that we do a 1040 for that is,
25   you know, a husband and wife, might have some stocks,
```

Page 74

```
 1   might have some interest and CDs, that type of thing,
 2   maybe buy and sells -- you know, a small type of client,
 3   but not tiny -- we probably would start getting, thinning
 4   out the file, you know, after three years.
 5        Q   And would you have an ethical obligation in
 6   that situation to return work papers or documents to the
 7   client?
 8        A   No.
 9        Q   No obligation?
10        A   Because we have a policy that they get
11   everything originally.
12            We -- we give -- whatever we have, we give
13   back -- we give 99 -- I never say a hundred -- but let's
14   say we give 99 percent back.  We don't like to keep
15   original stuff.  So if we photocopy something, we're not
16   gonna have to return that.
17            I'm talkin' about like original sheets of
18   entry, like 1098s, like mortgage interest statements or
19   real estate taxes.  We do not want to keep that.
20        Q   So again -- so if the client, you parted
21   ways -- whether the client terminated you or you
22   terminated the client -- on average, how long would you
23   keep the documents?
24        A   Probably three years after that.
25        Q   Okay.  Do you recall if you gave Dr. James
```

Page 75

```
 1   back any documents when you parted ways?
 2        A   I'm positive we didn't --
 3        Q   Didn't?
 4        A   -- at that time, because we have a policy of
 5   giving all the documents back at the time of service.
 6        Q   I see.
 7        A   That's what I was trying to explain before.
 8        Q   Okay.
 9        A   So whatever he would need, he would already
10   have.
11        Q   And so if -- I think you indicated -- well,
12   I'm not going to put words in your mouth.
13            You learned at some point in roughly 2005
14   that Dr. James had been contacted by the I.R.S., I
15   believe you said?
16        A   I do.  I have a recollection of that.
17        Q   Do you recall --
18        A   Not strong.  Not strong --
19        Q   I understand.
20        A   -- my recollection.
21        Q   Do you recall he -- do you recall whether he
22   contacted you?
23        A   Oh, he contacted us.
24        Q   Okay.  So you say "he contacted you," a
25   revenue agent --
```

Page 76

```
 1        A   Oh, no.
 2        Q   -- may have contacted you?
 3        A   A revenue agent contacted us maybe about, I'd
 4   say two, three years -- three years ago, maybe.
 5            And I'm really guessing.  I don't --
 6        Q   I understand.
 7        A   -- I have no records of, you know, that.
 8        Q   So in 2005, Dr. James contacted you about the
 9   penalty.
10            And I believe you said he hired William
11   Simon?
12        A   Right.
13        Q   To represent him?
14        A   That does come back to me.
15        Q   Okay.  And --
16        A   And I have no idea whether he did or not,
17   because he was just calling me up to see what, you know,
18   "What do you think" -- what I thought this was.
19            But he didn't give me enough paperwork.
20   That's the problem.  So I was kind of, you know, out of
21   the loop.
22        Q   And so in 2005, Dr. James contacted you about
23   the penalty, but decided not to retain you to assist him?
24        A   Yeah.  Just basically never told us "no;"
25   just never hired us.
```

Page 77

```
 1        Q   And so is it at that point that your
 2   relationship --
 3        A   Oh, no.  That was -- that was after our
 4   relationship terminated.
 5            'Cause he got another partner, and they went
 6   to the other partner's accountant.
 7        Q   And -- and I want to move to that point and
 8   clarify.
 9            Was that approximately, this was the year
10   prior, or months prior to this?  Or do you recall?
11        A   No.  It would have to be -- the last year we
12   did was '03.
13        Q   Right.
14        A   It would have to be '04.
15        Q   And sometime after that --
16        A   Yes.
17        Q   -- return was filed?
18        A   Yes.
19        Q   Okay.  And so you became aware that he had a
20   problem with the I.R.S.
21            Did you feel you were at that point under any
22   ethical obligation to keep your documents and your own
23   internal work papers?
24        A   The I.R.S. problem was, it was just like he
25   got a letter, so he had to file something.
```

Page 78

1    See, since I wasn't involved -- oh, we did
2  keep it back then.  But after he did leave, probably at
3  2006, 7 or sometime thereafter, we got -- we got rid of
4  them.  And this is common policy for all our clients.
5    I mean, we were up -- up until about two
6  years ago plus or minus, we used to have, on December 31,
7  we used to close down for that day, order a Dumpster, and
8  clean the whole office.  Because we figured our staff
9  wasn't gonna be workin' that day anyway.  So we'd
10  actually throw out monitors, we'd throw out old chairs,
11  and we'd go through all the files.  We had the whole team
12  come in here and do it.
13    And so this was common up until a few years
14  ago.  Now we don't do that anymore.
15    Q    At some point roughly in May of 2005, you met
16  with a representative from Bill Simon's office, Eric
17  Schmitz?
18    A    I have no recollection of that whatsoever.
19    Q    So you have no recollection of either meeting
20  or talking to Eric Schmitz?
21    A    No, not at all.  Don't even remember the
22  name.
23    Q    From Bill Simon's office?
24    A    Yes.
25    Q    Just for the record.

Page 79

1    Okay.  But nonetheless, in 2005 you knew
2  there was something going on with Dr. James and the
3  I.R.S.?
4    A    Yeah, 'cause he told me earlier, you know, I
5  guess, you know, that he got some kind of correspondence.
6  I don't know if it was an audit.  I don't know if it was,
7  you know, misfiled, not filing something or something or
8  one of the returns, you know, didn't he not -- you know,
9  sometimes clients will forget a bank account or they'll
10  forget a brokerage statement.
11    It's more common than you think.  And all of
12  a sudden they get a CP 2000 that says "Hey, you didn't
13  report your UBS account" or "You didn't report your Bank
14  of America account" or "Merrill Lynch" or something.
15    Q    Uh-huh.  So let me ask you a hypothetical,
16  then.
17    If Dr. James --
18    MR. MAY:  I'm going to object to the form.
19  BY MR. JONES:
20    Q    If Dr. -- well, I'm trying to understand your
21  business practices.
22    If a client contacted you and said, in 2005,
23  "The I.R.S. has selected my 2001 return for audit,"
24  regardless of whether that client was going to have you
25  assist them or somebody else, would you feel you would

Page 80

1  have some duty to preserve the documents in your
2  possession?
3    A    Well, if they were in my possession, yes.
4    But we have a policy of giving everything
5  back purposely.
6    Q    And how would you -- okay.  And this -- and
7  let's talk about that policy.
8    Is that policy documented, for example, in an
9  engagement letter with the client?
10    A    As a matter of fact, every letter that goes
11  with the return states it, yes.
12    Q    Okay.
13    A    It's actually preprogrammed in that letter
14  that goes back with the returns, "Please keep these."
15  You know, "We're returning all the records."
16    I mean, that's like for a thousand-plus
17  clients, like, you know.
18    Q    And these sort of records would include
19  things like 1099s, for example, that the client --
20    A    Whatever we have.
21    Q    Whatever --
22    A    And there's a -- there's a major, major,
23  major practical reason for it.
24    We don't want, 'cause we don't have the
25  space.  So if we give them back, okay -- and that's their

Page 81

1  records anyway.
2    We're not -- we don't, you know, we don't
3  keep their statement, their bank statements or their ---
4  at the end.  We don't want 'em.
5    Q    Do you ever scan any of their documents?
6    A    Well, now, today, we do.  But not back then,
7  because we weren't into scanning back then.  We'd
8  photocopy back then.
9    But -- we did have -- we usually keep copies
10  of those type of documents.  That's why we give 'em back
11  the originals.  We don't want to hold originals.
12    So if we had like a typical mortgage interest
13  statement or a real estate tax statement or a statement
14  of charities or whatever -- see, most of the time they
15  actually fill out the organizers, you know.  And we push
16  really hard over the years to have them fill out the
17  organizers.
18    So usually with real estate taxes, we might
19  not even get documents.  And we purposely discourage
20  that, because we want to keep less in our files, you
21  know.
22    These are just typical documents that any
23  individual that filed taxes, you know, usually, you know,
24  have.
25    Q    And so today, you say you might scan a lot of

Page 82

1 those documents that the client provided to you, and you
2 would keep an --
3     A   Within reason.
4     Q   -- electronic copy?
5         But during those years you didn't, for
6 example, photocopy the documents?
7     A   We did a lot of photocopying when it was
8 necessary.
9         But one thing we just don't do, if they fill
10 out the organizer and they put a whole list of medical,
11 most of the time it's not deductible anyway.
12        Some of our clients -- unfortunately, this is
13 part of our practice, this is something that's -- you
14 know, we joke about at the time -- they'll give us all
15 the prescriptions.
16        I don't want a stack of prescriptions.  I'm
17 not gonna go through those prescriptions and add 'em up.
18 They're supposed to do that.  They put it in the
19 organizer.
20        And what happens is, our front -- our front
21 staff basically, when something comes in and if an
22 organizer is not really filled out appropriately, they'll
23 probably call and probably send it back or send them
24 another copy and say, "Please do us a favor."
25        They do it with PR and kindness, of course.

Page 83

1 And they'll ask 'em to fill it out.
2         So we're pretty tough on that.
3     Q   Okay.  But you have no records pertaining to
4 Dr. James for any of these years?
5     A   No.  It's gone.
6     Q   Bear with me for a moment.  Looks like I
7 grabbed the wrong number here.  Oh.
8         Earlier this afternoon, Mr. May showed you
9 exhibit 14.  It's the Brian James financial statements
10 and general ledger.
11    A   Yes.
12    Q   Do you have that exhibit in front of you?
13 Exhibit 14?
14    A   We could.
15    Q   If you would, please.
16    A   Let's see if we can find it.
17        Okay.  Yes, I have it.
18    Q   And if you would turn to page -- the bottom
19 right side -- SAB0939.
20    A   Okay.
21    Q   And I believe you said that this -- these
22 statements were prepared by you or someone under your
23 direction at your firm?
24    A   Some -- well, these per se -- what happened
25 is that the client would furnish their QuickBooks to us.

Page 84

1 We would put the QuickBooks in our computer.
2         Now, I never did one -- I don't do this at
3 all.  I've done this zero amount of times, okay?  And the
4 -- we'd either have the QuickBooks and we'd work off of
5 QuickBooks and they would be -- we'd -- basically our
6 computer would take that, and they would be automatically
7 entered into this program.
8     Q   Okay.
9     A   So this is, in effect, like a QuickBooks
10 wannabe.
11    Q   Okay.  And you said, then, this information
12 as relevant would be used if -- might be used if you were
13 preparing the tax return?
14    A   Yeah, most likely.
15    Q   Okay.  If you look down -- and I think Mr.
16 May may have asked you about this entry or related
17 entries under 545.1 --
18    A   Yes.
19    Q   -- insurance.  And you see the last entry
20 there, it says Trustee Multiprotection.
21        Would that suggest to you that Dr. James or
22 his office or something might have had a trust?
23    A   Not necessarily.
24    Q   So you don't think the fact that the word
25 "trustee" is there should have raised an issue where you

Page 85

1 had -- you should have performed some additional due
2 diligence?
3     A   No.
4     Q   Is it possible that someone on your staff saw
5 that and saw the word "trustee," but they made the
6 determination no more due diligence was necessary?
7     A   This came from their QuickBooks.
8     Q   I understand where it came from.  I'm just
9 asking if the word "trustee" --
10    A   I don't see -- you know, I don't see why we
11 would have to do that.
12        You know, if there's -- there's all kinds of
13 trustee terminology in insurance all the time.  It's
14 actually a common term.  Sometimes checks are made out --
15 I know the AICPA has insurance, we make it out to the AIP
16 trust services or whatever, you know, for personal
17 umbrella.
18        We have all kinds of stuff like that.  I
19 mean, you know, it's done -- it's done a lot.
20    Q   On your Web page for your firm, it indicates
21 one of the many services that you provide is asset
22 protection and privacy management.
23    A   That's right.
24    Q   And I'll just quote from that Web page.
25        It says, "We have been advising our clients

Page 86

1  how to diversify and protect their assets for years"?
2      A   That's correct.
3      Q   Would that advice ever -- would you ever give
4  advice with respect to establishing a trust?
5      A   Most CPAs in my practice would do that,
6  because there's revocable trusts, of course.
7      Q   Right.  And have you been -- so have you been
8  involved with setting up trusts or working with a client
9  who's setting up a trust?
10     A   Usually with their attorney, you know, for
11 estate planning purposes.
12     Q   And do you know if any of these, any of the
13 trusts you've been involved with, are offshore trusts?
14     A   Actually, extremely few of 'em.
15         Maybe I've had -- I've been experienced maybe
16 with three, at the maximum.
17     Q   You set up trusts, for example, for doctors?
18     A   I don't set up the trust.
19     Q   I'm sorry.  You provided whatever service you
20 provided in connection with doctors who were setting up
21 trusts?
22     A   Well, what typically will happen is, okay, a
23 doctor might want to do some estate planning.  And
24 they'll have their attorney group or attorney in town or
25 wherever.  And we might have a, you know, half-an-hour

Page 87

1  conversation.  And, you know, and that's -- that happens,
2  I don't want to say a lot, but on a semi-regular basis.
3         I mean, it's part of our, the practice from
4  time to time.  You know.  We'd like to make sure that
5  they have a revocable trust.  So if somebody asks me
6  "Should I have a revocable trust," 90 percent of the time
7  I say "Yes."
8      Q   So you -- again, I'm going to be conscious --
9  I don't want to put words in your mouth.  I really don't.
10         So you said earlier you've done two or three
11 -- I forget the exact number -- 3520 forms --
12     A   Yes.
13     Q   -- that you took care of?
14         And would those be in connection with some of
15 your clients who had set up trusts?
16     A   Well, yeah.
17         Well, they wouldn't have done it.  Their
18 attorney would have done it.
19     Q   Right, okay.
20         And do you know -- and so you know that some
21 of those trusts must be offshore trusts?
22     A   Well, in this case -- in those cases, they'd
23 have to be; because you'd only file a 3520 with that.
24     Q   Do any of your doctor clients have offshore
25 trusts?

Page 88

1      A   None, zero.
2      Q   For example, the Michael M-o-l-l-o-d trust is
3  not an offshore trust?
4          MR. MAY:  Objection.  Foundation.
5      A   That's definitely not an offshore trust.
6          May I ask where you got that information?
7  Because that's one of my clients.
8  BY MR. JONES:
9      Q   The Internet.
10     A   Okay.  Then that's okay.
11     Q   Well, then, is it possible, back in
12 2000/2001 -- the time frame that Mr. May first talked
13 about at the beginning of the deposition -- you were
14 unaware of Form 3520?
15     A   Well, I was -- I always try to get what
16 business I can; because I, you know, I had some
17 schooling, et cetera, et cetera.  I'd be aware of it.
18         But I wasn't doing the 3520s back then.
19         I'd like to.
20     Q   And I saw on your website you also provide
21 advice to clients about record retention?
22         MR. MAY:  Objection.  Foundation.
23     A   Well, that's probably a hundred percent of
24 all CPAs do that.
25 BY MR. JONES:

Page 89

1      Q   So you have provided advice to clients
2  about --
3      A   Well, we have some --
4      Q   -- record retention?
5      A   -- we have a form that says -- you know,
6  there's a list that say "Okay, keep these, you know,
7  three years, four years."  It's something we copied from,
8  you know, a seminar or whatever, yes.
9          So I personally have never gave advice myself
10 from my mouth to them.  It's either on our website, or we
11 have a form that some of the staff have handed out when
12 they asked for it.
13     Q   Okay.  Today, based on what you've just said,
14 if a client had a dispute with you about whether income
15 had been reported, and it came down to a dispute over
16 whether they gave you a 1099 or not, a particular 1099,
17 you would have a scanned copy today.
18         In the event of a controversy between you and
19 that client, you could say "Look, I don't have that 1099,
20 it's not in my records"?
21         MR. MAY:  Objection to form.
22     A   I'd like to say yes and no, because I'm
23 confused by your question.
24 BY MR. JONES:
25     Q   Well, a client -- you have a client today

BayAreaReporting@gmail.com,   www.bar-tampa.com                         866-240-9500

Page 90

1    that has a dispute with you.
2        The client says "I told you -- I gave you a
3    1099 that showed this income"?
4        A    Yes.
5        Q    You would be able today to look at your
6    records and say "No, you didn't" because you've scanned
7    them, I think you just said that that --
8        A    Most likely, yes.
9        MR. MAY:  Objection to form.
10   BY MR. JONES:
11       Q    So most likely, yes?
12       A    Yes.
13       Yes.  I personally never scanned one document
14   in my life.
15       Q    But if that happened --
16       A    The staff does.
17       Q    -- if that happened back in the time frame of
18   2000, 2001, 2002, 2003 --
19       A    Right.
20       Q    -- you would have no record for any of your
21   clients?
22       A    No, we would have some records.
23       Q    Oh, you do have other records?
24       A    I'm projecting myself back in that time zone.
25   As of today, I probably won't.

Page 91

1        Q    Right.  But if the client showed up, say, in
2    2005 and said "I have a dispute with the I.R.S. and, Mr.
3    Famiglio, you didn't report my $100,000 on this 1099,"
4    you wouldn't have any evidence?
5        A    In 2003, as long as it was within the prior
6    three years, we most likely would.
7        Q    I thought you told me before, when you
8    completed the return, you gave the information back to
9    the taxpayer?
10       A    Right.
11       But we also photocopied, strong -- like I was
12   saying before, like we're not gonna photocopy the
13   prescription bills.
14       But if, in your example, if there's $100,000
15   of interest, you bet we would have that.
16       Now, if there was interest from Barnett Bank
17   or -- back then -- or Bank of America or whatever for 10
18   dollars, I might not have that.  Because the girls that
19   do it, you know, some small stuff, it really makes no
20   difference, they might not copy; because we have it
21   written in the organizer.
22       See, most clients will take that, where it
23   says interest income, and it'll be preprinted with the
24   accounts that they have from the last year.  And we like
25   that, so we -- that's like a checklist so we don't miss

Page 92

1    anything.
2        So that's where the controls and the balances
3    come from.  And they'll fill in $10.50 or $1,053, they'll
4    fill that in.
5        Q    I think, as you testified much earlier this
6    afternoon, in addition to preparing Dr. James' personal
7    tax returns, the Form 1040, you also prepared the income
8    tax returns for his corporation?
9        A    That's correct.
10       Q    And in doing that, you would primarily rely
11   upon -- would you primarily rely upon these financial
12   statements?
13       Or are there other things you relied upon?
14       A    Well, the -- the tax return doesn't come from
15   those exact financial statements that you have in your
16   hand.
17       Q    Okay.  Where would they --
18       A    Come from -- come from maybe a trial balance,
19   you know, or the -- the trial balance, it's a summary
20   type of figures, you know, that aren't balanced.
21       Q    And that would be provided to you by Dr.
22   James?
23       A    No, no.  That would be -- yes and no.  Yes
24   and no.
25       See, because we'd get a QuickBooks.  See, the

Page 93

1    trial balance is a summary, is a very simple summary of a
2    general ledger.  Okay?  That would move into our system.
3    We would take their software that they would give us.  It
4    would go into our computer.
5        Our computer would in a sense eat it up,
6    basically.  It would transfer into a format like -- like
7    that.  So basically, that's what a compilation is.
8        We're taking their records and compiling them
9    into a format that balances to make sure that, you know,
10   that nothing's spelled wrong or nothing's in the right
11   category in terms of the balance sheet.
12       Like something current versus long-term, that
13   type of thing.
14       Q    And so -- and that would be done primarily by
15   your staff people, the people working in your office?
16       A    My staff and whoever the office manager over
17   there is.
18       It's a combination.
19       Q    And how much due diligence would they
20   normally do in terms of looking at the client's books and
21   records?
22       A    It depends upon the engagement.
23       Q    Okay.  Well, on an engagement such as the one
24   that Dr. James had engaged you, to prepare these
25   financial statements and the general ledger, how much

Page 94

1   detail would they look at?
2       A   Well, this is what we -- this is what our
3   main checklist has.
4           We want to make sure, number one, that the
5   cash is in balance.  Okay?  And that's basically like --
6   that's like the golden rule.  You have to make sure that
7   we have a cash reconciliation.
8           I mean, this is basically like any I.R.S.
9   agent would do, too.  I mean, this is kind of common.
10  You do that.
11          If they have loans, we want to make sure that
12  the balance is right.  So we look at the balance sheet.
13  And the balance sheet is a list of assets and
14  liabilities.
15          And we say, "Is cash correct?  Is property
16  and plant and equipment correct?  Is other assets like
17  intangible correct?"  Okay.
18          There's a balance with the schedules.  "Is
19  the loans correct?  Is the American Express statement
20  that says the company owns $5,000, have we checked on
21  that?"
22          Now, there -- this is optional, but we do
23  that all the time.  And a lot of CPAs will do that.
24          And so with the balance sheet, when
25  everything's in balance, the reason it's called a balance

Page 95

1   sheet, because it balances.  And if we know the balances
2   are in balance, that gives us a lot of assurance.
3           And that's basically what we're looking for
4   and checking.
5       Q   And so in analyzing -- you indicated, for
6   example, you'd analyze the cash; outflow/inflow of cash?
7       A   Yeah, for the most part.
8           We want to make sure all the deposits are
9   credited.
10      Q   And so you would look at the appropriate
11  places in their books and records.
12          And would you then actually total up "Here's
13  cash that went out, cash that came in"?
14          Or what would you do?
15      A   Well, we don't always do that.  Because we're
16  gonna ask them to provide us with the bank
17  reconciliation.  If they don't have one, we're gonna do
18  it.
19          See, we don't go past there unless we have a
20  bank reconciliation; whether the client does it or one of
21  my staff members does it.
22          Now, if my staff member does it, you know,
23  it's more time on our part.  But if they've done a good
24  job, we have good bookkeepers there.  You know, we have
25  somebody that does a cash rec, which most businesses do.

Page 96

1           And we know that if the tax return says, you
2   know, $30,452, the bank rec should say $30,452, roughly.
3   I mean, there's always rounding or -- you know, round
4   changes like a dollar or two or 10 or 20.  That's
5   different.  We don't care about that.
6       Q   Do you recall if you did this type of --
7       A   Well, I don't recall that --
8       Q   -- cash reconciliation --
9       A   -- because, you know, I haven't done one --
10          THE REPORTER:  I'm sorry, you were talking
11  over one another.
12          "Do you recall if you did this type of"?
13          MR. JONES:  Cash reconciliation for Dr.
14  James?
15      A   Well, I personally don't recall it, because I
16  haven't done a cash reconciliation in a number of years.
17          But my staff is required to do it.  That's
18  what I have them do.
19  BY MR. JONES:
20      Q   Okay.  So your staff would have done it in
21  the case of Dr. James?
22      A   Absolutely.
23          We wouldn't have done the return unless --
24  because this is -- I mean, this is -- this is par for the
25  course, in other words, for doing a tax return.

Page 97

1           There's -- the page 4 is a balance sheet.
2   And it's a balance sheet, because it balances.  So you
3   want to make sure cash is correct.  You want to make sure
4   that liabilities are correct.
5           Because, see, if you take a picture of the
6   balance sheet at the beginning of the year and at the end
7   of the year, that -- and the difference would denote the
8   changes.  And that's how a normal accountant will feel
9   really good about the return, because it's in balance.
10          You try to give an I.R.S. -- I shouldn't say
11  that.  I've seen a lot of returns sent to the I.R.S.
12  that's totally out of balance.  It's so obvious, and
13  they've never done anything about it.  But that's a pet
14  peeve of mine, but.
15          We -- out of maybe thousands of returns that
16  we've done, they're always in balance.  I'll say maybe
17  there might have been one, we might have had a computer
18  error in maybe one out of 5,000 possibly that was off a
19  dollar or two.
20          But the computer doesn't let you do that.  It
21  has to be in balance, or it won't print.
22      Q   As a part of this process of analyzing the
23  cash balance, would your staff people -- do you think
24  you'd have your staff people -- had they seen, for
25  example, money being wired to clearly a foreign entity,

Page 98

1    would they have had a responsibility to look further and
2    ask questions about that?
3         A    Well, they don't necessarily have to have a
4    total responsibility.  But we do that, absolutely.
5         I mean, if we saw something odd like that;
6    which we really don't care at all.
7         Q    So if there were, say, substantial sums of
8    money going from Dr. James' either his bank accounts or
9    on his books and records to clearly foreign entities,
10   that should have raised some red flag, shouldn't it have?
11        A    If we had those records, yeah.
12             But we might not have -- QuickBooks doesn't
13   have all that.  You won't have all the detail.  That's
14   inner office.
15        Q    And how many staff during those years did you
16   have -- well, we haven't defined "staff."  I'm sorry.
17             What do you mean by "staff," first of all?
18        A    Staff accountants.
19        Q    Staff accountant.  How many, roughly, did you
20   have in those years?
21        A    Five or six or seven.
22        Q    I believe Dr. James' returns, the ones that
23   Mr. May talked to you about earlier today, were all filed
24   on extension?
25        A    Yes.

Page 99

1         Q    Do you have any recollection as to why they
2    would be filed on extension?
3         A    Can we talk off the record?
4              Would that be appropriate?
5         Q    I --
6         A    You know, I don't want to be critical of Dr.
7    James.  But he --
8         Q    I want you to tell the truth.
9         A    Well, I'll tell you the truth.  It's very
10   simple.
11             When it comes to money matters, he was -- I
12   don't want to generalize, either, so let me try to think
13   how I can word this.
14             He was always late with everything.
15        Q    What percentage --
16        A    If you looked on all his returns, you'll see
17   that he owed money in September and October all the time.
18             Do you know, when you paid that much,
19   $100,000 all the time, the penalties involved there?  He
20   constantly would be paying penalties.  It was par for the
21   course with him.
22        Q    You're talking about late estimated tax
23   penalties?
24        A    Oh, absolutely.
25        Q    Okay.

Page 100

1         A    He wouldn't pay his estimated payments on
2    time.
3              He would notoriously miss 'em --
4         Q    But that has --
5         A    -- and he was okay with that.
6         Q    But that has -- the payment of tax has
7    nothing to do with when you file the return?
8         A    Well, you asked me about filing it late.
9         Q    Do you have in your pile of documents there,
10   exhibit number 18, which again I believe Mr. May provided
11   to you?
12        A    Okay.
13        Q    And right on there on page 1?
14        A    Right.
15        Q    Do you see at the top it says Extension
16   Granted to 9/15/04?
17        A    Right.
18        Q    And down -- and where the signature line is
19   at the bottom for Signature by Return Preparer, it's
20   dated 3/10/04?
21        A    That's right.
22        Q    Why would that be?
23        A    Well, for a very good reason.
24             The tax returns are due March 15.  And we
25   always err on the side of caution.

Page 101

1              We might file many more extensions than we
2    need.  We just do it as a matter of fact.  So in case the
3    client doesn't pick it up before the deadline, it's
4    already done.
5         Q    So you're saying this return was prepared and
6    ready to go on 3/15/04?
7         A    It could possibly be.  Or it could have been
8    prepared and he didn't pick it up until later on.
9              If you look at all the other returns, you'll
10   see what I'm saying.  Because typically the personal
11   returns are always done at the last minute.  Or were
12   done, at the time.
13             Because he always owed money.
14        Q    Well, again, the fact that you owed money has
15   nothing to do with when you file your return, does it?
16        A    For Dr. James, it does.
17        Q    Why?
18        A    Because he doesn't want to -- he didn't want
19   to pay the money to the I.R.S. until the very last
20   minute.
21        Q    But I don't have to pay the money when I file
22   the return?
23        A    Well, you don't have to.  You're supposed to.
24        Q    As a matter of fact, for these returns filed
25   on extension, he would have had to pay the money by the

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

Page 102

1   original due date, not the extended due date?
2       A   That's correct.
3       Q   So the extended due date had nothing to do
4   with whether Dr. James had the money or didn't have the
5   money?
6       A   Well, it has nothing to do with whether he
7   had the money or not the money.
8       But his practice for years, his personal -- I
9   don't mean his business practice in terms of operating as
10  a medical practice -- but his personal method of, he'd
11  always pay, since I've, you know, did returns for Dr.
12  James -- which was through the nineties -- somehow, okay,
13  he would always pay late with interest and penalties.
14  And he didn't mind.
15      Q   If you have in front of you -- I apologize --
16  did you have 18 in front of you?
17      A   Oh, I don't know.  Don't worry about it.
18      Q   No.  Do you have 16 --
19      A   No need to apologize.
20      Q   -- 16 in front of you?
21      A   You want 16.  Yes.
22      Q   That's the 2002 1040?
23      A   Yes.
24      Q   And you see at the top of the page it says
25  Extension Granted to 10/15/03?

Page 103

1       A   That's correct.
2       Q   If you turn to the next page, it's dated by
3   your firm as 9/14/03?
4       A   Right.
5       Q   So you didn't have that one ready to go on
6   the original due date?
7       A   That's correct.  We had an extension -- well,
8   the original due date.
9       We have an extension until, that year, until
10  October 15.
11      Q   What percentage of your clients ask for
12  extensions?
13      Just roughly.
14      A   I got to think.
15      I mean, I never thought about -- we never
16  have any figures on that.  But I would say 25 percent.
17      Q   Then why is it you accountants are always
18  telling me you're so busy in September and October?
19      A   That's why.
20      Q   Okay.  You have no recollection of --
21      A   But the people that do it are usually
22  entrepreneur types.
23      And people that -- the records sometimes
24  leave a lot to be desired.
25      Q   And sometimes could there -- you not be able

Page 104

1   to file a return because they don't have all the
2   information?
3       A   That's a big judgment call, yes.
4       That's -- your -- your answer -- the answer
5   to that question is yes.
6       But sometimes if they -- if you have -- see
7   how much is missing.  I have -- I have refused to do
8   returns because a lot of things were missing.  And -- but
9   sometimes could you do a protective filing, you can call
10  it, if -- you know, knowing that you'll file an amendment
11  later on.
12      But if too many things are missing, I
13  won't -- we'll just say "Hey, I'm sorry, we're not gonna
14  do it."
15      So that's a judgment call.
16      Q   You're the one that -- it says extension --
17  I'm sorry -- at the top of that same exhibit 16, it says
18  Extensions Filed Certified?
19      A   Yes.
20      Q   Your firm would file the automatic --
21      A   Yes.
22      Q   -- extension request?
23      A   Yes.
24      Q   Do you recall whether the extensions for Dr.
25  James were all automatic extensions?

Page 105

1       As opposed to asking for additional
2   discretionary extensions, these were all automatic
3   extensions?
4       A   I -- I fail to remember the year that was
5   changed; but ever since it was changed.
6       Because it used to be you had to file two,
7   and I think it was changed in the 1990s.  I'm not so
8   sure, because it's been so long; usually get an automatic
9   automatically.
10      Because there used to be, I remember, you
11  know, August, you know, 14th, 15th, we'd go ahead and
12  we'd file the, you know, another 150 extensions; people
13  that didn't come in yet.
14      They were the old days.  But I don't know how
15  old that was.
16      Q   Just hang on for a moment.
17      Just a few more questions.
18      A   Go ahead.
19      Q   If -- you indicated you had some clients
20  that -- a handful of clients, or two or three -- that
21  have offshore trusts, as best you know.
22      Are you familiar with Form 2758?  It's an
23  extension for, to file the Form -- I'm sorry, I'm having
24  a mental block -- 3520-A?
25      A   I am somewhat familiar with that form.

Page 106

1    Q   So if you saw a form -- that extension
2    request 2758, you would then know that you weren't -- you
3    didn't have the 3520-A, and you would then probably have
4    to file an extension --
5        A   I don't --
6        Q   -- for the individual?
7        A   -- I don't know how to answer that, because
8    there's -- I think that form's for other types of
9    entities, too.  I'd have to see the form to determine
10   that.
11           Because they -- right now, they use a 7004.
12   That's an older form.
13       Q   Switching gears.
14           You said earlier that you recalled, but not
15   clearly, a revenue agent -- or an agent of the I.R.S.
16   calling you at some point and asking about Dr. James?
17       A   Right.
18       Q   And I presume about his 3520 forms?
19       A   No, not about that.
20       Q   What was the agent inquiring about?
21       A   He was -- he wanted to get copies of his
22   personal returns.
23       Q   And when, approximately, was that?
24       A   I don't really remember.
25           I'd say three, four years.  Two, three years

Page 107

1    ago.
2            It was a call, and he never got back to me
3    after that.
4        Q   And what did you tell the agent?
5        A   I said, "We'd do what we can to try to
6    accommodate ya."
7        Q   Did you produce any -- were you able to find
8    the returns?
9        A   I don't remember, 'cause I wouldn't have done
10   it.
11           If we did it -- he wanted -- you know, he
12   actually asked the returns to be -- to be given to Brian
13   James himself.  I found it a little bit odd.
14           But he said "Call me back," and he never
15   called me back, so I don't know where that ended.
16       Q   Would you have any record of --
17       A   No.
18       Q   -- about that call or --
19       A   Especially 'cause he's not a client.  I would
20   have just taken the call.
21           I just have a small recollection of it.
22       Q   So you still would have had copies,
23   potentially, of those returns when this agent called you,
24   whenever that was?
25       A   We possibly could have.  I mean, we could

Page 108

1    have regenerated them.
2            Because back then -- not now, because we
3    cleared out our systems -- but we could have
4    regenerated -- we would have copies.  But, you know, with
5    the way the system works is, you can push a button,
6    recalc it and print another return.
7            But it wouldn't be because it's a PDF.  It
8    would be they did some recalc.  We could have possibly
9    done that.
10       Q   I understand.
11           I want to go back to the extension question
12   again with Dr. James, because I'm still not clear as to
13   what your point was.  And I understand the point that you
14   say Dr. James maybe was paying late or didn't have the
15   money right then or whatever.
16           But I'm still confused as to --
17       A   Okay.
18       Q   -- why that would impact when he filed his
19   returns?
20       A   Because he owed the money.  He didn't have
21   it.
22           I mean, I'm not tryin' to be wise --
23       Q   So if a client --
24       A   -- but it's obvious.
25       Q   If a client came to you and said -- and you

Page 109

1    prepared their return and it was due April 15 and they
2    said, "I don't have the money for the balance due," would
3    you recommend they don't file the return timely?
4        A   Never.  That's not the issue.
5            Dr. James -- I was trying to say this, maybe
6    I misspoke -- he normally would come late in the year.
7    Like he'd give us the work like September or October.
8            As a matter of fact, I noticed in one of --
9    was it one of these years?  Let's see.
10           Yeah, the I.R.S. even circled it "Hurricane
11   Relief Extension," 'cause they gave us until December.
12       Q   Uh-huh.
13       A   And probably -- I'm gonna just guess at this,
14   because I don't remember -- December 15 is when we
15   printed this return.  Okay?  And he owed 300-some
16   thousand dollars.
17           See, if you look at all the returns, all
18   extension, he owed money.  Now, maybe that's -- given the
19   way my bias is as a CPA, I don't see the sense of paying
20   late, because it's so -- it's horrendous in terms of the
21   penalties.  I just -- you know, I just don't like clients
22   doin' that.  But he'd be one to do that all the time.
23           As a matter of fact, ever since I worked for
24   him.
25           MR. JONES:  Nothing more at this time.

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

---

Page 110

```
 1        MR. MAY:  Okay.
 2        I don't have any more questions for you,
 3   either, Mr. Famiglio.
 4        THE WITNESS:  Okay.
 5        MR. MAY:  So now, off the record.
 6        (Time noted:  3:30 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 111

```
 1
 2            CERTIFICATE OF OATH
 3
 4   STATE OF FLORIDA
 5   COUNTY OF HILLSBOROUGH
 6
 7        I, the undersigned authority, certify that GEORGE V.
 8   FAMIGLIO, JR. personally appeared before me and was duly
 9   sworn.
10
11        WITNESS my hand and official seal this 7th day of
12   October, 2011.
13
14
15
16
17
18
19            Phyllis DeFonzo, RPR
20            Notary Public State of Florida
21            My Commission Expires:  8/1/12
22            Commission No.:  DD 783768
23
24
25
```

---

Page 112

```
 1
 2            REPORTER'S CERTIFICATE
 3
 4
 5   STATE OF FLORIDA     :
 6   COUNTY OF HILLSBOROUGH:
 7        I, Phyllis DeFonzo, RPR, certify that I was
     authorized to and did stenographically report the
 8   deposition of GEORGE V. FAMIGLIO, JR.; that a review of
     the transcript was requested, and that the transcript is
 9   a true and complete record of my stenographic notes.
10        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor
11   am I a relative or employee of any of the parties'
     attorneys or counsel connected with the action, nor am I
12   financially interested in the outcome of the foregoing
     action.
13
         Dated this 7th day of October, 2011, IN THE
14   CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.
15
16
17            Phyllis DeFonzo, RPR
18
19
20
21
22
23
24
25
```

---

Page 113

```
 1
 2            ERRATA PAGE
 3   PLEASE ATTACH TO THE DEPOSITION OF GEORGE V. FAMIGLIO,
     JR. TAKEN ON SEPTEMBER 22, 2011 IN THE CASE OF
 4   BRIAN CHIVAS JAMES VS. UNITED STATES OF AMERICA
 5   PAGE LINE     CORRECTION AND REASON THEREFOR
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18   I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
     CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
19   SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.
20
21
     _____   _____
22   GEORGE V. FAMIGLIO, JR.        DATE
23
     _____   _____
24   WITNESS TO SIGNATURE           DATE
25
```

BayAreaReporting@gmail.com,   www.bar-tampa.com                      866-240-9500

Page 114

```
 1
 2     October 7, 2011
 3     Mr. George V. Famiglio, Jr.
       Famiglio & Associates
 4     1634 Main Street
       Sarasota, Florida 33606
 5
       In Re: September 22, 2011 deposition of George V.
 6          Famiglio, Jr., James v. United States of America
 7     Dear Mr. Famiglio:
 8     This letter is to advise that the transcript for the
       above-referenced deposition has been completed and is
 9     contained herein.  Please review the attached transcript
       and make corrections, if necessary, on the attached
10     Errata Sheet, sign and have it notarized, and send it
       back to our office.
11
       It is suggested that review of this transcript be
12     completed within 30 days of your receipt of this letter,
       as considered reasonable under Federal Rules*; however,
13     there is no Florida Statute in this regard.
14     The original of this transcript has been forwarded to the
       ordering party and your errata, once received, will be
15     forwarded to all ordering parties for inclusion in the
       transcript.  Thank you.
16
       Sincerely,
17
18     Phyllis DeFonzo
       Bay Area Reporting
19
20     Waiver:
21     I,_____, hereby waive the
       reading & signing of my deposition transcript.
22
23     _____        _____
       Deponent Signature         Date
24
25     *Federal Civil Procedure Rule 30(e)/Florida Civil
        Procedure Rule 1.310(e)
```

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR