# PLAINTIFF'S EXHIBIT 4
# Deposition of Eric Schmitz
# November 15, 2011

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


-------------------------- :

BRIAN CHIVAS JAMES,              :

     Plaintiff,              : Civil No.
                      8:11-cv-00271-JSM-AEP

vs.                              :

UNITED STATES OF AMERICA,        :

     Defendant.              :

-------------------------- :



DEPOSITION OF:  ERIC SCHMITZ

PURSUANT TO:    Notice by Counsel for Defendant

DATE:           November 15, 2011

TIME:           12:45 p.m. to 4:30 p.m.

PLACE:          W.H. Simon & Company, P.A.
                5680 Roosevelt Boulevard
                Clearwater, Florida 33760

REPORTED BY:    PHYLLIS DEFONZO, RPR
                Notary Public
                State of Florida at Large



Pages 1 - 169

Page 2

1   APPEARANCES:
2
3       KENDALL JONES, ESQUIRE
        DWAUNE L. DUPREE, ESQUIRE
        Sutherland, Asbill & Brennan, LLP
4       1275 Pennsylvania Avenue NW
        Washington, D.C. 20004-2415
5          Appearing for Plaintiff
6
7       MICHAEL W. MAY, ESQUIRE
        United States Department of Justice
8       Tax Division
        P.O. Box 14198
9       Washington, D.C. 20044
           Appearing for Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2
3                E X H I B I T S
              =Marked by the Court Reporter=
4
5    NO.  DESCRIPTION                    PAGE
6    32   1/19/07 Letter                  39
7    33   3/20/07 Letter                  42
8    34   1/28/09 Letter                  44
9    35   3/3/09 Letter                   47
10   36   6/6/05 Memorandum                   53
11   37   4/4/05 E-mail                   68
12   38   5/26/05 Memo                    71
13   39   3/5/08 Letter                   89
14   40   3/21/08 Letter                  96
15   41   Form 1040 Individual Tax Return, 2005   122
16   42   Activity Report                129
17   43   LexisNexis document                136
18   44   9/17/08 Letter                 142
19   45   6/17/05 E-mail                 148
20
21
22
23
24
25

Page 3

1
2                I N D E X
3
4    TESTIMONY OF ERIC SCHMITZ           PAGE
5    DIRECT EXAMINATION BY MR. MAY         6
6    CROSS-EXAMINATION BY MR. JONES      145
7    REDIRECT EXAMINATION BY MR. MAY     163
8    RECROSS-EXAMINATION BY MR. JONES    164
9    CERTIFICATE OF OATH            166
10   CERTIFICATE OF REPORTER        167
11   ERRATA SHEET                   168
12   WITNESS LETTER                 169
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2               E X H I B I T S
             =Previously Marked=
3
                       FIRST
4    NO.  DESCRIPTION                 MENTION
5    10   Form 3520-A, 2003              99
6    23   Form 3520, 2003               99
7    13   Financial Stmts and General Ledger, 12/31/01  104
8    14   Financial Stmts and General Ledger, 12/31/02  104
9    16   2002 Individual Tax Returns   108
10   17   Financial Stmts and General Ledger, 12/31/03  114
11   19   2003 Individual Tax Return    121
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR

Page 6

1           ERIC SCHMITZ,
2    the witness herein, being first duly sworn on oath, was
3    examined and deposed as follows:
4          DIRECT EXAMINATION
5    BY MR. MAY:
6       Q   All right, Mr. Schmitz.  My name is Mike May.
7    We've spoken in the past.
8        But just for the record, of course, I'm the
9    attorney representing the United States in this action,
10   the Brian James versus USA case.  And we're here for your
11   deposition.
12       Have you had your deposition taken before?
13      A   Yes.
14      Q   How many times?
15      A   Three, four.
16      Q   Okay.  So you know basically how it works.
17       I'll be asking you questions.  The court
18   reporter will be recording the questions and your
19   answers.  So that means a couple of things.
20       One, if you'll wait until I finish the
21   question to begin answering, that'll be helpful to her
22   and for the record to be clear.
23       Does that seem fair?
24      A   Uh-huh.
25      Q   And also, if you'll answer out loud.  So if

Page 7

1    you'll say "yes" or "no" instead of "uh-huh" or "uh-uh"
2    or something like that.
3       A   Yes.
4       Q   Okay?  At any point if we need to take a
5    break, that's, of course, fine.  The only real parameter
6    that there is on that is, if I've asked you a question --
7    or likewise, if Mr. Jones or Mr. Dupree is going to be
8    asking you questions, if they've asked you a question --
9    just ask that you answer the question, then we take a
10   break, and not while the question is pending.  Is that
11   fair?
12      A   Okay.
13      Q   Okay.  And I know that Mr. Jones and Mr.
14   Dupree are here this afternoon, but they are not
15   representing you in any way.
16       Is that correct?
17      A   Yes.
18      Q   So you have no attorney present?
19      A   Correct.
20      Q   Okay.  All right.  Mr. Schmitz, I believe we
21   are here at your offices today.
22       Is that right?
23      A   Yes.
24      Q   And just, I'd like to delve into your
25   background a little before we get into the substance of

Page 8

1    the case.
2        And so if you would, just tell me your
3    education?
4       A   I have two degrees from college, accounting
5    and finance.
6        That's it.
7       Q   Okay.  Are those both bachelors degrees?
8       A   Yes.
9       Q   Okay.  And so no graduate degrees of any
10   kind, or?
11      A   No.
12      Q   Okay.  Do you have any professional licenses?
13      A   I'm a CPA.
14      Q   Okay.  In addition to being a CPA, are there
15   any other certifications or licenses that you hold?
16      A   No.
17      Q   Okay.  Now, as far as your work experience,
18   how long has it been since you received your degrees?
19      A   87.  1987.
20      Q   Okay.
21      A   From --
22      Q   I'm sorry, go ahead.
23      A   From there, I went to I.R.S. for about 10
24   years.
25       Left the I.R.S., I think, in '97; and been

Page 9

1    here ever since.
2       Q   Okay.  And at the I.R.S., what positions did
3    you hold?
4       A   Revenue agent.
5       Q   Okay.  And aside from Revenue agent, was
6    there any other position?
7       A   Run-of-the-mill.
8        I was an OJI; I was on-the-job instructor.  I
9    taught some courses.  I went to expert witness school.
10       Can't think of anything else that stands out.
11      Q   Okay.  And those were all within the role of
12   being a Revenue agent.
13      A   Yes.
14      Q   Okay.  And then you said you came here in
15   1997?
16      A   Yes.
17      Q   And by "here," you mean William H. Simon &
18   Company?
19      A   W.H. Simon & Company.
20      Q   Okay.  And when you came here in 1997, what
21   was your position?
22      A   Employee.
23      Q   Okay.  And what's your position today?
24      A   Now I'm a partner.
25      Q   Okay.

Page 10

1     A   I -- I'm not sure what you mean by
2  "position."
3     Q   Okay.  Sure.  What's your job title?
4     A   This particular firm is unlike most CPA
5  firms.
6     Q   Okay.
7     A   We do not just do tax returns.
8        95 percent of our work comes from CPAs,
9  attorneys, and other preparers of tax returns.
10       And we specialize in tax controversy work,
11  both federal and state.
12    Q   Okay.  And by "tax controversy work," what do
13  you mean?
14    A   We handle audits.  We handle collection
15  problems.  We handle penalty issues, payroll tax issues.
16  We handle civil cases.  We handle criminal cases.
17       Any -- any time anybody experiences any type
18  of problem that's I.R.S.-related, or I.R.S. may show up
19  on the horizon, that's something that we do.
20    Q   Okay.  And so do you only represent clients
21  in front of the I.R.S. and the Florida Department of
22  Revenue?
23       Or have you ever represented some clients in
24  any other setting?
25    A   I guess that's it.  Yes.

Page 11

1     Q   Okay.
2     A   I.R.S. and DOR.
3        I've taken some clients through tax court,
4  but obviously I can't represent them in tax court.  They
5  represent themselves.
6     Q   Okay.
7        Okay, that's fine.  You said 95 percent, I
8  think, was controversy work?
9     A   Uh-huh.
10    Q   So what's the other five percent?
11    A   That's a darn good question.
12       Because as far as I'm concerned, it's
13  probably 99 percent.  Who knows.
14    Q   Okay.  Does your firm do any return
15  preparation?
16    A   We do some, but we're a referral-based firm.
17       So I try not to take on those types of
18  assignments.
19    Q   Okay.
20    A   But yeah, I do sometimes.  Yes.
21    Q   Okay.  And I think you said -- you alluded to
22  it -- but the work here at W.H. Simon & Company is done
23  on, largely on a referral basis?
24    A   Word of mouth.
25    Q   Okay.

Page 12

1     A   And referral basis, yes.
2     Q   So how does a client come to you, I guess is
3  my question?
4     A   His CPA could refer him.  His attorney could
5  refer him.  His tax attorney could refer him.  His estate
6  tax attorney could refer him.
7        He could prepare his own tax return and he
8  has an I.R.S. notice, so he comes to us on his own.
9     Q   Okay.  And so in the, I guess, the 14 years
10  or so since you came to W.H. Simon & Company, you'd say
11  the great majority of your time has been in tax
12  controversy work?
13    A   Yes.
14    Q   Is there any particular area of controversy
15  that you consider yourself a specialist in?
16    A   No more than any other area, no.
17    Q   Okay.  So, for example, say it was -- this
18  particular case involves foreign trust penalty; penalty
19  for not filing the proper forms for a foreign trust.
20       About how many cases involving that type of
21  penalty have you handled?
22    A   Over 14 years?
23    Q   Yes.
24    A   Wow, geeze.  I don't know.
25       I could only guess.

Page 13

1     Q   Well, would it be more than a dozen?
2     A   Sure.
3     Q   More than 50?
4     A   Foreign -- foreign issues which the I.R.S.
5  has only pushed in the last six, seven years?  I'd say
6  over 50.
7     Q   Okay.  Over 100?
8     A   I don't know if I could say that.
9     Q   Okay.  So maybe somewhere between 50 and 100?
10    A   Sure.
11    Q   Okay.  Issues involving reasonable cause in
12  front of the I.R.S. -- I don't know if the Florida
13  Department of Revenue has any reasonable cause issues or
14  not -- but at least in front of the I.R.S., how many
15  cases would you say that you've handled that have
16  involved a reasonable cause issue?
17    A   Over 100.
18    Q   Okay.  And that's not just foreign trust
19  issues, but all kinds of reasonable cause issues?
20    A   Correct.
21    Q   Would you consider yourself an expert on what
22  is and isn't reasonable cause?
23    A   I would not consider myself an expert in any
24  field.
25    Q   Okay.  Fair enough.

Page 14

1       All right.  Well, let's -- this case
2  obviously involves Dr. James, Brian C. James.
3       And how did you come to work for Dr. James?
4    A   My recollection is that he was referred to us
5  from Offshore Trust Services and/or Steve Donaldson or
6  some related party.
7    Q   Okay.  And how did Steve Donaldson and
8  Offshore Trust Services know to refer Dr. James to you or
9  to your firm?
10   A   Because they've referred clients to us in the
11  past as well.
12   Q   Okay.  And when was that?  When was that
13  referral?
14   A   I'd have to check the files.  I think 2005
15  sounds good.
16       I think I remember hearin' that as the date
17  that penalty notices came out, maybe.
18   Q   Okay.  And let's -- you know, probably the
19  exact date's probably not, you know, super-important for
20  our purposes.
21       But in relation to the notice that Dr. James
22  received from the I.R.S., do you know about how long
23  after he received that notice he came to you?
24   A   No.
25   Q   Okay.  I assume it would have been fairly

Page 15

1  soon?
2    A   Certainly we had enough time to argue the
3  issue, yes.
4    Q   Okay.  Was anyone else at W.H. Simon &
5  Company involved in working for Dr. James?
6    A   Bill Simon to some extent, I'm sure.
7    Q   Okay.  And I probably should have covered
8  earlier, but who is Bill Simon?
9    A   He's my partner.
10   Q   Okay.  And what is his background?
11   A   He's -- he was with the I.R.S. for 15 years.
12  A lot of his time was as the executive director of the XD
13  program.
14       I think when he left, he was the assistant
15  regional commissioner out of Atlanta; certainly oversaw
16  the southeast I.R.S.
17       I think from there, he may -- oh.  From
18  there, he went to work for one of the Big Eights; ran
19  their tax department for three, four, five years.  Just
20  guessing how long.
21       Eventually he left there and opened up his --
22  his own practice.
23   Q   Okay.  And that's this practice, the W.H.
24  Simon & Company?
25   A   Correct.

Page 16

1    Q   And when did he open W.H. Simon & Company?
2    A   '85, maybe.  I'm just guessin'.
3    Q   Okay, sure.  And you referred to "the Big
4  Eights."
5       Which one of the Big Eights?
6    A   I wanna say Ernst & -- Ernst & Young, but I'm
7  not sure.
8    Q   Okay.  And just for the record, what are the
9  Big Eights, or what were the Big Eights?
10   A   Want me to name 'em all?
11   Q   No.  Just what are they?
12   A   They are your major independent local -- not
13  local -- your major independent CPA firms.
14   Q   Okay.
15   A   Which are now the Big Four.
16   Q   Right.
17   A   Or the Final Four, I'm sorry.
18   Q   Oh, is that the -- Final Four?
19       All right.  And so what -- back to the work
20  that you did for Dr. James.
21       What was the work that you performed for Dr.
22  James?
23   A   We set about trying to get the penalty
24  waived.
25   Q   Okay.  And by "getting the penalty waived,"

Page 17

1  what do you mean?
2    A   Well, he was bein' assessed a penalty for
3  failure to file his foreign informational returns.
4    Q   Okay.
5    A   Specifically, 3520.
6    Q   All right.  And the foreign information
7  return in respect to what entity, or?
8    A   Horns -- Hornsby Trust, maybe, is the name.
9  I can't remember.
10   Q   Okay.
11       But is it that his trust that's --
12   A   It was his --
13   Q   -- located in Nevis, West Indies?
14   A   It was his foreign offshore trusts.
15   Q   Okay.  Do you know if it's in Nevis, West
16  Indies, or do you have --
17   A   I would, if I had my files.
18   Q   Okay.
19   A   Which you have in front of you, so.
20   Q   Sure.  Did you review any documents in
21  preparation for your deposition here this afternoon?
22   A   No, I really didn't.
23   Q   Okay.  How long has it been since you looked
24  at the file, Dr. James' file?
25   A   Probably the last time you and I talked.

Page 18

1      Q   Okay.  Prior to -- well, let me ask you a
2   different question.
3          When did you get notice of this lawsuit
4   that's brought us here today?
5      A   Well, once we were unable to get the penalty
6   waived at the administrative level, then we referred Dr.
7   James to Sutherland, Asbill.
8          THE REPORTER:  I'm sorry, Sutherland?
9          THE WITNESS:  Sutherland, Asbill.
10  BY MR. MAY:
11     Q   And just for the record, is that the law firm
12  of Mr. Jones and Mr. Dupree?
13     A   Yes, it is.
14     Q   Okay.
15     A   So I really don't know when they filed actual
16  suit.
17     Q   Okay.  But you've known for awhile that was
18  going to happen?
19     A   Yes.
20     Q   And maybe when it happened, you were --
21     A   Well --
22     Q   -- not noticed that day, but --
23     A   -- actually, I thought the case would be
24  settled before that, before any lawsuit was filed.
25          But yes, I knew it was an ongoing issue.

Page 19

1      Q   Okay.  So had you had active involvement --
2   how long has it been, really -- let me just rephrase the
3   question.
4          How long has it been since you really worked
5   on the case?
6      A   Actually had to work the issue?
7      Q   Right.
8      A   Probably in or around the time that I first
9   referred the case to specifically Shelly Kay --
10     Q   Okay.
11     A   -- of that firm.
12     Q   And Shelly Kay, is he also known as Sheldon
13  Kay?
14     A   Yes.
15     Q   S-h-e-l-d-o-n?
16     A   Yes.
17     Q   Okay.  Okay.  And about how long has that
18  been since you really were in the nitty-gritty of the
19  file?
20     A   I cannot remember.
21     Q   Okay, that's fine.
22          Has it been over a year?
23     A   Feels like that, yes.
24     Q   Okay.
25     A   I'm sure you've found the engagement letter

Page 20

1   in there.
2          So whatever date that was would be a good
3   indicator.
4      Q   Okay.  And back to the work that you
5   performed in trying to get the penalty waived.
6          What all was involved in that?  What specific
7   tasks did you perform?
8      A   Well, at that time when we first got
9   involved, there was a Revenue agent involved, asking for
10  the forms to be filed.  So my first work would have been
11  to deal with him, if you will.
12          I believe I did prepare the 3520s.  And I
13  think we submitted it to him, to that Revenue agent.
14          After that, the case found its way to
15  appeals, and I continued my efforts with the appeals
16  officer and the appeals manager.
17     Q   Okay.  And after appeals, was there anything
18  else?
19     A   After appeals.  After --
20          MR. JONES:  Objection.  Work product is going
21  to apply once he referred the case to Sutherland
22  for litigation.
23          MR. MAY:  Okay.
24  BY MR. MAY:
25     Q   Did you also file a formal claim for refund?

Page 21

1      A   I think during that process I filed the
2   claims, yes.
3      Q   Okay.
4      A   I think.  Pretty sure.
5      Q   Okay.  Is that a Form 843 or something like
6   that?
7      A   Sounds right, yep.
8      Q   Okay.
9      A   Yes.
10     Q   So in addition to working with the Revenue
11  agent, preparing and submitting some Forms 3520, working
12  with appeals, and possibly preparing and filing a Form
13  843 claim for refund -- without getting into anything
14  that you referred to that would be work product -- is
15  there any other tasks that you performed on behalf of Dr.
16  James?
17     A   There could be a lot of ancillary things that
18  happened.
19          Oh.  Yes.
20          I was going to say that there were a lotta
21  ancillary matters that I attended to during that process.
22  One that sticks out, I.R.S. for some reason started
23  collection on the penalties, even though we were in the
24  process of appealing them.
25          So I did have to work with a Revenue officer

Page 22

1   to get that cleared up as well.
2       Q   Okay.  I think we'll kind of flush out maybe
3   that, some of those things.
4           Aside from the, working with the Revenue
5   officer, were there any other things you worked on that
6   you considered ancillary matters?
7       A   Nothin' that I can think of.
8           But I'm sure somethin'll come up as we talk
9   about it.
10      Q   Okay.  And if it does, we can cover it then.
11  That'll be fine.
12      A   Uh-huh.
13      Q   As far as your interactions with I.R.S.
14  personnel, I think you've mentioned a Revenue agent, an
15  appeals officer, maybe an appeals officer manager?
16      A   Uh-huh.
17      Q   And a Revenue officer?
18      A   Uh-huh.
19      Q   Were there any other I.R.S. personnel that
20  you remember working with?
21      A   Could have been.  I could have spoken to the
22  Revenue officer's manager.
23          I think that I may have.  I don't -- I can't
24  recall exactly.
25          I guess that's about it.

Page 23

1       Q   Okay.  As far as the Revenue agent that you
2   initially worked with, was that a Ramon Fuentes?
3       A   Yes.
4       Q   And his name's spelled R-a-m-o-n,
5   F-u-e-n-t-e-s.
6           Is that right?
7       A   R-a-m-o-s, F-r-u-e-n-t-a-s, I believe.
8       Q   Okay.  Okay.  One or the other.
9           The appeals officer, was that Jorge Moral?
10      A   Jose Morales.
11      Q   Morales?  Okay.
12          And the Revenue officer, was that a Jim Beck?
13      A   That's it.  Jim Beck.
14      Q   Okay.  Do you remember the name of the
15  appeals officer's manager that you dealt with?
16      A   Yeah.  Friedlander.
17      Q   Okay.
18          Would that be like F-r-i-e-d-l-a-n-d-e-r?
19      A   That sounds like that's it.  I'm sure you
20  know of her first name.
21      Q   Okay.  Is it Anita --
22      A   Yes.
23      Q   -- possibly?
24      A   Thank you.
25      Q   Okay.  As far as Agent Fuentes goes, the

Page 24

1   Revenue agent --
2       A   Okay.
3       Q   -- I think you mentioned you'd kind of worked
4   with him getting the 3520s filed?
5       A   Uh-huh.
6       Q   How many interactions did you have with
7   Revenue Agent Fuentes?
8       A   I can't imagine how many.
9       Q   Okay.  So was it a lot?  A few?
10      A   More than a few.
11      Q   Okay.  More than a few?
12          And what were the nature of your interactions
13  with the Revenue agent?
14      A   Tryin' to satisfy his request to get some
15  3520s filed, and tryin' to get him to not recommend a
16  penalty bein' assessed.
17      Q   Okay.  And on the 3520s, did you prepare the
18  3520s that were submitted on behalf of Dr. James?
19      A   I believe so, yes.
20      Q   Okay.  How did you obtain the information to
21  complete the forms?
22      A   Well, obviously, I had the 3520-A already --
23      Q   Okay.
24      A   -- available, which had already previously
25  been filed with the I.R.S.  I had a copy of that.

Page 25

1           And I think what you're tryin' to ask is that
2   eventually I did speak to the people at Offshore Trust
3   Services, for example, to try to get some information.
4           That's about it, other than what's documented
5   in the files that you have there.
6       Q   Okay.  So in addition to the relying on the
7   3520-As and also perhaps some information from Offshore
8   Trust Services, was there any other information you used
9   in completing the 3520s?
10      A   I -- I can't recall.
11      Q   Okay.  Did you ever send to Revenue Agent
12  Fuentes a written explanation of why Dr. James' failure
13  to file his 3520 was due to reasonable cause?
14      A   I can't recall.
15          That would be in the file.
16      Q   Okay.  So you don't remember if you did or
17  you didn't?
18          Or do you remember --
19      A   I can't recall.
20      Q   Okay.
21      A   I can't recall, because it was his position
22  that there was no reasonable cause.
23      Q   Okay.
24      A   So did I reduce anything to writing?  It
25  would be in the files.

Page 26

1    Q   Okay.
2    A   I can't recall.
3    Q   So did you have conversations with Agent
4  Fuentes about the reasonable cause issue?
5    A   I had several conversations with him.
6        And I can't recall what the specifics of
7  those phone calls would have been.
8    Q   Okay.  When you spoke to him, was it always
9  by phone?
10       Do you remember ever meeting --
11   A   I never met him face-to-face.
12   Q   Okay.  Is one of the reasons you never met
13 with him is because his office is in Miami?
14   A   I have cases all over the country.
15   Q   Okay.
16   A   That wouldn't be a reason.
17   Q   Okay.  So maybe -- if there is a reason --
18 why did you never meet with Agent Fuentes?
19   A   I don't know if there was a -- I can't think
20 of a reason why I would not have.
21   Q   Okay.  Just never came up?
22   A   I was never requested to meet with him.
23   Q   Okay.
24   A   And I can't remember if I may have asked him
25 to come see me.

Page 27

1        That just doesn't happen, Mike.
2    Q   What doesn't happen?
3    A   They just don't come over and sit down and
4  meet with you.
5    Q   Sure.
6    A   He was interested in gettin' 3520s, and he
7  got those 3520s, and he was done with it.
8    Q   Okay.  What do you mean, "done with it"?
9    A   He was done with the case.
10   Q   Oh, okay.
11   A   His mind was already made up on the penalty,
12 for example, so he was done with the case.
13   Q   Okay.  What in your interactions with him led
14 you to believe he had made up his mind already?
15   A   When he said there was no reasonable cause;
16 he can't imagine what the reasonable cause, whatever it
17 be, for not filing those foreign informational returns.
18   Q   Okay.
19   A   He made it pretty clear that it was not his
20 call, and/or he didn't think reasonable cause would
21 apply.
22   Q   Okay.  Did he make that clear on more than
23 one occasion?
24   A   More than one -- I would think so.
25   Q   Okay.

Page 28

1    A   Since the process went on for awhile, and
2  obviously that was aforemost in my thoughts and my
3  process, so it was obvious that, you know, he wasn't
4  going to make any calls to waive the penalty.
5    Q   Okay.  So do you think it was someone else's
6  call as to whether or not he would have been able to
7  waive the penalty?
8    A   I don't know.
9        Could have been.  Wouldn't have been unusual.
10   Q   Okay.  But you didn't have any specific
11 knowledge that it was someone else's decision or not his
12 decision?
13   A   Not that I can recall.
14       I might have notes in the file that might
15 mention that.  I don't know.
16   Q   Okay.  As far as Appeals Officer Morrell --
17 or Morales?
18   A   Morales, Jose.
19   Q   Okay.  What was -- how many interactions did
20 you have with him?
21   A   You'd have to go back to the files, and I
22 believe all my phone calls are documented.
23       Maybe a half a dozen times, at the most.
24   Q   Okay.  So was it, again, your interactions
25 with him were again mainly by phone, or entirely by

Page 29

1  phone?
2    A   By phone.
3    Q   Okay.
4    A   In fact, he called me first.
5        And I went through a whole phone call with
6  him without even knowing he was an appeals officer.
7    Q   Okay.  And how did that transpire?
8    A   Well, when he first called, he notified -- he
9  told me in the phone conversation that he had been
10 assigned this case.
11       And I believe I said somethin' along the
12 lines, "Well, good, I haven't heard from anybody in
13 awhile."
14       But during that conversation, I made the
15 assumption that he was taking over the case for Mr.
16 Fuentes, actually.  And we went the whole phone call
17 without even knowing that he was an appeals officer;
18 which I found amazing.
19   Q   Okay.  So you knew he was with the I.R.S.?
20   A   Yes.
21   Q   You just didn't know he was an appeals
22 officer?
23   A   Right.
24   Q   Okay.  And then how did you come to learn he
25 was an appeals officer?

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 30

1     A   I think it was the second phone call.
2     I think it was the second phone call.  He
3  certainly didn't identify himself in the first one, no.
4     Q   Okay.  Had the penalty already been assessed
5  at that point?
6     A   I'd have to check the files.
7     Q   Okay.  I think you mentioned earlier that you
8  had some interactions with Mr. Morales' manager?
9     A   Yes.
10    Q   And was that at your instigation, or did they
11 initiate that?
12    A   I can't recall.  I'd have to check the files.
13    But I -- I seem to recall that nothing was
14 going on with the case.  And there was a reason for me to
15 call her.
16    But I would have to check the files to -- to
17 -- to remember.
18    Q   Okay.
19    A   In fact, she laughed when I told her, "Oh,
20 he's an appeals officer?"
21    I didn't realize that Jose Morales was an
22 appeals officer.  He never identified himself.
23    And she just laughed, and thought that was
24 funny.
25    Q   Okay.

Page 31

1     A   I said, "I still haven't even gotten a
2  'Welcome to Appeals' letter."
3     So I may very well have called her tryin' to
4  find out where the case was in the process.  But we can
5  all check the files.
6     Q   Okay.  In addition to that phone
7  conversation, did you have any other interactions with
8  his manager?
9     A   I'm sure we spoke another, at least -- we
10 spoke maybe two or three times after that, clearly.  I
11 think there's a letter in my file that's addressed to
12 her.
13    No face-to-face meetings, though.
14    Q   Okay.  Did she indicate to you who was going
15 to make the decision on the appeals process; whether it
16 would be her, or the appeals officer Mr. Morales?
17    A   Did she come out and say who was going to
18 make the decision?
19    I don't remember if she came out to say that.
20    Q   Okay.  Did you have an -- did you have an
21 impression as to who would have ultimate decision-making
22 on that --
23    A   Well --
24    Q   -- process?
25    A   -- the appeals manager always has the

Page 32

1  ultimate decision.
2     Q   Okay.  Did you have a sense as to whether she
3  was directing Mr. Morales or whether she was, you know,
4  leaving it largely up to him?
5     A   I -- clearly, Mr. Morales was not up-to-date
6  on the issue.
7     And the appeals manager told me that -- in
8  fact, she's the one that told me, you know, "This is the
9  type o' case we're lookin' to litigate."
10    So who was gonna make the ultimate decision?
11 Sounded like to me nobody was makin' the decision.
12    Q   Okay.  You mean they were just going to let
13 it go on and not settle?
14    A   She made it clear that there was -- there was
15 -- I think her words were along the lines of, "There's
16 not a lot o' support" or "There's not a lot of guidance
17 on this penalty."
18    I think my response was, "Well, I think the
19 reasonable cause regulations are pretty clear."
20    But she made it clear that, you know, there
21 was a higher standard for people that are involved with
22 foreign transactions.  And this is the type o' case that
23 she, she'd -- either she said she'd like to see it get
24 litigated, or the Service would like to litigate this
25 type of case.

Page 33

1     Q   So you weren't sure if that was her personal
2  opinion, or maybe --
3     A   I felt comfortable that was her personal
4  opinion.
5     Q   Okay.  So -- but do you have an opinion as to
6  whether or not the Service had some position on that?
7     Or whether you were just getting her personal
8  opinion?
9     A   I don't know if I can answer -- based on the
10 phone call I had with her, I can't answer your question.
11    But --
12    Q   Okay.
13    A   -- I think it's clear the Service has a
14 position on these types of penalties, yes.
15    Q   Okay.  I think you just -- if I'm
16 mischaracterizing, please correct me -- I think you said
17 you feel like the Service has, you know, has a position
18 on these kinds of penalties.
19    Is that just from your experience in this
20 case?  Or from other cases as well?
21    A   From other cases as well.
22    Q   Okay.  As far as the -- and earlier, we
23 discussed foreign issues in front of the I.R.S.
24    Narrowing it to cases like this one, where
25 there was a 3520 that was not filed and then a penalty

BAY AREA REPORTING, INC.   Phyllis DeFonzo, RPR

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 34

1   assessed, or maybe not assessed based on a reasonable
2   cause issue, how many of those types of cases have you
3   handled?
4           MR. JONES:  Objection on relevance.
5       You're asking him about other clients' cases?
6           MR. MAY:  No.  I'm just trying to get an idea
7   of the experience of the witness in these
8   particular types of cases.
9       A  So repeat your question?
10  BY MR. MAY:
11      Q  Okay.
12          I think earlier we discussed, you know,
13  foreign issues in general.  And I think you mentioned
14  you'd handled cases involving maybe somewhere from 50 to
15  100 foreign issues.
16          This case is a particular kind of foreign
17  issue; trust owner that didn't file his Form 3520, and
18  has raised as a defense to that failure to file
19  reasonable cause.
20          How many cases in that narrow subset have you
21  worked on?
22      A  Directly worked on two other cases.
23      Q  Okay.
24      A  Exactly like this.
25          And then in my travels and my professional

Page 35

1   associations, I've discussed other cases with other
2   representatives that had the same issues.
3       Q  Okay.
4           And do you think there are other
5   professionals, representatives, that have a similar
6   opinion to yours?
7       A  Yes.
8       Q  Okay.  Is there a consensus among all of them
9   that the --
10      A  Seems to be, yes.
11      Q  -- okay, as far as that goes?
12          And when I'm speaking about the -- what
13  there's a consensus about, what I'm saying is, do you
14  feel like there's a consensus that the I.R.S. has a
15  position on whether or not it wants to litigate these
16  cases?
17          Or is the consensus something else?
18      A  The consensus really is that the Service has
19  taken a position to hold taxpayers that are involved in
20  foreign issues to some kind of higher standard that
21  nobody's been able to define.
22          And that's based on my association with the
23  FICPA tax committee, for example, that I sit on; and
24  occasional meetings with AICPA tax section committees and
25  other professionals across the country.

Page 36

1       Q  Okay.  And just for --
2       A  Not to mention I.R.S. people that tell me
3   that directly.
4       Q  Sure.  Sure.
5           Just for clarity, you mentioned "the FICPA."
6   What is that?
7       A  That's the Florida Institute of Certified
8   Public Accountants.
9       Q  Okay.  And what's the -- I think you
10  mentioned "the AICPA," or?
11      A  That's the American Institute of Certified
12  Public Accountants.
13      Q  Okay.  And those are -- what are those?
14      A  Just professional associations of CPAs.
15      Q  All right.  Okay.
16          And so with the Appeals Officer Moral -- or
17  "Morales" -- clearly there was no settlement.
18          We wouldn't be here, I suppose, if you had
19  settled it at that point.
20          How did you receive notice that -- or how did
21  that transpire?
22      A  I can't recollect.
23          I'm sure we got a letter.  If so, it's in the
24  file.  Clearly he told us over the phone; told me over
25  the phone.

Page 37

1           He did offer some kinda settlement, by the
2   way.
3       Q  Uh-huh.
4       A  But it was insignificant.
5           I'm sure we -- I'd have to check the files.
6       Q  Okay.
7       A  I'm sure I've got it documented in a phone
8   call and/or a letter from him or -- it was finally
9   disposed of with appeals.
10          They were finished with it.
11      Q  Okay.  And after that is when you filed
12  the -- prepared and submitted a refund claim?
13      A  Possibly.  I'd have to look at the dates of
14  the claims.
15          I don't know if I filed 'em during that
16  process or immediately after.  Or it may have been
17  something I did with Mr. Kay.
18          So I'm not sure.
19      Q  Okay.  Fair enough.
20      A  I can't remember.
21      Q  Sure.  You mentioned a Revenue officer,
22  Revenue Officer Beck?
23      A  Yes.
24      Q  And what was his role, from your perspective?
25      A  Well, the penalty had already been assessed.

Page 38

1   And he had the file to collect the tax.
2       Q   Okay.
3       A   To collect the penalty, I should say.
4       Q   In addition to the civil penalty for the
5   failure to file the 3520s, did Revenue Officer Beck
6   attempt to collect any other liabilities?
7       MR. JONES:  Objection.
8       Any other tax issues are not in issue in this
9   case, so we object based on relevance.
10      MR. MAY:  Okay.
11  BY MR. MAY:
12      Q   You can answer.
13      A   At the time, Beck was -- he was there to
14  collect the civil penalty.
15      And there was a couple of current compliance
16  issues that he said needed to be taken care of first.
17      Q   What do you mean by "current compliance
18  issues"?
19      A   Well, his, I -- I'm only -- I can't recall
20  exactly.
21      We'd have to go back and check the files.  It
22  would be easier if you just pulled the files out, but.
23      I believe we were probably right before a
24  deadline date for a tax return, for example.  If the tax
25  return was due 10/15, and he and I are talkin' in

Page 39

1   September, he would have asked me to file that with him
2   as soon as possible, so he could check that off his list.
3       And I think he was a little bit behind on
4   some payroll taxes, maybe, at the time.
5       Q   When you say "he may have been a little
6   behind on some payroll taxes," who do you mean?
7       A   James.
8       Q   Dr. James?
9       A   Yes.
10      Q   Okay.  All right.
11      (1/19/07 Letter, is received and marked
12      exhibit 32 by the court reporter.)
13  BY MR. MAY:
14      Q   All right.  Mr. Schmitz, you've been handed
15  what's marked exhibit 32.
16      A   Uh-huh.
17      MR. JONES:  Just for the record, I'm
18  objecting again to this line of questioning.  We're
19  asking about information, documents outside the
20  scope of the issue in this case.
21      This deposition, to the extent it focuses on
22  those types of matters, is becoming burdensome and
23  costly to the client, when these are not issues in
24  the case.
25      MR. MAY:  Okay.

Page 40

1   BY MR. MAY:
2       Q   Mr. Schmitz, do you recognize exhibit 32?
3       A   Yes.
4       Q   And what is exhibit 32?
5       A   It's a letter from myself to Jim Beck.
6       Q   And that's Revenue Officer Beck that we've
7   been discussing.
8       Is that right?
9       A   Yes.
10      Q   And what's the nature of this letter to Mr.
11  Beck?
12      A   This is my letter to him regarding his
13  outstanding balance due on his Form 1040 for 2005.
14      Q   So --
15      A   Want me to keep goin'?
16      Want me to read it?
17      Q   No.  I don't think there's any reason for you
18  to read it out loud.
19      Earlier, a few moments ago, you mentioned
20  "current compliance issues."
21      Is this one of those compliance issues?
22      A   This would be a past due balance, obviously.
23  Yes.
24      Q   Okay.  And so at the time of this letter,
25  should I understand that Dr. James had not completely

Page 41

1   paid his liability, his income tax liability, for 2005?
2       MR. JONES:  Same objection as before.
3       We're spending a lot of the client's time and
4   money.  This is burdensome.
5       I don't see any relevance to the issue in the
6   case.
7       MR. MAY:  Your objection's on the record.
8   BY MR. MAY:
9       Q   You can answer.
10      A   Okay.  I'll answer a few more here.
11      Obviously, he owed a past due balance for his
12  1040 for 2005.
13      Q   Okay.
14      And was this about the time that Revenue
15  Officer Beck became involved --
16      A   I have no idea --
17      Q   -- to collect the -- to collect the civil
18  penalty?
19      A   I cannot recollect.
20      Q   Okay.  That's fine.
21      A   I'll wait until you pull the documents out
22  this time.
23      Q   Okay.
24      MR. MAY:  And just for the record, I have a
25  bunch of documents from the file.  Part of the

BayAreaReporting@gmail.com,    www.bar-tampa.com                    866-240-9500

Page 42

1    purpose of this deposition is to discover what is
2    relevant and what isn't relevant.
3        So you can keep making objections, but I'm
4    entitled to ask about these documents.
5        All right. Let's mark this one as 33.
6        (3/20/07 Letter, is received and marked
7    exhibit 33 by the court reporter.)
8    BY MR. MAY:
9    Q    All right, Mr. Schmitz. You've been handed
10   what's marked exhibit 33.
11       Do you recognize exhibit 33?
12   A    Yes, I do.
13   Q    And what is exhibit 33?
14   A    It is a letter from me to Jim Beck.
15   Q    Okay. And that's Revenue Officer Beck again?
16   A    Yes, it is.
17   Q    Okay. And what is the nature -- what was the
18   purpose of this letter?
19   A    This is --
20       MR. JONES: Just for the record, make a note
21   that I have a continuing objection, because this
22   can't possibly lead to evidence related to the
23   issue in the case. And it is becoming burdensome
24   for the client.
25       And, Mike, to the extent you have other

Page 43

1    documents, I'll stop making the objection as long
2    as we can note it's a continuing objection to
3    anything extraneous like this.
4        MR. MAY: I'm going to ask, if you have an
5    objection to a specific document, if you'll make
6    the objection at that time.
7        MR. JONES: Okay, then.
8        MR. MAY: Rather than note that it's a
9    continuing objection, just so the record's clear --
10       MR. JONES: Okay.
11       MR. MAY: -- as to which documents you're
12   objecting.
13   BY MR. MAY:
14   Q    All right. Now, Mr. Schmitz, this, your
15   letter to Mr. Beck and the fax sheet that's the second
16   page of exhibit 33 -- which appears to me to be a fax you
17   received from Mr. Beck, is that correct?
18       Is that a fair characterization of the second
19   sheet?
20   A    Yes.
21   Q    -- involves an under-reporter inquiry.
22       Is that a fair characterization of the
23   documents?
24   A    That's what Mr. Beck has called it, yes.
25   Q    Okay. Do you know what that is?

Page 44

1    A    No. I had no idea what this was, and still
2    don't know what this is.
3    Q    Okay. Fair enough.
4        What -- do you have any opinion about what it
5    might mean, an "under-reporter inquiry"?
6    A    I have no idea how it relates to James. I
7    have no idea.
8    Q    Okay.
9        (1/28/09 Letter, is received and marked
10   exhibit 34 by the court reporter.)
11   BY MR. MAY:
12   Q    All right. Mr. Schmitz, you've been handed
13   what's marked exhibit 34.
14       Do you recognize --
15       MR. JONES: Same objection, relevance and
16   burden -- covering matters outside of this case.
17   BY MR. MAY:
18   Q    Do you recognize exhibit 34?
19   A    Yes.
20   Q    And what is exhibit 34?
21   A    It's a letter from me to Dr. James.
22   Q    Okay. And in reference to what?
23   A    The letter says "Reference I.R.S. levy
24   action."
25   Q    Okay. Do you remember a levy from the I.R.S.

Page 45

1    on Dr. James?
2    A    Yes, I remember a levy.
3    Q    Okay. Do you remember the circumstances that
4    led to the levy?
5    A    I think, as stated in the letter, it was due
6    to the failure to make a $50,000 monthly payment.
7    Q    Okay. And what -- I was going to ask you --
8    what is the $50,000 monthly payment?
9    A    It was just an agreed-upon payment that I and
10   the Revenue officer arrived at, to keep the Revenue
11   officer from filing a levy.
12   Q    Okay. And so this was an agreement between
13   you and Revenue Officer Beck in relation to Dr. James'
14   civil penalties?
15   A    No. It has nothing to do with the civil
16   penalties.
17   Q    Okay. So what were these payments for?
18   A    Hmm. I can't tell from this letter.
19   Q    Okay. But there had been an agreement that
20   Dr. James make $50,000-a-month payments to Revenue
21   Officer Beck?
22       For the I.R.S.?
23   A    Clearly -- clearly, the letter states, "due
24   to the failure to make the agreed-upon $50,000 monthly
25   payment."

BAY AREA REPORTING, INC.    Phyllis DeFonzo, RPR

Page 46

1     That's all I can recall.
2     Q   Okay.  Do you remember the agreement that you
3  had made with Revenue Officer Beck?
4     A   I'll wait until you pull that out.
5     No, I don't recall it at this time.
6     Q   So you don't recall whether there was an
7  agreement?
8     A   This letter that you're asking about clearly
9  references an agreed-upon payment.
10    Q   Okay.
11    A   I don't know the circumstances of that
12  agreement yet.
13    I can't recall.
14    Q   Okay.  So do you remember the -- and I'm just
15  trying to narrow my question very specifically -- do you
16  remember -- you're saying "you don't recall."
17    Is it that you don't recall the specifics of
18  the agreement?  Or that you don't recall whether or not
19  there was an agreement?
20    A   I can't recall the specifics of the
21  agreement.
22    Q   Okay.  So do you --
23    A   Or whether or not there was a written
24  agreement.
25    Q   Okay.  So do you remember if there was an

Page 47

1  oral agreement?
2     A   I don't recall.
3     Q   Okay.  I'm not sure if I have what you're
4  looking for.
5     MR. MAY:  But we'll mark this one.
6     (3/3/09 Letter, is received and marked exhibit
7     35 by the court reporter.)
8  BY MR. MAY:
9     Q   All right, Mr. Schmitz.  You've been handed
10  what's marked exhibit 35.
11    Do you recognize exhibit 35?
12    MR. JONES:  Same objections as before, to the
13    extent we're focusing on things outside of the
14    issue in this case.
15    A   Yes, I do.
16  BY MR. MAY:
17    Q   And what is exhibit 35?
18    A   It's a letter from me to Dr. James.
19    Q   And what's it in reference to?
20    A   References "Update I.R.S. collection/levy
21  action" in the letter.
22    Q   Okay.  Is this related to exhibit 34, the
23  levy that's mentioned in the letter that is exhibit 34?
24    A   I can only assume so.
25    Q   Okay.  You don't recall specifically if it's

Page 48

1  the same levy, or if there had been more than one levy?
2     A   I can't imagine there bein' more than one
3  levy, but I don't know.
4     Q   Okay.  And I'll direct your attention to the
5  second paragraph of the body of this letter.
6     "Currently, you owe approximately 94,000
7  remaining on the civil penalty attributable to the
8  delinquent filing of the Form 3520 related to your
9  foreign trust, $71,000 from your Form 1040 for 2007, and
10 $160,000 for payroll taxes attributable to the first
11 quarter of 2008."
12    Did I read that paragraph correctly, Mr.
13 Schmitz?
14    A   I'm sorry, I wasn't followin' ya.
15    Q   Okay.
16    A   I was lookin' at the other letters.
17    Q   Okay.
18    I'll reread it.
19    I'm going to read the second paragraph out
20 loud, if you would follow along?
21    A   Okay.  I will.
22    Q   "Currently, you owe approximately $94,000
23 remaining on the civil penalty attributable to the
24 delinquent filing of the Form 3520 related to your
25 foreign trust, $71,000 from your Form 1040 for 2007, and

Page 49

1  $160,000 for payroll taxes attributable to the first
2  quarter of 2008."
3     Did I read that paragraph correctly?
4     A   You did.
5     Q   Okay.  Should I understand that the first
6  reference there, the $94,000, is the civil penalty that
7  we've been discussing here today that brought us here
8  today?
9     A   Now that I have all three letters, yes.
10 That's what all this is about, along with balance due on
11 his 1040 for 2007, and payroll taxes.
12    Q   Okay.  And when you say "all three letters,"
13 you're referring to exhibits 33, 34 and 35?
14    A   Correct.
15    Q   And you've just a moment ago reviewed those
16 exhibits.
17    Is that correct?
18    A   Correct.
19    Q   And as you reviewed them, did they refresh
20 your recollection --
21    A   Yes.
22    Q   -- on these matters?  Okay.
23    And so do you now recall that Dr. James had
24 an unpaid balance from his 2007 Form 1040?
25    A   Yes.

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 50

1     Q   And this is in March of 2009?
2     A   Correct.
3     Q   When would a Form 1040 for 2007 be due?
4     A   10/15/08.
5     Q   Okay.  That would be with extensions?
6  October 15 of 2008?
7     A   Correct.
8     Q   Okay.  And the $160,000 for payroll taxes
9  attributable to the first quarter of 2008?
10    A   Correct.
11    Q   What is that?
12    A   It is for exactly what you said.
13       It's for payroll taxes attributable to the
14 first quarter of 2008.
15    Q   Okay.  And by "payroll taxes," what taxes in
16 particular do you understand that to refer to?
17    A   Payroll taxes for his business.
18    Q   Okay.  Would that be a 941, employment tax?
19    A   Yes, it would.
20    Q   Okay.  And at what point, when would payroll
21 taxes from the first quarter of 2008 be due?
22    A   Generally 1/15/09 -- oh, first quarter?
23    Q   First quarter.
24    A   Generally April 30, 2008.
25    Q   And this letter exhibit 35 is dated March 3

Page 51

1  of 2009?
2     A   Yes.
3     Q   Okay.  Did you ever request a collection due
4  process hearing with Revenue Officer Beck?
5     A   I can't recall.
6        It would be in the files.
7     Q   Okay.  We saw the subject of at least a
8  couple of exhibits -- 34, 35 -- was an I.R.S. levy.
9        Were you surprised that Dr. James had been
10 levied?
11       MR. JONES:  Same continuing objection.
12    A   That's part -- that's part o' the process,
13 Mike, is, he owed a substantial amount o' money because
14 of those penalties.
15       And he wanted to collect those penalties
16 before we were able to find out if we could get 'em
17 waived.
18 BY MR. MAY:
19    Q   Okay.
20    A   So that caused probably a cash crunch on Mr.
21 James.
22    Q   Okay.  At some point, there's an agreement
23 for him to make some payments?
24    A   I don't know until we go through the files
25 together.

Page 52

1     Q   Okay.
2     A   He very well may have forestalled that levy,
3  if we had -- if I had continued to make those payments
4  with him.
5     Q   Okay.
6     A   Certain payments.  I can't recall which ones.
7     Q   Okay.  All right.
8        Okay.  Were notices of tax lien ever filed?
9     A   I can't recall.
10       MR. JONES:  Same objection.
11    A   I can't recall.
12 BY MR. MAY:
13    Q   In reference to your work with Dr. James, did
14 you ever meet with Dr. James?
15    A   I believe so, yes.
16    Q   Okay.  Do you remember how many times?
17    A   No, I don't recall.
18    Q   Okay.  More than once?
19    A   I can't recall.
20       I'll wait and see the files.
21    Q   Fair enough.
22    A   That's happened once.  I'll just wait for the
23 files this time.
24    Q   Fair enough.

Page 53

1     A   Okay.
2     Q   Fair enough.  Okay.
3        (6/6/05 Memorandum, is received and marked
4        exhibit 36 by the court reporter.)
5  BY MR. MAY:
6     Q   Now, Mr. Schmitz, you've been handed what's
7  marked exhibit 36.
8        A moment ago you said you had met with Dr.
9  James, but you couldn't remember how many times or when.
10 Is that a fair characterization?
11    A   I think my answer was, I couldn't recall and
12 I'd wait and see the files.
13    Q   Okay.
14    A   Yes.
15    Q   Okay.  So without -- without reviewing your
16 files, is it fair to say you don't have a clear
17 recollection of the number of meetings you had with Dr.
18 James?
19    A   Very fair to say.
20    Q   Okay.  And without reviewing those files, is
21 it fair to say that you don't have a clear recollection
22 of the substance of those meetings?
23    A   That's probably fair to say, yes.
24    Q   Okay.  Exhibit 36.  Do you recognize exhibit
25 36?

Page 54

1    A   It's a memorandum to the file from me.
2    Q   Okay.  And concerning -- well, what's the
3 date?
4    A   June 6, 2005.
5    Q   And what's the subject of the memorandum?
6    A   Interview of Dr. James.
7    Q   All right.  So did you meet with Dr. James on
8 June 6, 2005?
9    A   Yes.
10   Q   And has your recollection on that been
11 refreshed by looking at exhibit 36?
12   A   It's been proven that I met with him on June
13 6, 2005.
14       Yes.
15   Q   Okay.  Outside of the exhibit 36 -- I can see
16 that it has a date on it, June 6, 2005 -- do you have a
17 recollection, a memory, of the meeting that you had with
18 Dr. James?
19   A   I recall meeting with him in his office.
20 Yes.
21   Q   Okay.  And other than the date that's on the
22 memorandum, do you have any other reason to suspect -- I
23 mean to know that it was June 6 of 2005?
24   A   I know that it was June 6 by my memorandum.
25   Q   Okay.  So your knowledge is from the date

Page 55

1 line on exhibit 36.
2       Is that right?
3    A   Yes.
4    Q   Okay.  It may also be on your record of
5 actions in this, in the case file?
6    A   Maybe.
7    Q   Maybe?  All right.
8       Would you take a moment and just review
9 exhibit 36?
10   A   All three pages?
11   Q   Well, let me ask you about that.
12   A   All five pages?
13   Q   There are five pages in exhibit 36.
14       The memorandum is the first two pages.  Is
15 that fair?
16   A   Fair.
17   Q   Okay.
18   A   Yes.
19   Q   And then that's followed by three pages of
20 handwritten notes?
21   A   Yes.
22   Q   That are also dated 6/6/05?
23   A   Yes.
24   Q   Okay.  Are these your handwritten notes?
25   A   Yes.

Page 56

1    Q   So are these the handwritten notes that you
2 took during the meeting with Dr. James?
3    A   Yes.
4    Q   Okay.  And -- okay.
5       And the notes are of the substance of that
6 meeting?
7    A   Yes.
8    Q   Okay.  And then you reduced that to a
9 memorandum form after the meeting?
10   A   Yes.
11   Q   Okay.  And that memorandum is the first two
12 pages of exhibit 36?
13   A   Yes.
14   Q   Okay.  So if you'll take a moment and just
15 refresh your recollection by reviewing the memorandum and
16 the notes?
17   A   And the notes?
18   Q   Sure.
19   A   Would you like me to read through the notes
20 as well?
21   Q   If you think it will be helpful to refresh
22 your recollection.
23   A   I'll skip the notes.  Go ahead.
24   Q   Okay.
25       MR. JONES:  Just real quick, Mike.

Page 57

1       For the record, are these, with the Bates
2 numbers, did you provide these?  Or did Mr.
3 Schmitz?
4       MR. MAY:  The Bates numbers were put on by my
5 office.
6       So I hope the copies you received had the
7 same Bates numbers.
8       MR. DUPREE:  They did not.
9       MR. MAY:  They didn't?
10      MR. JONES:  No.  That's okay.
11 BY MR. MAY:
12   Q   All right, Mr. Schmitz.
13      You've reviewed exhibit 36, at least the
14 memorandum?
15   A   Yes.
16   Q   Does it refresh your recollection about your
17 meeting with Dr. James?
18   A   Yes.
19   Q   When you met with Dr. James, what did he tell
20 you he had told to George Famiglio?
21   A   As I recall, he didn't tell Dr. Famiglio when
22 he was in the process of -- he had met Donaldson
23 personally himself.  So he worked with Donaldson on this
24 so-called offshore transaction.
25      And he did not mention any o' that to his

Page 58

1   accountant.
2       Q   And his accountant is George Famiglio, as you
3   understood it?
4       A   Yes.
5       Q   So in your meeting with Dr. James in June of
6   2005, he told you that he had not told his accountant
7   about the offshore trust?
8       A   He did not discuss the transaction with
9   Famiglio at that time.
10      Q   At which time?
11      A   When he was setting up the transaction.
12      Q   Okay.
13      A   He dealt with Donaldson directly.
14      Q   Okay.
15          And did Dr. James tell you when he did
16  discuss the transaction with his accountant, George
17  Famiglio?
18      A   Let's see.
19          I don't think he ever discussed the
20  transaction with his accountant.
21      Q   Okay.  Did he indicate to you when he
22  informed his accountant about the transaction or about
23  the fact that he had an offshore trust?
24      A   Well, when the accountant got the copy of the
25  3520-A; but even then, I don't think he would have

Page 59

1   discussed it with him.
2       Q   Okay.
3       A   I mean, there's nothing to discuss at that
4   point.
5       Q   So it was your understanding that George
6   Famiglio's basis for knowing about the trust was that he
7   had received copies of the 3520-As?
8       A   Well, and I think Dr. James believed that --
9   at the time of this interview, he told me that he thought
10  that Donaldson or somebody from that company would be
11  contacted -- contacting the CPA as well.
12          But --
13      Q   Okay.
14      A   -- that's --
15      Q   So from your meeting with Dr. James in June
16  of 2005, your understanding of his communication of the
17  foreign trust to George Famiglio was through the 3520-As,
18  and perhaps that Steve Donaldson or someone would contact
19  Mr. Famiglio?
20      A   Yes.
21      Q   Okay.  Had Dr. James -- from your meeting
22  with Dr. James, did you have any understanding as to
23  whether Dr. James had ever told George Famiglio about the
24  foreign trust?
25      A   I don't think he discussed the transaction

Page 60

1   with him.
2       Q   Okay.  So do you understand that to mean that
3   he hadn't talked about it with George Famiglio?
4       A   I took it to mean that when he entered into
5   the transaction, and then he was looking into getting
6   into the transaction, he did not discuss it with his
7   accountant.
8       Q   Okay.  Okay.  So he didn't ask George
9   Famiglio's advice about foreign trusts?
10      A   Not that I know of, no.
11      Q   Okay.  I mean, did Dr. James indicate to you
12  that he had told George Famiglio that he had a foreign
13  trust?
14      A   I don't -- I don't know.
15      Q   Okay.
16      A   I guess I'll still stick with my other
17  answer; is that when he was getting involved in this
18  transaction, he did not discuss it with Mr. Famiglio.
19      Q   Okay.
20      A   Is the way I understand it, and it's the way
21  I'm readin' it here.
22      Q   Okay.  Aside from the memorandum, do you have
23  a recollection about the meeting, aside from what you've
24  recorded here in the memorandum?
25          Your meeting with Dr. James, excuse me.

Page 61

1       A   Do I have a recollection of the meeting with
2   Dr. James outside of this memorandum?
3       Q   And what I mean is, is what you remember
4   about the meeting just from what you're reading in this
5   memorandum?
6           Or do you have like a recollection in your
7   mind of the meeting, of when you were sitting with Dr.
8   James?
9       A   Obviously, it helps to recall the meeting as
10  well.
11          But this is what I understood.
12      Q   Okay.  Okay.  Now, in the meeting on June 6
13  of 2005 with Dr. James, what did Dr. James tell you about
14  when he informed George Famiglio about the notice from
15  the I.R.S. that he hadn't filed the 3520s and that he
16  might be assessed a penalty for that?
17      A   Just what it says in the third paragraph.
18          He called his accountant about the notice
19  when the notice came in.
20      Q   And he said -- he says, "the accountant said
21  that he had no idea that he was involved in this kind of
22  transaction."
23          Is that what that sentence says?
24      A   Right.  That's what it says.
25      Q   And there's a sentence there, "if you were

Page 62

1 interested in this kind of" -- or a clause, excuse me --
2 "if you were interested in this kind of stuff, you should
3 have come to me, et cetera"?
4      A   That's what Dr. James said that Famiglio said
5 to him.
6      Q   Okay.  So in June of '05, Dr. James told you
7 that George Famiglio said to him, "If you had been
8 interested in this kind of stuff, you should have come to
9 me."
10        What did you understand he meant by "this
11 kind of stuff"?
12     A   Offshore transaction that he was involved in.
13     Q   Okay.
14     A   Havin' an offshore trust.
15     Q   All right.  But Dr. James indicated to you
16 that in -- when he told Famiglio about the I.R.S. notice,
17 that Famiglio told Dr. James at that point, "Why didn't
18 you tell me about this?"
19     A   Are we at the asked-and-answered part o' this
20 session yet?
21     Q   Yes.  I mean, is that correct?
22     A   Asked and answered.
23        Yes.  Yes.
24     Q   Yes.
25     A   That's what it says here.

Page 63

1      Q   Okay.  If you'll look over into the next
2 page, the second page of the exhibit 36.  It's the first
3 full paragraph on this page 2, discussing Dr. James'
4 attorney.
5      A   Yes.
6      Q   Did Dr. James also tell you that he did not
7 discuss or disclose the foreign trust transaction with
8 his attorney as well?
9      A   Correct.
10     Q   Okay.  So in your meeting on June 6 of '05,
11 Dr. James told you he hadn't discussed the transaction
12 when he set it up with his accountant, and he hadn't set
13 it up -- and he hadn't discussed it with his attorney
14 when he set it up?
15     A   That's correct.
16     Q   Okay.  Did you ever talk to a Wendy Borden
17 that's mentioned there in that next paragraph?
18     A   I don't recollect talkin' to her.
19     Q   Okay.  Aside from what's written there in the
20 paragraph that discusses Wendy Borden and Shelly Smith,
21 do you have any recollection or knowledge of the role of
22 either Wendy Borden or Shelly Smith at Dr. James'
23 practice?
24     A   Not that's not written down here.
25     Q   Okay.  And what did you understand was Dr.

Page 64

1 James' purpose for establishing the trust, the foreign
2 trust?
3      A   My recollection is, it was asset protection.
4      Q   And as far as what actions Dr. James took
5 after receiving the I.R.S. notice, in addition to talking
6 with his accountant at that time, what other actions did
7 he indicate to you that he had taken?
8      A   Obviously, he must have talked to Donaldson,
9 since we got the case referred to us by Donaldson and/or
10 Crithfield.
11     Q   Okay.  And when you say "Donaldson," do you
12 mean Steve Donaldson?
13     A   I do.
14     Q   Okay.  And by "Crithfield," do you mean Duane
15 Crithfield?
16     A   I do.
17     Q   Okay.  And what's your understanding of the
18 role of Christopher Donaldson?
19     A   Christopher Donaldson, it's Steve's son.
20        I don't know who does what.  I don't know
21 what he does.
22     Q   Okay.  And do you know who Joshua Crithfield
23 is?
24     A   Yes.  That's Duane's son.
25        And I don't know what he does, either.

Page 65

1      Q   Okay.  Do you have a sense of the roles of
2 Steve Donaldson and Duane Crithfield as far as what they
3 do?
4        Let me rephrase that question, because it's
5 compound.
6        What is your understanding of the work that
7 Steve Donaldson does?
8      A   They do asset protection work.  Financial
9 planning, maybe.
10     Q   Okay.  And what about Duane Crithfield?
11     A   They both do -- they're both involved.
12 They're partners in what they do.
13        Duane might very well be more on the
14 compliance side.  Donaldson might very well be more on
15 the planning and sales side.
16        I don't -- I don't know.
17     Q   Okay.  In your mind, is there any real
18 distinction in the different tasks that they perform?
19     A   I have no idea actually what tasks they
20 really do perform.
21     Q   Okay.  What's been your interactions with
22 Steve Donaldson personally?
23     A   Personally?
24     Q   Yes.  Have you ever had any personal
25 interaction with Mr. Donaldson?

Page 66

1      A   I've met him, yes.
2      Q   Okay.
3      A   Yes.
4      Q   You mentioned that he refers clients to your
5   firm?
6      A   They have referred clients to our firm in the
7   past, yes.
8      Q   Okay.  Does he call your firm?
9         Or does he just tell the client, "You should
10   call Simon and Schmitz"?
11      A   It can work either way.
12      Q   Okay.  So have you spoken with him on those
13   occasions when he's referred someone to you?
14      A   Sometimes.
15      Q   Okay.  Does he give you his impression of the
16   case, of their issue?
17         Or does he just say, "I have somebody I need
18   you to help"?
19         Or how does that work?
20      A   I'm sure he'll go over what he knows.
21      Q   Okay.
22      A   I guess I'm not followin', but go ahead.
23      Q   No, that's fair.
24         You said you met Steve Donaldson, how many
25   times?

Page 67

1      A   I can't recollect how many times, Mike.
2      Q   Okay.  Would it have been more than five?
3   More than ten?
4      A   That'll be fine.  More than five is good.
5      Q   Okay.  Has it always been professionally, or
6   do you know him personally?
7      A   I guess I know him a little bit personally,
8   too.
9      Q   Okay.  I mean, is he a friend of yours?
10      A   I wouldn't call him a friend, no.
11      Q   Okay.  Do you have an opinion of Mr.
12   Donaldson's character for truthfulness?
13      A   You're interested in my opinions?
14      Q   Sure.  If you have one.
15      A   I find him to be truthful.
16      Q   Okay.  How about Christopher Donaldson?
17         Have you ever met Christopher Donaldson?
18      A   I'm sure I've met him once.
19      Q   Okay.
20      A   At least.
21         More than once.
22         Less than three times.
23      Q   Between one and three times?  Okay.
24         Since we're talking about this now.
25         Okay.

Page 68

1         (4/4/05 E-mail, is received and marked
2         exhibit 37 by the court reporter.)
3   BY MR. MAY:
4      Q   Mr. Schmitz, you've been handed what's marked
5   exhibit 37.
6         Do you recognize exhibit 37?
7      A   Yes.
8      Q   What is exhibit 37?
9      A   It is an e-mail from Barbara Smith to Bill
10   Simon.
11      Q   Okay.
12      A   Of an e-mail from Steve Donaldson to Bill
13   Simon.
14      Q   Okay.  So you've seen this e-mail before?
15      A   I'm sure I have.
16      Q   Okay.
17      A   I don't re -- I'm sure I have.
18      Q   Okay.  And what was the purpose of Mr.
19   Donaldson's e-mail?
20      A   I don't know what he had in mind.
21      Q   Okay.  So when he says in the e-mail, the
22   first paragraph, "I talked to Chivas at length," do you
23   understand that is Chivas, Brian Chivas James, Dr. James,
24   the plaintiff in this case?
25      A   Yes.

Page 69

1      Q   Okay.  And then the second sentence there
2   under the bullet point number one on exhibit 37, "He
3   realizes the biggest problem is the 1040B declarations of
4   no foreign accounts."
5         Do you know what he's referring to there?
6      MR. JONES:  Objection.  He says he doesn't
7   know what Donaldson was thinking, so this is
8   speculative.
9         You're asking for speculation.
10   BY MR. MAY:
11      Q   You can answer, if you know.
12      A   Michael, this is Steve's e-mail.
13         Clearly, he's pointing out his biggest
14   problem is his 1040B declarations of no foreign accounts.
15      Q   Okay.  Well, what is a 1040B declaration of
16   no foreign account?
17      A   I've never heard it called a 1040B.
18         But I assume he's talkin' about how the --
19   the box where you declare if you have a foreign bank
20   account.
21      Q   That's on a Schedule B of a Form 1040?
22      A   Well-testified to.  Yes, it is.
23      Q   Okay.  And then in paragraph -- the second
24   paragraph there, he gives a -- he says, "I have thought
25   in terms of an I.R.S. response."

BayAreaReporting@gmail.com,   www.bar-tampa.com                    866-240-9500

Page 70

1    It appears to me Mr. Donaldson's maybe
2  offering his opinion of Dr. James' approach to the civil
3  penalty issue?
4       MR. JONES:  Same objection as before.
5    A  Your guess is as good as mine, Mike.
6  BY MR. MAY:
7    Q  Okay.
8    A  I don't know what Steve's doin' here.
9    Q  Okay.
10      If that's what is -- if he's offering a
11 suggestion there as far as Dr. James' defense to the
12 civil penalty, what do you think of his -- what's your
13 opinion of his suggestion?
14   A  You want my opinion again?
15   Q  Sure.
16   A  I have no opinion on what Steve's talkin'
17 about.
18   Q  Okay.  All right.
19      At some point did you meet with George
20 Famiglio, Dr. James' accountant?
21   A  I did.
22   Q  Okay.  We have a memorandum of that meeting.
23      Would it be helpful for you to review the
24 memorandum to refresh your recollection of the meeting?
25   A  If you were to ask questions about it, I

Page 71

1  think it would be a good thing, yes.
2    Q  Okay.
3       (5/26/05 Memo, is received and marked exhibit
4       38 by the court reporter.)
5  BY MR. MAY:
6    Q  All right.  Mr. Schmitz, you've been handed
7  what's marked exhibit 38.
8       Do you recognize exhibit 38?
9    A  Yes, I do.
10   Q  And what is it?
11   A  It's a memorandum to the file dated May 26,
12 2005 from me about my interview of the accountant.
13   Q  Okay.  And is the accountant there George
14 Famiglio?
15   A  Yes, he was.
16   Q  Okay.  Again, it's kind of lengthy.
17      Maybe we could take a little break, and you
18 could review exhibit 38 to refresh your recollection.
19      We can maybe combine that with a little
20 break, and then I can ask you some questions about it.
21 Or if you'd like, we can all sit here and you can review
22 it.
23      It really matters not to me.
24   A  You can -- why don't you proceed with your
25 questions.

Page 72

1    Q  Okay.  You feel ready?
2    A  And then I'll pick out the answers for you.
3    Q  Okay.  Again I'll ask, aside from the
4  memorandum, do you have a recollection of your meeting
5  with Mr. Famiglio?
6    A  Yes.  I remember the meeting.
7    Q  Okay.  And did the meeting take place on May
8  26 of 2005?
9    A  Yes.
10   Q  Okay.  And where was the meeting with Mr.
11 Famiglio?
12   A  "I arrived this mornin' at George Famiglio's
13 office."
14      It was at his office.
15   Q  Okay.  His office that's in Sarasota?
16   A  I believe it was, yes.
17   Q  Okay.  And why had you set up a meeting with
18 Mr. Famiglio?
19   A  So I could go down and review his files.
20   Q  Okay.  And what would be the purpose of
21 reviewing his files?
22   A  Just to get a familiar -- become familiar
23 with what he has in his files, see what he knows.
24   Q  Okay.  At this point -- well, was it your
25 understanding that Dr. James had hired George Famiglio to

Page 73

1  prepare Forms 3520, and he hadn't?
2       Or did you have any impression about that
3  one way or the other?
4    A  It was my understanding that he had hired
5  George Famiglio to take care of his tax responsibilities,
6  tax issues, all his returns.
7       All that type o' stuff.
8    Q  Okay.  And at this point, did you believe
9  that the responsibility for not filing the 3520s was on
10 George Famiglio?
11   A  I don't know -- I don't know if I made a
12 final determination of that.  But -- you mean legally
13 speaking?
14   Q  No.  I'm just asking for your opinion.  I
15 mean --
16   A  I'm just goin' down to see his files, to see
17 -- see what he has.
18   Q  Okay.  At some point after May 26, 2005, did
19 you form an impression as to whether or not Mr. Famiglio
20 was responsible for the failure?
21   A  After this date?
22   Q  Yes.
23   A  Sure.
24   Q  Okay.  And what's your impression?
25   A  He got a copy of the 3520-A, and he knows to

Page 74

1  do a 3520.
2      Q   Okay.  How did you know he got a copy of the
3  3520-A?
4      A   I just -- that's what I understood from all
5  the various parties.
6      Q   Which parties?
7      A   Dr. James, and I know -- or I don't know as a
8  fact -- but I know that Offshore Services mails them out
9  to the CPAs and/or to the clients as well.
10        But they certainly try to mail 'em out to the
11  CPAs; whoever's representing the client.
12      Q   And you mean Offshore Trust Services, is that
13  the -- one of the entities controlled by Duane Crithfield
14  and --
15      A   Yes.
16      Q   -- who worked with Steve Donaldson?
17      A   Yes.
18      Q   Okay.  Is it your understanding that Offshore
19  Trust Services prepared the Forms 3520-A for Dr. James'
20  trust for the years 2001, 2002 and 2003?
21      A   They signed off on 'em, yes.
22      Q   Okay.  And so it was your understanding that
23  they had provided copies of those Forms 3520-A to George
24  Famiglio?
25      A   Yes, I would have -- that's what I would have

Page 75

1  thought would have happened, yes.
2      Q   Okay.  Do you have any direct knowledge that
3  that did happen?
4      A   I didn't see any letters or anything like
5  that, no.
6      Q   Okay.  So during your meeting with George
7  Famiglio, what did he tell you about when he found out
8  about Dr. James' foreign trust?
9      A   Told me that he knew nothin' of this
10  transaction until the client brought him the penalty
11  notice.
12      Q   And just generally, when was the penalty
13  notice?
14      A   I don't know what the date that -- I don't
15  know the date that the notice was provided to him.  I
16  don't know that date.
17      Q   Okay.  Do you know if it was earlier in the
18  year 2005?
19      A   I don't know.  I -- I'm assumin' when it came
20  out, that's when Famiglio said he got it.
21        So I assume he got it when it came out.
22      Q   Okay.  Was it your understanding that George
23  Famiglio got a notice from the I.R.S.?
24      A   The accountant told me that he knew nothing
25  of this transaction until the client brought him the

Page 76

1  penalty notice.
2        Is that he told me.
3      Q   Okay.  So his -- what he told you, at least,
4  was that the client brought him the notice; not that he
5  received the notice from the I.R.S.
6        Is that --
7      A   Asked and answered.
8        Yes.  That's what I've said a couple o' times
9  now.
10        I'm not sure what you're lookin' for, Mike.
11      Q   Sure, no.  There's some discussion in this
12  memorandum about Steve Donaldson.
13      A   Okay.
14      Q   I think shortly after that sentence maybe you
15  were just looking at.
16      A   Okay.
17      Q   Who mentioned Steve Donaldson?
18        Did he bring up Steve Donaldson, or did you
19  inquire about him?
20      A   He brought that up.
21      Q   Okay.  And what was the context of him
22  bringing that up?
23      A   The context was that the client had called
24  Famiglio regarding the notice.
25        But the accountant says that the client had

Page 77

1  already called and spoke with Steve Donaldson, and had
2  already signed up with us by the next day.
3      Q   Okay.  So in the -- the context was, Dr.
4  James had told George Famiglio about Steve Donaldson.
5        Is that a fair understanding of what your
6  memorandum says and of the conversation that you had with
7  George Famiglio?
8      A   Apparently, I asked him why he didn't just
9  represent the client.
10        And he said that Dr. James had called him up
11  regarding the notice.
12        But the accountant said that the client had
13  already called and spoke with Steve Donaldson about the
14  notice, I guess.
15      Q   Okay.  Do you know if George Famiglio knew
16  about -- knew Steve Donaldson before that conversation
17  with the client, with Dr. James?
18      A   All I can tell you is, he brought his name up
19  in the meeting as if he knew him.
20        I don't know.
21      Q   Okay.  Did you all discuss Steve Donaldson
22  and his work during the meeting?
23      A   Not really.
24      Q   Not really?  Okay.
25        Now, there's some question about the files

Page 78

1  that Mr. Famiglio was going to give you.
2        Is that right?
3     A  Some question?
4     Q  Yes.  There seems to have been maybe some
5  misunderstanding about what files you were there to get?
6     A  Oh.
7        That's what he says, yes.
8     Q  Okay.  And what was that?  So what was his
9  misunderstanding?
10    A  When I got -- much like this, he was supposed
11 to have the files for me, and they all -- and they
12 weren't there.
13    Q  Okay.  So when you called to set up the
14 meeting, he was going to have the tax files?
15       Or just all of his files -- what files did
16 you expect that he would have?
17    A  My notes said, the memo says that it was
18 previously arranged for me to review the tax files for
19 '1, '2 and '3.
20    Q  Okay.
21    A  So yes, he was supposed to have those tax
22 files available at the meeting.
23    Q  Okay.  Who made that arrangement?
24    A  Me.
25    Q  Okay.  Did you make it with him personally or

Page 79

1  with --
2     A  Yes.
3     Q  -- his staff?
4     A  Him.
5     Q  With him?
6     A  Telephone.
7     Q  Okay.  So you had spoken with him and said --
8  told him you would like to review --
9     A  Yes.
10    Q  -- the '01 --
11    A  Yes.
12    Q  -- '02 and '03 --
13    A  Yes.
14    Q  -- files?
15    A  Yes.
16    Q  Tax files?
17    A  Yes.
18    Q  And when you arrived, only the 2003 file was
19 there?
20    A  Yes.
21    Q  And only one 2003 file, the corporate file?
22    A  Yes.
23    Q  You mentioned he became talkative in, I
24 think, the fifth paragraph.
25    A  Okay.

Page 80

1        I did mention that.
2     Q  What did he become talkative about?
3     A  I'm sorry, your question was specifically
4  what was he talkative about?
5     Q  Sure.  What did y'all discuss?
6     A  He talked about anything other than the
7  client, apparently.
8     Q  Okay.  For example?
9     A  Talked about himself.
10       Talked about how he was involved in -- he
11 also was involved in foreign trusts.
12       Just whatever.
13       He talked about anything he could, other than
14 the client.
15    Q  Okay.  Do you think he was trying to avoid
16 the topic of talking about the client?
17       Or were you just having a conversation and he
18 was just talking?
19    A  I clearly asked him for three years' worth of
20 tax files.
21       And he only gave me one year, and it was a
22 partial.  And he didn't -- wasn't very talkative about
23 the client.
24       So yes, I assume he didn't wanna talk about
25 the client.

Page 81

1     Q  Okay.  You mentioned he mentioned his own
2  involvement in foreign trusts?
3     A  Yes.
4     Q  What did he say was the nature of his
5  involvement?
6     A  Said he, too, was involved in foreign trusts.
7     Q  That was all?  Just that he was involved?
8     A  I didn't really drill him on it.
9     Q  Okay.
10    A  But clearly he's involved with setting up
11 foreign trusts himself.
12    Q  And when you say "clearly he's involved in
13 setting up foreign trusts himself" --
14    A  Just based on the conversations we had, yes.
15    Q  Okay.  Okay.  Other than what he told you,
16 you're not aware of his activities in setting up foreign
17 trusts?
18    A  Well, he was a financial planner.
19       Nothin' sticks out, Mike.
20    Q  Okay.  What did you understand was George
21 Famiglio's role in working for Dr. James?
22    A  My understanding was, he was handling all of
23 the -- all of his tax requirements.
24    Q  Okay.
25    A  He was doin' write-up work, payroll returns,

Page 82

1   tax returns, and the whole gamut.
2         And he also did his personal return.
3      Q   Outside of preparing his business and
4   personal returns, did you have any understanding about or
5   impression of George Famiglio's role in providing
6   financial advice to Dr. James?
7      A   I don't -- I don't know if he provided much
8   in the way of financial advice.
9         I don't know.
10     Q   At one point in the memo, the second
11   paragraph on the second page of exhibit 38, the last
12   sentence of that second paragraph.
13        "He is also not involved with the client in
14   any way regarding investment advice or investing his
15   funds, et cetera."
16        Was that what he told you, or was that your
17   understanding of his role?
18     A   That's what he told me.
19        I said, "The accountant states, 'No.'  He is
20   not involved with the client in any way regarding
21   investment advice or investing his funds."
22     Q   Okay.  Is that -- does that comport with your
23   understanding?
24     A   That is my understanding, yes.
25     Q   Okay.  So I guess what I'm asking is, when

Page 83

1   George Famiglio told you he wasn't involved with giving
2   Dr. James investment advice, did you believe him?
3      A   I don't -- I didn't really make a judgment at
4   that time.
5         I don't know.
6      Q   Okay.
7      A   I'm just trying to get the facts.
8      Q   Okay.
9      A   That's what he told me.
10     Q   Okay.  Do you know whether or not that was
11   true at the time?
12     A   At the time?
13     Q   Right.
14     A   I didn't know at the time.  I was just trying
15   to gather some facts.
16     Q   Okay.  Do you know now whether that is a true
17   or false statement?
18     A   No, I don't guess I do know if that's true or
19   false.
20     Q   Okay.  That's just what he said, and you have
21   no opinion of whether it's true one way or the other?
22     A   Right.
23     Q   Okay.
24        Okay.  I'm going to refer you to the first
25   page of exhibit 38.  The fifth paragraph, the large

Page 84

1   paragraph that's second from the bottom of the page.
2      A   Okay.
3      Q   The last sentence.
4         "The accountant did state he was told by the
5   client that Donaldson had taken care of everything in
6   regards to the proper forms to be filed."
7         What did that mean?
8      A   That meant that he told me that he was told
9   by the client that Donaldson had taken care of everything
10   in regards to the proper forms to be filed.
11     Q   Okay.  So does that mean -- because I think
12   that sentence is -- there may be a couple of ways to read
13   that sentence.  So I want to make sure I'm reading it the
14   way that you intended it.
15        Talking about "the proper forms to be filed,"
16   does that mean that Dr. -- George Famiglio said that Dr.
17   James told him Steve Donaldson was taking care of the
18   forms that had to be filed as of May 26, 2005 that had
19   not been filed?
20        Or was it that Dr. James told George
21   Famiglio, Donaldson was taking care of the forms to be
22   filed; the forms that had not been filed?
23     A   Well, since I was down there, and everybody
24   knew we were talkin' about 3520s --
25     Q   Uh-huh.

Page 85

1      A   -- and the accountant said to me that he was
2   told by the client that Donaldson had taken care of
3   everything in regards to the proper forms to be filed, my
4   assumption is, is that's what the accountant was talkin'
5   about.
6      Q   The 3520s?
7      A   The 3520s, yes.
8      Q   That the 3520s had not been filed?
9      A   Yes.  And any other forms that had to be
10   filed.
11     Q   And that was going forward, or in 2001, 2002,
12   2003, that Dr. James believed Steve Donaldson was taking
13   care of filing those?
14     A   One of the things I gotta be careful with,
15   Mike, when I try to interview an accountant, is when I
16   begin to start sounding like you; and I keep tryin' to
17   pin him down, he's gonna -- I'm not gonna get any
18   information out of him.
19        So there will be times when I don't sit there
20   and try to pick on him like this, for example, the way
21   that you're doing; because he's just gonna shut up.  And
22   I'm just there tryin' to get some information.
23        I'm tryin' to find out what his thoughts are,
24   what he did and what he didn't do.
25     Q   Okay.

Page 86

1    A   Those types of things.
2        So no.  I did not -- I didn't pick at that to
3    find out, "Well, what do you mean by that specifically?"
4        I just didn't do that.
5    Q   Okay.  So this sentence is just something
6    that he said?
7    A   Absolutely.  It is exactly the way it's
8    written.
9        The accountant told me --
10   Q   Okay.
11   A   -- what he says the client had told him.
12   Q   Okay.
13   A   Is that what really happened?  I don't know.
14   Q   Sure.
15   A   I didn't -- I don't believe him afterwards.
16   Q   Okay.  Why don't you believe him?
17   A   It just -- the whole thing in -- the whole
18   thing.  The whole meeting.
19       There was nothing there that was supposed to
20   be there.  He says he would get those things for me.  He
21   never called back and presented me with the files.  He
22   didn't wanna talk about the client.  He didn't talk much
23   about the client.
24       He wasn't very cooperative, is the way I
25   would look at it.

Page 87

1    Q   Okay.  I think at one point in the memo you
2    said, "He's clearly not thrilled to sit with me and
3    provide his tax files"?
4    A   That's just my opinion.
5    Q   That was your impression?
6    A   Yes.
7    Q   What did you base that impression on?
8    A   The whole darn meeting.  The whole thing.
9        The fact that he didn't have the files.  The
10   fact that he's tellin' me at one point he doesn't know
11   anything about foreign transactions, then at the next
12   point he's tellin' me he's also -- he does that work
13   himself.  Well, which is it?
14       Those types of things.
15   Q   Okay.
16   A   He didn't sit down --
17   Q   Anything else?
18   A   -- he didn't sit down and talk about the
19   client.  He did whatever he could to talk about somethin'
20   else.  I had to keep tryin' to pull him back in.
21       And these are the comments that he made.
22   Q   Okay.
23   A   I just don't find it very --
24   Q   Okay.  Did you ever meet with George Famiglio
25   at another time besides May 26 of '05?

Page 88

1    A   No.
2    Q   And I think we mentioned Offshore Trust
3    Services a couple of times, and I may have asked you a
4    question already once about them.
5        But what is Offshore Trust Services, as you
6    understand it?
7    A   It's one of -- I believe they're -- they
8    specialize in the compliance; compliance requirements of
9    foreign trusts.
10   Q   Okay.  Would that include the filing of Forms
11   3520-A?
12   A   Ones that they filed in this case?  Yes.
13   Q   Right.  Do you know if they prepare Forms
14   3520 for people?
15   A   Yes.
16       Oh, 3520s?
17   Q   Yes.  3520s.
18   A   I don't know.  I don't think so.
19       I think they prepare the paperwork that needs
20   to be filed for a foreign trust to be in compliance with
21   U.S. laws.
22   Q   Okay.  And the foreign trust return -- just
23   for the record and for clarity -- is the 3520-A?
24   A   That's the informational return, yes.
25   Q   That's supposed to be filed by the trust?

Page 89

1    A   Correct.
2    Q   And the 3520 is the form that's supposed to
3    be filed by the trust owner or beneficiary?
4    A   Beneficiary or the owner, yes.  Unless they
5    got it backwards.
6    Q   Or I may have said it backwards.
7    A   Okay.
8    Q   That's fine.
9        All right.
10       MR. MAY:  I've got quite a bit more
11   questions.
12       Are you fine?  Does anyone need to take a
13   break?
14       THE REPORTER:  I wouldn't mind taking a
15   two-minute break.  Is that okay?
16       (Recess taken.)
17   BY MR. MAY:
18   Q   All right.  Mr. Schmitz, well, I think this
19   would be a better way to do this.
20       (3/5/08 Letter, is received and marked
21   exhibit 39 by the court reporter.)
22   BY MR. MAY:
23   Q   All right.  Mr. Schmitz, you've been handed
24   what's marked exhibit 39.
25       Do you recognize exhibit 39?

Page 90

1     A   Yes.
2     Q   Was there some discussion in your
3  interactions with, maybe with Appeals Officer Morales,
4  about whether or not Dr. James owned some kind of
5  universal life policy inside of his trust?
6     A   Mr. Morales did not understand foreign trust.
7  He didn't know what it meant.
8        At the time -- and I don't know what the
9  answer is even today -- at the time I had thought, we had
10 thought, that what was in that trust was a foreign
11 variable life insurance policy; which is the normal, you
12 know, one of the normal transactions that occurs.
13       So here we are with Morales, tryin' to
14 explain to him what a foreign trust is, and tryin' to
15 explain to him how a variable life insurance policy
16 worked.  He didn't really understand.
17       For example, he thought that if he took a
18 loan out on his U.S. Life insurance policy, that it was
19 taxable.
20       So we had to --
21    Q   And you mean if Dr. James took a loan out?
22    A   Well, in this example, we used him.
23    Q   Okay.
24    A   And he used himself in his example.
25       I can't -- he didn't understand how this

Page 91

1  stuff worked.
2        So we tried to explain to Morales how the
3  foreign trust that owns a foreign variable life insurance
4  policy works.
5        And so we eventually, as I recall, when we
6  were talkin' -- workin' with Morales, he wanted to see
7  something in writing.
8        We said -- I said, or maybe even Bill said --
9  "Well, how about we get the trust company to explain it
10 for you?"
11       So we did that.  And that's what this letter
12 was about.
13    Q   Exhibit 39, the letter is to explain the
14 variable life insurance policy inside of Dr. James'
15 foreign trust?
16    A   Correct.
17       And this was provided to the appeals officer.
18    Q   Okay.  If you'll look in the second page of
19 exhibit 39, there's an e-mail?
20    A   Uh-huh.
21    Q   From a Barbara Smith to Josh Crithfield?
22    A   Correct.
23    Q   Who is Barbara Smith?
24    A   She's our secretary.
25    Q   Okay.  And the next page appears to be the

Page 92

1  same letter?
2     Q   Next page, page 3?
3     Q   The third page of exhibit 39.  It's marked
4  WSH00430.
5     A   Uh-huh.
6     Q   Is that the same letter, just not on the
7  letterhead?
8     A   Yeah.  It probably came to us by e-mail.
9     Q   Okay.  And then --
10    A   Or a Word file or somethin'.
11       And then, you know, we said, "Well, put it on
12 your -- put it on your letterhead, you're the one --
13 you're the one writing the letter."
14       Yes.
15    Q   Okay.  Do you know who drafted the letter?
16    A   I assume it was Keithley Lake, but it could
17 have been anybody from the Offshore Trust Services over
18 there.
19    Q   Okay.
20    A   Could have been Donaldson, could have been
21 Crithfield.
22       Because again, they're all the same.  And
23 First Fidelity Trust is the insurance company that
24 they're also all a part of.
25    Q   Okay.  Do you know who Keithley Lake is?

Page 93

1     A   All I can tell you, he's the director of
2  First Fidelity Trust.
3     Q   And you just know that from the signature
4  block and this letterhead on --
5     A   Well --
6     Q   -- exhibit 39?
7     A   -- I had heard his name before in
8  conversations while we were tryin' to figure out what was
9  goin' on.
10    Q   Okay.  Did you later come to find out as
11 to -- let me ask you differently.
12       Does -- did Dr. James have a variable life
13 insurance inside of his trust?
14    A   Today, I still don't know exactly what it is.
15       It may be a private annuity.  It may be a
16 private annuity within the trust.
17       That's the last thing I heard from them as
18 well.
19    Q   Okay.
20    A   As you see from the records.
21    Q   Right.  As far as exhibit 39, do you consider
22 it an accurate description in general terms of what a
23 variable life insurance policy is?
24    A   Sure.
25    Q   And the tax implications of it?

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

Page 94

1     A  Yes.
2     Q  Okay.  But specifically in reference to Dr.
3  James, I think a moment ago you're not sure whether or
4  not he really had --
5     A  At the time --
6     Q  -- this kind of policy?
7     A  I'm sorry.
8     Q  No.  At that time, did you --
9     A  At that time, we believed that there was a
10 foreign variable life insurance owned by a foreign trust.
11 That is what we believed at the time.
12        That's what I believed at the time; when we
13 were goin' through this whole process, including up
14 through the process with Morales.
15     Q  Okay.  And what do you think now?
16     A  Last -- last I was told is, it may not have
17 been a life insurance policy.  It may have been a private
18 annuity.
19     Q  Okay.  And how would that be different with
20 respect to this $50,061 in distributions?
21     A  Well --
22     Q  What difference would that make?
23     A  -- I still believe that the 50,000 is nothing
24 but back and forth between the two entities -- James
25 bein' an entity and the trust bein' an entity -- of

Page 95

1  contributions, distributions, that type o' thing.
2        However, if there is a -- so what you're
3  sayin' is, you want me to put a -- a -- an annuity into a
4  foreign trust and tell you if it works the same way?
5     Q  Sure.
6     A  Okay.
7        You can -- the trust can purchase a foreign
8  annuity, 'cause it would be a foreign policy at that
9  point.  And you would basically still have the same
10 rules.  It still builds up tax-free within the annuity.
11        But when you take distributions, whenever
12 those distributions might occur, you pay tax on it at
13 that point.
14     Q  Okay.
15     A  Up to basis -- so you're basically building
16 up tax-free earnings in the private annuity.  When you
17 get your money out, it's taxable to some extent.
18        It's kinda like your pension.  When you get
19 your pension, it's gonna be taxable to some extent.  Do
20 you know what that is?  I don't know, and you're not
21 gonna know.
22        We go by the box that tells us what it is.
23     Q  Okay.
24     A  But that's -- that's how that would work.
25     Q  On the contri -- first case, say it's a

Page 96

1  variable life policy.
2        Would the contributions to a life insurance
3  policy of that nature be deductible?
4     A  No.
5     Q  Okay.
6     A  No.
7     Q  How about if it was an annuity?
8        Would the contribution into the annuity be
9  deductible?
10    A  No.
11        You're purchasing the annuity, and/or you're
12 purchasing a foreign life insurance policy -- a life
13 insurance policy, be it foreign or domestic.  That's not
14 deductible.
15    Q  Right.  It's only what's after that that
16 there might be some tax deferral of growth --
17    A  Right.
18    Q  -- inside an annuity?
19    A  The only tax feature to it is the buildup of
20 tax-free of income within it.
21    Q  Okay.
22        (3/21/08 Letter, is received and marked
23        exhibit 40 by the court reporter.)
24 BY MR. MAY:
25    Q  All right.

Page 97

1        Mr. Schmitz, you've been handed what's marked
2  exhibit 40.
3        Do you recognize exhibit 40?
4     A  Yes.
5     Q  And what is exhibit 40?
6     A  It's a letter from me to Jorge Morales.
7     Q  And what was this letter about?
8     A  After bein' told by the trust people that
9  what was inside that policy was a foreign variable life
10 insurance policy, that we were then notified that that's
11 not the case; that he really had a private annuity, which
12 I guess is why you asked that earlier question.  So
13 great.  Now we look like idiots.
14        So this is me -- actually, I called him
15 first.  I think.  Yes, I did.  I called him first.
16        And then I put this in writing to let him
17 know that "Yeah, we're wrong.  Apparently it's a private
18 annuity."
19     Q  Okay.  But as far as the distributions or
20 contributions, the $50,000, you don't think it made
21 really any difference whether it was an annuity or a life
22 insurance policy?
23     A  Well, yes.  The answer is yes.
24     Q  "Yes," it makes no difference?
25     A  It makes no difference, you're correct.

Page 98

1    But at this point I could care -- honestly, I
2  could have cared less whether or not we had unreported
3  income. The Revenue agent didn't think we had unreported
4  income. I wasn't concerned about it then. I wasn't even
5  concerned about it when we were tryin' to deal with
6  appeals on whether or not he had reasonable cause for not
7  filin' the form.
8    Who cares if he had unreported income. He
9  didn't know he had unreported income. I didn't even know
10  he had unreported income.
11    If he had, I just wasn't concerned whether or
12  not we had unreported income.
13    Q  Okay.
14    A  So I at least wanted to tell him "Okay,
15  you're right, it was not a" -- turns out -- not that he
16  was right, 'cause he didn't know what it was, either,
17  Morales -- but I wanted to let him know that I didn't
18  know, either.
19    But, you know, tried to correct the error as
20  quickly as I could.
21    Q  Sure. And I think you testified a few
22  moments ago, as of today you're still not sure what it
23  really was?
24    A  I'm not convinced until I see the paperwork.
25    Q  Okay. Have you ever seen any policies that

Page 99

1  were held by the trust?
2    A  Well, no, I don't think we ever saw the
3  actual policy stuff.
4    Q  Okay.
5    I'm going to hand you what was marked in an
6  earlier deposition exhibit 10.
7    And I'm going to go ahead and hand you what's
8  also been -- earlier was marked as exhibit 23.
9    MR. MAY:  I'm sorry, but this one does not
10  have the sticker on it.
11    It's the 2003 3520.
12    I don't know why I don't have another copy of
13  that one.
14    MR. JONES:  I'm sorry, which one is that?
15    MR. MAY:  23, it's the 2003 3520.
16    And 10 is the 3520-A from 2003.
17    MR. JONES:  And you don't have an extra copy
18  of that one?
19    MR. MAY:  No, I'm sorry. I thought I did.
20    MR. JONES:  Okay.
21  BY MR. MAY:
22    Q  I'm just trying to tie up a loose end here,
23  Mr. Schmitz.
24    If you'll look in exhibit 10, which is the
25  3520-A of the Hornsby trust for 2003, on the second page

Page 100

1  in the part 2, line 17, where it shows the distributions
2  to owners?
3    A  Uh-huh.
4    Q  Is this the 50,000 that -- it has a notation
5  here, $50,025 -- is this the 50,000 that was discussed in
6  the letters to Mr. Morales?
7    A  Yes.
8    Q  Okay. And then referring to exhibit 23,
9  which is the 3520, Dr. James' 3520, where would those
10  distributions show up, if they were a distribution, on
11  the 3520?
12    A  Is this the 3520 we did? I did? There's no
13  signature on this.
14    Q  I understood that it was.
15    I don't believe I have a copy of a signed
16  3520.
17    A  Okay.
18    Q  So I'm not -- can you identify it? I mean,
19  do you recognize exhibit 23?
20    A  I guess we could ask the secretary to look
21  up, see what my P10 is.
22    Q  Okay.
23    A  I don't know what it is.
24    Q  Okay.
25    A  But your question --

Page 101

1    Q  Is this distribution -- this $50,000, where
2  would it show up on the 3520?
3    If at all?
4    A  Well, I'm not sure if it would show up at
5  all.
6    If -- I don't know where we are in the
7  sequence, time sequence of returns here.
8    Q  Okay.
9    A  If, in fact, this is a foreign variable life
10  insurance policy, the income is reported here.
11    But it doesn't carry over as a distribution
12  to James, because it's building up within the policy.
13    Q  Okay.
14    A  All right? So I'm not -- I don't know, so I
15  don't -- is this the one that was filed?
16    Q  That's my understanding.
17    A  Okay.
18    Q  So it may not necessarily be in with the
19  3520 --
20    A  Well, it --
21    Q  -- is that what you're saying?
22    A  Well, if it is a variable life insurance
23  policy in the trust, it would not be taxable to James, is
24  my point.
25    Q  Okay. So it wouldn't need to be reported on

Page 102

1  the 3520?
2      A   It wouldn't need to be reported as income.
3      Q   Okay.  Okay.
4      A   Now, distributions, transfers back and forth
5  are supposed to be reported.
6          Well, here.  Page 2 of the unnumbered exhibit
7  clearly shows he transferred $607,000 of cash to the
8  trust.
9      Q   Okay.  And that page 2 in the lower
10 right-hand corner, does it have the numbers SAB0138?
11     A   Right.
12     Q   Okay.
13     A   So I guess what I'm sayin' is, this doesn't
14 show me there's a -- here's the distribution down here,
15 50,025.
16     Q   Okay.  And where was that?
17     A   That's on part 2 of the 3520-A.
18     Q   And that's marked OTS - James 00060?
19     A   Right.
20     Q   Okay.
21     A   And it was our understanding that that was a
22 mistake.
23         And it should have been netted against the
24 transfers that he made, I guess, in the same year or
25 somethin'.

Page 103

1      Q   Okay.  All right.
2          And then on, looking on the 3520-A at the
3  page OTS - James 000061, which is the third page of the
4  3520-A?
5      A   Uh-huh.
6      Q   In the statement of foreign trust income
7  attributable to U.S. owner, there's the other income,
8  annuity income, 50,061?
9      A   Uh-huh.
10     Q   And you're saying that because that was
11 within -- if that was income within a private annuity,
12 that wouldn't necessarily be reportable on a 1040?
13     A   It would not be reportable on a 1040 if it
14 came from a variable life insurance policy.
15     Q   Okay.  And if it came from an annuity, would
16 that be any different?
17     A   It would be different.
18         If it came from an annuity, you'd apply it
19 against whatever basis he has, and whatever part of it --
20 of that private annuity is earnings would be taxable,
21 yes.
22     Q   Okay.
23     A   So -- but I --
24     Q   Now, these are the two numbers that were
25 discussed in your letters, the March 5 letter and the

Page 104

1  March 21 letter?
2      A   Uh-huh.
3      Q   Exhibits 39 and 40?  Okay.
4          Did you eventually obtain some financial
5  statements from Dr. James for his business, the Brian
6  James M.D., P.A.?
7      A   Whaddaya got -- whaddaya got in the file?
8      Q   Sure.  That's previously marked 13.  Do you
9  recognize exhibit 13?
10     A   No, I really don't.
11     Q   Okay.  So you don't remember seeing Dr.
12 James' business 2001 financial statements?
13     A   I may have.  I just.
14     Q   You don't know?
15     A   I don't remember.
16     Q   Okay.  That's fine, then.  I don't have any
17 questions about that.
18         Mr. Schmitz, I'm going to hand you what's
19 marked exhibit -- what was previously marked exhibit 14.
20 Do you recognize exhibit 14?
21     A   No.
22     Q   Okay.
23     A   I don't recall, no.
24     Q   Do you recall, in your memorandum of your
25 meeting with George Famiglio, that you mentioned the

Page 105

1  financial statements from Dr. James' business, referring
2  to some federal or some overseas wire transfers?
3      A   I don't know if I said "financial
4  statements," or did I say "ledger"?
5      Q   Okay.  Maybe you said "ledger."  We can look
6  back at that.
7      A   I do remember there was some foreign wire
8  transfers comin' out of his bank account that would have
9  had to have been accounted for by Famiglio when he did
10 his write-up work.
11     Q   Okay.  This is exhibit 38.
12         The second page of exhibit 38, the third
13 paragraph.  The 2003 -- you mentioned the 2003 general
14 ledger.
15         Was that general ledger in the form of what
16 we're looking at here, exhibit 14?  Or that was some
17 other form?
18     A   I think it was some other form.
19     Q   Okay.  And clearly, that was referencing the
20 2003 ledger, not the 2002.
21         Is that right?
22     A   Right.
23     Q   Okay.  So you think you had access to some
24 other financial records of Dr. James' business?
25     A   Here's what happened.

Page 106

1    I'm tellin' you what I saw that he provided
2  in 2003.  And as you see in this thing, I'm tellin' him,
3  "Well, send me the other stuff."
4        He said he was gonna send me the other stuff.
5  And he did send me a few other things, maybe
6  no more than an inch thick, everything in there.
7        I think I transferred that up under the
8  Covell, I transferred it up to one o' the attorneys.
9    Q    Okay.
10       MR. JONES:  For the record, those were
11   provided to you.
12       MR. MAY:  Okay.
13       MR. JONES:  Tax returns --
14       THE WITNESS:  Okay.
15       MR. JONES:  -- primarily.
16       THE WITNESS:  Yeah, and I didn't make a copy
17   of that.
18       MR. JONES:  And these statements --
19       MR. MAY:  That was --
20       MR. JONES:  Yes.
21       MR. MAY:  -- you think that was these general
22   ledgers?
23       MR. JONES:  Yes.
24       THE WITNESS:  Okay.  I didn't --
25       MR. MAY:  Okay.  Well, I --

Page 107

1        THE REPORTER:  Could I have one at a time,
2  please?
3        MR. JONES:  Yes.  Those documents were turned
4  over to you.
5        MR. MAY:  Okay.
6        MR. JONES:  And to the best of my
7  recollection, it was the tax returns for 2003 and
8  these three financial statements, slash, general
9  ledgers.
10       MR. MAY:  Okay.
11  BY MR. MAY:
12   Q    Well, Mr. Schmitz, I'll refer you in the
13  second part, I think, of this exhibit 14, the 2002
14  statements and general ledger, the page that's marked in
15  the lower right corner SAB0939.  It's page 6 of the
16  general ledger.
17   A    Okay.
18   Q    And about halfway down the page, do you see a
19  heading, "545.1 Insurance - General"?
20   A    Yes.
21   Q    And it looks like to me the first transaction
22  under that, there's a date and some letters, but then it
23  says "wire transfer"?
24   A    Okay.
25   Q    Do you see that?

Page 108

1    A    Uh-huh.
2    Q    In the amount of 110,000?
3    A    Yes.
4    Q    Do you know, just by looking at this general
5  ledger, is that a foreign wire transfer, or?
6    A    You can't -- you can't tell if it's foreign
7  by lookin' at that, no.
8    Q    Okay.
9    A    I couldn't tell that.
10   Q    Okay.  Do you know what that wire transfer
11  was for?
12       Do you have any reason --
13   A    No.
14   Q    Okay.
15   A    I did note some foreign wire transfers in the
16  information I looked at at Famiglio's.
17   Q    Okay.
18   A    But I don't think it was '02.  I think it was
19  '03, maybe.
20   Q    Okay.
21       MR. MAY:  That's 16.
22  BY MR. MAY:
23   Q    Mr. Schmitz, I'm going to hand you what's
24  previously been marked exhibit 16 before?
25       Have you ever seen exhibit 16 before?

Page 109

1    A    I'm sure I have.
2    Q    Okay.  What does it look like to you?
3    A    It's a 2002 tax return.
4        Form 1040 for Brian James.
5    Q    Okay.  And that's the client, the plaintiff
6  in this case?
7    A    Yes.
8    Q    I refer your attention to the second page of
9  exhibit 16.
10       Just below the signature block there's two
11  asterisks, "interest not included," "penalty not
12  included," kind of at the bottom of the page, the page
13  marked I.R.S. admin 000007?
14   A    Okay.
15   Q    And there's some amounts there.  Do you know
16  what those are for?
17       MR. JONES:  Well, objection to foundation.
18  He didn't prepare this return.
19       MR. MAY:  Sure.  I'm just asking him as a tax
20  professional.
21  BY MR. MAY:
22   Q    Do you know what those are for?
23   A    Tellin' me failure to pay estimated tax
24  penalty.
25   Q    Okay.  And what is that?  What is a failure

Page 110

1    to pay estimated tax penalty?
2         A    You fail to make your quarterly tax payments
3    properly, and you owe more tax than you should.
4         Q    Okay.  And you -- now, Mr. Jones indicated,
5    and I understand, you did not prepare this Form 1040.  Is
6    that correct?
7         A    Correct.
8         Q    So your understanding of what that is is just
9    based on your general knowledge of tax practice?
10        A    Yes.
11             Program -- tax programs will tell you what
12   your estimated tax penalty is and how much interest you
13   owe.
14        Q    Okay.  And when would someone owe interest
15   when they file their tax return?  Under what kind of
16   circumstances?
17        A    Well, you can file a timely return and still
18   owe interest because you didn't have enough tax paid in
19   by 4/15 even though you filed 10/15, for example.
20        Q    Okay.  And you mean, by "4/15," you mean
21   April 15?
22        A    Yes.
23        Q    And by "10/15," you mean October 15?
24        A    Yes.
25        Q    Because when is the tax due?

Page 111

1         A    4/15.
2         Q    April, right.  Okay.
3              So someone might incur an interest or perhaps
4    some penalty if they didn't fully pay on April 15?
5         A    Yes.
6         Q    Okay.  Is that your understanding of what's
7    being reported here on Dr. James' tax return for that
8    year, 2002?
9              MR. JONES:  Well, same objection.
10             I also -- in the last deposition, we
11        objected.  This is the I.R.S. version of the return
12        with I.R.S. markings on it.
13             It didn't come from our files, but.
14   BY MR. MAY:
15        Q    You can answer.
16        A    Yes, I assume that that's what this is.
17        Q    Okay.  Fair enough.
18             Turning --
19        A    Even though I don't always see it on the
20   bottom like this, but.
21        Q    Okay.  Sometimes maybe it's -- is it not
22   marked at all, even though someone may owe interest, or?
23        A    Sometimes it's marked, yes.
24        Q    Or sometimes somewhere else on the form?
25        A    Yes.

Page 112

1         Q    Okay.  Turning now in exhibit 16 to the
2    schedule B, which is I.R.S. admin 000009.
3         A    Yes.
4         Q    And I think earlier we referenced a line 8 on
5    the schedule B.
6              Is that the line 8 here on this page of
7    exhibit 16 at the bottom?  "During 2002, did you receive
8    a distribution from or were you the grantor of or
9    transferor to a foreign trust?"
10        A    Yes, that is line 8 on the tax return.
11        Q    Right.  And what does Dr. James' 1040 for
12   2002 indicate?
13             MR. JONES:  Same objection as before.
14             This isn't a --
15             THE REPORTER:  I can't hear you.
16             MR. JONES:  Same objection as before, the
17        last objection.
18   BY MR. MAY:
19        Q    So what does exhibit 16 indicate that Dr.
20   James reported to the I.R.S.?
21        A    The return has "No" marked, yes.
22        Q    Okay.  And what, based on your understanding
23   of Dr. James' ownership of the Hornsby trust, what should
24   the answer have been to line 8?
25             Or which box should have been marked?

Page 113

1         A    Well, I would think he would have box --
2    boxed in "Yes."
3              He would have checked "Yes."
4         Q    Instead of "No," as is marked here?
5         A    Right.  I think he's a grantor of a foreign
6    trust.
7         Q    Okay.  Was he also a transferor to a foreign
8    trust in 2002?
9         A    Yeah.
10        Q    Okay.  And does line 8 there mention the Form
11   3520?
12        A    No.
13        Q    Below the question, "Did you receive" --
14        A    Oh, yes.
15             Sorry.
16        Q    Okay.
17             All right.  Okay.
18             Of course, you know the tax program defaults
19   to "No," dontcha?
20        Q    The software --
21        A    Yes.
22        Q    -- that's used to prepare the forms?
23        A    Yeah.
24        Q    I had heard that before.  I haven't used it,
25   so I don't know that for myself.

Page 114

1        Mr. Schmitz, I'm handing you what was
2  previously marked as exhibit 17.
3        A   Yes.
4        Q   Do you recognize exhibit 17?
5        A   Just a client's general ledger.  I don't
6  recall it.
7        Q   Okay.  Is this maybe the general ledger that
8  you looked at for 2003?
9        Or do you --
10       A   It could have been, yes.
11       Q   It could be?  Okay.
12       But you're not sure?
13       A   I think I looked at a different -- it could
14  have been the same thing.
15       Q   Okay.  But it might not have been?
16       A   I guess --
17       Q   Okay.
18       A   -- I guess not.
19       Q   Sorry, I just.
20       I'll direct your attention to the -- page 5
21  of the general ledger.
22       A   I'm there.
23       Q   Okay.  The page marked SAB0955 in the lower
24  right corner.
25       A   Yes.

Page 115

1        Q   Under insurance malpractice, the heading "545
2  - Insurance Malpractice"?
3        A   Yes.
4        Q   There's a transaction dated December 25 of
5  '03, "Outgoing Fed Wire DR TRN"?
6        A   Yes.  That's the one I've seen before.
7        Q   Okay.  What about that tells me that's going
8  to an overseas location?
9        A   That is an out -- outgoing fed wire transfer.
10       Q   So that's only used for wire transfers to
11  overseas?
12       Or could it -- is it also used for outgoing
13  wire transfers within the United States?
14       A   Outgoing from within the United States to
15  offshore.
16       Q   Okay.
17       A   They use the -- they use the word "outgoing."
18       Q   Okay.  So that always means overseas?
19       A   Yes.
20       Q   Okay.  And how do you know that?
21       I mean, what's the basis of your knowledge?
22       A   Just seein' it before; buncha times.
23       Q   Okay.  And it's always been for an overseas
24  wire transfer?
25       A   Yes.

Page 116

1        Q   Okay.  But that's the one you refer to in the
2  memo as designated --
3        A   I think so.  Looks like the same amount.  I
4  think I reviewed the '03, right?
5        Q   I think that was the reference in the
6  memorandum as to the 2003 general ledger.
7        A   It just seems to me that's the one I've
8  noticed before.
9        Q   Okay.
10       A   See, I'm not -- I'm not entirely sure this is
11  the exact same general ledger I saw at his office.
12       Q   Okay.
13       A   I think there's a different -- I don't think
14  this is the exact same thing.
15       Q   Okay.
16       A   Lemme take a minute to clarify.
17       Q   Sure.  If you'd like to take a moment to
18  review, that would be fine.
19       A   Yeah.  The one I saw said, quote, "federal
20  overseas wire transfer."
21       This is not the same general ledger that I
22  saw.
23       Q   Okay.  Are you sure --
24       A   At his office.
25       Q   Okay.  You're sure that this is not --

Page 117

1        A   Now that I've --
2        Q   -- the same general ledger?
3        A   Now that I've seen this a little closer, yes,
4  I'm quite confident.
5        I saw a true general ledger.  This is
6  financial statements.
7        And then he -- and then he put -- this isn't
8  the general ledger for the year.  I saw the general
9  ledger for the year at his office.
10       This is a general ledger for the month of
11  December.
12       Q   Okay.
13       A   Upon closer inspection.  So that's all this
14  is.
15       Q   Okay.
16       A   This would be his, what he probably considers
17  his compiled financial statements or somethin'.
18       But no, this is not the same one I saw.
19       Interesting.
20       Q   Okay.  And when you looked at one at his
21  office, did that one stay at his office?
22       A   Yes.  I didn't take anything with me from his
23  office.
24       It was a year-to-date general ledger.
25       Q   Okay.  So that was something different than

Page 118

1  this?
2      A   Absolutely.
3          This may, in fact, have been what I received
4  in the mail, that I forwarded up to the attorneys.
5          But I didn't spend a lotta time with that,
6  because I received it way after the fact.
7      Q   Okay.  Because Mr. Famiglio later sent you
8  some files or documents?
9      A   Yes.
10     Q   Okay.  And when was that?
11         Do you remember about when you received all
12 those?
13     A   I think I transferred it to the attorneys --
14         THE WITNESS:  You guys are still my
15     attorneys.  I know I'm not supposed to talk about
16     Covell stuff, but.
17     A   -- I transferred in the same overnight
18 package that I received it in to the attorneys, so they
19 might be able to see the date on it.
20 BY MR. MAY:
21     Q   Okay.
22     A   And I kept it in its original package that it
23 came to me.  And then I think I sent it up the same way.
24         For some reason, since I was outta the case
25 by that time, I didn't bother to make a copy.

Page 119

1      Q   Okay.  But you mean -- but you didn't receive
2  it around the time you sent it to the attorneys; you
3  received it, and then sometime later you sent it on?
4      A   Yes, yes.
5      Q   You just made sure you kept the original
6  packet?
7      A   Yeah.
8      Q   Is that -- okay.
9      A   I try to do that when I get somethin' along
10 the lines like that.
11     Q   Okay.  But as we're sitting here today,
12 you're absolutely -- are you absolutely certain that you
13 saw something else --
14     A   I am --
15     Q   -- at his office?
16     A   I am one hundred percent certain I saw a
17 year-to-date general ledger with the wording that I've
18 got there on that memo.
19         I don't put quotes around the words unless
20 I'm reading it verbatim.
21     Q   Okay.  So you're sure it did not say
22 "Outgoing Fed Wire" --
23     A   Absolutely --
24     Q   -- "DR TRN," as is in the general ledger that
25 we --

Page 120

1      A   Yeah, that's somethin' different.
2          That's different wording.  And I guess that's
3  what threw me off.
4          You go back to exhibit 38, yeah, see, I saw
5  the 2003 general ledger.  If I'd only seen the month of
6  December, I would have said that.
7          And then I make note of a $150,000
8  transaction, quote, federal overseas wire transfer.
9          That's me tellin' myself it's what it said
10 word-for-word.
11     Q   Okay.  Do you know what that insurance was
12 for?
13         Do you have any idea what kind of insurance
14 that would have been for?
15     A   Which one are you talkin' about now?
16     Q   The one that we just looked at.
17     A   The 150?
18     Q   Yes, the 150,000.  Do you have any knowledge
19 of that?
20     A   Well, it's under malpractice.  But no, I
21 don't know what it was.
22         I was concerned with tryin' to look at
23 transactions like this and wonder why it wasn't picked up
24 by the accountant when he does his write-up.  I wasn't
25 real concerned over the insurance.

Page 121

1      Q   Okay.  Sure thing.
2          All right.  Mr. Schmitz, I'm going to hand
3  you what's previously been marked 19.
4      A   I just wanna look.
5      Q   Okay, sure thing.
6          MR. JONES:  That's 19, you said?
7          MR. MAY:  19.
8          MR. JONES:  And I believe, just for the
9      record, we objected to this one previously.
10         It has I.R.S. markings on it.  It's not the
11     one from taxpayer's file.
12 BY MR. MAY:
13     Q   You were just looking at -- examining, I
14 think -- exhibit 17, the 2003 general ledger?
15     A   I was?
16     Q   Just then, just a moment ago?
17     A   Okay.
18     Q   Were you reviewing that exhibit?
19     A   Yeah.
20     Q   What were you reviewing?  What were you
21 looking at?
22     A   I was lookin' to see if $150,000 of insurance
23 showed up on the ledger.
24     Q   Okay.  And did it?
25     A   Well, you cut me off from it, but.

Page 122

1      Q   Oh, okay.
2      A   I didn't see it under life, workers, health,
3   liability or whatever.
4          And I don't know if this is the complete
5   story, but it's not jumpin' out at me.
6      Q   Okay.
7      A   Oh, I'm sorry.  Yeah, it is.
8          Here's malpractice separately stated.  Hmm.
9      Q   Okay.  All right.  I've handed you what's
10  marked exhibit 19.  That purports to be Dr. James' tax
11  return for the year 2003, his 1040 for 2003.
12         I'll direct your attention again to the
13  schedule B, which is marked "I.R.S. admin 000034," and
14  the line 8.
15     A   Same answer as 2002.
16     Q   Okay.
17         (Form 1040 Individual Tax Return, 2005, is
18         received and marked exhibit 41 by the court
19         reporter.)
20  BY MR. MAY:
21     Q   Mr. Schmitz, you've been handed what's marked
22  exhibit 41.
23         What is exhibit 41, if you recognize it?
24     A   2005 tax return.
25     Q   Okay.

Page 123

1          Doctor --
2      A   For Dr. James.
3      Q   And his individual 1040?
4      A   Yes.
5      Q   I direct your attention to the schedule B
6   again, which is WHS00434.
7      A   Yes.
8      Q   And the line 8.  Is it again marked
9   incorrectly, as we saw with the 2002 and 2003?
10     A   Yep.  Yes.
11         Same answer.
12     Q   Okay.  You attribute that to the software
13  defaulting to -- and I know you did not prepare this
14  return -- do you know the reason why it's marked, still
15  marked incorrectly on his 2005 tax return?
16     A   No.
17         My comment on the default is that if the
18  preparer does not specifically ask you the question, they
19  don't mark the box.
20         And, therefore, it defaults to "No."
21     Q   Okay.
22     A   Which has since been changed by the industry.
23  That's all.
24     Q   Okay.  So now does it default to "Yes"?
25     A   I think it's been changed by the industry.

Page 124

1   I'm not sure.
2      Q   Okay.
3      A   I just did a '10 return.  I'm tryin' to
4   figure it out.
5          Oh, well.
6      Q   All right.  Now, earlier we talked about Dr.
7   James' trust may or may not have owned a variable life
8   insurance policy, or maybe it was an annuity policy.
9          Are you aware if -- do you know if Dr. James'
10  trust owned any other kinds of insurance policies?
11     A   Not -- no.
12     Q   Have you ever heard of a business protection
13  policy?
14     A   Yes.
15     Q   And what is that?
16     A   That's some kind of an insurance you could
17  get for business protection that would be tailored to
18  your business somehow; for various damages, various
19  hazards.
20         And I think Donaldson and Crithfield and
21  those guys were offerin' that type of insurance.
22     Q   Okay.  Have you done any work on cases
23  involving a business protection policy?
24     A   I've never represented a client where that
25  expense was an issue, no.

Page 125

1      Q   Okay.  When you say "that expense was at
2   issue," what do you mean by "at issue"?
3      A   Well, that the purpose of the audit was for
4   that transaction.
5      Q   Okay.  Do you know if there had been audits
6   of people where that expense was at issue?
7      A   Yes, I've heard, and I'm aware of what's
8   goin' on.  Yes.
9      Q   What do you mean by "what's going on"?
10     A   Well, there's a criminal investigation goin'
11  on.  And that was, at one time, that transaction was
12  bein' looked at by the Service.
13         And they were contending that it was not real
14  insurance or something.
15     Q   Okay.  Do you have any opinion about the
16  business protection policy, whether it's legitimately
17  deductible or not?
18     A   Well, I know that CI is not makin' an issue
19  of it anymore.  And from what I understand, there's a
20  real insurance company offshore that they're placing the
21  policy with.
22         So it's not -- it's not the sham that the
23  Service thought it was.  That's all I know.
24     Q   Do you know if Dr. James had -- and I may
25  have already asked this, I apologize if I did -- but do

Page 126

1   you know if Dr. James had a business protection policy?
2       A   I think I have since learned that he did have
3   one.
4       Q   Okay.
5       A   But that, that was probably within the last
6   coupla years, one year or two years.
7           I was already done with -- we were already
8   done with our issue with Morales and appeals.  I think
9   it's somethin' I learned later.
10      Q   From your perspective, if he'd had a policy,
11  would it have been properly deductible?
12      A   I don't see why not.
13          I mean, if there is, in fact, an insurance
14  company and they are, in fact, taking your money and
15  they're giving you an insurance policy, I don't know.  I
16  mean.  But I'm skeptical of anything offshore.
17          I don't get very much documentation from
18  State Farm, when you stop and think about it.  All you
19  get's this little policy thing.  And you're hopin' that
20  when you total your car, that somebody's gonna write ya a
21  check.
22          But from what I understand, there's a real
23  insurance company offshore that will do that type -- will
24  accept that type of policy.
25      Q   Have you worked -- what is your experience in

Page 127

1   what insurance is?
2           I mean, have you delved into that?  Have you
3   had cases involving insurance?
4           Because somebody could write him a check,
5   just a hypothetical?
6       A   Okay.
7       Q   And maybe that's not appropriate here, but
8   somebody -- Person A writes Person B a check for $60,000.
9   In the memo line, he writes "Insurance."
10          And at the end of the year, Person B is going
11  to give Person A back $45,000 and keep 15,000 as a fee.
12          How do we know whether or not there was
13  really an insurance policy?
14          MR. JONES:  Objection.  We're into
15  speculation now.
16          This is speculative.
17      A   Based on what --
18          MR. JONES:  Unless he's become your expert
19  now.
20          MR. MAY:  Well --
21      A   But what you're sayin' is a complete sham,
22  because you're sayin' he got 45,000 outta 60 back.
23  BY MR. MAY:
24      Q   Yes.
25      A   Yes.  Well, that's silly.  That's a sham.

Page 128

1       Q   And I'm just trying to -- yeah, okay.
2       A   That's a scam.
3           That's a tax shelter that should be shut
4   down.
5           And I'm sure is, if it's that obvious.
6       Q   Sure.  And I mean --
7       A   But apparently, this one isn't.
8       Q   Well -- and I guess what I'm really asking
9   is, is it the label that determines whether or not it's
10  deductible?
11          Or is it the substance of what the thing is
12  that determines whether it's deductible; as insurance,
13  for example?
14      A   Now you're just havin' fun.
15          Well, look.  I.R.S. can get whatever they --
16  as much documentation as they can to prove it, I guess.
17          State Farm is known to be a reputable
18  company.  I'm sure that I could just show the check to an
19  auditor, and he'd be okay with it.
20          Has an auditor ever asked me for anything
21  else on State Farm insurance?  No.  'Cause it's a
22  reputable insurance company.
23      Q   Okay.
24      A   But the day that State Farm starts kickin'
25  back most of my money to me?  I think we're gonna have a

Page 129

1   problem, and I think I.R.S. would ask for more
2   documentation.
3           I personally would be skeptical of anybody
4   that pays for foreign insurance.  And if I learned that
5   he got money back, I would not sign my name on that tax
6   return.
7           And I might add, in the 2003 general ledger,
8   I certainly didn't see any money comin' back to James,
9   for example, so.
10          So I didn't know anything.
11          (Activity Report, is received and marked
12      exhibit 42 by the court reporter.)
13          (Recess taken.)
14  BY MR. MAY:
15      Q   All right, Mr. Schmitz.  You've been handed
16  what's marked exhibit 42.
17          Do you recognize exhibit 42?
18      A   Yes.
19      Q   And what is exhibit 42?
20      A   This was information that we got from the
21  Offshore Trust Services.
22      Q   Related to Dr. James' trust?
23      A   Yes.
24      Q   And I mean, is it -- to me it looks like just
25  a bunch of -- a record of a bunch of transactions, debits

Page 130

1  and credits?
2      MR. JONES:  Objection.  Is there a question?
3  BY MR. MAY:
4      Q   Is that a fair characterization?
5      Or -- I'm just trying to understand what this
6  document is.
7      A   This is a buncha debits and credits that will
8  eventually total up to representing transfers and any
9  other -- well, represents transactions of the trust, I
10  assume.
11      Q   Okay.  And did you rely on this document in
12  preparing the 3520, for example, or in other tasks that
13  you performed for Dr. James?
14      A   I got this from them as they were tryin' to
15  explain that the $50,000 in issue was nothing more than a
16  distribution back to James that should have only --
17  should have been offset by his contributions from James.
18      Q   Okay.  Can you point to me the line on here
19  where it shows that, or the group of lines?
20      A   No.  I really can't.
21      Q   Okay.  Now, there's some markings, some
22  checkmarks, some -- for example, on this first page of
23  exhibit 42, WHS00419.
24      A   Uh-huh.
25      Q   There's kind of a line drawn here at one

Page 131

1  point under 257,650.
2      Are those your -- is that your handwriting,
3  or do you know whose handwriting that is?
4      A   You know, some o' those markings are Bill
5  Simon's.
6      Or, quite frankly, it could have been
7  Offshore Trust, whoever sent it to us.  That could be
8  their markings as they were tryin' to figure out what was
9  goin' on.
10      Q   Okay.
11      A   I personally put the onus on them to -- to
12  reconcile it and tell -- tell -- tell me what was right
13  and wrong.
14      Q   You asked Offshore Trust Services?
15      A   Yeah.  I mean, they sent this to us.
16      We said, you know, "We need somethin' here to
17  show us what you guys are talkin' about."
18      And -- and this is what we got.
19      Q   Okay.
20      A   And I'm not sure how much use we had of this,
21  if any.
22      Q   Okay.
23      A   I can't remember what stage of the process we
24  got it.
25      Q   I notice the date on the first page, the

Page 132

1  WHS00419, in the upper right corner the date April 22,
2  2005?
3      A   April 22 --
4      Q   In the upper right-hand corner.
5      A   Oh.  Oh.
6      Yes.
7      Q   Is that -- do you know if that's when it was
8  printed out, or?
9      A   I really don't --
10      Q   You don't know?
11      A   -- remember.
12      Q   Okay.  Okay.
13      The relationship between the -- we've already
14  discussed that a 3520-A is different than a 3520, and
15  maybe what the difference of those is.
16      As far as the information that's reported on
17  a 3520 and a 3520-A, what's the difference in the
18  information that's reported?
19      A   Off the top o' my head, I don't think there
20  is much difference, if any.
21      I.R.S. has always been the first to admit
22  that it is a duplicative form.  And years ago, they
23  had -- I can't remember -- I remember when I was
24  researchin' somethin' and I saw where -- I can't remember
25  what this was now.  I made a copy of it and sent it up to

Page 133

1  Shelly.  Just kind of an FYI thing.
2      But it was -- it was I.R.S. officials
3  explaining to the public that "The 3520 and the 3520-A
4  are duplicative.  We understand they're duplicative.  We
5  think it's kinda silly that there are two forms
6  ourselves.  And we're gonna -- and we're going to -- we
7  hope to combine the two and have one form, X number -- 12
8  months from the date of this announcement."
9      And I can't remember anything more than that.
10      Q   Do you think there should only be one form?
11      A   It's all pretty much the same information.
12      Maybe presented differently, but it's all the
13  same information.
14      One, you need a statement signed by the
15  owner -- well, no, that goes in both of 'em, too.
16      So I think they're pretty much the same
17  information, yes.
18      Q   Okay.
19      A   That's my own personal opinion.
20      Q   Do you have an opinion, I mean -- so when it
21  comes to the reasonable cause question, if some-- if a
22  foreign trust has filed its 3520-A, do you think that
23  foreign trust owner should just, per se, have reasonable
24  cause?
25      A   No, not at all.  That's still a form that's

Page 134

1   required to be filed.
2        But I can tell you that it's not Anita
3   Friedberg -- Friedlander.  There was another lady that
4   was in charge in the I.R.S.  She was a coordinator for
5   this issue.
6        And her stated position was -- and I think
7   I've got her name written in the file -- her stated
8   position, she either made the comment directly to me or
9   to Shelly Kay or to another attorney, that she said
10  "Look.  In cases where the 3520-A had been filed, we
11  recognize that the taxpayer is not tryin' to hide
12  anything by not filing the 3520.  So yes, we're treating
13  those penalties differently.  You know, we're more
14  lenient on those penalties.  We can see that, we
15  understand that."
16       But -- I -- and I tried to get the case to
17  that person, but I couldn't get it outta the hands of
18  appeals.
19       Q   Was that a Maria Espinosa?
20       A   That's it.  That's the name, yeah.
21       Q   And was that her opinion?
22       A   That was her comments, yeah.
23       Q   Her comments?
24       A   Yeah.
25       Q   Did you consider that an official I.R.S.

Page 135

1   position?
2        A   When?
3        I'm talkin' after the fact now.  I'm talkin'
4   after the fact --
5        Q   Okay.
6        A   -- when the penalty's been assessed, and the
7   Service is lookin' to collect $800,000 from our guy that
8   doesn't have the money, and yet we're still in the
9   process of tryin' to appeal the penalty; all these things
10  are crashing down.
11       And I was tryin' to get the case to her, out
12  of appeals to her.  I specifically said to Friedlander, I
13  think, "You got a coordinator here.  Her position is
14  this.  That's our -- that's our set of facts.  You know.
15  Can you at least contact her and get a little guidance or
16  get her opinion or somethin' like" -- and I just couldn't
17  get anybody to release the case to her.
18       Q   And you --
19       A   So this is all after --
20       Q   Yeah.
21       A   -- the fact.
22       Q   Right.
23       A   Certainly if the 3520 is due and needs to be
24  filed, then you gotta file the form.
25       I don't think you can blow it off just

Page 136

1   because it's duplicative.  No.  I wouldn't -- I don't
2   believe that at all.
3        Q   Okay.  And as far as your efforts to get the
4   case to Maria Espinosa -- or rather her comments that you
5   described a moment ago about cases where a 3520-A was
6   filed but not a 3520 -- were those comments said to
7   you?
8        Or did you hear that from someone else?
9        A   I think those were comments to Shelly Kay.
10       And that's one reason why we filed the
11  claims, to try to get another bite at the appeals apple.
12       Q   And by "filing the claims," you mean the
13  refund claims?
14       A   Yes.
15       'Cause that would give us another opportunity
16  to go to appeals.
17       But apparently, that never materialized.
18       Q   Okay.
19       (LexisNexis document, is received and marked
20       exhibit 43 by the court reporter.)
21  BY MR. MAY:
22       Q   Mr. Schmitz, you've been handed what's marked
23  exhibit 43.
24       Do you recognize exhibit 43?
25       A   Is this the one I was talkin' about?

Page 137

1        Q   I was going to ask you that.
2        I'll direct your attention to, it's on the
3   first page of this.  This is, I'll represent this is
4   I.R.S. Notice 97-34.  This particular copy was printed
5   from LexisNexis, so it may look different than you may
6   have seen.
7        Under -- and I'll direct your attention
8   specifically to Section I, where it begins near the
9   bottom of the first page of exhibit 43.
10       A   Okay.  Yeah, this looks familiar.
11       Q   And --
12       A   What's your question --
13       Q   -- if you'll -- I'll just ask you to maybe
14  read those --
15       A   Yeah, they --
16       Q   -- couple of paragraphs under Section I?
17       A   This may be what I was thinkin'.
18       Q   When you referred a few moments ago to the
19  I.R.S. officials saying they're going to phase out both
20  forms and only have one form, is this -- do you believe
21  this is what you were referring to?
22       A   May very well be this, yeah.  This does read
23  very familiar.
24       Q   Okay.
25       A   I read an hour or two o' this kinda stuff

Page 138

1   every morning on the tax services, so I can't -- but this
2   does look familiar, yes.
3        Q   Okay.  Do you know, are you aware of
4   whether -- was there ever a time when the trust owner was
5   required to file both the 3520-A and the 3520?
6        A   That wouldn't surprise me.
7            But I don't -- I can't remember of a time
8   like that, no.
9        Q   Okay.
10       A   I think it was specifically because of, you
11  know, separation of the entities or somethin'.
12       Q   Okay.
13       A   So no.  I guess not.
14       Q   Okay.  And I think earlier you testified that
15  you came to work here at W.H. Simon & Company in 1997?
16       A   Uh-huh.
17       Q   Is that correct?
18       A   Uh-huh.
19       Q   And during your time with the I.R.S., were
20  you involved with foreign trust compliance issues at all?
21       A   The short answer is yes.
22       Q   Okay.  In what ways?
23       A   Well, I and another Revenue agent -- I guess
24  this is a formal proceeding -- but I would say it was a
25  buddy o' mine, he and I did an awful lotta work in -- on

Page 139

1   foreign trust returns back in those days.  And we
2   couldn't even get CI to take the cases.  Couldn't even
3   get 'em to take the cases.
4            It was such a sham to us that we couldn't --
5   you know, we were just shocked that nobody wanted to make
6   a criminal case out of it.
7            And then I had one where -- it was a local
8   case -- a guy outta Tarpon Springs, and I.R.S. flew me
9   out to Salt Lake City to be the expert witness, slash,
10  whatever else; a fact witness it was, but.  And I was
11  amazed that we dropped the fraud penalty in a heartbeat.
12       I got there on -- I reported to duty Monday
13  at 8 o'clock in the mornin', at the Salt Lake city I.R.S.
14  office.  And I sat there outside a closed office until
15  about 9:30 when the attorneys started showin' up.  It was
16  just so laid back.
17       And by Friday morning, they had just waived
18  the civil fraud penalty, and let the taxpayer go with an
19  accuracy-related penalty.
20       And I spent that whole week doin' absolutely
21  nothin', and I was paid for it by the government.
22       I asked the guy what I was supposed to do on
23  Tuesday and Wednesday.  I said, you know, "Is there
24  anything you want me to do?"
25       He said, "No."  He goes, "If you wanna go

Page 140

1   rent a car, go -- go -- go vacation."
2            But yeah, we did a -- I did a lot -- a lotta
3   work, cases on -- in that area back then.
4        Q   And the work you did, was it related to
5   non-reporting of income on 1040s?
6        A   1041s, shifting of income and common business
7   trusts and those types of things.
8        Q   Okay.  So it didn't involve Forms 3520-A or
9   3520?
10       A   There was no -- I don't remember anybody
11  workin' those cases back in those days.
12       Q   Okay.
13       A   In the nineties, early nineties.
14       Q   Okay.  Who are Jonathan and Kyoko Fuller?
15       A   That was one o' the other cases I worked on.
16       Q   Okay.  There -- if there were a couple of
17  documents in Dr. James' file that mention their names,
18  why would that be?
19            Why would they be in that file?
20            MR. JONES:  Objection.
21       A   I -- I'm -- I'm not even gonna answer any
22  questions on other taxpayers.
23  BY MR. MAY:
24       Q   Okay.  Under what basis?
25       A   I just feel uncomfortable doin' it.

Page 141

1        Q   Okay.
2            MR. JONES:  My objection is on the basis, I
3   believe, that it would appear to me that the record
4   was erroneously turned over and relates to another
5   matter.
6            MR. MAY:  Okay.
7            MR. JONES:  I know it relates to another
8   matter.
9            MR. MAY:  Okay.  Well, I --
10  BY MR. MAY:
11       Q   So let me ask you this.
12           MR. JONES:  I can even tell you who in your
13  office handled the matter.
14  BY MR. MAY:
15       Q   Is there any connection between Jonathan and
16  Kyoko Fuller and Dr. James?
17       A   I don't know, Mike.
18           That's another client.  I'm not gonna talk
19  about it.
20       Q   Okay.
21       A   You can go off course on your client or his
22  client, and that's fine.
23           But I just feel uncomfortable talkin' about
24  other taxpayers.
25       Q   And who's Greg Koehler?

Page 142

1      Do you remember a Greg Koehler?
2    A   Not off the top o' my head.
3    Q   Okay.
4      (9/17/08 Letter, is received and marked
5    exhibit 44 by the court reporter.)
6    MR. JONES:  This is similar to the last
7    objection.
8      It appeared that this is not relevant, has no
9    bearing on this case.  It appeared to us it was
10   turned over erroneously.  It has nothing to do with
11   our case, but.
12   MR. MAY:  Okay.
13   BY MR. MAY:
14   Q   Mr. Schmitz, do you recognize exhibit 44?
15   A   Yes, I do.
16   Q   What is exhibit 44?
17   A   It's a letter from me to Greg Koehler,
18   "Keeler."
19   Q   Is it "Keeler"?  I think I may have said
20   "Koehler" a moment ago.
21   A   I --
22   Q   I don't --
23   A   I would guess "Keeler."
24   Q   Okay.  Who is Mr. Koehler?
25   A   Well, I think this is pretty silly, but this

Page 143

1    is just a lender.
2      It's a lender.
3    Q   A lender?
4    A   Yeah.  He was borrowin' -- Brian James had to
5    borrow some money.
6      It's nothin' more than a lender.
7    Q   Okay.  And Mr. Koehler's interest, I assume
8    -- I'm interpreting from exhibit 44 that a notice of tax
9    lien had been filed against Dr. James?
10     Is that a fair reading?
11   A   Give me a chance to read this --
12   Q   Okay.
13   A   -- 'cause this one is really silly.
14     Some o' the other ones were kinda silly, out
15   in left field, but this one really is.
16     So lemme read it and I'll try to give you an
17   honest answer here.
18     Yeah.  This is --
19   Q   You -- what are the circumstances?
20   A   This is nothin' more than a lender.
21     He's tryin' to pay off all the four, five,
22   six, seven hundred thousand dollars of civil penalties,
23   along with his other obligations.
24     And he's already got a lien outstanding.  So
25   no lender's gonna lend you money when you got a lien

Page 144

1    outstanding.
2      So this guy was looking for satisfaction
3    that -- because I'm sure I told, I explained to him
4    and/or the doctor that, you know, once you get the lien
5    paid off -- I'm sorry -- once -- yeah -- once you get the
6    balance paid off, the lien'll come off.
7      "Well, can't we get the lien off first before
8    I lend him the money?"
9      "Well, no.  We need the money so we could pay
10   the lien."
11     You know, that kinda stuff.
12     So I was just tryin' to, you know -- I guess
13   I needed to promise the guy that "When I get the check,
14   it's goin' right to the I.R.S., I'm not gonna steal it.
15   I'll take it down to I.R.S., we'll get it paid off, and
16   then they will eventually release the lien and you'll
17   have your priority again."
18     That's all.
19   Q   Okay.  Fair enough.
20   A   By the way, are we done with this one?
21   Q   Yes.
22   A   Okay.
23   Q   Okay.  I'm just going to look through here.
24   A   You got a dark opinion of Dr. James, huh,
25   Mike?

Page 145

1    Q   What?
2    A   You have a dark opinion of Dr. James, huh?
3    Q   My opinion isn't relevant.
4    A   Sure it is.
5    Q   Okay.  I think -- okay.
6    MR. MAY:  I'm going to pass the witness.
7    MR. JONES:  Okay.  Thanks, Mike.
8      CROSS-EXAMINATION
9    BY MR. JONES:
10   Q   I'm just going to review a couple of things.
11     And I was trying to take notes, but it's
12   always hard, and don't really know until the deposition
13   comes back.
14     So for the record, I'm Ken Jones at
15   Sutherland, Asbill and Brennan.  And along with Mr.
16   Dupree, we represent Dr. James, as you know, Mr. Schmitz.
17     I just want to cover a couple of things that
18   you talked about this afternoon.
19     You mentioned that the I.R.S. suggested to
20   you, people at the I.R.S. suggested to you that there was
21   a higher standard when it came to reasonable cause in
22   this case?
23   A   Uh-huh.
24   Q   Did they ever articulate to you why that was?
25   A   No.

BayAreaReporting@gmail.com,    www.bar-tampa.com                     866-240-9500

Page 146

1    Q   You indicated, I believe, you're a CPA and
2  formerly a Revenue agent, correct?
3    A   Yes.
4    Q   Would you have taken a case like this if you
5  didn't think there was a case to be made for reasonable
6  cause?
7    A   No.
8    Q   Well, it almost sounds as if -- and again,
9  like Mike often says, I don't want to put words in your
10 mouth -- were you saying that no one was willing to
11 listen?
12      MR. MAY:  Objection.
13 BY MR. JONES:
14   Q   To the facts?
15      Was any -- were they not willing to listen to
16 the facts in this case; "they," the I.R.S.?
17   A   Now, that's my personal opinion.  It is that
18 everybody's mind was made up.
19      And Miss Friedlander made it clear that she
20 would like to see this typo o' case litigated.
21   Q   Okay.  Someplace in your pile of documents
22 you have exhibit 38, which is the interview of the
23 accountant, Mr. Famiglio.
24   A   Yes, 38.
25   Q   Okay.  And at one point during Michael May's

Page 147

1  questioning, I believe you said you had some concerns
2  about what Famiglio was telling you in terms of his
3  truthfulness.
4      Is that what you said?
5    A   Well, I don't know if I said that, but it
6  just -- I clearly asked for records ahead o' time.  It's
7  not unusual to do so.  There were none there to speak of.
8      And when he told me why, it just didn't make
9  any sense.
10      I mean, he told me, he said, "Oh, I'm sorry,
11 I thought all you needed was the 2003."
12      "Well, no.  We talked about this before.
13 It's a three-year penalty.  I need all three years of
14 it."
15      And then -- and then he told me it was --
16 yeah, I recall more specific -- but he told me he thinks
17 the '01 and '02 files were off-site.
18      Well, that's -- nobody keeps their files
19 off-site that recent.  Everybody keeps three years in
20 their office.  Because of the statute and I.R.S. issues,
21 you always keep three years at your office.  So -- just
22 didn't sound right.
23      I guess I need to look at this a little
24 closer, but.
25      Just -- just other things.  I mean, the fact

Page 148

1  that he wouldn't answer questions and talk about the
2  client, I thought was -- I thought that was telling.
3      In conjunction with, he didn't even keep all
4  his records.
5    Q   Let's focus on that issue of the records.
6      MR. JONES:  And I'm going to have a
7  document -- I don't believe, Mike, that you
8  offered this one.  If it's already an exhibit, I
9  apologize.
10      MR. DUPREE:  45.
11      (6/17/05 e-mail, is received and marked
12 exhibit 45 by the court reporter.)
13 BY MR. JONES:
14   Q   Okay?
15   A   Yeah.  Yeah.  That's it.
16   Q   You've read the document?
17   A   Yes.
18   Q   So previously, I believe you testified you
19 went to meet with Famiglio to try to get information.  He
20 doesn't show up with many documents.
21      And this e-mail within indicates that
22 subsequent to that, there were some documents that were
23 produced?
24      MR. MAY:  Objection to form.
25   A   Yes.  But lemme -- lemme go back and find --

Page 149

1  I'm just curious when my meeting was with him.
2      May, okay.
3      Yes.
4  BY MR. JONES:
5    Q   So he did subsequently produce some
6  documents; I believe you testified to that as well?
7    A   Yes.
8    Q   But you also, in response to one of Mr. May's
9  questions, indicated that the general ledger that you saw
10 for 2003 was different from the exhibits that you were
11 looking at?
12   A   Different from this one in here, yes.
13   Q   So if Famiglio today says he no longer has
14 records in his possession, yet he had some records at
15 your time, would he not be truthful if he told us in a
16 recent deposition a month or two ago, "I don't have any
17 records"?
18      MR. MAY:  Objection.  Calls for speculation.
19   A   Well, I -- yeah, I mean -- I can't believe
20 somebody -- I can't believe somebody wouldn't keep the
21 records when he knows there's an ongoing issue.
22 BY MR. JONES:
23   Q   Well --
24   A   Is that what you're --
25   Q   Yes.  I was going to ask the next question.

Page 150

1    The next question was going to be, Famiglio
2  knew there was an issue with the I.R.S. with respect to
3  the penalty for not filing Form 3520, yes?
4    A   Yes.
5    Q   And he had some documents in his possession
6  that day --
7    A   Yes.
8    Q   -- that you met with him?
9    A   Yes.
10   Q   He subsequently produced some documents.
11       So if he no longer has, why would he have
12  destroyed those documents?
13       Can you conceive of any reason?
14       MR. MAY:  Objection to form.
15   A   I wouldn't do that.  I don't, I don't know --
16  I don't know.
17       Assuming that's rhetorical, "I don't know" --
18  BY MR. JONES:
19   Q   Would that be reasonable --
20   A   -- and "I don't know."
21   Q   Would it be reasonable for a Certified Public
22  Accountant, knowing that his client had a dispute with
23  the I.R.S., to -- I'm not going to say destroy -- to no
24  longer maintain the records?
25   A   Yeah, that's not smart.

Page 151

1        MR. MAY:  Objection, foundation.
2    A   That's not smart.
3  BY MR. JONES:
4    Q   If Famiglio in a deposition testified that
5  taxes were owed on Form 1040 at the time the return was
6  filed on extension, do you have a view as to whether
7  that's correct or not?
8        MR. MAY:  Objection, form.
9    A   Say that again?
10 BY MR. JONES:
11   Q   If Famiglio in his deposition testified that
12  tax payments would be due when a return is filed on
13  extension, is that a correct statement?
14   A   No.  The tax is due on 4/15 of --
15   Q   So if Famiglio told Dr. James that, that
16  would be incorrect?
17   A   That would be incorrect.
18   Q   Do you know if there's a normal industry
19  practice for retention of records; when client records
20  are destroyed by a CPA?
21   A   Five years is generally the number, five to
22  seven years.
23   Q   So did it seem unusual to you, the way
24  Famiglio only had a few records and said he was going to
25  have to get the other records, did that seem unusual to

Page 152

1  you?
2    A   Yes.
3    Q   Why might Famiglio have a reason to not be
4  truthful?
5        MR. MAY:  Objection --
6  BY MR. JONES:
7    Q   -- with respect to this matter?
8        MR. MAY:  -- to form.
9        MR. JONES:  I'll ask the question a different
10  way.
11       Withdrawn.
12 BY MR. JONES:
13   Q   Do you think under these circumstances a CPA
14  might have some liability exposure?
15       MR. MAY:  Objection --
16 BY MR. JONES:
17   Q   Vis-a-vis --
18       MR. MAY:  -- foundation.
19 BY MR. JONES:
20   Q   -- his client?
21   A   He shouldn't be destroying records.
22       He shouldn't have lost records, or he should
23  have paid attention to keepin' his records, absolutely.
24       I don't know if that is cause for liability
25  or not.  I'm sure you can sue him for it.

Page 153

1        I don't know.
2    Q   I realize I'm asking a CPA that question.
3    A   I don't know.  That's why I don't do returns.
4    Q   We've been -- again, Mr. May asked you
5  several times your opinion, so I'll ask you your opinion.
6        If Famiglio had information in front of him
7  that would indicate that there was an offshore trust, and
8  he failed to file Form 3520, would that be malpractice,
9  in your view?
10       MR. MAY:  Objection, foundation.
11   A   I'm struggling with the word "malpractice."
12       But certainly, if you're goin' through some
13  -- if you're -- if you're doin' the write-up work for
14  somebody and you're takin' somebody's bank statements and
15  canceled checks and you're puttin' that into a general
16  ledger -- and you're doin' his personal taxes, by the
17  way -- and you see foreign transfers, money goin'
18  overseas, you owe it to your client; everybody knows that
19  just brings up a whole host of pitfalls and issues and
20  filing considera -- considerations.
21       So yeah, I think you're doin' your client a
22  disservice.  And I don't know if it's malpractice or not,
23  but I think you have the responsibility to ask your
24  client where that money's goin' and for what.
25       Obviously, I mean, that's why I made note of

Page 154

1  it, yes.
2  BY MR. JONES:
3      Q   Well, let me go at this a little differently,
4  though.
5          Back in the early 2000s, do you think it is
6  possible that a professional, a tax professional, might
7  be confused as to the difference between a Form 3520 and
8  a Form 3520-A?
9      A   Taxpayer?  Professional?
10     Q   No.  Professional.
11     A   Professional?  I've seen it before, yes.
12 I've seen -- I've seen confusion over these issues,
13 absolutely.
14     Q   And do you know, why would they be confused?
15     A   Well, for the 3520, again, is really -- it
16 asks for the same information as a 3520-A.
17         I mean, I've seen some people think they're
18 supposed to attach a copy of the 3520-A to the 1040.
19         But they do somethin'.  Nothing was done in
20 this particular case.
21         You got money goin' offshore to foreign
22 jurisdictions, and you don't ask the client whether or
23 not he has a foreign bank account or a foreign trust so
24 you can mark the box properly?
25         I think that those are, at minimal, errors.

Page 155

1      Q   You testified before, I think earlier today,
2  that on June 6, 2005 you met with Dr. James.
3          And if you need to put the exhibit in front
4  of you, it's exhibit 36, your interview notes.
5      A   Yes.
6      Q   You met with Dr. James at his office in
7  Tampa, according to the memo?
8      A   Yes.
9      Q   This was a medical office?
10     A   Yes.
11     Q   So the type of office where he was seeing
12 patients and -- do you recall?
13     A   Yes.
14     Q   What's been your experience in meeting with
15 Dr. James or talking to him?
16         Is he accessible?
17     A   Yeah, he's accessible.
18     Q   Does he ever seem pressed for time?
19         MR. MAY:  Objection, form.
20 BY MR. JONES:
21     Q   Well, I'm trying to find the circumstances
22 when you went to meet with him at this meeting, if you
23 recall?
24     A   Well, I just called and got it set up, and
25 everything went well.

Page 156

1          And he didn't kick me out early sayin' he's
2  too busy to talk or anything like that.  We sat down and
3  talked.
4      Q   Uh-huh.
5          In this memo, which I think you still have in
6  front of you?
7      A   Yeah.
8      Q   In the next-to-last paragraph on the bottom
9  of the first page, you say -- you said that Dr. James was
10 concerned about fees, and your rates specifically?
11     A   Okay.
12     Q   So do you recall, he was concerned about how
13 much time it was going to take to meet with you, or?
14         MR. MAY:  Objection, form.
15     A   Well, I think I might be readin' this
16 differently.
17 BY MR. JONES:
18     Q   Okay.
19     A   And I'm reading from that document.
20         "Comments made by the accountant in my prior
21 interview of him were confirmed during this interview by
22 Dr. James.  He was, in fact, concerned about fees."
23         Oh, okay.  So I'm goin' back up to where
24 somebody told me, the accountant told me he was concerned
25 with fees.

Page 157

1          Yeah.  I mean, he asked me, yeah, he was
2  concerned about fees.  And he at least asked me what our
3  rates were.  He didn't know what our billing rates were.
4          So in other words, what I'm sayin' in that
5  paragraph is that the comments made by the accountant to
6  me, and the accountant told me that -- if you go back to
7  my interview with the accountant, he mentions that, you
8  know --
9      Q   Okay.
10     A   -- "I didn't wanna give you this stuff,
11 'cause I was concerned with fees," or somethin' like
12 that, so.
13         That's all.
14     Q   Okay, just a moment.
15         Did you have an impression when you met with
16 George Famiglio that he -- you said you had an impression
17 he was familiar with offshore transactions?
18     A   Yes.
19     Q   That he had assisted clients with those types
20 of transactions?
21     A   It sounded like he was also in the business
22 and -- well -- and he told me that, you know, he also is
23 involved with providing services for offshore entities.
24         That's it.
25     Q   So do you think he was irritated that he

Page 158

1  hadn't been able to provide these services for --
2      A   Oh, no --
3      Q   -- Dr. James?
4      A   -- yeah, no question.
5          And he was irritated that I was workin' the
6  case as well instead of -- he mentioned to me somethin'
7  about how, you know, he could have gotten the penalty
8  waived.
9      Q   Okay.
10     A   I said, "Yeah, well, see if I do it first,
11  buddy."
12     Q   Another exhibit -- just one quick question --
13  that Mr. May provided you near the end, exhibit 42, the
14  sort of spreadsheet-looking document?
15     A   Yes.
16     Q   And I believe you said that it was provided
17  to you by Offshore Trust Services?
18     A   Yes.
19     Q   Do you know -- do you see in the upper
20  right-hand corner where it says "OpID: JJC"?
21     A   Yes.
22     Q   Do you know who that is?
23     A   I'm guessin' Josh Crithfield.  I'm just
24  guessin'.
25         I don't know what the other "J" means,

Page 159

1  though.  So I don't know.
2      Q   Okay.  And then another exhibit a few
3  exhibits back from that, exhibit 39, which this is the
4  letter that Mr. May asked you about, the letter from
5  Keithley Lake to Mr. Simon dated March 5, 2008?
6      A   Yes, yes, okay.  I gotcha.
7      Q   And if you turn to the second page of exhibit
8  39?
9      A   Uh-huh, the e-mail?
10     Q   Yes --
11     A   Yes.
12     Q   -- the e-mail.
13     A   Yes.
14     Q   I'm trying -- help me understand what's going
15  on here.
16         Was it your understanding that Offshore Trust
17  Services was authorized to sign Keithley Lake's
18  signature?
19     A   I don't know.
20         That's not Keithley Lake's signature?  I
21  don't know.
22     Q   I don't know.  I'm asking you.
23     A   I don't know.
24     Q   Again, I don't want to put words in your
25  mouth.

Page 160

1          You got a draft of the letter from Keithley
2  Lake.  And then this e-mail says, "Here's this letter and
3  it will be executed by Keithley Lake."
4          Why did you go through Offshore Trust
5  Services and not back to Keithley Lake?
6      A   Keithley Lake's -- he's -- he lives -- he
7  lives in Nevis.  He lives in Nevis.  I think it's Nevis.
8  He lives in the foreign jurisdiction, which is where the
9  insurance company is and the trust company is.
10         That's what -- that's his part of the --
11  that's his -- that's his part of the setup.
12     Q   Do you know if Keithley Lake signed this,
13  this letter?
14     A   You know, I never gave that -- I -- I -- I
15  don't know.
16         I don't know what --
17     Q   Similarly, do you know if Crithfield, Josh
18  Crithfield, signed the letter for Keithley Lake?
19     A   I don't know.
20         I guess either could have happened, I guess.
21  I never --
22     Q   And I'll ask --
23     A   -- gave that much thought.
24     Q   -- come back to the first question.
25         Was Offshore -- do you know or have any

Page 161

1  knowledge whether Offshore Trust Services was authorized
2  to sign documents on behalf of Keithley Lake?
3      A   I have no idea.
4      Q   Well, going back to the exhibit we just
5  talked about, exhibit 42, the spreadsheet.
6      A   Okay.
7      Q   Do you know if Offshore Trust Services, do
8  you know if they -- did they generate this document
9  themselves, or would they have gotten it from Keithley
10  Lake?
11     A   All I can say is that we got it from Offshore
12  Trust Services.
13         Now, did they get it from somebody else?  I
14  don't know.
15     Q   You may -- this document -- and again, I
16  apologize if Mr. May asked you this, it's been a long
17  day.
18         You asked for this document from OTS or from
19  the Offshore Trust people in the West Indies?
20     A   No.  We would have asked Offshore Trust
21  people in Tampa.
22     Q   And "they" being Josh Crithfield, you would
23  have asked?
24     A   I would have dealt with Duane.  I would have
25  dealt with Duane or Steve.

BayAreaReporting@gmail.com,   www.bar-tampa.com                          866-240-9500

Page 162

1    But if I didn't make the call, maybe Bill
2  did. Who knows. Maybe Bill made that call, and he may
3  have talked to somebody else.
4    But one of those guys is who we try --
5    Q   Okay.
6    A   -- to deal with.
7    Q   And "Duane" would be Duane Crithfield?
8    A   Correct.
9    Q   Was he located in the United States at that
10 time?
11   A   Yes.
12   Q   Do you know if he's under criminal
13 investigation?
14     MR. MAY:  Objection.
15   A   I -- I think he is.
16 BY MR. JONES:
17   Q   And do you know if Josh Crithfield, his son,
18 is under criminal investigation?
19     MR. MAY:  Objection, foundation.
20   A   No idea.
21     MR. JONES:  What's the basis for the
22 objection, for the record?
23     MR. MAY:  Foundation.
24     MR. JONES:  I'm just asking him if he knows.
25     MR. MAY:  Sure.

Page 163

1      MR. JONES:  Okay.  Just a moment.  If we can
2  have just a moment here.
3      MR. MAY:  Sure.
4      MR. JONES:  Off the record.
5      (Off the record.)
6      MR. JONES:  Back on the record.
7  No further questions.
8      MR. MAY:  Okay.
9      Mr. Schmitz, I do have one question.
10          REDIRECT EXAMINATION
11 BY MR. MAY:
12   Q   Mr. Jones was asking you about industry
13 practice for how long records would be retained by an
14 accountant.
15     And you said that -- I think you said five
16 years would be standard to retain records of a client?
17   A   Five to seven is the number I hear most o'
18 the time.
19     I don't think anything's etched in stone.
20 But like in my work with other people, five seems to be a
21 good number, five to seven at the most.
22   Q   Okay.  And so what's your source for that
23 information?
24   A   I don't know if there's anything etched in
25 stone where you're required to keep records a certain

Page 164

1  period o' time.
2    If there is, I don't know what it is.
3    Q   Okay.
4    A   I know there's a Best Practices someplace.
5  But I don't know what that number is.
6    Q   Okay.  And so your five to seven years is
7  just based on your knowledge of the practice of
8  accountants?
9    A   Well, the statute of limitation is three
10 years, and it can get extended to six.
11     So I picked five.  And that's what everybody
12 seems to -- that's the number I hear from everybody.
13   Q   Okay.
14     MR. MAY:  All right.  That's all.
15          RECROSS-EXAMINATION
16 BY MR. JONES:
17   Q   Following up on what Mr. May just asked.  See
18 if I can help refresh your recollection.
19     Isn't it correct that the AICPA puts out some
20 sort of working guidelines for CPAs in terms of things
21 like record retention?
22   A   They -- yes.
23   Q   So it's possible they have a guideline on
24 this topic of how long to keep records?
25   A   I would think there is.

Page 165

1    And I betcha a hundred bucks it says five
2  years.  But I don't know what it is.
3    Q   And be that as it may.
4    Just to cover the point that we touched on
5  just a little bit ago.
6    But if you had a client -- Mr. May asked you
7  some hypotheticals -- if you had a client who had a
8  dispute with the I.R.S. and the client told you, "We're
9  having a dispute with the I.R.S. over a penalty," can you
10 conceive of a circumstance where you would get rid of
11 records without going back and talking to the client?
12   A   None at all.  Keep all those records.
13     MR. JONES:  No further questions.
14     MR. MAY:  All right.
15     THE REPORTER:  And the same orders as
16 previously?
17     MR. MAY:  Yes.
18     MR. JONES:  Yes.
19     THE REPORTER:  Thank you.
20     (Time noted:  4:30 p.m.)
21
22
23
24
25

Page 166

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

   I, the undersigned authority, certify that ERIC SCHMITZ personally appeared before me and was duly sworn.

   WITNESS my hand and official seal this 28th day of November, 2011.

                Phyllis DeFonzo, RPR

                Notary Public State of Florida

                My Commission Expires:  8/1/12

                Commission No.:  DD 783768

---

Page 168

ERRATA PAGE

PLEASE ATTACH TO THE DEPOSITION OF ERIC SCHMITZ TAKEN ON NOVEMBER 15, 2011 IN THE CASE OF BRIAN CHIVAS JAMES VS. UNITED STATES OF AMERICA

PAGE LINE     CORRECTION AND REASON THEREFOR

I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

_____  _____
ERIC SCHMITZ                DATE

_____  _____
WITNESS TO SIGNATURE         DATE

---

Page 167

REPORTER'S CERTIFICATE

STATE OF FLORIDA     :
COUNTY OF HILLSBOROUGH:
   I, Phyllis DeFonzo, RPR, certify that I was authorized to and did stenographically report the deposition of ERIC SCHMITZ; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.
   I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the foregoing action.

   Dated this 28th day of November, 2011, IN THE CITY OF TAMPA, COUNTY OF HILLSBOROUGH, STATE OF FLORIDA.

        Phyllis DeFonzo, RPR

---

Page 169

November 28, 2011
Mr. Eric Schmitz
W.H. Simon & Company, P.A.
5680 Roosevelt Boulevard
Clearwater, Florida 33760

In Re: November 15, 2011 deposition of Eric Schmitz,
       James v. United States of America
Dear Mr. Schmitz:
This letter is to advise that the transcript for the above-referenced deposition has been completed and is contained herein.  Please review the attached transcript and make corrections, if necessary, on the attached Errata Sheet, sign and have it notarized, and send it back to our office.

It is suggested that review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*; however, there is no Florida Statute in this regard.
The original of this transcript has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.  Thank you.

Sincerely,

Phyllis DeFonzo
Bay Area Reporting

Waiver:
I,_____, hereby waive the reading & signing of my deposition transcript.

_____  _____
Deponent Signature            Date

*Federal Civil Procedure Rule 30(e)/Florida Civil
 Procedure Rule 1.310(e)